# Exhibit A

# SUPERIOR COURT OF RICHMOND COUNTY
## STATE OF GEORGIA

**SUMMONS**

TO: KEEL, BROOKS DR.

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

> **Tanya Jeffords**
> **Tanya D. Jeffords and Associates, PC**
> **437 Walker Street**
> **Augusta, Georgia 30901**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 8th day of June, 2020.**

Clerk of Superior Court

Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

**General Civil and Domestic Relations Case Filing Information Form**

☥ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
RICHMOND COUNTY, GEORGIA

**2020RCCV00265**

ASHLEY WRIGHT

☑ Superior or ☐ State Court of _Richmond_ _____ County

JUN 03, 2020 11:24 PM

*Hattie Holmes Sullivan*

Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

| For Clerk Use Only | |
|---|---|
| Date Filed _06-03-2020_<br>**MM-DD-YYYY** | Case Number _2020RCCV00265_ |

**Plaintiff(s)**

Williams, Lesley Dr.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**

Board of Regents of Univeristy System of GA

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Augusta Univeristy | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| Augusta University Health System | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| Medical College of Georgia | | | | |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** _Jeffords, Tanya_ **Bar Number** _390055_ **Self-Represented** ☐

**Check one case type and, if applicable, one sub-type in one box.**

| General Civil Cases | |
|---|---|
| ☐ | Automobile Tort |
| ☐ | Civil Appeal |
| ☐ | Contract |
| ☐ | Contempt/Modification/Other Post-Judgment |
| ☐ | Garnishment |
| ☐ | General Tort |
| ☐ | Habeas Corpus |
| ☐ | Injunction/Mandamus/Other Writ |
| ☐ | Landlord/Tenant |
| ☐ | Medical Malpractice Tort |
| ☐ | Product Liability Tort |
| ☐ | Real Property |
| ☐ | Restraining Petition |
| ☑ | Other General Civil |

| Domestic Relations Cases | |
|---|---|
| ☐ | Adoption |
| ☐ | Contempt |
| | ☐ Non-payment of child support, medical support, or alimony |
| ☐ | Dissolution/Divorce/Separate Maintenance/Alimony |
| ☐ | Family Violence Petition |
| ☐ | Modification |
| | ☐ Custody/Parenting Time/Visitation |
| ☐ | Paternity/Legitimation |
| ☐ | Support – IV-D |
| ☐ | Support – Private (non-IV-D) |
| ☐ | Other Domestic Relations |

☐   Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
**Case Number**              **Case Number**

☑   I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐   Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐   Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____
_____

Version 1.1.20

**&#10041; EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
RICHMOND COUNTY, GEORGIA
**2020RCCV00265**
**ASHLEY WRIGHT**
JUN 03, 2020 11:24 PM

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

## IN THE SUPERIOR COURT OF RICHMOND COUNTY
## STATE OF GEORGIA

DR. LESLEY WILLIAMS,

     Plaintiff,

v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a AUGUSTA UNIVERISTY, AUGUSTA
UNIVERSITY HEALTH SYSTEM,
MEDICAL COLLEGE OF GEORGIA,
AUGUSTA UNIVERSITY HOSPITAL;
DR. BROOKS KEEL, in his individual
capacity;
DR. PHILLIP COULE, in his individual
capacity;
DR. WALTER MOORE, in his individual
capacity;
DR. STEFFEN MEILER, in his individual
capacity;
DR. MARY ARTHUR, in her individual
capacity; and
JOHN DOES.

     Defendants.

Civil Action No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

NOW COMES Dr. Lesley Williams, Plaintiff in the above-styled matter, by and through

undersigned counsel of record, and hereby files her Complaint in this action, and shows this

honorable Court as follows:

### PRELIMINARY STATEMENT AND INTRODUCTION

1.     This is a Complaint brought by the Plaintiff, former Anesthesiology resident, Dr.

Lesley Williams for declaratory, injunctive, and monetary relief for disparate treatment based on

her sex, female, and retaliation in violation of Title IX of the Education Amendments of 1972, 20

U.S.C. § 1681(a) ("Title IX"), for violations of the Georgia Whistleblower Act, O.C.G.A. § 45-1-

4 ("GWA"); for sex discrimination in violation of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983; for defamation of character in violation of Georgia law; and for litigation expenses under O.C.G.A. § 13-6-11 against the Defendants and John Does.[1]

2.       The Plaintiff, Dr. Williams, is a former resident in Augusta University's ("AU's") Department of Anesthesiology and Perioperative Medicine, also known as the Anesthesiology Residency Department ("ARD").

3.       A Medical Residency is a stage of graduate medical education during which qualified physicians—those who have completed medical school and obtained a Doctor of Medicine ("M.D.") or Doctor of Osteopathic Medicine ("D.O.") degree—receive more in-depth training within a specific area of medicine in which the physician intends to practice.

4.       Dr. Williams is from a small town in Georgia.  Dr. Williams received her Bachelor's Degree from Valdosta State University, and her Master's Degree in Public Health from the Mercer University School of Medicine. She graduated from Xavier School of Medicine as Valedictorian and earned her M.D. from Windsor School of Medicine.  She was the first person in her family to go to college and her goal was to become a doctor and practice medicine as an Anesthesiologist.

5.       Dr. Williams did her first year of residency in Chicago and then she applied for and was accepted into AU's Department of Anesthesiology and Perioperative Medicine ("ARD")in July of 2017.

---

[1] Dr. Williams has timely filed a Charge of Discrimination pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., with the United States Equal Employment Opportunity Commission ("EEOC") and upon receipt of a Right to Sue letter will timely seek leave to amend this Complaint to add counts for discrimination and retaliation under the Americans with Disabilities Act for the Defendants' failure to provide a reasonable accommodation for her disability based upon her PTSD and their retaliation against her for opposing the unlawful discrimination.

6.     The ARD is comprised of medical students, resident physicians ("residents"), attending physicians ("attendings"), and administrative staff. Attending physicians act as educators and supervisors for residents.

7.     The Anesthesiology resident program is a four-year training program which includes one (1) year with various subspecialties and the residents work with general cases and more complex cases such as orthopedics, neurosurgery, cardiac and vascular, and pediatrics.

8.     During the second year of her residency in March of 2018,  Plaintiff was a victim of sexual assault but she sought to return to her goal of becoming an Anesthesiologist and went back to work and her training at AU despite the setback from the sexual assault.

9.     Individual Defendant, Dr. Steffen Meiler, at all times relevant to this complaint, was the Chairperson of the entirety of the Department of Anesthesiology and Perioperative Medicine.

10.     Individual Defendant, Dr. Mary Arthur, at all times relevant to this complaint, was the Residency Program Director for the Department of Anesthesiology and Perioperative Medicine.

11.     Dr. Ankit Jain, at all times relevant to this complaint, was the Associate Residency Program Director for the Department of Anesthesiology and Perioperative Medicine.

12.     Individual Defendant, Dr. Walter Moore, at all times relevant to this complaint, was the Senior Associate Dean for Graduate Medical Education and Designated Institutional Official. Defendant Moore's responsibilities included oversight over the entire residency program, to include the ARD and other departments.

13.     Dr. David Hess, at all times relevant to this Complaint, was the Dean of the Medical College of Georgia.

14.     The individual Defendants as the agents of AU, acted individually and collectively, with others in the ARD to violate the Plaintiff's right to be treated the same as other similarly situated male residents by harassing her and other female residents with unfair treatment and attitudes regarding drug tests, fit for duty tests, and disparate treatment in privileges and discipline by having Dr. Coule terminate her privilege to practice at the AU Medical Center so that Dr. Hess would then have to overturn his decision to reinstate the Plaintiff after the Defendants had worked to have her fired in retaliation for engaging in protected activity under the GWA, the ADA, and Title IX.

