IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

DR. LESLEY WILLIAMS,          *
                              *
        Plaintiff,            *
                              *
        v.                    *          CV 120-100
                              *
BOARD OF REGENTS OF THE       *
UNIVERSITY SYSTEM OF GEORGIA, *
et al.,                       *
                              *
        Defendants.           *
                              *

_____

**O R D E R**

_____

Presently before the Court is the Board of Regents of the
University System of Georgia (the "Board of Regents"), Dr. Brooks
Keel, Dr. Walter Moore, Dr. Steffen Meiler, and Dr. Mary Arthur's
second motion for partial judgment on the pleadings (Doc. 32).
For the following reasons, the motion is **GRANTED**.

## I. BACKGROUND[1]

Plaintiff, Dr. Lesley Williams, began working as a first-year
anesthesia resident at the Medical College of Georgia ("MCG") of
Augusta University ("AU") on July 1, 2017. (Am. Compl., Doc. 23,
¶ 43.) After a traumatic event that occurred on March 15, 2018,
Plaintiff was diagnosed with post-traumatic stress disorder

_____

[1] Plaintiff's Amended Complaint is replete with conclusory allegations.
The Court only includes facts relevant to the issues before it.

("PTSD"). (Id. ¶¶ 45-46.) Her PTSD was considered a disability, and in April 2018 she was assigned a point of contact in the Title IX office. (Id. ¶¶ 49, 69.) Additionally, on May 15, 2018, Dr. Meiler requested Plaintiff undergo a "Physician Back to Work Evaluation."[2] (Id. ¶ 70.)

While Plaintiff was being treated for PTSD, she requested modified duty in her residency program. (Id. ¶ 51.) During this time, she was placed on a one-month elective research rotation. (Id. ¶ 54.) Following her research rotation, she completed an obstetrics rotation and a pediatrics rotation, during which she treated patients. (Id. ¶¶ 55-58.) On June 8, 2018, the Anesthesiology Residency Department ("ARD") informed Plaintiff that she was only supposed to be observing patients during her rotations. (Id. ¶ 59.) Because Plaintiff had been treating patients, the ARD asked her to delete the case logs of the work she completed while treating patients and not submit them to the Accreditation Council for Graduate Medical Education ("ACGME"), the entity responsible for accrediting all graduate medical training. (Id. ¶¶ 61-62.) Plaintiff believed this violated the accreditation standards of the residency program, so she reported the ARD's actions to the ACGME. (Id. ¶ 65.)

---

[2] Plaintiff's evaluation was conducted by a company named Lifegaurd and occurred on May 23, May 29, and June 20, 2018. (Am. Compl., at ¶¶ 70, 73, 78.)

On June 19, 2020, Plaintiff fainted while in the operating room.[3] (Id. ¶ 74.) Two days later, Dr. Jeremy Hertza, who works for Lifeguard, emailed Plaintiff requesting she take a drug test. (Id. ¶ 79.) The test was initially scheduled for June 22, 2018 at Quest Diagnostics. (Id.) However, "[w]hile on her way to Quest Diagnostics, . . . Dr. Meiler and Dr. Moore and other members of the ARD called [her] and demanded that she return to AU to take the drug screen." (Id. ¶ 80.) Plaintiff objected to the test and "[Dr.] Meiler and other members of the ARD demanded that [she] sign a form stating that she was *voluntarily* taking the drug screen." (Id. ¶¶ 81-82.) Plaintiff signed the form but "wrote in that the test was being mandated by her department." (Id. ¶ 83.) Additionally, Plaintiff alleges "[Dr.] Meiler and [Dr.] Moore and other ARD members required that her samples be tested for operation room drugs." (Id. ¶ 85.) Plaintiff's work badge was confiscated on June 22, 2018, the day of the drug test, and she was told she could not return to work until her results came back. (Id. ¶ 86.) Plaintiff alleges that she was not allowed to return to work for a month despite her drug test only showing her prescribed drugs. (Id. ¶¶ 87-89.)