15.     The Defendants acted individually and collectively to retaliate against the Plaintiff for reporting the Defendants to the Accreditation Council for Graduate Medical Education ("ACGME") regarding her case logs as a resident and engaging in protected activity by complaining about the disparate treatment she received as a female resident as compared to the male residents who engaged in egregious acts and were not subjected to drug and fit for duty tests, refused reasonable accommodations or terminated from the program.

16.     The Institutional Defendants, acting by and through its Individual Defendants, failed to follow its own policies regarding drug testing and fit for duty tests, and policies and guidelines required by the GWA, the ADA and Title IX, which are evidence of pretext for sex discrimination and retaliation.

**JURISDICTION AND VENUE**

17.     The Superior Court of Richmond County, Georgia has subject matter jurisdiction over this action pursuant to Ga. Const. Art. VI, § IV, Para. 1 and O.C.G.A. § 15-6-8 to include

Plaintiff's federal and state law causes of action, the transactions and occurrences relevant to which occurred in Richmond County, Georgia.[2]

18.     Augusta University operates the Medical College of Georgia ("MCG"), and the teaching hospital, Augusta University Medical Center ("AU Medical Center"). AU is a fiduciary obliged to pay Centers for Medicare and Medicaid Services ("CMS") funds for Graduate Medical Education ("GME") resident salaries and associated administrative costs to train residents like Plaintiff in their respective specialty and receive federal funds.

19.     Augusta University Health System is a domestic not-for-profit corporation that manages the clinical operations associated with Augusta University's resident program and is located at 1120 15th Street, Augusta, GA 30912, in Richmond County.

20.     All Individual Defendants in this matter are currently employed by AU and are residents of Richmond County, Georgia or regularly conduct business in Richmond County, Georgia at AU which is located at 1120 15th Street, Augusta, GA 30912.

21.     All Defendants are subject to personal service either directly or through their agents or are subject to Georgia's long-arm statute, O.C.G.A. § 9-10-91.

22.     At all times relevant hereto the Plaintiff was a resident of Georgia and resident of AU's Anesthesiology residency program in Richmond County.

23.     Venue is proper in this Court pursuant to O.C.G.A. § 9-10-93 as a substantial part of the transactions, acts, omissions, and injuries occurred in Richmond County, Georgia.

---

[2] Pursuant to Ga. Const. Art. VI, § IV, Para. 1 Georgia Superior Courts have subject matter jurisdiction over federal claims. See, e.g. *Turner v. Giles*, 264 Ga. 812, 450 S.E.2d 421 (1994); *Wyman v. Popham*, 252 Ga. 247, 312 S.E.2d 795 (1984).

## PARTIES

### PLAINTIFF

24.     Dr. Lesley Williams is a citizen of the United States and an adult resident of the State of Georgia who resides in Richmond County.

25.     Dr. Lesley Williams was accepted into the Department of Anesthesiology and Perioperative Medicine Residency program at AU and began her education there on or about July 1, 2017, and at all times relevant hereto was an "employee" of AU until June 5, 2019, when she was unlawfully terminated from the residency program.

### INSTITUTIONAL DEFENDANTS

26.     The Institutional Defendant, Augusta University, is a member institution of the University System of Georgia located in Augusta, Georgia.

27.     Pursuant to O.C.G.A. § 20-3-51, Defendant Board of Regents of the University System of Georgia ("BOR") is vested with the government, control, and management of the University System of Georgia and all of its institutions, including Augusta University.

28.     BOR receives federal financial assistance and is therefore subject to Title IX's prohibitions against sex discrimination and retaliation which provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §§ 1681(a)

29.     As a board of the state which employs or appoints a public employee or public employees, BOR is a "public employer" within the meaning of the GWA.

30.     Defendant BOR is subject to the jurisdiction of this Court and may be served with process through the University Systems of Georgia Board of Regents upon the State of Georgia Department of Administrative Services Commissioner, at 200 Piedmont Avenue, Suite 1804WT, Atlanta, GA 30334; by delivering a copy of the Summons and Complaint to Dr. Steve Wrigley, Chancellor of the Board of Regents of the University System of Georgia, 270 Washington Street, S.W., Suite 7025, Atlanta, Georgia 30334; by delivering a copy of same to Edward Tate, Vice Chancellor for Legal Affairs, at the same address; and by delivering a copy of same to the Office of the State Attorney General, 40 Capitol Square, SW, Atlanta, GA 30333.

31.     Augusta University Health System is a domestic not-for-profit corporation that manages the clinical operations associated with Augusta University.

32.     Defendant Augusta University Health System is subject to the jurisdiction of this Court and may be served with process and the Complaint by delivering a copy of the Summons and Complaint to Katrina Keefer, Chief Executive Officer, Augusta University Medical Center, 1120 15th Street, Augusta, GA 30912.

## INDIVIDUAL DEFENDANTS

33.     Dr. Brooks Keel ("Defendant Keel") is the President of Augusta University. He has ultimate responsibility and authority for the operation, fiscal integrity, and personnel of Augusta University. He also is responsible for ensuring that AU complies with applicable federal and state laws, regulations, University System of Georgia rules and policies, and accreditation standards.

34.     Defendant Dr. Keel may be served with legal process by delivering a copy of the Summons and Complaint to Defendant Keel at Augusta University Medical Center, 1120 15th Street, Augusta, GA 30912.

35.    Dr. Phillip Coule ("Defendant Coule") is the Chief Medical Officer of Augusta University Medical Center.

36.    Defendant Dr. Coule may be served with legal process by delivering a copy of the Summons and Complaint to Defendant Coule at Augusta University Medical Center, 1120 15th Street, Augusta, GA 30912 or his home address.

37.    Dr. Steffen Meiler ("Defendant Meiler") is the Department of Anesthesiology and Perioperative Medicine Chairperson.

38.    Defendant Dr. Meiler may be served with legal process by delivering a copy of the Summons and Complaint to Defendant Meiler at Augusta University Medical Center, 1120 15th Street, Augusta, GA 30912 or his home address.

39.    Individual Defendant, Dr. Walter Moore is the Senior Associate Dean for Georgia Medical Education and Designated Institutional Official.

40.    Defendant Dr. Moore may be served with legal process by delivering a copy of the Summons and Complaint to Defendant Meiler at Augusta University Medical Center, 1120 15th Street, Augusta, GA 30912 or his home address.

41.    Individual Defendant, Dr. Mary Arthur is the Residency Program Director for the Department Anesthesiology and Perioperative Medicine.

42.    Defendant Dr. Arthur may be served with legal process by delivering a copy of the Summons and Complaint to Defendant Meiler at Augusta University Medical Center, 1120 15th Street, Augusta, GA 30912 or his home address.

## FACTUAL ALLEGATIONS

43.     Beginning on July 1, 2017, Dr. Lesley Williams was a first-year anesthesia resident working in the GME Residency Program at the Medical College of Georgia ("MCG") of Augusta University.

44.     During her first year  of residency at AU, Dr. Williams received positive performance evaluations.

45.     Unfortunately and through no fault of her own, on March 15, 2018, Dr. Williams was sexually assaulted in her own home.

46.     As a result, Dr. Williams was diagnosed with Post Traumatic Stress Disorder ("PTSD") and immediately began treatment with Dr. Amy House.

47.     Dr. House treated and counseled Dr. Williams throughout her recovery.

48.     The ARD, led by Defendants Dr. Meiler and Dr. Arthur and overseen by Defendants Dr. Keel, Dr. Coule, and Dr. Moore, were aware of the traumatic event that Dr. Williams went through and were notified of her diagnosis of Post-Traumatic Stress Syndrome.