After Plaintiff passed her "Physician Back to Work Evaluation," Dr. Hertza recommended seven different accommodations

---

[3] Plaintiff alleges fainting is a side effect of her PTSD medication. (Am. Compl., at ¶ 76.)

be put in place so that Plaintiff could return to work. (Id. ¶ 90.) However, on August 6, 2018, "Dr. Meiler and Dr. Arthur and other members of the ARD reported that they would not be able to accommodate [Plaintiff]." (Id. ¶¶ 93-94.) Additionally, "Dr. Meiler and Dr. Moore and other members of the ARD" required her to "undergo a medical simulation," to which Plaintiff objected. (Id. ¶¶ 96, 102.) On August 9, 2018, Plaintiff notified Dr. Meiler, Dr. Moore, and other members of the ARD that her "PTSD symptoms were now subclinical and she was ready to return to work." (Id. ¶ 114.) However, Plaintiff was not allowed to return to work. (Id. ¶ 116.) She then agreed to undergo the medical simulation. (Id. ¶ 117.)

On November 14, 2018, AU issued Plaintiff a written warning for stating in June that she would "take their damn drug test so that when it comes back clean they could shove it up their ass." (Id. ¶ 120; Doc. 35, at 7-8.) On February 23, 2019, Plaintiff was accused of abnormal examination behavior and termination was proposed, which she appealed to an ad hoc committee. (Am. Compl., at ¶¶ 127-28.) On May 2, 2019, the committee found that termination for her conduct was not warranted. (Id. ¶ 129.) Dean David Hess, the Dean of MCG, accepted the committee's recommendation and ordered that Plaintiff be reinstated. (Id. ¶ 131.) Dr. Meiler and Dr. Arthur indicated to Plaintiff that they would appeal the decision to reinstate her; however, they later

told Plaintiff they would not appeal the decision. (Id. ¶¶ 133-34.)

On June 3, 2019, Dr. Meiler and Dr. Arthur "convened a special faculty meeting to create additional support for [Plaintiff's] termination," which included creating new performance evaluations. (Id. ¶¶ 135-36.) Dr. Meiler and Dr. Moore provided this information to Dr. Phillip Coule, AUMC's Chief Medical Officer, who suspended her privileges on June 4, 2019. (Id. ¶¶ 35, 138-39.) On June 5, 2019, Dean Hess terminated Plaintiff from the AU residency program. (Id. ¶ 140.) Plaintiff appealed her termination to Dr. Keel, the President of AU, but it was upheld. (Id. ¶¶ 141-42.)

## II. LEGAL STANDARD

"After the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." Cunningham v. Dist. Att'y's Off. for Escambia Cnty., 592 F.3d 1237, 1255 (11th Cir. 2010) (citation omitted). "The legal standards applicable to Federal Rule of Civil Procedure 12(c) motions for judgment on the pleadings and Rule 12(b)(6) motions to dismiss are the same." Marshall v. Safeco Ins. Co. of Ind., No. CV 112-113, 2013 WL 12155468, at *1

(S.D. Ga. Apr. 16, 2013) (citing <u>Roma Outdoor Creations, Inc. v.</u> <u>City of Cumming</u>, 558 F. Supp. 2d 1283, 1284 (N.D. Ga. 2008)). Therefore, when considering a motion for judgment on the pleadings, the Court must "accept as true all material facts alleged in the non-moving party's pleading[] and . . . view those facts in the light most favorable to the non-moving party." <u>Perez v. Wells</u> <u>Fargo N.A.</u>, 774 F.3d 1329, 1335 (11th Cir. 2014).

> Moreover, "while notice pleading may not require that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim, it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'"

<u>Fin. Sec. Assurance, Inc. v. Stephens, Inc.</u>, 500 F.3d 1276, 1282-83 (11th Cir. 2007) (quoting <u>Roe v. Aware Woman Ctr. for Choice,</u> <u>Inc.</u>, 253 F.3d 678, 683 (11th Cir. 2001)).