49.     Her diagnosis of Post-Traumatic Stress Syndrome was regarded as a disability by the Defendants.

50.     Returning back to the residency program at AU to continue to pursue her  goal of becoming an anesthesiologist that she had worked so hard for was a part of her recovery process from PTSD.

51.     In accordance with her treatment plan, Dr. Williams requested modified duty in her residency program until her PTSD symptoms improved.

52.     Dr. House likewise notified AU that she was treating Dr. Williams and advised them that Dr. Williams was best able to assess her ability to safely treat patients.

53.     Dr. Williams as a physician always respected and honored her commitment to patient safety and considered it when deciding what she was able to do or not do when returning to her residency.

54.     In response, AU placed her in a one-month elective research rotation during which time she was to conduct independent research and publish her work for peer review.

55.     Following the research rotation which lasted about a month, Dr. Williams was already scheduled for a rotation in Obstetrics followed by a rotation in Pediatrics and she began continuing with her regular rotation.

56.     During the Obstetrics rotation, Dr. Williams performed 43 cases and 109 procedures with supervision by those in the Obstetrics program.

57.     There were no complaints regarding her performance during the obstetrics rotation.

58.     During the Pediatrics rotation, Dr. Williams continued treating patients with supervision by attending physicians in the Pediatrics department.

59.     On or about June 8, 2018, the Anesthesiology Residency Department ("ARD") informed the Plaintiff that she was not supposed to be treating patients during her rotations but merely observing.

60.     The Plaintiff was not aware that she was supposed to be merely observing and neither were her supervising attendings in Obstetrics and Pediatrics.

61.     Upon this discovery, the ARD asked Dr. Williams to alter and delete the case logs of the work she had actually performed treating patients and not submit them to the Accreditation Council for Graduate Medical Education ("ACGME") at the end of her residency for credit.

62.     The ACGME is the body responsible for accrediting all graduate medical training programs (i.e., internships, residencies, and fellowships) for physicians in the United States. The

six ACGME Core Competencies are: patient care; medical knowledge; practice based learning and improvement; interpersonal and communication skills; professionalism; and systems-based practice. Each competency is made up of different milestones that residents are required to master at key stages of their medical training.

63.     AU and the AU Medical Center are a Sponsoring Institution as they are an entity that oversees, supports, and administers a certain set of ACGME accredited residency/fellowship programs and the Plaintiff was a resident of their program.

64.     At all times relevant hereto the Plaintiff was a resident in AU's anesthesiology program and the Defendants were required to comply with the Accreditation Council for Graduate Medical Education work-hour guidelines.

65.     Dr. Williams was not comfortable with what the ARD was asking her to do and she reported the ARD's actions to the Accreditation Council for Graduate Medical Education ("ACGME") because she believed it violated the accreditation standards of the residency program to falsify her training or fail to report accurately her training.

66.     The ARD would later cite this report to ACGME as grounds for terminating Dr. Williams on June 5, 2019.

67.     When Dr. Williams questioned how she breached the ARD's trust as a grounds for her termination, Defendant Arthur stated that the ARD could not trust her because she reported that Defendant Arthur required her to delete the logs whereas the doctors she worked with cannot be expected to "cross all their T's and dot all of their I's" as would lawyers.

68.     After the individual Defendants became aware that Dr. Williams submitted her case logs for credit, Dr. Williams and her supervisors were informed in the Pediatric Department that

she was not to treat patients, even with supervision, and instead, she was only allowed to observe others practice medicine until she completed a fit for duty test.

69.     On or about April of 2018, Dr. Williams was assigned a point of contact in the Title IX office.

70.     On May 15, 2018, the Defendant Dr. Meiler contacted a company named LifeGuard and requested a "Physician Back to Work Evaluation" to be performed on Dr. Williams.

71.     The evaluation would examine her functional capacity and include a "full neuropsychological evaluation."

72.     The basis for the evaluation was because the Plaintiff had been the victim of a sexual assault and not because she was presently unable to perform her job duties.

73.     The neurological portions of the evaluation occurred on May 23, 2018 and May 29, 2018, and she passed those evaluations.

74.     On Tuesday, June 19, 2018, the Plaintiff, who was taking medication for her PTSD that has low blood pressure and dehydration as a common side effect, fainted while in the operating room.

75.     She was taken to AU's Emergency Room where during the course of her treatment for fainting in the ER, Defendant Coule asked the Plaintiff routine questions including questions about drug and alcohol use.

76.     Dr. Williams informed Defendant Coule of her prescription medications related to her PTSD treatment one of which causes low blood pressure, dehydration, and fainting and answered his questions truthfully as her attending physician.

77.     Upon information and belief, Defendant Coule communicated her confidential and personal patient information that he obtained in the course of treatment to the individual Defendants, other members of the ARD and others at AU.

78.     Dr. Williams continued to perform her fit for duty tests, sitting for the motor functional capacity portion of the fit for duty test on June 20, 2018, which was already scheduled prior to the incident in the ER where her prescription medication made her pass out.

79.     On or about Thursday June 21, 2018, Dr. Hertza emailed Dr. Williams requesting that she take a drug screening test, which had been scheduled at Quest Diagnostics for Friday, June 22, 2018.

80.     While on her way to Quest Diagnostics, the Individual Defendants Dr. Meiler and Dr. Arthur and other members of the ARD called Dr. Williams and demanded that she return to AU to take the drug screen in-house.

81.     Dr. Williams objected to the test, stating that it was unfounded and unreasonable.

82.     Defendant Meiler and other members of the ARD demanded that Dr. Williams sign a form stating that she was *voluntarily* taking the drug screen.

83.     Dr. Williams crossed out the "voluntary" portion of the form and wrote in that the test was being mandated by her department.

84.     Dr. Williams was taken to occupational health on the AU campus rather than an independent lab where her blood and urine were obtained for testing.

85.     In addition to the standard panel, Defendants Meiler and Moore and other ARD members required that her samples be tested for operation room drugs.

86.     On June 22, 2018, Dr. Williams' badge was confiscated and she was told she could not return to work until the drug test results came back.

87.    Dr. Williams was not allowed to work and continue with the requirements for completing her residency for a month.

88.    Dr. Williams drug screen was negative for all drugs other than those she was prescribed for PTSD and showed that she had not abused recreational, operation room, or other drugs.

89.    Although her drug test was negative, the Defendants still refused to allow Dr. Williams to return to work.

90.    Dr. Williams passed the fit for duty test, and Dr. Hertza recommended seven modest accommodations which would allow Dr. Williams to return to accomplish her normal work duties and rotations needed to complete her residency program: 1) extra time to complete tasks; 2) frequent breaks; 3) slowly transition into high stress work environment; 4) avoid serial days on call with little sleep and high stress; 5) provide a contact within the company to whom she can reach out if symptoms of PTSD arise; 6) frequent meetings with supervisors to ensure no risk to patient safety arises; and 7) continue with individual therapy.

91.    On July 26, 2018, Defendants Dr. Moore, Dr. Meiler, and Dr. Arthur, along with other ARD members, convened a meeting in the absence of Dr. Williams and her representatives. The meeting included LifeGuard South, attorneys from the legal department, Human Resources, and Compliance and Risk Management.

92.    At the meeting, Defendants Dr. Meiler and Dr. Arthur and other members of the ARD stated that they would not allow Dr. Williams to return to work with the accommodations she requested or with those recommended by Dr. Hertza.

93.    On August 6, 2018 Defendants Dr. Moore, Dr. Meiler, and Dr. Arthur and other members of the ARD met with Dr. Williams and her Title IX advocate.

94.     At the meeting, Defendant Dr. Meiler and Dr. Arthur and other members of the ARD reported that they would not be able to accommodate Dr. Williams as recommended by LifeGuard, the company they hired to perform her fit for duty tests.