### III. QUALIFIED IMMUNITY

Dr. Meiler, Dr. Moore, Dr. Arthur (collectively, the "Individual Doctors"), and Dr. Keel move to dismiss Plaintiff's claims against them under 42 U.S.C. § 1983 in Count Four and Eight because of qualified immunity.[4]

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct

---

[4] Plaintiff only asserts claims against the Individual Doctors and Dr. Keel in their individual capacities.

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)) (alterations adopted and internal quotation marks omitted). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. (citation and internal quotation marks omitted). In other words, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Robinson v. Payton, 791 F.3d 824, 829 (8th Cir. 2015) (citing Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing Vinyard, 311 F.3d at 1346). To determine whether a government official was acting within the scope of his discretionary authority, courts consider whether the official "(a) perform[ed] a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (citation omitted). Here, there is no question that the Individual Doctors and Dr. Keel were acting within the scope

of their discretionary authority at all relevant times outlined in the Amended Complaint.

"Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006) (quoting Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003)). Accordingly, the Court must turn to the Amended Complaint to determine whether Plaintiff has alleged sufficient facts to demonstrate that the Individual Doctors and Dr. Keel are not entitled to qualified immunity. See Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1319 (11th Cir. 2016). To overcome a qualified immunity defense, a plaintiff "must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)).[5]

"'Clearly established law' is law that is sufficiently established so as to provide public officials with 'fair notice' that the conduct alleged is prohibited." Randall v. Scott, 610

---

[5] The Court may consider these issues in any order. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

F.3d 701, 715 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The Eleventh Circuit has articulated three ways in which a law can be clearly established. "First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law." Vinyard, 311 F.3d at 1350. This means "the conduct 'so obviously violates the Constitution that prior case law is unnecessary.'" Hudson v. City of Riviera Beach, No. 12-80870-CIV, 2014 WL 1877412, at *13 (S.D. Fla. May 9, 2014).

Second, "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." Vinyard, 311 F.3d at 1351. "The third and final way for a right to become clearly established is 'by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose.'" Joseph v. Bd. of Regents of Univ. Sys. of Ga., No. 1:20-CV-502, 2020 WL 6494202, at *13 (N.D. Ga. May 8, 2020) (citing Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997); Vinyard, 311 F.3d at 1351-52) ("We believe that most judicial precedents are tied to particularized facts and fall into this category.")). The Court now turns to each of Plaintiff's claims against the Individual Doctors and Dr. Keel.

## A. COUNT FOUR - EQUAL PROTECTION

Plaintiff asserts the Individual Doctors and Dr. Keel "violated [her] constitutional right to be free from sex discrimination in employment." (Am. Compl., at ¶ 217.) The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of laws." U.S. CONST. amend. XIV, § 1. It "requires government entities to treat similarly situated people alike." Campbell v. Rainbow City, 434 F.3d 1306, 1313 (11th Cir. 2006). A violation of the Equal Protection Clause is not just that defendants treated a plaintiff differently than other persons; it requires that the differential treatment "was motivated by an intent to discriminate." Elston v. Talladega Cnty. Bd. of Educ., 997 F.2d 1394, 1406 (11th Cir. 1993); see also McCleskey v. Kemp, 481 U.S. 279, 292 (1987).

Plaintiff argues the "right to be free from sex discrimination is clearly established by long-standing precedent." (Doc. 35, at 12.) However, "[t]he inquiry whether a constitutional violation is clearly established is undertaken in light of the specific context of the case, not as a broad general proposition." Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d 1338, 1345 (11th Cir. 2013) (citing Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012)) (internal quotation marks omitted). The Eleventh Circuit has emphasized that "courts must not permit plaintiffs to discharge their burden by referring to general rules and the violation of abstract rights . . . because qualified immunity is a doctrine

that focuses on the actual, on the specific, on the details of concrete cases." Maggio v. Sipple, 211 F.3d 1346, 1354 (11th Cir. 2000) (internal citation and quotation marks omitted). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Id. (citing Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993), as modified, 14 F.3d 583 (11th Cir. 1994)). Moreover, "[i]n the context of public employment cases, it is only in the rarest of cases [that] reasonable governmental officials truly know that the termination or discipline of a public employee violated clearly established federal rights." Joseph, 2020 WL 6494202 at *13 (quoting Anderson v. Burke Cnty., 239 F.3d 1216, 1222 (11th Cir. 2001)) (quotation marks omitted).