95.     Dr. Williams informed Defendants Dr. Moore, Dr. Meiler, and Dr. Arthur and other members of the ARD that she could perform her duties and she had evaluations that show she had been meeting and could continue to meet the program's requirements.

96.     The Defendants Dr. Meiler and Dr.  Moore and other members of the ARD dismissed the evaluations as insufficient while simultaneously imposing a new requirement that she undergo a medical simulation.

97.     Defendants Dr. Moore, Dr. Meiler, and Dr. Arthur and other members of the ARD violated AU's policy by requiring her to submit to LifeGuard's fit for duty evaluation and simulation by not completing the mandatory Fitness for Duty Request Form.

98.     Defendants Dr. Walter Moore, Dr. Meiler, and Dr. Arthur and other members of the ARD violated AU's policy by not involving Human Resources to determine if the legal requirements for their request for LifeGuard to conduct the fit for duty test were met.

99.     Defendants Dr. Walter Moore, Dr. Meiler, and Dr. Arthur and other members of the ARD violated AU's policy by not involving Human Resources to discuss observed behavior which could justify such a request.

100.     Defendants Dr. Walter Moore, Dr. Meiler, and Dr. Arthur and other members of the ARD violated AU's policy by not having an undue hardship justification for refusing to implement the accommodations recommended by LifeGuard after Dr. Williams completed and passed the fit for duty tests.

101.    Defendants Dr. Walter Moore, Dr. Meiler, and Dr. Arthur and other members of the ARD violated AU's policy by not offering alternative accommodations that could allow Dr. Williams to perform her essential job functions and proceed with completion of her residency training in Anesthesiology.

102.    Dr. Williams objected to performing the simulation exam and drug examinations as she was again having to "jump through hoops" that male residents were not subjected to in order to continue working after a stressful event or incident and continue their resident training.

103.    Upon information and belief, a male resident at AU had a mental breakdown in the operating room during a procedure.

104.    Upon information and belief, said male resident communicated that he was having suicidal thoughts and ideations.

105.    Upon information and belief, said male resident was given two weeks away from work and AU allowed him to return without requiring a fit for duty test and without being requested to take a drug test.

106.    Upon information and belief, a different male resident at AU was involved in a vehicular homicide during which law enforcement officers and the state accused him of having a blood alcohol level exceeding the legal limit.

107.    Upon information and belief, the male resident was charged with vehicular homicide.

108.    Upon information and belief, AU did not require the male resident to undergo a fit for duty test.

109.    Upon information and belief, the male resident was not asked or required to undergo a drug or alcohol screen.

110.    Upon information and belief, male residents have been caught engaging in sexual harassment of females, having sex in the call room, and leaving pornography around but were not terminated from the residency program for the egregious acts or required to submit to the additional fit for duty tests.

111.    Male residents did not have their privileges suspended at the AU Medical Center by Dr. Coule nor were there requests to terminate them from the program.

112.    Unlike other similarly situated male residents, Dr. Williams was required to undergo additional tests and written up for a comment and merely trying to get past her PTSD by continuing her lifelong goal of becoming an Anesthesiologist.

113.    Dr. Williams again requested that she be allowed to return to work to complete her residency program.

114.    On August 9, 2018 Dr. Williams, Dr. Hertza, and Dr. Williams' physician, Dr. House met with Dr. Meiler and Dr. Moore and other members of ARD. Dr. House notified the Defendants and other members of the ARD that Dr. Williams' PTSD symptoms were now subclinical and she was ready to turn to work with the level of supervision typical of residents.

115.    When completing a residency in Anesthesiology, residents are usually supervised by an attending physician.

116.    Again, Dr. Williams was not allowed to return to work and her residency program.

117.    Due to implicit and explicit threats to her ability to complete her residency, Dr. Williams agreed to undergo the simulation examination.

118.    On or about September 14, 2018, Dr. Williams, in a letter by her attorney Mike Brown (who is now deceased), complained to Dr. Meiler, Dr. Moore, Dr. Arthur (the Anesthesiology Residency Program Director) and Dr. Ankit Jain (the Anesthesiology Residency

Program Associate Director) about her suspension from the residency program, the unjustified gauntlet of evaluations they imposed upon her, the disparate treatment she endured compared to her male colleagues, and the failure of AU to accept the accommodations recommended by LifeGuard. Further, the letter reiterated Dr. Williams' willingness to do whatever it took to resume her residency but also emphasized the need for AU to actually consider the requested accommodations.

119.    On or about November 5, 2018, having received no response to his preceding letter, Mr. Brown wrote to AU requesting a response to his September 14, 2018 letter.

120.    After receiving the letter from her attorney lodging a complaint about the differential treatment of male residents, and the Defendants failure to provide a reasonable accommodation for her PTSD, on or about November 14, 2018, AU issued Dr. Williams a written warning for inappropriate behavior which was alleged to have occurred on June 22, 2018, wherein in frustration at what they were putting her through  she told them she would take their damn drug test so that when it comes back clean they could shove it up their ass.

121.    The written warning was an adverse action that was given in retaliation for Dr. Williams engaging in protected activity.

122.    Dr. Williams engaged in protected activity when she had her attorney send the letter in September.

123.    Dr. Williams engaged in protected activity when she had her attorney send the letter in November.

124.    AU continued its retaliation against her for having reported them to the ACGME.

125.    AU continued its retaliation against Dr. Williams for asserting her rights under Title IX and for her protected activity under the GWA and (the ADA).

126.    AU would later cite the June 22, 2018 comment as partial justification for her termination although the Plaintiff was not issued the warning about the alleged inappropriate behavior until after she complained of the disparate treatment she was receiving compared to her male counterparts  with regard to the requirements of additional testing in order to return to work and her residency training.

127.    On February 23, 2019, Dr. Williams was accused of "abnormal examination behavior" for having access to study materials during an examination break and this was stated as the reason for the Defendants to terminate her from the residency program.

128.    In accordance with AU procedures, Dr. Williams challenged this attempt to terminate her to an ad hoc committee.

129.    On May 2, 2019, found that termination of Dr. Williams was not warranted and the ad hoc committee published its findings to Dean David C. Hess.

130.    The ad hoc committee recommended to Dean Hess that he reinstate Dr. Williams to continue her residency training with several recommendations including assigning her a new mentor and a clear performance improvement plan.

131.    On or about May 19, 2019, Dean Hess **agreed** with the recommendation of the ad hoc committee and he **overturned** the proposed termination of Dr. Williams and ordered her reinstatement.

132.    On or about May 20, 2019, the Office of Employment Equity ("OEE") published to Dean Hess its findings that university policy was violated by failing to follow existing procedure for reasonable accommodations and by failing to follow existing procedure for requesting fit for duty tests with regard to Dr. Williams.

133.    Initially Defendants Dr. Meiler and Dr. Arthur indicated to Dr. Williams that they would appeal Dean Hess's decision, an action that was not allowed by or consistent with AU policies.

134.    Subsequently, on or about May 24, 2019, Defendant Dr. Arthur emailed Dr. Williams informing her that they decided not to appeal Dean Hess's decision and she could return to work on June 3, 2019.

135.    Despite telling Dr. Williams the contrary, on June 3, 2019, Dr. Meiler and Dr. Arthur, without Dr. William's knowledge, convened a special faculty meeting to create additional support for the termination of Dr. Williams.

136.    This additional support included creating new performance evaluations which were wholly negative and undeserved as a form of retaliation.

137.    Dr. Williams learned of the additional information only after her termination and prior to filing this lawsuit.

138.    Dr. Williams learned that the Defendants Dr. Meiler and Dr. Moore provided this additional information, in violation of Dr. Williams' due process rights to notice of and opportunity to be heard concerning the accusations against her, along with the information already deemed insufficient for termination to Defendant Dr. Coule and to Dean Hess.