### 1. Plaintiff's Allegations

Plaintiff alleges, without specificity as to which doctor, that the Individual Doctors[6] committed discriminatory actions against her by "ordering her to submit to fit for duty testing" (Am. Compl., at ¶ 218), "ordering her to submit to drug testing" (Id. ¶ 219), "limiting her participation in the residency program" (Id. ¶ 220), "refusing to fully reinstate her to the residency program" (Id. ¶ 221), "falsely accusing her of drug and/or alcohol abuse" (Id. ¶ 222), "issuing the written letter of reprimand" (Id.

---

[6] The Court analyzes Plaintiff's claims against Dr. Keel separately. See infra Section III.C.

11

¶ 223), "soliciting and giving Dr. Hess undeserved negative performance reviews" (Id. ¶ 224), and "terminating her employment" (Id. ¶ 225). However, the Court must determine which doctor committed the alleged actions because each defendant "is only liable for his or her own misconduct." Joseph, 2020 WL 6494202, at *11 (citing Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009)).[7] In particular, a Section 1983 claim "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (citation omitted). Therefore, "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Id. The Court "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." Id. The

---

[7] Plaintiff frequently refers to "Defendants" throughout her Amended Complaint without defining which Defendant she is referencing. It is the Plaintiff's duty "to give the defendants adequate notice of the claims against them[.]" Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1323 (11th Cir. 2015). Although this kind of pleading is considered a shotgun pleading in the Eleventh Circuit, the Court will allow the Amended Complaint to stand as is since Defendants did not take issue with it; however, the Court will not be so lenient in the future. See id. ("[The fourth type of shotgun pleading] is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts . . . or which of the defendants the claim is brought against."); Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) ("The complaint is replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged[.]").

Court considers Plaintiff's allegations against each Individual Doctor below.

Pursuant to Plaintiff's Amended Complaint, the relevant allegations against Dr. Meiler are as follows: (1) "Dr. Meiler contacted . . . LifeGuard and requested a 'Physician Back to Work Evaluation' to be performed on [Plaintiff]" (Am. Compl., at ¶ 70); (2) "While on her way to Quest Diagnostics, . . . Dr. Meiler . . . called [Plaintiff] and demanded that she return to AU to take the drug screen in-house" (Id. ¶ 80); (3) "[Dr.] Meiler . . . demanded that [Plaintiff] sign a form stating that she was voluntarily taking the drug screen" (Id. ¶ 82); (4) "[Dr.] Meiler . . . required that her samples be tested for operation room drugs" (Id. ¶ 85); (5) Dr. Meiler determined Plaintiff would not be allowed to return to work with certain accommodations (Id. ¶¶ 91-92, 94); (6) Dr. Meiler required Plaintiff "undergo a medical simulation" (Id. ¶ 96); (7) "Dr. Meiler . . . indicated to [Plaintiff] that [she] would appeal Dean Hess's decision" to overturn her proposed termination (Id. ¶ 133)[8]; and (8) "Dr. Meiler . . . convened a special faculty meeting to create additional support for the termination of [Plaintiff]" and provided this information to Dr. Coule and Dean Hess (Id. ¶¶ 135, 138).

_____

[8] Dr. Arthur later told Plaintiff that she and Dr. Meiler would not appeal Dean Hess's decision. (Am. Compl., at ¶ 134.)

Next, the relevant allegations against Dr. Arthur are as follows: (1) Dr. Arthur determined Plaintiff would not be allowed to return to work with certain accommodations (Id. ¶¶ 92, 94); (2) "Dr. Arthur indicated to [Plaintiff] that [she] would appeal Dean Hess's decision" to overturn her proposed termination (Id. ¶¶ 132-33); and (3) "Dr. Arthur . . . convened a special faculty meeting to create additional support for the termination of [Plaintiff]" (Id. ¶ 135).