139.    On or about June 4, 2019, Defendant Dr. Coule suspended her privileges to practice medicine at the AU Medical Center and revoked her access to AU medical facilities, effectively terminating her employment and continuation of her residency training with the university despite Dr. Hess' decision to reinstate her.

140.    On June 5, 2019, citing only the suspension of her privileges to practice medicine by Defendant Dr. Coule and failing to mention consideration of newly provided information, Dean

Hess reversed his decision and terminated Dr. Williams from the AU residency program altogether.

141.    Dr. Williams appealed her termination to Defendant Dr. Keel, President of AU, citing her claims of discrimination based upon being a female, having a disability, and for retaliation for reporting and opposing what she believed to be illegal activity on behalf of Defendants Dr. Meiler, Dr. Arthur, Dr. Moore and others.

142.    Dr. Keel upheld the termination without meaningful investigation into her claims of discrimination based upon sex, retaliation and other violations of the law.

## POST TERMINATION

143.    Beginning in February of 2019, in an effort to change her environment and prior to her termination, Dr. Williams was seeking to transfer to an open residency position. She was chosen for an interview with Dr. Jeffrey Huang of HCA Healthcare in Tampa, Florida.

144.    However, after being chosen for an interview, Dr. Jeffrey Huang withdrew her from consideration after asking her, "what about your drug problem" and stating that he spoke with her chairman.

145.    Upon information and belief, the chairman he was referring to is Defendant Dr. Meiler.

146.    These allegations were knowingly false, and in the least, showed a reckless disregard for the truth as Dr. Williams had passed her drug screen and there was nothing to support a statement by anyone at AU that she was abusing any drugs.

147.    These false allegations were retaliatory in nature and made for the purpose of destroying Dr. Williams' career by ruining any chances she had to begin anew at another program.

148.    These false allegations were made with the knowledge that anesthesia programs form a small community and the false allegations, would reach most, if not all, anesthesia residency programs, preventing Dr. Williams from finishing her residency training in Anesthesiology and ruining her career.

## WILLFUL AND WONTON PATTERN AND PRACTICE OF SEX DISCRIMINATION AND RETALIATION

149.    In an email dated February 20, 2020, former Interim Chief Compliance Officer of Augusta University, John Lott, confirmed what Dr. Williams' was going through, when he complained of what he describes as "illegal searches and drug testing, ADA violations, and Title 9 violations."

150.    Mr. Lott described systemic abuses of university policies, state, and federal laws by university officials and how the "compliance" process at AU is complicit in these rights violations.

151.    Mr. Lott further described how "senior leaders" at AU engaged in campaigns of misinformation to discriminate and retaliate against, primarily, female residents while using those same structures to protect their male counterparts, even those male counterparts accused of crimes.

152.    Mr. Lott stated, "No one deserves to go through what Dr. Sarah Kavianpour, Dr. Lesley Williams (another victim of AU drug policy misconduct), and Dr. Richard Callan have gone through due to broken compliance program processes, blatant dishonesty, and direct targeting by superiors despite these individuals being victims of broken processes that need to be corrected."

153.    Finally, when Mr. Lott complained of these violations to his immediate supervisor, he was terminated the following day.

154.    The Defendants actions of terminating those who complain about violations of the law, federal and state or guidelines, has a chilling effect on employees and residents.

155.   Dr. Williams was violated when through no fault of her own she was sexually assaulted and diagnosed with PTSD which the Defendants perceived as a disability and was a disability.

156.   Dr. Williams was violated again when the Defendants, individually and collectively, violated its own institutional policies and rules, state laws, and federal laws to terminate her from the residency program because she was a woman that asserted her right to be credited for the cases she logged and performed, because she was a woman that would not back down when asked to submit to drug and fitness tests that males were not asked to submit to, and because she was a woman that requested a reasonable accommodation for dealing with the PTSD that came after her sexual assault.

157.   AU has engaged in a pattern and practice of sex discrimination, fabricating justifications for said discrimination, and retaliating against anyone who opposes their illegal acts or asserts their rights.

158.   AU's compliance department does not exist to ensure compliance but to assist the Defendants in evading compliance and punishing victims.

### Count One:
### Sex Discrimination on the Basis of Dr. Williams' Sex in Violation of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. §§ 1681, et seq. Against Institutional Defendants

159.   All preceding paragraphs are hereby incorporated as though fully restated herein.

160.   Paragraphs 14 -16, 45, 48, 55-60, 64, 68-73, 75-83, 85-90, 92-93, 95-99, 102-113, 116-120, 126, 128-135, 138-142, 149-153, 156, and 157 are specifically incorporated as though fully restated herein as being particularly relevant to this count.

161.    Count One of this cause of action is timely filed and any prerequisites to suit have been met.

162.    Title IX and its implementing regulations prohibit a recipient of federal funding from discriminating against an employee in education-related employment on the basis of sex, including in rates of pay or any other form of compensation and changes in compensation, job assignments, fringe benefits available by virtue of employment, employer-sponsored activities, including those that are social and recreational, termination, and any other term, condition, or privilege of employment. 34 C.F.R. § 106.51.

163.    At all times relevant to this Complaint, Board of Regents was an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

164.    At all times related to this Complaint, Dr. Lesley Williams was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

165.    Institutional Defendants discriminated against Dr. Williams because of her sex— female—by subjecting her to disparate treatment in a manner that adversely affected the terms and conditions of her employment by subjecting her to drug tests in violation of their own policy.

166.    Institutional Defendants discriminated against Dr. Williams because of her sex— female—by subjecting her to disparate treatment in a manner that adversely affected the terms and conditions of her employment by subjecting her to fit for duty tests in violation of their own policy.

167.    Institutional Defendants discriminated against Dr. Williams because of her sex— female—by subjecting her to disparate treatment in a manner that adversely affected the terms and conditions of her employment by subjecting her to disparate discipline.

168.    Institutional Defendants discriminated against Dr. Williams because of her sex—female—by subjecting her to disparate treatment in a manner that adversely affected the terms and conditions of her employment by treating her more harshly than male residents and terminating her from the program despite the ad hoc committees finding and recommendation that she not be terminated.

169.    Institutional Defendant's actions constitute discrimination in violation of Title IX and its implementing regulations.

170.    Institutional Defendants' actions described above have directly and proximately caused, and continue to cause, Dr. Williams to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

### Count 2:
### Unlawful Retaliation in Violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, et seq. Against Institutional Defendants

171.    All preceding paragraphs are hereby incorporated as though fully restated herein.

172.    Paragraphs 14-16, 44, 48, 55-60, 64, 66, 69, 73, 75, 75-77, 79-83, 86-89, 95-99, 102, 112, 113, 116-118, 120-123, 125-131, 133-136, 138-142, and 149-157 are specifically incorporated as though fully restated herein as being particularly relevant to this count.

173.    Count Two of this cause of action is timely filed and any prerequisites to suit have been met.

174.    Title IX and its implementing regulations prohibit retaliation against an employee for her opposition to Title IX discrimination or participation in a Title IX proceeding.

175.   At all times relevant to this Complaint, Defendants AU and Board of Regents were an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

176.   At all times relevant to this Complaint, Dr. Williams was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

177.   Dr. Williams engaged in protected activity by opposing treatment that she reasonably believed constituted unlawful discrimination under Title IX and its implementing regulations.

178.   Her opposition included objecting to the requested fit for duty testing.

179.   Her opposition included objecting to the drug testing.

180.   Her opposition included objecting to the simulation exercise.

181.   Her opposition included the September 14, 2018 letter from her attorney.

182.   Her opposition included opposing and reporting discrimination on the basis of sex in employment in a federally funded education program to AU's Office of Employment Equity and other university officials.