Finally, the relevant allegations against Dr. Moore are as follows: (1) "While on her way to Quest Diagnostics, . . . Dr. Moore . . . called [Plaintiff] and demanded that she return to AU to take the drug screen in-house" (Id. ¶ 80); (2) Dr. Moore required Plaintiff "undergo a medical simulation" (Id. ¶ 96); and (3) Dr. Moore provided "new performance evaluations" to Dr. Coule and Dean Hess (Id. ¶¶ 136, 138).

## 2. Analysis

Plaintiff argues her "right to be free from sex discrimination is clearly established by long-standing precedent" and cites to Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1494 (11th Cir. 1995); Nicholson v. Ga. Dep't of Hum. Res., 918 F.2d 145, 148 (11th Cir. 1990); and Goodwin v. Cir. Court of St. Louis Cnty., 729 F.2d 541 (8th Cir. 1984) in

support of her argument.[9]  (Doc. 35, at 12.)  However, no case Plaintiff cites discusses drug screens, fit-for-duty tests, or negative performance evaluations.  Further, Plaintiff makes no attempt to do any fact-to-fact analysis in her response to Defendants' motion.  The cases she cites merely "serve . . . as a statement of the general proposition against sex discrimination." Joseph, 2020 WL 6494202, at *13.  And, "the question is not whether sex discrimination is permissible.  Instead, the question is whether [the] [d]efendants' specific actions toward [the plaintiff] violated clearly established law."  Id.  Without providing case law relevant to the conduct complained of in Plaintiff's Amended Complaint, Plaintiff has failed to meet her burden.

Moreover, the conduct of the Individual Doctors is not so obviously discriminatory that Plaintiff may bypass the presentation of fact-specific case law.  See Randall, 610 F.3d at 716 ("The peculiar facts of [the] case must be 'so far beyond the hazy border between excessive and acceptable that every objectively reasonable [government official] had to know that [their conduct] was violating the Constitution even without caselaw on point.'"  (quoting Priester v. City of Riviera Beach,

---

[9] The Court is not bound by Eighth Circuit precedent.  See Joseph, 2020 WL 6494202 at *13 (explaining "decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose" can establish whether a law is clearly established in this Circuit).

208 F.3d 919, 926 (11th Cir. 2000))). Therefore, the Individual Doctors are entitled to qualified immunity from liability on Plaintiff's Equal Protection claim.

### B. COUNT EIGHT - SEARCH & SEIZURE

Plaintiff also asserts the drug test violated her right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' . . . and applies to the states through the Due Process Clause of the Fourteenth Amendment." Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 ("AFSCME") v. Scott, 717 F.3d 851, 866 (11th Cir. 2013) (quoting U.S. CONST. amend. IV.) (citation omitted). It is well-established that a drug test is considered a search for purposes of the Fourth Amendment. See id.; Chandler v. Miller, 520 U.S. 305 (1997); Skinner v. Ry. Lab. Execs.' Ass'n, 489 U.S. 602 (1989).

Whether a drug test is lawful turns on its reasonableness. Chandler, 520 U.S. at 313. "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." Id. (citing Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652-53 (1995)). Typically, "this standard is met only when a search 'is accomplished pursuant to a judicial warrant issued upon probable cause.'" Lebron v. Sec'y, Fla. Dep't of Child. & Fams., 710 F.3d 1202, 1206 (11th Cir. 2013) (quoting Skinner, 489 U.S. at 619). However, "[t]he Supreme Court has

developed a narrow exception to the Fourth Amendment expectation of individualized suspicion where a search serves special governmental needs." Friedenberg v. Sch. Bd. of Palm Beach Cnty., 911 F.3d 1084, 1091 (11th Cir. 2018) (quotation marks and citations omitted); see also Chandler, 520 U.S. at 313 ("But particularized exceptions to the main rule are sometimes warranted based on special needs.").[10] The Eleventh Circuit has determined special needs exist where "government employees [are] engaged in safety-sensitive tasks." Friedenberg, 911 F.3d at 1096 (internal quotation marks and citation omitted).