183.   Defendants AU and Board of Regents were aware of Dr. Williams' protected activity.

184.   Defendants AU and Board of Regents committed an adverse action against Dr. Williams by removing her from the residency program.

185.   Defendants AU and Board of Regents committed an adverse action against Dr. Williams by subjecting her to several unfounded, personally invasive examinations.

186.    Defendants AU and Board of Regents committed an adverse action against Dr. Williams by delaying her return to work.

187.    Defendants AU and Board of Regents committed an adverse action against Dr. Williams by refusing to investigate her complaints of discrimination and retaliation.

188.    Defendants AU, Board of Regents, and Augusta University Medical System committed an adverse action against Dr. Williams by terminating her employment and training for her residency.

189.    Defendants AU and Board of Regents committed an adverse action against Dr. Williams by engaging in post-termination acts of retaliation, such as falsely characterizing her as a drug abuser to other programs.

190.    Defendants AU's and Board of Regents' retaliatory actions were such that they would have dissuaded a reasonable employee from making or supporting a charge of discrimination.

191.    The adverse actions taken by Defendants AU and Board of Regents against Dr. Williams were knowingly and willfully done and causally connected to Dr. Williams' protected activity.

192.    Defendants AU's and Board of Regents' actions described above have directly and proximately caused, and continue to cause, Dr. Williams to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

**Count 3:**
**Unlawful Retaliation in Violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4**
**Against Institutional Defendants**

193.    All preceding paragraphs are hereby incorporated as though fully restated herein.

194.    Paragraphs 14-16, 44, 55-68, 76, 79-82, 88, 89, 112, 113, 116, 120-131, 133-136, 138-142, 149-154, 156, and 157 are specifically incorporated as though fully restated herein as being particularly relevant to this count.

195.    Count Three of this cause of action is timely filed and any prerequisites to suit have been met.

196.    The Georgia Whistleblower Act ("GWA") prohibits a public employer from retaliating against a public employee who discloses a violation or noncompliance with a law, rule, or regulation to a supervisor or government agency, or who objects to any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with the law. O.C.G.A. § 45-1-4.

197.    Defendants AU and Board of Regents are public employers within the meaning of the GWA.

198.    Dr. Williams is a public employee within the meaning of the GWA.

199.    Dr. Williams' conduct of objecting to practices by AU that she reasonably believed were discriminatory and retaliatory in violation of federal law, as set forth herein, constituted objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation.

200.    Dr. Williams' conduct of objecting to and reporting to ACGME the fact that the Defendants requested her to delete and falsely report her completion of cases, procedures, and

hours, as set forth herein, constituted objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation.

201.   Dr. Williams reasonably believed that falsifying documents to the ACGME was a violation of a law, rule or regulation that governed the Institutional Defendants because the ACGME is the accrediting agency that requires the Sponsoring Institution to provide a learning environment where residents have the opportunity to raise concerns and provide feedback without intimidation or retaliation, and in a confidential manner.

202.   Defendants were aware of Dr. Williams' protected activity.

203.   Defendants took adverse employment actions against Dr. Williams by delaying her reinstatement from its original, unlawful suspension of her from the residency program.

204.   Defendants took adverse employment actions against Dr. Williams by fabricating undeserved negative performance evaluations.

205.   Defendants took adverse employment actions against Dr. Williams by lying about her abusing drugs and/or alcohol.

206.   Defendants took adverse employment actions against Dr. Williams by terminating her employment.

207.   Defendants took adverse employment actions against Dr. Williams by engaging in post-termination acts of retaliation, such as falsely characterizing her as a drug abuser to other programs.

208.   The adverse employment actions taken by Defendants against Dr. Williams were causally connected to Dr. Williams' protected disclosures and opposition activity.

209.    Defendants' actions described above have directly and proximately caused, and continue to cause, Dr. Williams to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income as an Anesthesiologist, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

### Count 4:
### Violation of Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause Against Defendants Keel, Coule, Meiler, Moore and Arthur in their individual capacities

210.    All preceding paragraphs are hereby incorporated as though fully restated herein.

211.    Paragraphs 14-16, 44-45, 48, 55-60, 64, 66, 70-73, 75-83, 85-90, 92-93, 95-99, 102-113, 116-118, 120-123, 125-126, 128-135, 138-142, 149-153, 156, and 157 are specifically incorporated as though fully restated herein as being particularly relevant to this count.

212.    Count Four of this cause of action is timely filed and any prerequisites to suit have been met.

213.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex.

214.    This constitutional right is clearly established. *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Davis v. Passman*, 442 U.S. 228, 235 (1979)).

215.    Pursuant to 42 U.S.C. § 1983, persons who, acting under the color of state law, violate an individual's constitutional rights can be held liable for damages in their individual capacity.

216.   At all times relevant to this Complaint, Dr. Williams was an employee of a public institution, Augusta University.

217.   Individual Defendants Dr. Keel, Dr. Coule, Dr. Meiler, Dr. Moore and Dr. Arthur, acting under the color of state law, violated Dr. Williams' constitutional right to be free from sex discrimination in employment, by directly participating in Defendants AU's and Board of Regents' discriminatory actions to subject Dr. Williams to disparate treatment in a manner that adversely affected the terms and conditions of her employment and subjecting her to disparate discipline.

218.   Individual Defendants committed discriminatory actions against Dr. Williams by ordering her to submit to fit for duty testing in violation of AU's own policy.

219.   Individual Defendants committed discriminatory actions against Dr. Williams by ordering her to submit to drug testing in violation of AU's own policy.

220.   Individual Defendants committed discriminatory actions against Dr. Williams by limiting her participation in the residency program.

221.   Individual Defendants committed discriminatory actions against Dr. Williams by refusing to fully reinstate her to the residency program.

222.   Individual Defendants committed discriminatory actions against Dr. Williams by falsely accusing her of drug and/or alcohol abuse.

223.   Individual Defendants committed discriminatory actions against Dr. Williams by issuing the written letter of reprimand only after receiving the letter from her lawyer.

224.   Individual Defendants committed discriminatory actions against Dr. Williams by soliciting and giving Dr. Hess undeserved negative performance reviews.

225.   Individual Defendants committed discriminatory actions against Dr. Williams by terminating her employment.

226.    Defendant Dr. Coule violated Dr. Williams' constitutional right to be free from sex discrimination in employment by working in concert with Defendants Dr. Meiler, Dr. Moore, Dr. Arthur, and others to terminate her privileges at AU Medical Center so that Dr. Hess would then have to reverse his decision to reinstate her to the residency program.

227.    Defendants Dr. Meiler and Dr. Arthur violated Dr. Williams' constitutional right to be free from sex discrimination in employment by seeking her termination after Dr. Hess reinstated her and furnishing false and misleading information without her knowledge in violation of her due process rights to cause Dr. Hess to terminate her.

228.    Defendant Dr. Keel, acting under the color of state law, violated Dr. Williams' constitutional right to be free from sex discrimination in employment, because he was in a position of authority to take responsive action to stop the violations of Dr. Williams' constitutional rights as described above, he knew about the violations of Dr. Williams' rights, yet he failed to act, thereby acquiescing in the discriminatory conduct and causing the discrimination against Dr. Williams to persist and worsen.

229.    Defendant Keel's failure to act in the face of known violations of Dr. Williams' constitutional rights amounted to deliberate indifference.

230.    Defendant Keel has failed to act in face of known violations of other female residents' rights.

231.    As a direct result of the actions, statements and/or policies of the Individual Defendants, Dr. Williams has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

232.    The Individual Defendants acted intentionally and with callous disregard for Dr. Williams' known statutory and constitutional rights.