According to the Amended Complaint, on June 19, 2018, Plaintiff fainted while in the operating room. (Am. Compl., at ¶ 74.) On June 21, 2018, Dr. Hertza, who is not a defendant in this action, emailed Plaintiff requesting that she take a drug test at Quest Diagnostics the following day. (Id. ¶ 79.) Dr. Meiler and Dr. Moore did not become involved until the day of the scheduled drug test when they called Plaintiff and "demanded . . . she return to AU to take the drug screen." (Id. ¶ 80.) Additionally, Dr. Meiler and Dr. Moore "required that her samples be tested for operation room drugs." (Id. ¶ 85.) The drug test

---

[10] The Supreme Court has "upheld suspicionless searches and seizures to conduct drug testing of railroad personnel involved in train accidents . . . ; to conduct random drug testing of federal customs officers who carry arms or are involved in drug interdiction . . . ; and to maintain automobile checkpoints looking for illegal immigrants and contraband[.]" Vernonia Sch. Dist. 47J, 515 U.S. at 653-54 (internal citations omitted).

was scheduled only after Plaintiff fainted while working in the operating room.

It is obvious there is a special need "beyond normal law enforcement that . . . justif[ies] departure[] from the usual warrant and probable-cause requirements." Skinner, 489 U.S. at 620 (quotation marks and citation omitted). Plaintiff was an anesthesiology resident student working in the operating room. The facts in this case align with the facts in Pierce v. Smith where a "medical resident in the emergency medicine residency program" at a Texas university was required to take a drug test after slapping a patient. 117 F.3d 866, 868 (5th Cir. 1997). The Fifth Circuit found the case was a "special needs" one and explained:

> The present setting not only involves the practice of medicine, an endeavor subject to extensive governmental regulation, but also both a student-school and an employee-supervisor relationship. [The Plaintiff] was undergoing training in the medical school's emergency medicine residency program, and was in essence both a student and an employee providing professional services to the public.

Id. at 874. The Fifth Circuit further explained that "[w]hat the [Supreme] Court said of the railroad employees in Skinner is true 'in spades' as to [the Plaintiff], practicing and learning emergency medicine, namely that she 'discharged duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.'" Id. at 874 (citing

Skinner, 489 U.S. at 628). The Court agrees with the Fifth Circuit's reasoning and finds a special need exists here.

When "special needs" are present, the Court must determine whether the need is "substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." Chandler, 520 U.S. at 306; see also Friedenberg, 911 F.3d at 1091. To do so, the Court "must undertake a context-specific inquiry, examining closely the competing private and public interests *advanced by the parties*." Chandler, 520 U.S. at 306 (emphasis added). "At this balancing stage, 'the ultimate burden of persuasion remains squarely on the plaintiff.'" Friedenberg, 911 F.3d at 1091-92 (quoting AFSCME, 717 F.3d at 880).

Plaintiff does not offer any facts to suggest her private interests outweigh Defendants' (acting as arms of the state) interest in public safety. Instead, she merely argues Defendants' justification for her drug test was "disingenuous" when compared to how other employees were treated. (Doc. 35, at 22.) In Pierce, the Fifth Circuit determined the plaintiff's "status as a student-employee in [an] emergency medicine residency program diminished her legitimate expectations of privacy vis-à-vis the search at issue." Pierce, 117 F.3d at 874; see also Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 671 (1989) ("[I]t is plain that certain forms of public employment may diminish privacy

expectations even with respect to . . . personal searches."). The same is true here.