233.   The Individual Defendants' conduct described above has directly and proximately caused, and continues to cause, Dr. Williams to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income as an Anesthesiologist, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation which has ruined her career.

### Count 5:
### Defamation of Character (Libel) Against All Defendants

234.   All preceding paragraphs are hereby incorporated as though fully restated herein.

235.   Paragraphs 75-77, 79-82, 85, 88, 143-148, and 157 are specifically incorporated as though fully restated herein as being particularly relevant to this count.

236.   Count Five of this cause of action is timely filed and any prerequisites to suit have been met.

237.   Defendants made false and malicious statements defaming Dr. Williams to her coworkers and prospective employers, expressed in print and writing tending to injure and actually injuring the reputation of Dr. Williams and exposing her to public hatred, contempt, or ridicule.

238.   Defendants made false and malicious statements defaming Dr. Williams by alleging that she abused alcohol.

239.   Defendants made false and malicious statements defaming Dr. Williams by alleging that she abused drugs.

240.   Defendants made false and malicious statements defaming Dr. Williams by alleging that she was a threat to patient safety.

## Count 6:
## Defamation of Character (Slander) Against All Defendants

241.     All preceding paragraphs are hereby incorporated as though fully restated herein.

242.     Paragraphs 75-77, 79-82, 85, 88, 143-148, and 157 are specifically incorporated as though fully restated herein as being particularly relevant to this count.

243.     Count Six of this cause of action is timely filed and any prerequisites to suit have been met.

244.     Defendants maliciously, willfully, intentionally or otherwise made statements and accusations that were false, imputed criminal behavior to Dr. Williams, and were detrimental to her good name and professional reputation.

245.     Defendants maliciously, willfully, intentionally or otherwise made statements and accusations that were false, in reference to her trade, office, or profession, calculated to injure her therein, and were detrimental to her good name and professional reputation.

246.     The statements were made publicly to individuals who otherwise would not have heard such statements.

247.     The statements were wholly false, baseless and had a significant/detrimental impact on Dr. Williams' personal and professional reputation.

248.     Defendants defamed Dr. Williams through false statements that she abused alcohol.

249.     Defendants defamed Dr. Williams through false statements that she abused drugs.

250.     Defendants defamed Dr. Williams through false statements that she was a threat to patient safety.

## PLAINTIFF'S DAMAGES

251.    Dr. Williams felt violated when she was sexually assaulted but she worked hard to recover and not live her life as a victim. She sought relief in continuing to pursue her lifelong goal of being an Anesthesiologist and but for the Defendants unlawful actions she would have completed her post-graduate training at AU and would have been able to sit for her exam and work as an Anesthesiologist earning an income with a typical range of $300,000.00 to $500.000.00 present day.

252.    As a result of the Defendant's willful and wanton actions in discriminating against the Plaintiff and retaliating against her for engaging in protected activity, the Plaintiff has been precluded from entering into another residency program to complete her education.

253.    As a result of the Defendant's willful and wanton actions in discriminating against the Plaintiff, and retaliating against her for engaging in protected activity, the Plaintiff has not been able to find comparable employment or use her medical degree consistent with her educational achievements.

254.    As a result of the Defendant's willful and wanton actions in discriminating against the Plaintiff and retaliating against her for engaging in protected activity she experienced extreme emotional pain after having her rights violated again by the Defendants based upon her sex after she was recovering from having been violated based upon her sex.

255.    The Plaintiff demands compensation for her emotional pain and suffering, humiliation and embarrassment, loss of income, loss of future income, lost opportunities, and damage to her reputation, her privacy, and her career because the actions of the Defendants have ensured that the Plaintiff will not be accepted into any other residency program.

256.    The conduct of one or more Defendants has evidenced a willful and wanton reckless disregard for the Plaintiff's federal and state rights and punitive damages may be assessed by the enlightened conscious of the jury.

**Count 7:**
**Claim for Expenses of Litigation under O.G.C.A. § 13-6-11, Against All Defendants**

257.    All preceding paragraphs are hereby incorporated as though fully restated herein.

258.    Under O.G.C.A. § 13-6-11, a successful plaintiff may recover her attorneys' fees and other expenses of litigation where she specifically pleads and proves that the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense.

259.    The Institutional and Individual Defendants acted in bad faith and caused Dr. Williams unnecessary trouble and expense by knowingly and intentionally discriminating against Dr. Williams on the basis of her sex in her terms and conditions of employment.

260.    The Institutional and Individual Defendants acted in bad faith and caused Dr. Williams unnecessary trouble and expense by terminating Dr. Williams in bad faith and for a dishonest purpose in retaliation for her protected activity.

261.    The Institutional and Individual Defendants acted in bad faith and caused Dr. Williams unnecessary trouble and expense by working to overturn the ad hoc committees' recommendation and Dr. Hess' decision to reinstate her residency by soliciting negative performance reviews and making false allegations without giving her an opportunity to rebut those allegations or be heard in a secret meeting.

262.    The Institutional and Individual Defendants acted in bad faith and caused Dr. Williams unnecessary trouble and expense by refusing to reinstate her even after acknowledging that they violated policy and the law when dealing with the Plaintiff.

263.    The Institutional and Individual Defendants acted in bad faith and caused Dr. Williams unnecessary trouble and expense by sabotaging her attempts to resume her career  by joining other residency programs.

264.    As a direct and proximate result of Defendants' bad faith violation of Dr. Williams' rights, Dr. Williams has suffered unnecessary trouble and expense.

265.    These damages include court costs, reasonable attorneys' fees, and other litigation expenses, in an amount to be determined at trial by a jury.

## REQUESTED RELIEF

WHEREFORE, Dr. Williams demands a TRIAL BY JURY and for the following relief:

266.    A declaratory judgment that the Institutional Defendants have engaged in unlawful discrimination on the basis of sex and retaliation in violation of Title IX and the GWA;

267.    A declaratory judgment that the Individual Defendants have engaged in unlawful discrimination on the basis of sex in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983;

268.    An injunction prohibiting the Institutional Defendants from engaging in unlawful discrimination on the basis of sex and retaliation in violation of Title IX and the GWA and the requirement that an outside agency be required to oversee any allegations of violations of the law so that an adequate investigation can be conducted without fear of reprisal for other employees;

269.   For reinstatement to the residency program so that the Plaintiff can finish her training in Anesthesiology without fear of reprisal or discrimination with full back pay plus interest, and reinstatement of full fringe benefits;

270.   Alternatively, if Plaintiff is not reinstated then the Defendant should be ordered to clean the Plaintiff's file to reflect the truth and provide her a recommendation to another program within its University System or another system and/or order front pay for the time period that she would have been paid as a resident at AU absent the unlawful actions of the Defendant;

271.   Award Dr. Williams damages in an amount to be proved at trial for economic losses, damage to her personal and professional reputation, and pain and suffering that she has experienced as a result of Defendants' unlawful conduct;

272.   Award Dr. Williams punitive damages against the Individual Defendants in an amount to be proven at trial;

273.   Award Dr. Williams pre-judgment and post-judgment interest;

274.   Award Dr. Williams reasonable attorney's fees and costs for all claims upon which she prevails at trial as allowed by law; and

275.   Award Dr. Williams other and further relief as the Court may deem appropriate.

Respectfully submitted this 3rd day of June, 2020.

s/ Tanya D. Jeffords
Tanya D. Jeffords
GA Bar No. 390055
Kenneth S. Ratley
GA Bar No. 359246
Attorneys for Plaintiff

The Law Offices of Tanya D. Jeffords
and Associates, PC
437 Walker Street
Augusta, GA 30901
(706) 722-3019