Further, Plaintiff does not suggest that the collection of the drug test itself was unreasonably invasive and obtrusive. See Pierce, 117 F.3d at 875-76 (analyzing the obtrusiveness of a drug test). Moreover, the Individual Doctors did not request the initial drug test, they only requested that Plaintiff's samples be tested for operation room drugs (which Plaintiff has access to) *after* she fainted in the operating room. Plaintiff admits the drug test was not random but disagrees with the Individual Doctors' justification since she gave them "adequate explanations and reasons" for her fainting. (See Doc. 35, at 22.) However, Plaintiff's explanation for her conduct does not eliminate Defendants' interest in safety. Additionally, Plaintiff's "argument about defendants' deviation from established procedures" does not show a "Fourth Amendment violation, since those guidelines define the internal procedures, not her constitutional rights." Kavianpour v. Bd. of Regents of Univ. Sys. of Ga., No. 1:20-cv-00152, 2021 WL 2638999, at *36 (N.D. Ga. Jan. 28, 2021), *report and recommendation adopted as modified*, 2021 WL 2635854 (N.D. Ga. Mar. 29, 2021) (quoting Fowler v. New York City Dep't of Sanitation, 704 F. Supp. 1264, 1276 (S.D.N.Y. 1989)) (alterations adopted and internal quotation marks omitted).

Plaintiff has simply failed to put forth any allegations that weigh in favor of her privacy interests. Thus, the Court finds

Plaintiff's drug test was justified from its inception and reasonable in scope. See O'Connor v. Ortega, 480 U.S. 709, 725-26 (1987) ("[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for . . . investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable[.]").

Even if the drug test was not reasonable, the Individual Doctors are protected by qualified immunity because Plaintiff has not presented, and the Court cannot find, any binding case law that clearly establishes that the drug test here was unconstitutional. A broad principle of law does not clearly establish the law in this case "with obvious clarity" either. Coffin v. Brandau, 642 F.3d 999, 1015 (11th Cir. 2011) ("To find that a broad principle of law clearly establishes the law as to a specific set of facts, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." (internal quotation marks and citation omitted)). Eleventh Circuit "case law has made clear that 'obvious clarity' cases will be rare" because "[a] reasonable official's awareness of the existence of an abstract right . . . does not equate to knowledge that his conduct infringes the right." Id. (citations omitted). "[I]t would be inappropriate

to hold government officials to a higher level of knowledge and understanding of the legal landscape than that displayed by judges whose everyday business it is to decipher the meaning of judicial opinions." Id. (quoting Denno v. Sch. Bd. of Volusia, Cnty., 218 F.3d 1267, 1274 (11th Cir. 2000)).

In the Fourth Amendment expectation of privacy context, obvious clarity is even more rare "because it is inherently fact-specific, thus not lending itself to clearly established law." Id. (citations omitted). Thus, given the Fifth Circuit's[11] opinion in Pierce, and the lack of fact specific case law regarding the issue here, the Court cannot conclude that the Individual Doctors violated clearly established law. The Individual Doctors are therefore entitled to qualified immunity.

### C. SUPERVISORY LIABILITY – DR. KEEL

Plaintiff does not allege that Dr. Keel personally participated in any specific constitutional violation. Instead, she argues "he was in a position of authority to take responsive action to stop the violations [and] . . . he knew about the violations . . . , yet he failed to act." (Am. Compl., at ¶ 228.) However, "[a] supervisor cannot be liable for the constitutional violation of his subordinate if the constitutional violation was

---

[11] Fifth Circuit opinions are not binding in this Court, "but opinions from other courts can suggest that reasonable jurists would not know that certain factual situations rise to the level of constitutional violations, and therefore reasonable officers would not either." Coffin, 642 F.3d at 1017 n.16.

not then clearly established." Dukes v. Deaton, 852 F.3d 1035, 1045-46 (11th Cir. 2017) (citing Keating v. City of Miami, 598 F.3d 753, 763 (11th Cir. 2010)). Because the Court determined the Individual Doctors did not violate clearly established law, Dr. Keel is also entitled to qualified immunity.