**✹ EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
RICHMOND COUNTY, GEORGIA

**2020RCCV00265**

ASHLEY WRIGHT
JUN 03, 2020 11:24 PM

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

IN THE SUPERIOR COURT OF RICHMOND COUNTY, GEORGIA

Civil Action File No. 2020RCCV00265

|  |  |  |
|---|---|---|
| Williams, Lesley Dr. | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Judge: ASHLEY WRIGHT |
| | ) | |
| Board of Regents of Univeristy System of... | ) | |
| Augusta Univeristy | ) | |
| Augusta University Health System | ) | |
| Medical College of Georgia | ) | |
| Augusta University Hospital | ) | |
| Moore, Walter Dr. | ) | |
| Coule, Phillip Dr. | ) | |
| Defendants | ) | |

## STANDING ORDER FOR MEDIATION IN CIVIL CASES

In accordance with the mandate of the Georgia Constitution of 1983 that the judicial branch of government provide "speedy, efficient and inexpensive resolution of disputes and prosecutions," and pursuant to Uniform Superior Court Rule 1.2 as well as the Georgia Supreme Court's Alternative Dispute Resolution Rules encouraging the use of alternative dispute resolution by the courts of this state, the following **Standing Order for Mediation in Civil Cases** is hereby entered. As set forth herein, all contested civil matters filed in the Superior Courts of the Augusta Judicial Circuit, **unless exempted**, as set forth below, must be mediated in accordance with this Order.

**MEDIATION REQUIRED.**

Mediation is a prerequisite to a case's placement on the trial calendar, and **must be conducted in compliance with this Order**. All such mediations shall be conducted in accordance with the rules of the Augusta Judicial Circuit ADR Program (hereinafter "AJC ADR Program".)

The parties shall agree upon a mediator from the roster of mediators registered by the Georgia Office of Dispute Resolution (http://godr.org/) who have been chosen for service in the AJC ADR Program. A copy of the roster may be obtained by contacting the AJC ADR Program Director, Debbie Goode (hereafter "ADR Director"), at 706-821-2357 or dgoode@augustaga.gov.

Parties shall contact the mediator directly and schedule the mediation. The plaintiff's counsel shall provide the date of the mediation and the name of the mediator selected and agreed to by all parties, by completing the attached Notice of Mediation Status form (Attachment A hereto) which must be provided by email or U.S. mail to the ADR Director, **prior to the scheduled session.** Unless otherwise agreed, the parties shall share the cost of the mediator equally, and should be prepared to pay the mediator at the conclusion of the session. Should the parties fail to agree upon a mediator, the court or the ADR Director will appoint one for them and may set the fee. If any party is unable to afford the cost of mediation, they may contact the ADR Office to request an Application for Fee Waiver/Fee Reduction.

Should the parties desire to use a mediator not on the AJC ADR Program roster, they are permitted **to petition the court** to utilize any mediator **provided he/she is registered with the Georgia Office of Dispute Resolution in the appropriate category.** If approved, **prior to mediation,** Plaintiff shall notify the ADR Director in writing of the name of the mediator, and the time and location of mediation. He/she shall be paid in accordance with the agreement of the parties and said mediator.

2

The parties and their counsel shall negotiate in *good faith* to resolve all issues in this case with the mediator. Within *seven* calendar days after mediation the parties shall notify the ADR Director whether mediation was successful by completing and submitting to the ADR Director a copy of the attached Attestation Form (Attachment B hereto,) as set forth below in the provision of this order entitled Attestation of Mediation Participation or Exemption. In the absence of settlement, the parties lose none of their rights to a final hearing or trial.

Compliance with this Order does not require the parties to reach a settlement. The mediator has no authority to compel settlement. Any settlement is entirely voluntary.

**APPEARANCE.**

The presence of parties at all mediation conferences is required unless the court excuses attendance for good cause shown. The requirement that a party appear at a mediation conference is satisfied if the following persons are physically present:

(a)    The party and/or:

(1)    The party's representative who has:

(i)    Full authority to settle without further consultation; and

(ii)    A full understanding of the dispute and full knowledge of the facts;

(2)    A representative of an insurance carrier for any insured party if that representative has full authority to settle without further consultation, except that telephone consultations with persons immediately available are permitted. Appearance of an insurance carrier's representative by telephone is only permitted if all parties agree to such telephonic appearance.

**DISCRETIONARY EXEMPTIONS.**

Any party may petition the court to exempt the case from mediation by filing a Mediation Exemption Petition, a copy of which shall also be provided to the ADR Director.  An exemption from mediation may be requested for the following reasons:

(a)      The issue(s) to be considered has been previously mediated by a mediator registered with the Georgia Office of Dispute Resolution;

(b)      The issue(s) presents a question of law only;

(c)      Good cause shown before the judge to whom the case is assigned.

Any exemption shall be within the discretion of the court.

**MANDATORY EXEMPTIONS.**

The following shall be exempt from mediation except upon petition of all parties or upon *sua sponte* motion of the court:

(a)      Appeals from rulings of administrative agencies;

(b)      Forfeitures of seized properties;

(c)      Bond validations; and

(d)      Declaratory relief.

**CONFIDENTIALITY AND PRIVILEGE.**

The Georgia Supreme Court Alternative Dispute Resolution Rules and the Augusta Judicial Circuit Alternative Dispute Resolution Rules provide protections, immunities, and benefits to parties, counsel, and registered neutrals in properly conducted court-connected mediations.  All submissions provided to a registered mediator, discussions, representations, and statements made

4

in connection with a court-connected mediation proceeding shall remain confidential and privileged consistent with Georgia law. Parties and neutrals acting in a court-annexed or court-referred ADR process are entitled to these confidentiality and immunity protections. (Supreme Court ADR Rule 6.1 and 6.2.) Non-registered mediators do not have the confidentiality or immunity protections provided by the Supreme Court of Georgia.

**ATTESTATION OF MEDIATION PARTICIPATION OR EXEMPTION.**

Prior to requesting a pretrial conference or trial date, the requesting party is directed to complete and submit a filed copy of the attached Attestation Form to the ADR Director. The original attestation shall be filed with the Clerk of Court. Failure to attest will result in continuance of the matter until compliance is demonstrated.

**EFFECTIVE DATE OF ORDER**

This Order shall become effective the date it is filed and shall apply to all civil cases except those exempted as described above.

**SO ORDERED** this _____ day of _____, 20____.


_____
Judge, Superior Court
Augusta Judicial Circuit

IN THE SUPERIOR COURT OF _____ COUNTY, GEORGIA

CIVIL ACTION FILE NO. _____

_____,  )
        **PLAINTIFF,**           )
                                 )
**VS.**                            )
                                 )
_____,  )
        **DEFENDANT.**      )

## NOTICE OF MEDIATION STATUS
### (Attachment A)

I do hereby confirm that the parties in the above styled action have selected and agreed

to the following registered mediator:

        Mediator's Name: _____

        Date of Mediation: _____

Parties request a mediator be assigned by the AJC ADR Program.

Granted an Exemption (See copy attached.)

This _____ day of _____, 20___.

                        _____
                        Plaintiff's Counsel

                        Printed Name: _____

**IN THE SUPERIOR COURT OF _____ COUNTY, GEORGIA**

**CIVIL ACTION FILE NO.** _____

_____,   )
       **PLAINTIFF,**       )
                            )
**VS.**                       )
                            )
_____,   )
       **DEFENDANT.**    )

### ATTESTATION FORM
#### (Attachment B)

I do hereby attest that the parties in the above styled action have;

      **Attended Mediation:**

      Date: _____

      Mediator's Name: _____

      Outcome: _____

      **Granted an Exemption** (See copy attached.)

This _____ day of _____, 20___.

_____
Requesting Party's Signature

Printed Name: _____

**Sworn to and subscribed before me,**
This _____ day of _____, _____.

_____
Notary Public
My Commission expires: _____

7