## IV. REMAINING CLAIMS

Plaintiff concedes several claims. First, Plaintiff concedes Dr. Keel, Dr. Moore, Dr. Meiler, and Dr. Arthur are not proper parties to her Americans with Disabilities Act ("ADA"), Title III claim in Count Eleven. (Doc. 35, at 24 n.4.) Thus, Defendants' motion is **GRANTED** as to Count Eleven against Dr. Keel, Dr. Moore, Dr. Meiler, and Dr. Arthur.

Additionally, Plaintiff concedes that the Board of Regents has sovereign immunity with regards to her libel and slander claims in Count Five and Count Six. (See id. at 24 n.5.) Thus, Defendants' Motion is **GRANTED** as to Counts Five and Six against the Board of Regents. Plaintiff also clarifies that she brings Counts Twelve, Thirteen, and Fourteen against only the Institutional Defendants.[12] (Id. at 24.) To the extent Plaintiff asserts claims against Dr. Keel, Dr. Moore, Dr. Meiler, and Dr.

---

[12] Plaintiff's Amended Complaint defines "Institutional Defendants" to include Augusta University, the Board of Regents, and Augusta University Health System. (Am. Compl., at ¶¶ 26-32.)

Arthur in Counts Twelve, Thirteen, and Fourteen, they are **DISMISSED**.

Further, Defendants argue the Individual Doctors and Dr. Keel are not proper parties to Count Nine and Ten of Plaintiff's Amended Complaint. Plaintiff does not address Defendants' argument in her response to Defendants' motion and her Amended Complaint fails to specify which Defendant she brings the claims against. However, Count Nine and Ten are claims under Title II of the ADA. "It is well established in this [C]ircuit that '[o]nly public entities are liable for violations of Title II of the ADA.'" Mazzola v. Davis, 776 F. App'x 607, 610 (11th Cir. 2019) (citing Edison v. Douberly, 604 F.3d 1307, 1308 (11th Cir. 2010)). Thus, to the extent Plaintiff asserts claims against Dr. Keel, Dr. Moore, Dr. Meiler, and Dr. Arthur in Counts Nine and Ten, they are **DISMISSED**.

Finally, Plaintiff argues that Dr. Keel, Dr. Moore, Dr. Meiler, and Dr. Arthur should not be dismissed from the case because she seeks declaratory and injunctive relief. (Doc. 35, at 21.) The Court need not address Plaintiff's argument at this time because there are remaining claims against Dr. Keel, Dr. Moore, Dr. Meiler, and Dr. Arthur. (See Am. Compl., at 34.)

## V. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendants' partial motion for judgment on the pleadings (Doc. 32) is **GRANTED**. Specifically, the following parties and claims are **DISMISSED**:

(1) Count Four is **DISMISSED** as to Dr. Meiler, Dr. Moore, Dr. Arthur, and Dr. Keel;

(2) To the extent Plaintiff asserts state tort claims, Counts Five and Six, against the Board of Regents, Plaintiff's claims are **DISMISSED**;

(3) Count Eight is **DISMISSED** as to Dr. Meiler, Dr. Moore, Dr. Arthur, and Dr. Keel;

(4) To the extent Plaintiff asserts ADA Title II claims, Counts Nine and Ten, against Dr. Meiler, Dr. Moore, Dr. Arthur, and Dr. Keel, Plaintiff's claims are **DISMISSED**;

(5) To the extent Plaintiff asserts ADA Title III claims, Count Eleven, against the Board of Regents, Dr. Meiler, Dr. Moore, Dr. Arthur, and Dr. Keel, Plaintiff's claims are **DISMISSED**;

(6) To the extent Plaintiff asserts claims under the Rehabilitation Act, Counts Twelve and Thirteen, against Dr. Meiler, Dr. Moore, Dr. Arthur, and Dr. Keel, Plaintiff's claims are **DISMISSED**.

(7) To the extent Plaintiff asserts a state breach of contract claim, Count Fourteen, against Dr. Meiler, Dr. Moore, Dr. Arthur, and Dr. Keel, Plaintiff's claims are **DISMISSED**.

**ORDER ENTERED** at Augusta, Georgia, this ___7th___ day of July, 2021.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA