**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| DR. LESLEY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No.: |
| v. | ) | 1:20-cv-00100 |
| | ) | |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY SYSTEM OF GEORGIA; | ) | |
| AU HEALTH SYSTEM, Inc.; | ) | |
| AU MEDICAL CENTER, Inc.; | ) | |
| DR. BROOKS KEEL, in his individual | ) | |
| capacity; | ) | |
| DR. PHILLIP COULE, in his individual | ) | |
| capacity; | ) | |
| Dr. STEFFEN Meiler, in his individual | ) | |
| capacity; | ) | |
| DR. MARY ARTHUR, in her individual | ) | |
| capacity; | ) | |
| and JOHN DOES,[1] | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF STATE DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

NOW COME Defendants Board of Regents of the University System of Georgia ("the

BOR"); Dr. Brooks Keel, in his individual capacity; Dr. Steffen Meiler, in his individual capacity;

and Dr. Mary Arthur, in her individual capacity (collectively "the Individual Doctors", collectively

with the BOR "State Defendants") and file this Brief in Support of their Motion for Summary

Judgment.

---

[1] Fictitious party pleading is not generally permitted in federal court. <u>Richardson v. Johnson</u>, 598 F.3d 734, 738 (11th Cir. 2010) (affirming the dismissal of claims against a defendant identified only as "John Doe"). Consequently, any claim asserted by Plaintiff against "John Does" should be dismissed. <u>Id.</u>; <u>Moulds v. Bullard</u>, 345 Fed. Appx. 387, 390 (11th Cir. 2009) (affirming the dismissal of "John Doe" defendants).

## I.    STATEMENT OF FACTS

### A.    The Parties

Beginning July 1, 2017, Plaintiff, Dr. Lesley Williams, was a resident in the Department of Anesthesiology and Perioperative Medicine ("the Department") at Augusta University.[2] (Doc. 23 at ¶ 25.) Dr. Steffen Meiler is the Chair of the Department, and Dr. Mary Arthur is the Director of the Department's residency program. (Doc. 23 at ¶ 37 and 41.) Dr. Walter Moore served as Senior Associate Dean for Graduate Medical Education at the Medical College of Georgia.[3] (Doc. 23 at ¶ 39.) Dr. Brooks Keel is the President of Augusta University. (Doc. 23 at ¶ 33.) At all relevant times, Drs. Keel, Moore, Meiler, and Arthur were employed by the BOR, d/b/a Augusta University. (Doc. 23 at ¶ 20; Doc. 26 at ¶ 20.)

AU Medical Center Inc. ("AUMC" or "the hospital") is a private, non-profit corporation that operates the hospital affiliated with the Medical College of Georgia. (Doc. 73, *passim*.) AU Health System, Inc. is the sole corporate member of AUMC. (Doc. 73 at p. 4 n.1.) Dr. Phillip Coule is AUMC's Chief Medical Officer. (Doc. 80, *passim*.) As Chief Medical Officer, Dr. Coule is responsible for oversight of patient safety issues at the hospital. Id.

### B.    Medical Residencies and Privileging for Residents

A medical residency occurs after a doctor graduates from medical school and involves in-depth training within a specific medical specialty. (Exh. A – Arthur Dec. at ¶ 3.) Residents learn "by actually providing medical care." (Exh. B – Coule Depo. at pp. 13-14.) Resident education is hands-on, and residents treat patients under the supervision of other, more experienced, physicians

---

[2]Augusta University and the Medical College of Georgia exist and operate as units of the BOR. O.C.G.A. § 20-3-1; McCafferty v. Medical College of Ga., 249 Ga. 62 (1982), overruled on other grounds by Self v. City of Atlanta, 259 Ga. 78 (1989).

[3] Dr. Moore passed away on May 25, 2021 and has been dismissed from the case. (Doc. 94.)

("attending physicians"). (Exh. A – Arthur Dec. at ¶ 4.) Anesthesiology residents practice under the supervision of attending physicians and are given increasing responsibility to get them to the point of being independently responsible for all aspects of patient care. (Exh. C – Meiler Depo. at p. 20.) During their training, anesthesiology residents rotate through a series of different subspecialties (for example: Pediatrics, Obstetrics, and the General Operating Room). (Exh. A – Arthur Dec. at ¶ 5.) Each rotation typically lasts four weeks. (Exh. A – Arthur Dec. at ¶ 6.) Residents are students first, but they are also employees who receive a salary. (Exh. A – Arthur Dec. at ¶ 7.) Residents at Augusta University are primarily trained at the hospital – AUMC. (Exh. D – Arthur Depo. at p. 20.)

Attending physicians are granted "clinical privileges" by the hospital that authorize them to treat patients at AUMC as members of the medical staff. (Exh. B – Coule Depo. at pp. 16-17; Exh. E – Bylaws at Coule MD 0230.[4]) Residents, including Plaintiff, are not members of the medical staff and do not have the same clinical privileges as attending physicians. (Exh. B – Coule Depo. at pp. 14 and 17.) They are considered "housestaff" and have limited housestaff privileges to train at AUMC, which may include providing supervised clinical services, without full clinical privileges and without being members of the medical staff. (Exh. B – Coule Depo. at pp. 17-18.) Residents cannot provide patient care without the supervision of an attending physician. (Exh. B – Coule Depo. at p. 14.) A resident whose housestaff privileges at AUMC are suspended cannot complete their residency at Augusta University. (Exh. D – Arthur Depo. at pp. 20-21.)

Anesthesiology is a particularly demanding specialty. It is a high-stress profession where the stress can be unpredictable. (Exh. A – Arthur Dec. at ¶ 8; Exh. F – Plaintiff Depo. Vol. 1 at p.

---

[4] Exh. E is a copy of the Bylaws of the Medical Staff of AUMC.

86.) Patients are sedated, the anesthesiologist is attending to them, and those patients depend on the anesthesiologist to respond to any emergencies that might arise. (Exh. A – Arthur Dec. at ¶ 9; Exh. F – Plaintiff Depo. Vol. 1 at p. 87.) Emergencies can arise suddenly and unpredictably, and a patient's status can go from normal to disastrous very quickly. (Exh. A – Arthur Dec. at ¶ 10; Exh. F – Plaintiff Depo. Vol. 1 at p. 87.) The profession requires attention to detail, concentration, and memory. (Exh. A – Arthur Dec. at ¶ 11; Exh. F – Plaintiff Depo. Vol. 1 at p. 87.) Anesthesiology residents must be able to deal with life-threatening situations independently and rapidly. (Exh. A – Arthur Dec. at ¶ 12.) They must rapidly and independently acquire and process information in order to assure individual responsibility for all aspects of anesthesiology care. (Exh. A – Arthur Dec. at ¶ 13.)

### C.    March 2018 – Plaintiff Is Injured and Unable to Perform Her Duties

On March 15, 2018, Plaintiff was sexually assaulted in her home.[5] (Doc. 23 at ¶ 45.) She was hit in the head several times, she lost consciousness, and she was "probably" concussed. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 55-56.) She was understandably absent from the residency program for several days after the assault and returned on March 20, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 64-65.)

When Plaintiff returned to the residency program, she was "absolutely not" prepared to return to full duty, and she asked her supervisors not to put her to work in the operating room. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 66-67.) On March 26, 2018, she met with Drs. Meiler and Arthur (and other representatives of the Department) to discuss her fitness for duty. (Exh. F – Plaintiff Depo. Vol. 1 at p. 66 and Depo. Exh. AU-6.) She was having trouble sleeping, moments

---

[5] Plaintiff does not contend that any Defendant was in any way responsible for the assault. (Exh. F – Plaintiff Depo. Vol. 1 at p. 55.)

of forgetfulness, trouble concentrating, and difficulty paying attention to detail. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 68-69 and 72.) Drs. Meiler and Arthur were concerned that these problems would affect Plaintiff's ability to safely care for patients. (Exh. A – Arthur Dec. at ¶ 15; Exh. G – Meiler Dec. at ¶ 4.) Plaintiff agreed to provide them with information from her therapist regarding her ability to work. (Exh. A – Arthur Dec. at ¶ 16; Exh. F – Plaintiff Depo. Vol. 1 at pp. 70-71; Exh. G – Meiler Dec. at ¶ 5.)

Plaintiff's therapist was Dr. Amy House, Ph.D. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 59-60.) On March 27, 2018, Dr. House wrote a letter to the residency program indicating that Plaintiff was experiencing "reactions that make sustained attention and concentration difficult." (Exh. A – Arthur Dec. at ¶ 17 and Dec. Exh. 1; Exh. H – House Depo. at p. 16 and Depo. Exh. D-1.) The letter went on to say that "because of [Plaintiff's] current difficulties with sustained attention and concentration, it is not advisable that she engage in patient care at the current time." Id. Dr. House recommended that the Department accommodate Plaintiff, "perhaps with some elective rotations out of the usual sequence . . .." Id. The Department accommodated this request by placing Plaintiff on a "research rotation" beginning April 1, 2018. (Exh. A – Arthur Dec. at ¶ 18.) During the research rotation, Plaintiff would do research for academic credit without treating patients. (Exh. A – Arthur Dec. at ¶ 19.)

**D.      April 2018 – Dr. House Recommends an Independent Evaluation of Plaintiff**

The research rotation began on April 1, 2018 and ran through the month. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 75-76 and Depo. Exh. AU-8.) As April drew to a close, the Department sought an update about Plaintiff's ability to return to work. (Exh. A – Arthur Dec. at ¶ 20.) On April 20, 2018, Dr. House sent an email to Drs. Meiler and Arthur indicating that Plaintiff's "current self-assessment [was] that she can engage in supervised patient care." (Exh. A – Arthur Dec. at ¶ 21

and Dec. Exh. 2; Exh. H – House Depo. at p. 19 and Depo. Exh. D-2.) Dr. House believed that this self-assessment was "reasonable and likely accurate," but she had not formally assessed Plaintiff's cognitive capabilities at that point. Id. Dr. House went on to say that evaluating Plaintiff's ability to return to full duty was "not my role as her treating provider." Id. Instead, she recommended that the Department "request an independent objective evaluation of [Plaintiff's] ability to function effectively at her job, especially as it relates to attention and concentration." Id.

Plaintiff met with Dr. Meiler on April 20, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 87-88.) She recorded this meeting. (Exh. F – Plaintiff Depo. Vol. 1 at p. 88.) During the meeting, Plaintiff told Dr. Meiler, "Right now, I know my brain is still screwed up," and indicated she was having memory problems. (Exh. I at 10:50.[6]) She was not comfortable making split-second, life-or-death decisions. (Exh. I at 11:30.) She was not prepared to work in the cold, in the dark, or with a Black man as a patient.[7] (Exh. I at 05:25.) Being exposed to those triggers caused her to experience "a reaction of high anxiety" akin to a panic attack. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 61-62.) She was scheduled to begin a rotation in Obstetrics ("OB") in May 2018. When Dr. Meiler asked her if she felt she could do that, Plaintiff responded, "for the most part." (Exh. I at 04:25.) Dr. Meiler indicated that he was concerned because he did not know Plaintiff's ability to

---

[6] Exh. I is a recording made by Plaintiff of her meeting with Dr. Meiler on April 20, 2018. All citations are to the run time of the recording where the dialog described begins.

[7] Plaintiff's assailant was a Black man. (Exh. F – Plaintiff Depo. Vol. 1 at p. 55.) Many of the patients that Plaintiff would be required to treat were Black men. (Exh. A – Arthur Dec. at ¶ 25.) Operating rooms are kept cool for infection control purposes and may be dimly lit, particularly when minimally invasive, video assisted procedures are being performed. (Exh. A – Arthur Dec. at ¶ 26.) Plaintiff's inability or unwillingness to work in the cold, in the dark, or with Black men as patients thus significantly limited her ability to perform the duties of an anesthesiology resident. (Exh. A – Arthur Dec. at ¶ 27.)

perform her duties, said he would talk to Dr. Arthur, and suggested that "there may be requirements you will have to abide by." (Exh. I at 21:55 and 24:15.)

As suggested by Dr. House, Drs. Meiler and Arthur decided to request an independent, objective evaluation of Plaintiff's ability to perform her duties as a resident. (Exh. A – Arthur Dec. at ¶ 21; Exh. G – Meiler Dec. at ¶ 6.) Their decision was based on Dr. House's letters and on Plaintiff's own admission that she was having trouble with focus, memory, and sleeping. (Exh. A – Arthur Dec. at ¶ 23; Exh. G – Meiler Dec. at ¶ 7.) Those issues gave them concerns about Plaintiff's ability to safety care for patients, which is why they wanted to evaluate her ability to perform her duties an anesthesiology resident. (Exh. A – Arthur Dec. at ¶ 24; Exh. G – Meiler Dec. at ¶ 8.) They wanted an evaluation to understand whether Plaintiff was experiencing "deficits that could interfere with her performance as a resident anesthesiologist taking care of patients in our various care areas." (Exh. C – Meiler Depo. at pp. 81-82.) Accordingly, Dr. Meiler met with Plaintiff on April 25, 2018 and told her he wanted a third party to evaluate her ability to work before she started seeing patients again. (Exh. F – Plaintiff Depo. Vol. 1 at p. 95; Exh. G – Meiler Dec. at ¶ 9.) Plaintiff responded, "That's fine." (Exh. F – Plaintiff Depo. Vol. 1 at p. 95.)

With Dr. House's assistance, Drs. Meiler and Arthur chose Dr. Jeremy Hertza, the Fitness for Duty Program Coordinator for a company called LifeGuard, to evaluate Plaintiff. (Exh. A – Arthur Dec. at ¶ 28; Exh. F – Plaintiff Depo. Vol. 1 at pp. 96-98 and Depo. Exh. AU-12; Exh. G – Meiler Dec. at ¶ 10; Exh. J – Hertza Depo. at p. 28.) Dr. Hertza testified that Drs. Meiler and Arthur were interested in evaluating Plaintiff's abilities to perform her duties as an anesthesiology resident, and he recalled they had concerns about patient safety. (Exh. J – Hertza Depo. at p. 23.) LifeGuard's standard procedure is to perform a functional capacity evaluation and a neuropsychiatric evaluation. (Exh. J – Hertza Depo. at pp. 24-25.) These examinations would

demonstrate Plaintiff's ability to provide patient care and perform the duties of an anesthesiology resident. (Exh. J – Hertza Depo. at p. 26.)

### E.    May and June 2018 – Plaintiff, Who Had Not Been Cleared for Duty, Treats Patients

Meanwhile, Plaintiff was on vacation from May 4 to May 14, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 99 and 102.) When Plaintiff returned from vacation, Dr. Arthur met with her and explained that she would be on "observership" until she was cleared to treat patients.[8] (Exh. A – Arthur Dec. at ¶ 29.) While on observership, Plaintiff was expected to check in daily, read up on the cases scheduled that day, and stay in the operating room as an observer. (Exh. A – Arthur Dec. at ¶ 30.) She would not be permitted to provide patient care, but she would be able to stay engaged with the practice of anesthesiology and in contact with the other residents and the attending physicians in the Department. (Exh. A – Arthur Dec. at ¶ 31.) Plaintiff was paid during the observership. (Exh. A – Arthur Dec. at ¶ 32.)

Plaintiff began a rotation in Obstetrics on May 14, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 104-05.) The Department was still waiting for the results of the LifeGuard evaluation, and Dr. Meiler had told Plaintiff on April 25, 2018 that he wanted a third party to evaluate her ability to work before she started seeing patients again. (Exh. F – Plaintiff Depo. Vol. 1 at p. 95; Exh. G – Meiler Dec. at ¶ 9.) Dr. Arthur had told Plaintiff she would be on observership until she was cleared to treat patients. (Exh. A – Arthur Dec. at ¶ 29.) Nonetheless, Plaintiff treated patients in Obstetrics. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 109-110.) Plaintiff continued to treat patients after beginning a Pediatrics rotation in June 2018. (Exh. A – Arthur Dec. at ¶ 34.) She did so without being released to duty. (Exh. A – Arthur Dec. at ¶ 35.)

---

[8] Plaintiff testified that she does not remember this meeting. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 102-03.)

Residents are required to log the cases they perform in a database maintained by the Accreditation Council for Graduate Medical Education ("ACGME").[9] (Exh. A – Arthur Dec. at ¶ 36.) This allows their supervisors to monitor their progress and make sure they satisfy the minimum requirements for graduation. (Exh. A – Arthur Dec. at ¶ 37.) The residency program has access to the database and is able to review the information logged by residents. (Exh. A – Arthur Dec. at ¶ 38.) In early June 2018, Karen McDaniel (the Department's Residency Program Coordinator), realized that Plaintiff was logging cases in the database. (Exh. K – McDaniel Depo. at pp. 14-15.) This was incorrect, because Plaintiff was on observership and had not been cleared to treat patients. (Exh. A – Arthur Dec. at ¶ 39; Exh. K – McDaniel Depo. at pp. 15-16.) Ms. McDaniel brought the issue to Dr. Arthur's attention. (Exh. A – Arthur Dec. at ¶ 40; Exh. K – McDaniel Depo. at p. 14.) Drs. Meiler and Arthur met with Plaintiff on June 8, 2018 and reiterated that she would remain on observership and not treat patients until cleared to do so. (Exh. A – Arthur Dec. at ¶ 41; Exh. G – Meiler Dec. at ¶ 11.) Because Plaintiff was on observership, Dr. Arthur directed her to delete the cases she had logged with ACGME in May and June 2018. (Exh. A – Arthur Dec. at ¶ 42.) Plaintiff should not take academic credit for those cases. (Exh. A – Arthur Dec. at ¶ 43.)

### F.    Late June 2018 – Plaintiff's Unprofessional Behavior in Pediatrics

On Monday, June 18, 2018, Dr. Arthur received an email from Dr. Heather Byrd, an attending physician in Pediatrics, reporting that Plaintiff had "disappeared" that day and the previous Friday. (Exh. A – Arthur Dec. at ¶ 44 and Dec. Exh. 3.) Dr. Ellen Basile, another attending physician in Pediatrics, reported to Dr. Arthur that Plaintiff had not been in the operating room the

---

[9] ACGME is an accrediting organization that sets standards for training residents to become qualified and safe practitioners. (Exh. C – Meiler Depo. at p. 24.)

previous Thursday, either. (Exh. A – Arthur Dec. at ¶ 45 and Dec. Exh. 4.) Then, on Tuesday, June 19, 2018, Plaintiff unexpectedly lost consciousness in the operating room. (Exh. A – Arthur Dec. at ¶ 46; Exh. F – Plaintiff Depo. Vol. 1. at pp. 147-48.) She was on observer status, standing against the wall while a medical procedure was being performed on a pediatric patient. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 147-48.) She felt light-headed and passed out. (Exh. F – Plaintiff Depo. Vol. 1 at p. 148.) She was taken to the emergency room where she was treated by defendant Dr. Phillip Coule. (Exh. B – Coule Depo. at pp. 34-35.)

Anesthesiology is a profession with a high risk for substance abuse disorder, and anesthesiology residents in particular are at high risk because of their access to controlled substances and the stress of the profession. (Exh. C – Meiler Depo. at pp. 44-45.) Drs. Meiler and Arthur believed it was necessary to rule out substance abuse as the reason for Plaintiff's unexplained loss of consciousness.[10] (Exh. A – Arthur Dec. at ¶ 47; Exh. G – Meiler Dec. at ¶ 12.) After conferring with human resources, the legal department, and the Graduate Medical Education office, they decided to require Plaintiff to be drug tested. (Exh. A – Arthur Dec. at ¶ 48; Exh. G – Meiler Dec. at ¶ 13.)

On June 22, 2018, Drs. Meiler, Arthur, and Associate Program Director Dr. Ankit Jain met with Plaintiff to discuss her being drug tested. (Exh. A – Arthur Dec. at ¶ 50; Exh. G – Meiler Dec. at ¶ 15.) Plaintiff recorded this meeting. (Exh. F – Plaintiff Depo. Vol. 1 at p. 156.) Dr. Jain began the meeting by explaining why Plaintiff was being drug tested, and he handed her a form to review

---

[10] A previous incident in which Plaintiff had gone to the emergency room in late 2017 complaining of shortness of breath, lightheadedness, and a "heart flutter" also factored into the decision to drug test her. (Exh. A – Arthur Dec. at ¶ 49; Exh. G – Meiler Dec. at ¶ 14.)

and sign. (Exh. L at 00:45.[11]) Plaintiff's response was profane, disrespectful, and blamed her loss of consciousness on her use of alcohol:

> To start with, this is bullshit. Straight up. I'm on medication that lowers my blood pressure. I spent Friday night drinking at the roast. I spent Saturday night drinking at graduation. I spent Sunday drinking at the lake. So they gave me three liters of fluid and fixed me.

(Exh. L at 02:30.) After some additional discussion, Plaintiff stated, "I will take your drug test, just so y'all can shove it up your ass."[12] (Exh. L at 04:50.)

When Plaintiff said "bullshit" and "shove it up your ass" about the drug test, she was talking to Dr. Meiler, the Chair of the Department. (Exh. M – Plaintiff Depo. Vol. 2 at p. 84.) Dr. Meiler found Plaintiff's actions to be unprofessional and disrespectful, and he decided to discipline her for them. (Exh. G – Meiler Dec. at ¶ 17.) He decided the most appropriate time to discipline Plaintiff would be when she returned to duty. (Exh. G – Meiler Dec. at ¶ 18.)

### G.    July 2018 – LifeGuard Issues Its Report

On July 10, 2018, LifeGuard issued its final report of the functional capacity evaluation and neuropsychological evaluation of Plaintiff. (Exh. J – Hertza Depo. at p. 27 and Depo. Exh. D-2.) The report fully and completely detailed the results of those evaluations. (Exh. J – Hertza Depo. at pp. 28-29.) The purpose of the report was to explain Plaintiff's ability to return to work as a resident. (Exh. J – Hertza Depo. at p. 32.) The functional capacity evaluation evaluated Plaintiff's physical ability to perform her duties as a resident and found that she was able to meet the physical demands of the residency. (Exh. J – Hertza Depo. at pp. 54-55.) However, the neuropsychological

---

[11] Exh. L is a recording made by Plaintiff of the meeting of June 22, 2018. All citations are to the run time of the recording where the dialog described begins.

[12] Plaintiff received the results of the drug test in late July, 2018; the results were negative. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 164-65.)

evaluations that Dr. Hertza performed raised concerns about Plaintiff's abilities. (Exh. J – Hertza Depo. at p. 55.)

A neuropsychological evaluation is a process by which a doctor looks at a person's brain function using standardized tests. (Exh. J – Hertza Depo. at p. 29.) Dr. Hertza conducted his neuropsychological evaluation of Plaintiff in order to determine if there were any cognitive or psychiatric/psychological factors that would impact her ability to successfully manage her responsibilities at the medical school. (Exh. J – Hertza Depo. at p. 29.) During the examination, Plaintiff reported to Dr. Hertza that she was experiencing symptoms including difficulty with increased startle responses, fear in certain situations, hyper-vigilance, difficulty being alone, triggers of cold and darkness, variable ability to handle stress, and increased emotionality. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 172-73; Exh. J – Hertza Depo. at p. 35.) She reported experiencing a rapid onset of cognitive difficulties. (Exh. J – Hertza Depo. at p. 40.) She was slowly improving, but was not back to baseline. Id. She reported changes in her ability to pay attention to things and her mental organization. Id. Those changes were supported by objective tests Dr. Hertza performed. Id.

Dr. Hertza's testing showed that Plaintiff functioned in the high average range intellectually, but she was having difficulty with attention and processing speed and would take more time to complete tasks. (Exh. J – Hertza Depo. at p. 36.) Her ability to sustain focus during prolonged activities was with difficulty. (Exh. J – Hertza Depo. at p. 42.) The tests also showed that Plaintiff's weaknesses and variability would get worse in the event that she was subjected to high stress. (Exh. J – Hertza Depo. at pp. 36-37.) Plaintiff's attention and processing speed issues would get worse under high-stress situations – for example, if a patient had a sudden emergency. (Exh. J – Hertza Depo. at p. 56.) Dr. Hertza's report stated, "As anesthesiology consists of almost

constant stress in high pressure environments typically involving high risk patient safety situations, extreme caution should be used when reintegrating [Plaintiff]." (Exh. J – Hertza Depo. at p. 37.)

        LifeGuard and Dr. Hertza included seven "recommendations" in the report:

1.     [Plaintiff] should be provided with extra time to complete tasks to help compensate for her attention and processing speed issues;

2.     [Plaintiff] should be provided with frequent breaks to help compensate for her mild attentional issues;

3.     [Plaintiff] should slowly transition into a high stress work environment; any work in a high stress environment should begin in smaller blocks of time (half days) and slowly increase (it may be prudent to have [Plaintiff] participate in a simulation to evaluate how she copes with various stress scenarios prior to her return to practice);

4.     [Plaintiff] should avoid serial days on call with little sleep/high stress;

5.     [Plaintiff] should be provided a contact within her company to whom she can reach out if stress and/or PTSD symptoms arise;

6.     [Plaintiff] should have frequent meetings with supervisors to ensure no risk to patient safety arises; and

7.     [Plaintiff] should continue with individual therapy.

(Exh. J – Hertza Depo. at p. 55 and Depo. Exh. D-2 at p. 7.) It was Dr. Hertza's opinion that these recommendations were necessary for Plaintiff to function within her work environment in the Department. (Exh. J – Hertza Depo. at p. 54.) Plaintiff testified that she would not have gone back to work in July 2018 without having all seven recommendations in place, because "I was not putting myself or my patients in jeopardy." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 177-78.)

        Dr. Hertza met with Drs. Moore, Meiler, and Arthur on July 26, 2018 to discuss the results of the evaluations. (Exh. G – Meiler Dec. at ¶ 19.) At the meeting, Dr. Hertza reviewed the results of his evaluations, including Plaintiff's issues with focusing and processing speed that the evaluations had revealed. (Exh. J – Hertza Depo. at p. 61.) He also discussed the recommendations

contained in his report. (Exh. J – Hertza Depo. at p. 60-61.) In particular, because of the attention and processing speed issues Plaintiff was experiencing, Dr. Hertza recommended Plaintiff be provided with extra time to complete tasks, including the patient care tasks that an anesthesiologist would perform on a day-to-day basis. (Exh. J – Hertza Depo. at pp. 55-56.) In order to compensate for Plaintiff's attentional issues, Dr. Hertza recommended that she be provided with frequent breaks on an as-needed basis. (Exh. J – Hertza Depo. at p. 56.)

Dr. Hertza's report also indicated, "it may be prudent to have [Plaintiff] participate in a simulation lab to evaluate how she copes with various stress scenarios prior to her return to practice." (Exh. J – Hertza Depo. at p. 57.) The simulation would expose Plaintiff to various scenarios that might occur in the practice of anesthesiology in a controlled environment in order to assess her ability to perform the duties of an anesthesiology resident. (Exh. A – Arthur Dec. at ¶ 52; Exh. J – Hertza Depo. at pp. 62 and 67.) At his deposition, Dr. Hertza explained why he recommended the simulation:

> I am not an anesthesiologist. So what I wanted to make sure . . . is that we were very diligent in looking at all the potential risks to patient care prior to really clearing her for anesthesiology because it's a very high risk, high pressure situation. And you can sit there in my office and you can go through five hours' worth of testing, which is pretty intense, but it's not sitting there in an anesthesia-like environment. So we can predict some of the challenges that she would have and we're very accurate in that, but ultimately when we're talking about people's lives we really want to make sure that we're spot on and we're comfortable with our conclusions. . . . I think it's appropriate to have an anesthesiologist make sure that an anesthesiologist can do their job and that was the idea behind that evaluation.

(Exh. J – Hertza Depo. at pp. 57-58.) Ultimately, Dr. Hertza offered the Department two options: (1) slowly integrate Plaintiff back into the residency program according to the seven recommendations contained in the report; or (2) allow Plaintiff additional time to continue with her therapy and then clear her for duty through the simulation. (Exh. J – Hertza Depo. at pp. 67-69.)

**H.      August 2018 – The Department Cannot Safely Provide All Seven of Dr. Hertza's Recommendations**

The Department could not feasibly provide at least two of Dr. Hertza's seven recommendations.[13] (Exh. A – Arthur Dec. at ¶ 54; Exh. G – Meiler Dec. at ¶ 21.) First, the Department could not allow Plaintiff extra time to complete tasks. (Exh. G – Meiler Dec. at ¶ 23.) As a resident, Plaintiff would be required to respond immediately to sudden and unexpected emergencies. (Exh. G – Meiler Dec. at ¶ 24.) There was simply no way to give her extra time to respond in an emergency situation when a patient's life could be at risk. (Exh. G – Meiler Dec. at ¶ 25.) Second, the Department was not able to allow Plaintiff to take frequent breaks on an as-needed basis. (Exh. G – Meiler Dec. at ¶ 26.) In the Department, one attending physician typically supervises two residents at a time. (Exh. G – Meiler Dec. at ¶ 27.) Each of those residents works in a different room, and the attending physician moves between them as necessary. (Exh. G – Meiler Dec. at ¶ 28.) The Department is short-staffed and very busy. (Exh. G – Meiler Dec. at ¶ 29.) Patients under anesthesia cannot be left unattended safely, and residents sometimes have to forgo even regularly-scheduled breaks in order to provide appropriate patient care. (Exh. G – Meiler Dec. at ¶ 30.) Thus, Plaintiff could not safely take breaks as needed. (Exh. G – Meiler Dec. at ¶ 31.)

Because the Department could not provide all seven of Dr. Hertza's recommendations, the decision was made to go with his other option – the simulation. (Exh. G – Meiler Dec. at ¶ 33.) Drs. Moore, Meiler, and Arthur met with Plaintiff on August 6, 2018. (Exh. G – Meiler Dec. at ¶ 34.) Also present was Brittany Bing from Rape Crisis Services. (Exh. G – Meiler Dec. at ¶ 35.)

---

[13] Dr. Meiler believed it would be "very difficult" for the Department to slowly transition Plaintiff back into a high stress environment. (Exh. C – Meiler Depo. at p. 91.) Dr. Arthur believed the Department could accommodate a slow transition. (Exh. D – Arthur Depo. at pp. 68-69.)

During the meeting, Drs. Meiler and Arthur explained that the Department could not provide the extra time to complete tasks and frequent breaks recommended by Dr. Hertza. (Exh. A – Arthur Dec. at ¶ 55; Exh. G – Meiler Dec. at ¶ 36.) They told Plaintiff that they wanted her to take the simulation before returning to duty. (Exh. A – Arthur Dec. at ¶ 56; Exh. G – Meiler Dec. at ¶ 37.) Plaintiff did not want to take the simulation. After some discussion, Ms. Bing suggested that all parties meet with Dr. Hertza to discuss the matter. (Exh. G – Meiler Dec. at ¶ 38.)

As suggested by Ms. Bing, Drs. Moore, Meiler, Arthur, and Jain met with Plaintiff, Ms. Bing, and Drs. House and Hertza (who attended via telephone) on August 9, 2018. (Exh. G – Meiler Dec. at ¶ 39.) Plaintiff recorded this meeting. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 6-7.) At the meeting, Dr. Hertza explained that Plaintiff's processing speed was "highly variable," particularly when under pressure. (Exh. J – Hertza Depo. at p. 65; Exh. N at 00:20.[14]) She was triggered by being in a cold room, in the dark, or around individuals who reminded her of her assailant. (Exh. J – Hertza Depo. at p. 65; Exh. N at 01:30.) Dr. Hertza was not sure if exposure to those triggers would potentially put a patient at risk, and he told the Department, "That's the problem." (Exh. J – Hertza Depo. at p. 66; Exh. N at 02:25.) He went over the options he had previously discussed with the Department: provide Plaintiff a "very guided, very slow" return to the residency program in accordance with the seven recommendations in his report or evaluate her through the simulation. (Exh. J – Hertza Depo. at p. 67; Exh. N at 02:55.)

Dr. House identified an error in Dr. Hertza's report – the report indicated that Plaintiff's memory was mildly to moderately impaired when it was actually in the high average range. (Exh. N at 07:30.) At his deposition, Dr. Hertza testified that this error did not change any of his

---

[14] Exh. N is a recording made by Plaintiff of the meeting of August 9, 2018. All citations are to the run time of the recording where the dialog described begins.

recommendations. (Exh. J – Hertza Depo. at pp. 71-72.) Dr. House then asked Dr. Hertza to explain how Plaintiff's variable processing speed might affect her functioning. (Exh. N at 08:40.) He responded that the data suggested Plaintiff could function at a very high level, but may not do so consistently. (Exh. J – Hertza Depo. at p. 72; Exh. N at 09:30.) His concern was that, under pressure, there were times when Plaintiff would be "spot on," but at other times, she would "not be responding as fast as she needs to in a crisis." (Exh. J – Hertza Depo. at pp. 72-73; Exh. N at 11:10.) Dr. House opined that Plaintiff's PTSD symptoms had become "sub-clinical" and were no longer having a "major impact" on her. (Exh. N at 14:25.) Dr. Hertza responded, "So the question would be . . . if it's not impacting day-to-day functioning, it may or may not be indicative of how she's going to handle a really intense situation in the [operating room]." (Exh. J– Hertza Depo.at p. 74; Exh. N at 15:20.)

Ultimately, it was decided that Plaintiff would have to complete the simulation before she could return to duty. (Exh. A – Arthur Dec. at ¶ 56; Exh. G – Meiler Dec. at ¶ 40.) It took some time to schedule the simulation, and Plaintiff remained on paid leave during this time. (Exh. G – Meiler Dec. at ¶ 41.)

## I.    September 2018 – Plaintiff's Attorney Contacts the Department and Plaintiff Complains to ACGME

On September 14, 2018, attorney Mike Brown wrote a letter to Drs. Moore, Meiler, and Arthur on Plaintiff's behalf. (Exh. C – Meiler Depo. at pp. 77-78 and Depo. Exh. P-17.) In the letter, Mr. Brown indicated, "While my client will go . . . for the simulation, we request that you reconsider this alternative. [Plaintiff] requests that she be placed directly into the program with the accommodations suggested by Dr. Hertza." Id. As noted, above, the Department could not provide all seven accommodations recommended by Dr. Hertza, so Plaintiff was required to complete the simulation.

On September 26, 2018, Plaintiff emailed ACGME, because "I wanted my department to stop with all the crap they were putting me through." (Exh. M – Plaintiff Depo. Vol. 2 at pp. 10-11 and Depo. Exh. AU-39.) ACGME's response indicated that they had spoken to Dr. Moore about the issues raised in the email. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 10-11 and Depo. Exh. AU-39.) Plaintiff was not part of any conversations between ACGME and Dr. Moore. (Exh. M – Plaintiff Depo. Vol. 2 at p. 12.)

### J.    October 2018 – Plaintiff and Dr. House Complete ADA Accommodation Forms

On October 1, 2018, Plaintiff sent an email to ADA Coordinator Antoinette Lewis. (Exh. F – Plaintiff Depo. Vol. 1 at p. 210; Exh. M – Plaintiff Depo. Vol. 2 at p. 10 and Depo. Exh. AU-38.) In response, Ms. Lewis obtained the essential functions Plaintiff's position from Dr. Arthur and sent Plaintiff an ADA accommodation request form to complete. (Exh. O – Lewis Depo. at pp. 32-33 and Depo. Exh. 132.) Plaintiff initially completed the form herself and submitted it to Ms. Lewis. (Exh. F – Plaintiff Depo. Vol. 1 at p. 215.) Ms. Lewis told Plaintiff to have Dr. House complete the form instead. (Exh. O – Lewis Depo. at p. 65.) Dr. House then completed and signed the relevant pages of the form.[15] (Exh. F – Plaintiff Depo. Vol. 1 at pp. 214 and Depo. Exh. AU-25; Exh. H – House Depo. at pp. 28-29 and 31 and Depo. Exh. D-5.) Dr. House indicated on the form that she was treating Plaintiff for post-traumatic stress, and she checked a box indicating that the impairment did not affect Plaintiff's ability to perform the essential functions of her job. (Exh. H – House Depo. at pp. 31-32 and Depo. Exh. D-5.) However, Dr. House went on to recommend accommodations for Plaintiff. (Exh. H – House Depo. at p. 34 and Depo. Exh. D-5.) Dr. House's

---

[15] The completed form is attached to Volume 1 of Plaintiff's Deposition as Exhibit AU-25. On that exhibit, pages Bates-stamped BOR 2810 and 2811 were completed by Plaintiff, and pages Bates-stamped BOR 2812 through 2814 were completed by Dr. House. (Exh. F – Plaintiff Depo. Vol. 1. at pp. 215 and 218; Exh. H – House Depo. at pp. 32, 34, and 60.)

recommended accommodations were essentially the same as Dr. Hertza's seven recommendations. (Exh. H – House Depo. at pp. 35-36 and Depo. Exh. D-5.)

Ms. Lewis also put Plaintiff in touch with Director of Employment Equity Glenn Powell, because she believed some of the issues in Plaintiff's email raised EEO issues under Title VII. (Exh. O – Lewis Depo. at p. 26-27.) Mr. Powell contacted Plaintiff via email on October 15, 2018 and spoke with her twice about her complaints. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 8-9.)

Meanwhile, Ms. Lewis spoke with Plaintiff, who stated that the only accommodation she believed she needed was a break every two to three hours. (Exh. O – Lewis Depo. at p. 43.) Ms. Lewis eventually sent a letter to Dr. Arthur, dated November 12, 2018, stating, "when [Plaintiff] returns to work, a 10-15 minute break is recommended every 2-3 hours . . ." (Exh. O – Lewis. Depo. at p. 79 and Depo. Exh. P-131.)

### K.    November and December 2018 – Plaintiff Returns to Duty

Plaintiff was returned to the residency program on November 14, 2018 – two days after Ms. Lewis' letter to Dr. Arthur. (Exh. A – Arthur Dec. at ¶ 58; Exh. F – Plaintiff Depo. Vol. 1 at pp. 222-23.) She was assigned another one-month research rotation, for which she would receive academic credit. (Exh. A – Arthur Dec. at ¶ 59; Exh. F – Plaintiff Depo. Vol. 1 at p. 223.) Plaintiff testified that the only accommodation she required at the time was a "slow integration" back into the residency program. (Exh. F – Plaintiff Depo. Vol. 1 at p. 224.) She received that accommodation. (Exh. F – Plaintiff Depo. Vol. 1 at p. 225.)

When Plaintiff returned to the residency program on November 14, 2018, she received a disciplinary warning for unprofessional behavior based on her conduct when she was told to take a drug test on June 22, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at p. 225 and Depo. Exh. AU-27.)

As noted above, Dr. Meiler had previously decided to discipline Plaintiff for the event when she returned to duty. (Exh. G – Meiler Dec. at ¶ 18.) That time had come.

LifeGuard issued its Final Report regarding the Simulation on December 10, 2018. (Exh. A – Arthur Dec. at ¶ 60; Exh. F – Plaintiff Depo. Vol. 1 at p. 228 and Depo. Exh. AU-28.) This report recommended:

> [A]fter a brief period of close observation and appropriate mentoring [Plaintiff] should be given the opportunity to proceed with her anesthesia training at her current level without the need to keep her away from high acuity/high stress situations and without the need for breaks over and above what is normally given at her institution.

(Exh. F – Plaintiff Depo. Vol. 1 at p. 228 and Depo. Exh. AU-28.) Accordingly, the Department returned Plaintiff to clinical duties beginning December 17, 2018. (Exh. A – Arthur Dec. at ¶ 61; Exh. F – Plaintiff Depo. Vol. 1 at p. 231.) She was slowly integrated back into the residency program, as the simulation report recommended. (Exh. A – Arthur Dec. at ¶ 62; Exh. F – Plaintiff Depo. Vol. 1 at p. 231.) Plaintiff accepted that process. (Exh. F – Plaintiff Depo. Vol. 1. at p. 233.)

### L.    February 2019 – Plaintiff Improperly Extubated a Patient, Cheated on a Standardized Test, and Abandoned Her Call

Plaintiff tended to her duties without incident until February 12, 2019. On that date, She made a serious mistake while treating a patient under the care of attending physician Panthea Taghizedeh, M.D. (Exh. A – Arthur Dec. at ¶ 63 and Dec. Exh. 6; Exh. M – Plaintiff Depo. Vol. 2 at p. 8.) According to Dr. Taghizedeh, Plaintiff extubated the patient without a pulse oximeter. (Exh. A – Arthur Dec. at ¶ 63 and Dec. Exh. 6.) According to Plaintiff, the patient "kicked off her pulse ox," but it had been put back on "by neuro" when Plaintiff extubated her. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 244 and 247.) Plaintiff also improperly extubated the patient while the patient was still on the ventilator. (Exh. A – Arthur Dec. at ¶ 63 and Dec. Exh. 6; Exh. F – Plaintiff Depo. Vol. 1 at pp. 243-44 and 246.) In Plaintiff's words, "When I actually extubated her, [the patient]

was still on the little bit of assist on the breathing." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 243-44.) Plaintiff concedes that she should have removed the patient from pressure support before extubating her. (Exh. F – Plaintiff Depo. Vol. 1 at p. 246.) The patient experienced a very quick and critical decline, and multiple other attending physicians had to be called to resuscitate and rescue the patient. (Exh. A – Arthur Dec. at ¶ 63 and Dec. Exh. 6; Exh. F – Plaintiff Depo. Vol. 1 at pp. 245.)

Then, on February 23, 2019, Plaintiff was caught cheating on a standardized test called the In-Training Examination ("ITE"). (Exh. A – Arthur Dec. at ¶ 64; Exh. F – Plaintiff Depo. Vol. 1. at p. 257.) The ITE is a standardized test created and graded by the American Board of Anesthesiology and is administered annually across the country. (Exh. A – Arthur Dec. at ¶ 65.) The test is taken on a computer, and it is structured so that test takers can review and change their answers if they want to. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 258-59.) Plaintiff signed a form prior to taking the ITE that forbade her from bringing "books, papers, or memoranda of any kind to the examination site." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 259-60 and Depo. Exh. AU-32.) The form also indicated that Plaintiff must not "in any way provide or receive unauthorized information about the content of the examination while it is in progress." Id. A proctor is present during the ITE "to make sure that no one has notes" during the examination. (Exh. K – McDaniel Depo. at p. 38.)

The ITE is 200 questions long. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 258-59.) Plaintiff had completed 100 questions on the test when she left the test room and went to a breakroom next door. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 264-66.) Her study guide was there on a chair. (Exh. F – Plaintiff Depo. Vol. 1 at p. 265-66.) There had been two questions on the previous year's test about a cardiology matter called "TEE pictures." (Exh. F – Plaintiff Depo. Vol. 1 at p. 267.)

Plaintiff had not done a cardiology rotation, and she wanted to "refresh her knowledge" about TEE

pictures. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 267-69.) She began flipping through her study

guide looking for the section on cardiology. (Exh. F – Plaintiff Depo. Vol. 1 at p. 267.) Plaintiff

was looking for information about TEE pictures in her study guide, when another student and then

the proctor caught her. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 267-68.) The American Board of

Anesthesiology considered this behavior to be cheating. (Exh. F – Plaintiff Depo. Vol. 1 at p. 270

and Depo. Exh. AU-33.)

Plaintiff was on overnight call on March 13, 2019. (Exh. F – Plaintiff Depo. Vol. 1 at pp.

279-80.) She was on duty until 7:00 a.m. and required to carry a pager, which would be used to

notify her in case of an emergency. (Exh. A – Arthur Dec. at ¶ 66; Exh. F – Plaintiff Depo. Vol. 1

at p. 280.) At the end of her shift, Plaintiff was expected to hand the pager to the next resident on

duty and notify the senior resident before leaving. (Exh. A – Arthur Dec. at ¶ 67.) The senior

resident that night was Dr. Lydia Searcy. (Exh. A – Arthur Dec. at ¶ 68.) Dr. Searcy notified Dr.

Arthur that plaintiff had been seen outside the hospital at about 6:30 that morning. (Exh. A – Arthur

Dec. at ¶ 69.) Plaintiff had not told Dr. Searcy she was leaving, and she had not received permission

to leave early. (Exh. A – Arthur Dec. at ¶ 70.) When Dr. Searcy finally reached Plaintiff on the

phone, Plaintiff indicated she had left the building and left the pager on a desk. (Exh. A – Arthur

Dec. at ¶ 71.) Dr. Arthur also spoke to Dr. Salman Janjua (the resident scheduled to relieve Plaintiff

that morning) and to the attending physician, Dr. Victor Rizzo. (Exh. A – Arthur Dec. at ¶ 72.)

Both confirmed Dr. Searcy's report.[16] Id. Accordingly, Dr. Arthur concluded that Plaintiff had

---

[16] Plaintiff admits leaving "a little before 7:00 a.m." without checking with Dr. Searcy. (Exh. F –
Plaintiff Depo. Vol. 1 at pp. 288-89.) She denies leaving the pager on a desk. (Exh. F – Plaintiff
Depo. Vol. 1 at p. 285.)

abandoned her call by leaving early on the morning of March 14, 2019. (Exh. A – Arthur Dec. at ¶ 73.)

### M.    March 2019 – Plaintiff Admits to Using THC Edibles

On March 18, 2019, the Department's Clinical Competency Committee ("CCC") held a hearing to consider a formal disciplinary recommendation for Plaintiff's cheating on the ITE.[17] (Exh. A – Arthur Dec. at ¶ 74.) Plaintiff spoke at length to the CCC and admitted that she had opened her study guide during the ITE, "just for refreshing knowledge." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 263-69; Exh. Q at pp. 4-5.[18]) Moreover, at the conclusion of the CCC hearing, Plaintiff confessed that she had used "THC Gummies". (Exh. Q at p. 9.)

When deposed, Plaintiff stated that the CCC hearing transcript was in error and that she had confessed to eating only one THC Gummy. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 271.) Plaintiff also deposed that the edible was a "Reese's Cup". (Exh. F – Plaintiff Depo. Vol. 1 at p. 272.) It was given to her by a friend in St. Augustine, Florida in April or May 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 272-73.) In any event, it is undisputed that Plaintiff had consumed an edible containing THC – the psychoactive component of marihuana. (Exh. F – Plaintiff Depo. Vol. 1 at p. 271.)

### N.    March to May 2019 – the Department Terminates Plaintiff from the Residency Program, and Plaintiff Appeals

With one abstention, the CCC voted unanimously to recommend Plaintiff's immediate termination from the residency program. (Exh. A – Arthur Dec. at ¶ 75.) The CCC notified Dr.

---

[17] Augusta University policy requires each residency program to have a Clinical Competency Committee which, among other functions, is charged with recommending disciplinary action for residents. (Exh. P – Browder Dec. at ¶ 3 and Dec. Exh. 1.)

[18] Exh. Q is a transcript of the CCC hearing prepared by a certified court reporter.

Meiler of its decision via email on March 19, 2019. (Exh. G – Meiler Dec. at ¶ 42 and Dec. Exh. 1.) According to the email, the CCC had considered the cheating incident along with "previous professionalism lapses." Id. Dr. Meiler considered the CCC's recommendation and agreed with it. (Exh. G – Meiler Dec. at ¶ 43.) He issued a letter to Plaintiff terminating her from the residency program. (Exh. G – Meiler Dec. at ¶ 44 and Dec. Exh. 2.)

Augusta University's House Staff Policy 13.0 sets out a grievance process for residents subjected to disciplinary action. (Exh. P – Browder Dec. at ¶ 3 and Dec. Exh. 1.) Pursuant to the policy, Plaintiff had the option of appealing Dr. Meiler's decision, and she did so. (Exh. M – Plaintiff Depo. Vol. 2 at p. 14 and Depo. Exh. AU-41; Exh. P – Browder Dec. at ¶ 3 and Dec. Exh. 1.)

An Ad Hoc Committee met to consider Plaintiff's appeal on April 26, 2019. Dr. Arthur, assisted by Dr. Basile, presented the reasons why the Department sought to terminate Plaintiff from the residency program. (Exh. R at p. 5.[19]) They provided the Ad Hoc Committee with a number of documents supporting Plaintiff's termination. (Exh. A – Arthur Dec. at ¶ 76 and Dec. Exh. 7.) In addition to the cheating incident, Drs. Arthur and Basile described numerous incidents of Plaintiff behaving unprofessionally, including: logging cases while on observer status; taking credit for cases performed by other residents; "disappearing" while on observership in pediatrics; behaving inappropriately and using of profanity when told to take a drug test on June 22, 2018; admitting to the use of THC gummies; and abandoning call on the morning of March 14, 2019. (Exh. R at pp. 6-24.) Plaintiff then spoke at length on her own behalf, offering her rebuttal to the issues raised by Drs. Arthur and Basile. (Exh. R at pp. 27-97.)

---

[19] Exh. R is a transcript of the Ad Hoc Committee hearing prepared by a certified court reporter.

Plaintiff was persuasive. On May 2, 2019, the Ad Hoc Committee recommended against terminating Plaintiff from the residency program. (Exh. S – Hess Dec. at ¶ 3 and Dec. Exh. 1.) The policy required the Dean of the Medical College of Georgia to consider the Ad Hoc Committee's recommendation and decide whether or not to uphold Plaintiff's termination. (Exh. S – Hess Dec. at ¶ 4.) On May 17, 2019, Dean David Hess issued a letter to Plaintiff informing her that he had decided to not uphold her termination and return her to the residency program. (Exh. S – Hess Dec. at ¶ 5 and Dec. Exh. 2.)

### O.    Plaintiff's Unprofessional Behavior Was a Risk to Patient Safety

Once it became known that Dean Hess had reinstated Plaintiff to the residency program, "[the] faculty voiced great concerns" to Dr. Meiler. (Exh. C – Meiler Depo. at p. 34.) The Department faculty had lost trust in Plaintiff's professionalism and ability to be trained. (Exh. C – Meiler Depo. at p. 139.) They felt that they could not trust Plaintiff due to a number of professional transgressions, and the incident in which Plaintiff had cheated on the ITE was the final event that led them to lose trust in her. (Exh. C – Meiler Depo. at pp. 123-24.) Because of these concerns, Drs. Meiler and Arthur called a faculty meeting to give the faculty an opportunity to meet with Dr. Moore and Dean Hess. (Exh. C – Meiler Depo. at pp. 34 and 119-20; Exh. D – Arthur Depo. at pp. 113-14.)

The faculty meeting took place on June 3, 2019. (Exh. C – Meiler Depo. at p. 119.) The Department faculty were nearly unanimous in opposing Plaintiff's return to the residency program. (Exh. A – Arthur Dec. at ¶ 78; Exh. G – Meiler Dec. at ¶ 46; Exh. S – Hess Dec. at ¶ 7.) Faculty members expressed concerns about Plaintiff's self-reported use of THC. (Exh. A – Arthur Dec. at ¶ 79; Exh. G – Meiler Dec. at ¶ 47; Exh. S – Hess Dec. at ¶ 8.) They also expressed concerns that Plaintiff was dishonest and could not be trusted. (Exh. A – Arthur Dec. at ¶ 80; Exh. G – Meiler

Dec. at ¶ 48; Exh. S – Hess Dec. at ¶ 9.) Plaintiff's trustworthiness was in question because she had cheated on the ITE. (Exh. A – Arthur Dec. at ¶ 81; Exh. G – Meiler Dec. at ¶ 49; Exh. S – Hess Dec. at ¶ 10; Exh. T – Cartwright Depo. at p. 21.) Throughout the meeting, numerous faculty members expressed concerns that Plaintiff's unprofessional behavior was a threat to patient safety. (Exh. A – Arthur Dec. at ¶ 82; Exh. G – Meiler Dec. at ¶ 50; Exh. S – Hess Dec. at ¶ 11.) Ultimately, the faculty gave a vote of no confidence to Plaintiff. (Exh. C – Meiler Depo. at p. 122.)

After the meeting of June 3, 2019, Dr. Arthur encouraged the faculty to put their concerns about Plaintiff in writing. (Exh. A – Arthur Dec. at ¶ 83.) As Dr. Arthur testified:

> I asked a rhetorical question [to the faculty]: Are you willing to back up your statement with evaluations? And it was a categorical, yes, send us 360 evaluations and we will complete them.

(Exh. D – Arthur Depo. at p. 117.) Dr. Arthur thus arranged for evaluation forms to be sent to the faculty, and a number of faculty members completed evaluations of Plaintiff on June 3 and 4, 2019. (Exh. A – Arthur Dec. at ¶ 84.)

For his part, Dean Hess recognized that there were patient safety issues at hand. (Exh. S – Hess Dec. at ¶ 12.) Dr. Coule, as Chief Medical Officer of AUMC, is responsible for oversight of patient safety issues at the hospital. (Exh. B – Coule Depo. at pp. 8-10; Exh. S – Hess Dec. at ¶ 13.) As Chair of the Department and Program Director of the residency program, Drs. Meiler and Arthur had an obligation to bring safety concerns involving residents to the Chief Medical Officer's attention. (Exh. S – Hess Dec. at ¶ 14.) Dean Hess recommended that Drs. Meiler and Arthur bring their patient safety concerns about Plaintiff to Dr. Coule's attention. (Exh. C – Meiler Depo. at pp. 128-29.) Dr. Coule asked Drs. Meiler and Arthur to submit their concerns about Plaintiff to him in writing. (Exh. B – Coule Depo. at pp. 72 and 77.)

Consequently, Drs. Arthur and Meiler sent Dr. Coule a letter dated June 4, 2019 outlining their concerns about Plaintiff. (Exh. A – Arthur Dec. at ¶ 85; Exh. G – Meiler Dec. at ¶ 51 and Dec. Exh. 3.) The letter explained that Plaintiff had engaged in a series of unprofessional transgressions that had resulted in an irrevocable breach of trust with the Department. Id. The letter then detailed Plaintiff's unprofessional behavior, including: the incident of February 12, 2019 where Plaintiff improperly extubated a patient; the incident of March 13-14, 2019 where Plaintiff abandoned her call by leaving early; Plaintiff's admission of drinking heavily the weekend prior to passing out in the operating room on June 19, 2018; Plaintiff cheating on the ITE; Plaintiff's issues logging cases while on observer status and not cleared for duty; Plaintiff's use of profanity and disrespectful behavior on June 22, 2019; and Plaintiff's admission to the use of THC edibles. Id. The letter explained that anesthesiologists operate in "complex, high-hazard domains" and must "support a high reliability environment for our patients." Id. Plaintiff had engaged in a pattern of unprofessional actions which, in the aggregate, made her unreliable and untrustworthy to the point that she could not practice anesthesiology safely. (Exh. A – Arthur Dec. at ¶ 86; Exh. G – Meiler Dec. at ¶ 52.)

**P.    Dr. Coule Suspends Plaintiff's Housestaff Privileges**

Dr. Coule had treated Plaintiff after she passed out in the operating room on June 19, 2018. (Exh. B – Coule Depo. at pp. 33-34.) At the time, she told him that she had been drinking heavily over the previous weekend. (Exh. B – Coule Depo. at pp. 42-43.) Plaintiff also mentioned some substance abuse that weekend – specifically her use of THC gummies. (Exh. B – Coule Depo. at pp. 36 and 41.) Dr. Coule had concerns for patient safety then. (Exh. B – Coule Depo. at p. 37.) He would have suspended Plaintiff's privileges in June 2018 based on her reports of alcohol and

drug use, but because he learned that information as her treating physician, he chose not to act on it in order to preserver her patient privacy. (Exh. B – Coule Depo. at p. 70.)

Dr. Coule reviewed Drs. Meiler and Arthur's letter, along with the attached documentation, in detail. (Exh. B – Coule Depo. at p. 76.) He then wrote a letter dated June 4, 2018 suspending Plaintiff's privileges to practice medicine as a resident in anesthesia at AUMC and the Children's Hospital of Georgia and revoking her access to the Medical Center. (Exh. B – Coule Depo. at p.66 and Depo. Exh. P-325.) The decision to suspend Plaintiff's privileges was solely Dr. Coule's. (Exh. B – Coule Depo. at p. 67.) In making his decision, Dr. Coule relied on the information presented to him by the residency program combined with his own knowledge from treating Plaintiff on June 19, 2018. (Exh. B – Coule Depo. at pp. 67, 73 and 88.) The decision was based on the totality of the information available to Dr. Coule, "not on any one piece of information." (Exh. B – Coule Depo. at p. 135.) Dr. Coule made his decision "in the interest of patient safety." (Exh. B – Coule Depo. at p. 108.)

When he made his decision, Dr. Coule was acting in accordance with the authority granted him as Chief Medical Officer of AUMC under Section 5.1 of the Bylaws of the Medical Staff of the AU Medical Center. (Exh. B – Coule Depo. at p. 153.) That section of the Bylaws gives him the ability to deny access to any housestaff when, in his sole opinion as Chief Medical Officer of the medical center, the housestaff is deemed to be at risk for the medical center's patients or themselves. (Exh. B – Coule Depo. at p. 154; Exh. E – Bylaws at Coule MD 0238.)

### Q.    Dean Hess Terminates Plaintiff from the Residency Program and Plaintiff Appeals

Dean Hess received a copy of Dr. Coule's letter. (Exh. S – Hess Dec. at ¶ 15 and Depo. Exh. 3.) He agreed that Plaintiff presented a risk to patient safety. (Exh. S – Hess Dec. at ¶ 16.) On June 5, 2019 he issued a letter to Plaintiff informing her that she could no longer return to the

residency program because she no longer had clinical privileges or access to the Medical Center. (Exh. S – Hess Dec. at ¶ 17 and Dec. Exh. 4.)

On June 25, 2019, Plaintiff directed an email to Dean Hess and Dr. Moore with the subject "Appeal of Termination." (Exh. M – Plaintiff Depo. Vol. 2 at p. 20 and Depo. Exh. AU-45.) Because Dean Hess had made the decision to terminate Plaintiff, the next level of appeal was to the President of Augusta University. (Exh. P – Browder Dec. at ¶ 5; Exh. S – Hess Dec. at ¶ 18.) Plaintiff's email thus escalated the grievance process to Dr. Brooks Keel, the President of Augusta University. (Exh. M – Plaintiff Depo. Vol. 2 at p. 20.)

President Keel directed Dr. Gretchen Caughman, Provost and Executive Vice President for Faculty Affairs, and Dr. Kathy Browder, Associate Provost for Faculty Affairs, to investigate Plaintiff's appeal. (Exh. P – Browder Dec. at ¶ 6; Exh. U – Keel Depo. at p. 119.) Dr. Browder took the lead in the investigation. (Exh. P – Browder Dec. at ¶ 7.) She obtained information from Dean Hess's office. (Exh. P – Browder Dec. at ¶ 8.) She reviewed documents related to the case and spoke at length with Plaintiff over the phone about her grievances. (Exh. P – Browder Dec. at ¶ 9.) It appeared to Dr. Browder that the evidence of patient safety concerns related to Plaintiff was strong. (Exh. P – Browder Dec. at ¶ 10.) It was not a violation of Augusta University policy for Drs. Meiler and Arthur to take patient safety concerns involving Plaintiff to Dr. Coule. (Exh. P – Browder Dec. at ¶ 11.) It was Dr. Coule's prerogative to suspend Plaintiff's housestaff privileges. (Exh. P – Browder Dec. at ¶ 12.) It was appropriate for Dean Hess to terminate Plaintiff from the residency program after her privileges were suspended. (Exh. P – Browder Dec. at ¶ 14.)

After discussing the matter, Dr. Browder and Dr. Caughman verbally recommended that Plaintiff's termination from the residency program be upheld. (Exh. P – Browder Dec. at ¶ 15.) President Keel received their verbal report and decided on that basis to uphold Dean Hess'

decision. (Exh. U – Keel Depo. at pp. 119-20.) President Keel then issued a letter to Plaintiff on July 18, 2019 upholding Dean Hess' decision to terminate her from the residency program. (Exh. U – Keel Depo. at p. 84 and Depo. Exh. P-9.)

President Keel's letter informed Plaintiff that she had a right to apply for a review of his decision with the University System Board of Office of Legal Affairs. (Exh. U – Keel Depo. at pp. 30 and 55 and Depo. Exh. P-9.) Thus, Plaintiff's counsel directed a letter to Edward Tate, Vice Chancellor for Legal Affairs, on August 7, 2019. (Exh. M – Plaintiff Depo. Vol. 2 at p. 25 and Depo. Exh. AU-47.) Mr. Tate issued a letter affirming Plaintiff's termination from the residency program on October 24, 2019. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 25-26 and Depo. Exh. AU-48.)

Plaintiff's last day of employment as a resident was November 1, 2019. (Exh. M – Plaintiff Depo. Vol. 2 at p. 26.) She was paid continuously until that date (Exh. M – Plaintiff Depo. Vol. 2 at p. 26.)

## II.    LEGAL ARGUMENT AND CITATION OF AUTHORITY

### A.    The Court's Prior Order Dismissed Counts Four, Five, Six, Eight, and Eleven Against State Defendants

Plaintiff filed her Amended Complaint on September 21, 2020 asserting a total of fifteen separate claims against State Defendants. (Doc. 23, *passim*.) State Defendants filed a Motion for Partial Judgment on the Pleadings as to the Second Amended Complaint on October 29, 2020. (Doc. 32.) The Court granted that Motion in its entirety in an Order dated July 7, 2021. (Doc. 60.) In its Order, the Court dismissed the following claims against State Defendants: Count Four (a Section 1983 claim based on alleged sex discrimination); Count Five (a libel claim); Count Six (a slander claim); Count Eight (a Section 1983 claim alleging that Plaintiff's drug test amounted to an illegal search); and Count Eleven (a claim arising under Title III of the ADA). (Doc. 60 at p.

25.) The Court also determined that the Individual Doctors were not proper defendants to several claims as noted below. (Doc. 60 at p. 25.)

As a result, the following claims remain: Count One (Title IX sex discrimination against the BOR); Count Two (Title IX retaliation against the BOR); Count Three (Georgia Whistleblower Act against the BOR); Count Seven (Section 1983 due process against the Individual Doctors); Count Nine (ADA Title II disability discrimination against the BOR); Count Ten (ADA retaliation against the BOR); Count Twelve (Rehabilitation Act disability discrimination against the BOR); Count Thirteen (Rehabilitation Act retaliation against the BOR); Count Fourteen (Breach of Contract against the BOR); and Count Fifteen (Attorneys' Fees pursuant to O.C.G.A. § 13-6-11). For the reasons set forth below, summary judgment should be granted as to all of these remaining claims.

## B.    Count One (Title IX Sex Discrimination) Should Be Dismissed

In Count One of her Amended Complaint, Plaintiff alleges that the BOR violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., and discriminated against her based on her sex "by subjecting her to disparate treatment in a manner that adversely affected the terms and conditions of her employment" by requiring her to be drug tested; by requiring fitness for duty testing; by disciplining her; and by terminating her from the residency program. (Doc. 23 at ¶¶ 165-68.) The Board of Regents is entitled to summary judgment on this claim.

### 1.    Plaintiff's Title IX Claim is Preempted by Title VII

Although there is a split of authority, courts, including federal courts in Georgia, have determined that a plaintiff does not have a private right of action to bring employment-based claims under Title IX. Joseph v. Bd. of Regents, 2020 U.S. Dist. LEXIS 208570, at *12 (N.D. Ga. May 8, 2020); Hankinson v. Thomas Cty. Sch. Dist., 2005 U.S. Dist. LEXIS 25576, at *6 (M.D. Ga.

Oct. 28, 2005) (Title VII preempts employment discrimination claims for money damages brought under Title IX); <u>Reese v. Emory Univ.</u>, 2015 U.S. Dist. LEXIS 193183, at *13 (N.D. Ga. Jan. 29, 2015) (dismissing claims of employment discrimination and retaliation asserted under Title IX), <u>but</u> <u>see</u>, <u>Reza v. Univ. of S. Ala.</u>, 2018 U.S. Dist. LEXIS 207029 (S.D. Ala. December 4, 2018) (magistrate's report and recommendation compiling authorities). The Fifth Circuit Court of Appeals has held that "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." <u>Lakoski v. James</u>, 66 F.3d 751, 753 (5th Cir. 1995). To allow Plaintiff's Title IX claim to proceed would be to "disrupt a carefully balanced remedial scheme for redressing employment discrimination by employers" which is found in Title VII. <u>Lakoski</u>, at 754. Because Plaintiff's Title IX claim is preempted by Title VII, it should be dismissed.

### 2.    Plaintiff Cannot Establish a *Prima Facie* Case of Sex Discrimination

Those courts that allow Title IX claims based on alleged employment discrimination judge them by the same standards as claims raised under Title VII. <u>Kazar v. Slippery Rock Univ. of Pa.</u>, 679 Fed. Appx. 156, 163 (3[d] Cir. 2017); <u>see also</u>, <u>Bowers v. Bd. of Regents of the Univ. Sys. of Ga.</u>, 509 Fed. Appx. 906, 910 (11th Cir. 2013) (applying Title VII case law to student's Title IX claim). In the case at hand, there is no direct evidence that any of the acts Plaintiff complains of were based on her sex. Accordingly, the familiar burden-shifting analysis of McDonnell Douglas applies. <u>Hornsby-Culpepper v. Ware</u>, 906 F.3d 1302, 1312 (11th Cir. 2018); <u>Maynard v. Bd. of Regents</u>, 342 F.3d 1281, 1289 (11th Cir. 2003). Plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of discrimination. <u>Hornsby-Culpepper</u>, 906 F.3d at 1312. The burden then shifts to the BOR to articulate a legitimate, non-discriminatory reason for the

challenged action. Id. Plaintiff must then prove, again by a preponderance of the evidence, that the legitimate reason proffered was a mere pretext for discrimination. Id.

In order to establish a *prima facie* case of sex discrimination, Plaintiff must show: (1) she is a member of a protected class; (2) she was qualified; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly-situated individual outside her protected class. Maynard, 342 F.3d at 1289. Here, Plaintiff cannot meet this standard.

At the outset, only Plaintiff's termination from the residency program and (arguably) the disciplinary warning issued to her in November 2019 could be considered adverse employment actions.[20] To be actionable, an adverse employment action must have a negative impact on the terms, conditions, or privileges of Plaintiff's job in a real and demonstrable way. Henderson v. City of Birmingham, 826 Fed. Appx. 736, 741 (11th Cir. 2020). A typical adverse employment action affects "continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." Id. Merely being subjected to a drug test does not constitute an adverse employment action. McQueen v. Ala. Dep't of Transp., 769 Fed. Appx. 816, 824 (11th Cir. 2019) (in the context of a retaliation claim, a "drug test did not constitute an adverse employment action because [the plaintiff] passed the test and did not suffer any tangible harm as a result"). Indeed, this Court has already found that "Plaintiff's drug test was justified from its inception and reasonable in scope." (Doc. 60 at p. 21.) Likewise, the fitness for duty examinations required of Plaintiff did not affect

---

[20] Disciplinary memoranda that do not cause any present or foreseeable future economic injury are not adverse actions. Henderson, 826 Fed. Appx. 736, 741 (11th Cir. 2020). For purposes of this Motion, State Defendants will assume, without conceding, that the disciplinary warning issued to Plaintiff was an adverse action.

her continued employment or pay. As explained in detail below, these examinations were lawful and allowed under the ADA. They are not actionable.

As to the disciplinary warning and termination, there is no evidence of similarly situated male anesthesiology residents who were treated more favorably than Plaintiff. Under Eleventh Circuit precedent, Plaintiff must show that she and her comparators were "similarly situated in all material respects." Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019). A similarly situated comparator would have engaged in the same basic conduct (or misconduct) as Plaintiff and would share her employment or disciplinary history. Id. at 1227-28. Here, Plaintiff can point to no male residents who exhibited the type of behavior underlying the disciplinary warning issued to her. Nor can Plaintiff point to any male resident who exhibited the same pattern of unsafe and unprofessional behavior that resulted in her termination from the residency program. Thus, Plaintiff cannot establish a *prima face* case of sex discrimination, and her Title IX claim should be dismissed.

> **3.    No Adverse Action Was Taken Based on Plaintiff's Sex, and Legitimate, Non-Discriminatory Reasons Exist for the Acts She Complains Of**

Even if Plaintiff could establish a *prima facie* case, none of the actions she complains of were based on her sex. (Exh. G – Meiler Dec. at ¶ 53; Exh. S – Hess Dec. at ¶ 19; Exh. U – Keel Depo. at pp. 121-22.) To the contrary, the BOR acted based on legitimate, non-discriminatory reasons. Plaintiff was drug tested after an unexplained accident – passing out while observing in the operating room. She was required to be evaluated by LifeGuard at the suggestion of her treating therapist and after her own admission that she was having trouble with focus, memory, and sleeping. She admits to telling Dr. Meiler the drug test was "bullshit" and that he could "shove it up [his] ass" and agrees that conduct was entirely unprofessional and inappropriate. (Exh. M –

Plaintiff Depo. Vol. 2 at p. 85.) Most significantly, after her housestaff privileges were suspended, Plaintiff could no longer serve as a resident in training. (Exh. P – Browder Dec. at ¶ 13). She lost her privileges as the result of a pattern of unprofessional actions which, in the aggregate, made her unreliable and untrustworthy to the point that she could not practice anesthesiology safely. (Exh. A – Arthur Dec. at ¶ 86; Exh. B – Coule Depo. at pp. 88 and 90-96; Exh. G – Meiler Dec. at ¶ 52.) Those actions, detailed at length above, had nothing to do with Plaintiff's sex.

The burden shifts to Plaintiff to introduce "significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Brooks v. Cty. Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006). She cannot meet this burden. Simply put, there is no evidence to show either that the proffered reasons are false or that discrimination was the real reason for the acts Plaintiff complains of. Id. State Defendants are entitled to summary judgment on this claim.

## C.    Count Two (Title IX Retaliation) Should Be Dismissed

Plaintiff next contends that the BOR retaliated against her in violation of Title IX by: (1) terminating her from the residency program; (2) "subjecting her to several unfounded, personally invasive examinations"; (3) delaying her return to work;[21] (4) refusing to investigate her complaints; (5) and falsely characterizing her as a drug-abuser to other programs. (Doc. 23 at ¶¶ 184-89.) At the outset, Plaintiff's employment-based retaliation claim is preempted by Title VII and should be dismissed for the reasons set out above. Reese, 2015 U.S. Dist. LEXIS 193183, at *11. For that reason alone, the claim should be dismissed.

Assuming the claim were not preempted, "[r]etaliation claims under Title IX are analyzed under the framework for claims under Title VII." Kocsis v. Fla. State Univ. Bd. of Trs., 788 Fed.

---

[21] It is not entirely clear what Plaintiff means by this. State Defendants assume she refers to the time from May 2018 to November 2018 when she was on paid leave pending the results of the LifeGuard examinations.

Appx. 680, 686 (11th Cir. 2019). Plaintiff must first establish a *prima facie* case: (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events. Id. She cannot do so.

Once again, Plaintiff complains of acts that do not rise to the level of adverse employment actions. The only acts taken by BOR that could be construed as "personally invasive examinations" are the drug test and fitness for duty tests that Drs. Meiler and Arthur required. As explained above, these tests were not materially adverse actions and do not support a claim under Title IX. Likewise, failing to investigate a complaint is not itself an adverse employment action. Entrekin v. City of Panama City, 376 Fed. Appx. 987, 995 (11th Cir. 2010); Barr v. Silberg, 2020 U.S. Dist. LEXIS 156932, at *29 n6 (S.D. Ga. August 28, 2020). Finally, there is simply no evidence to support the allegation that the BOR falsely characterized Plaintiff as a drug-abuser to other programs.

What remains are Plaintiff's claims based on her termination from the residency program and for "delaying her return to work." However, she cannot point to evidence showing that either act was causally connected to any complaint of sex discrimination she may have made. Plaintiff's return to the residency program was "delayed" until she was able to safely return to duty. She was terminated from the residency program after her housestaff privileges had been suspended because of the pattern of unprofessional actions detailed above. No action was taken against Plaintiff based on any complaint of sex discrimination. (Exh. G – Meiler Dec. at p. 53; Exh. S – Hess Dec. at ¶ 19; Exh. U – Keel Depo. at pp. 121-22.)

"Significantly, when it comes to retaliation claims, a plaintiff must demonstrate that [her] participation in protected activity was the 'but-for' cause of the adverse employment action." Bailey v. Metro Ambulance Servs., 992 F.3d 1265, 1277 (11th Cir. 2021); Kocsis, 788 Fed. Appx. at 686. "Stated another way, a plaintiff must prove that had she not complained, she would not

have been fired." <u>Cisero v. ADT LLC of Del.</u>, 2021 U.S. Dist. LEXIS 85286, at *34 (N.D. Ga. April 27, 2021), <u>report and recommendation adopted at</u>, 2021 U.S. Dist. LEXIS 187804, at *12 (N.D. Ga. September 30, 2021). Plaintiff cannot meet this standard. There is no evidence that a protected activity was the basis of these decisions, and in any event Plaintiff cannot demonstrate that her participation in a protected activity was the "but-for" cause of them.

If Plaintiff could establish a *prima facie* case of retaliation, her claim would fail because the BOR had legitimate, non-retaliatory reasons for the acts complained of. The reasons underlying Plaintiff's drug test, fitness-for-duty tests, the "delay" in returning her to duty, and the basis for her termination are detailed above. Plaintiff cannot point to any evidence showing the proffered reasons to be pretextual, and State Defendants are entitled to summary judgment on this claim.

### D.    Count Three (Georgia Whistleblower Act) Should Be Dismissed

Count Three of Plaintiff's Amended Complaint asserts a claim under the Georgia Whistleblower Act ("GWA"), O.C.G.A. § 45-1-4. (Doc. 23 at ¶¶ 193-209.) This claim is based on the email that Plaintiff sent to ACGME on September 26, 2018 and involves the obstetrics cases Plaintiff logged while on observership and was required to delete. (Doc. 23 at ¶¶ 200-01; Exh. M – Plaintiff Depo. Vol. 2 at pp. 10-11 and 31.) State Defendants are entitled to summary judgment on this claim.

### 1.    Plaintiff Did Not Disclose a Violation of a Law, Rule or Regulation to a Supervisor or Government Agency

In order to establish a *prima facie* case under the GWA, Plaintiff must show, *inter alia,* that she disclosed a violation of a law, rule, or regulation to either a supervisor or a government agency. <u>West v. City of Albany</u>, 830 Fed. Appx. 588, 597 (11th Cir. 2020); <u>Franklin v. Pitts</u>, 349 Ga. App. 544, 547 (2019). As used in the GWA, the term "law, rule, or regulation" includes "any federal, state, or local statute or ordinance or any rule or regulation adopted according to any

federal, state, or local statute or ordinance." O.C.G.A. § 45-1-4(a)(2). Here, Plaintiff's email to ACGME involves no such thing. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 10-11 and Depo. Exh. AU-39.) The email is a lengthy recitation of the numerous disagreements Plaintiff had with the Department that was sent "because I wanted my department to stop with all the crap they were putting me through." (Exh. M – Plaintiff Depo. Vol. 2 at p. 11.) Plaintiff's complaint about case logs to ACGME does not involve any alleged violation of a law, rule, or regulation, and her GWA claim based on that complaint should be dismissed. West, 830 Fed. Appx. at 598; Coward v. MCG Health, Inc., 342 Ga. App. 316, 320 (2017).

Plaintiff's GWA claim also fails because it is not based on any disclosure made to a supervisor or a government agency. There is no evidence that ACGME is an "agency of federal, state, or local government . . ." O.C.G.A. § 45-1-4(a)(1). Nor is ACGME a "supervisor" as defined by the GWA. O.C.G.A. § 45-1-4(a)(6). ACGME is a private association made up of representatives of five medical organizations. McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 521 (3d Cir. 1994) "[ACGME] standards are neither 'laws' nor 'state' provisions." LaRavia v. Cerise, 2010 U.S. Dist. LEXIS 144279, at *25 (M.D. La. December 13, 2010). For this additional reason, the GWA claim should be dismissed.

### 2.   Legitimate, Non-Retaliatory Reasons Support Plaintiff's Termination

Assuming a *prima facie* case existed, GWA claims are evaluated under the McDonnell Douglas analysis. Lamar v. Clayton Cty. Sch. Dist., 605 Fed. Appx. 804, 806 (11th Cir. 2015); Franklin, 349 Ga. App. at 547 (2019). Plaintiff's GWA claim alleges a laundry list of purported adverse acts, most of which are utterly unsupported by the record. (Doc. 23 at ¶¶ 203-07.) Only one merits consideration: the allegation that the BOR unlawfully terminated Plaintiff from the residency program (Doc. 23 at ¶ 206.) As detailed above, legitimate, non-retaliatory reasons

support Plaintiff's termination, and Plaintiff cannot show those reasons to be pretextual. Accordingly, even if Plaintiff could establish a *prima facie* claim under the GWA, such claim cannot survive the McDonnell Douglas analysis and should be dismissed. Swint v. City of Carrollton, 859 Fed. Appx. 395, 400 (11th Cir. 2021) (grant of summary judgment as to GWA claim affirmed).

### E.   Count Seven (Procedural Due Process Under Section 1983) Should Be Dismissed

Count Seven of the Amended Complaint asserts a procedural due process claim against the Individual Doctors under 42 U.S.C. § 1983, claiming that Plaintiff was deprived of due process when her privileges were suspended by Dr. Coule without her first being provided notice of the charges and an opportunity to respond. (Doc. 23 at ¶¶ 251-87.) State Defendants are entitled to summary judgment on this claim.

### 1.   Plaintiff Was Not Deprived of a Constitutionally-Protected Property Interest

A Section 1983 claim asserting a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected property interest; (2) state action; and (3) constitutionally-inadequate process. Yarbrough v. Decatur Hous. Auth., 941 F.3d 1022, 1026 (11th Cir. 2019). As to the first element, property interests, by their nature, are created and defined by existing rules or understandings that stem from an independent source such as state law or a contract with the state. Gray v. Bd. of Regents of the Univ. Sys., 150 F.3d 1347, 1350-51 (11th Cir. 1998). As explained in the Brief filed by Dr. Coule in support of his Motion for Summary Judgment, Plaintiff had no property rights in her privileges to practice medicine as a resident in anesthesia. (Doc. 80 at pp. 19-20.) Section 5.1 of AUMC's Medical Staff Bylaws allowed Dr. Coule, in his capacity as the hospital's Chief Medical Officer, to suspend Plaintiff's privileges as

a resident if, in his sole opinion, he believed she presented a risk to AUMC's patients. (Exh. B – Coule Depo. at pp. 152-154 and Depo. Exh. P-23; Exh. E – Bylaws at Coule MD 0238.)

Generally speaking, there is no protected property interest in an at-will position. Warren v. Crawford, 927 F.2d 559, 562 (11th Cir. 1991) "Under Georgia law, a physician does not have either a contract interest or property interest in maintaining medical privileges at Georgia hospitals." Jimenez v. WellStar Health Sys., 596 F.3d 1304, 1311 (11th Cir. 2010). As housestaff, Plaintiff had no constitutionally-protected property interest in the limited privileges AUMC afforded her, and she cannot complain that those privileges were suspended.

Likewise, Plaintiff had no protected property interest in continued enrollment in the residency program. Although courts frequently assume the existence of a protected property interest in these circumstances, neither the Supreme Court nor the Eleventh Circuit Court of Appeals has held that a graduate student or medical resident has a constitutionally-protected property interest in continued enrollment at a public university.[22] Page v. Hicks, 773 Fed. Appx. 514, 518-19 (11th Cir. 2019).

Plaintiff and the BOR entered into a one-page contract styled "House Officer Notice of Appointment" on July 1, 2018 ( "the Notice of Appointment"). (Exh. M – Plaintiff Depo. Vol. 2 at p. 37 and Depo. Exh. AU-50.) Presumably, Plaintiff bases her due process claim on this contract and on the grievance policy allegedly incorporated therein. The Notice of Appointment, however, explicitly states that its duration begins on "7/1/18" and ends "6/30/19". Id. On its face it gives Plaintiff no interest at all after June 30, 2019.

---

[22] To the contrary, the Eleventh Circuit has held that a resident had no protected property interest in studying at a VA Hospital, despite the existence of certain grievance policies, because that resident had "neither a guarantee of future employment . . . nor a statutory right to appeal any adverse personnel action." Hardison v. Cohen, 375 F.3d 1262, 1268 (11th Cir. 2004).

The Notice of Appointment indicates that various "Augusta University policies and procedures" would "govern the following conditions of [Plaintiff's] employment", including those for "redress of grievances." Id. Assuming *arguendo* that this language is sufficient to incorporate those policies by reference, the grievance policy for residents is policy H.S. 13.0. (Exh. P – Browder Dec. at ¶ 3 and Dec. Exh. 1.) The only concrete guideline regarding dismissal in that policy is that the CCC shall "recommend disciplinary action, including dismissal, of a [resident] who has violated any applicable Law or policy, or otherwise failed to meet the criteria for continued employment according to academic and non-academic guidelines." Id. The policy does not require that dismissals be only "for cause" or any similar language. Id.

In the employment context, the Eleventh Circuit has held that a public employee does not have a constitutionally protected property interest where the public employer has "significant discretion" to terminate the employee. Amador v. Town of Palm Beach, 517 Fed. Appx. 834, 838 (11th Cir. 2013); see also, Wallace v. Bd. of Regents of the Univ. Sys., 967 F. Supp. 1287, 1293 (S.D. Ga. 1997) (policy that employees may be dismissed if their supervisor determines their performance of duty or personal conduct is unsatisfactory did not create an at-will employment relationship); Bd. of Regents of the Univ. Sys. of Ga. v. Hogan, 298 Ga. App. 454, 457 (2009) (employee who could be terminated if her supervisor found her work to be unsatisfactory had no property interest in her job). Here, Policy H.S. 13.0 provided Drs. Meiler, Hess, and Keel significant discretion to dismiss Plaintiff from the residency program if she failed to meet unspecified "academic or non-academic guidelines". Plaintiff was effectively enrolled at-will and had no property interest in continuing in the residency program. Thus, her due process claim should be dismissed.

## 2.        Plaintiff Received The Process She Was Due

Assuming *arguendo* that Plaintiff had any property interest in continued enrollment in the residency program, she received all the process to which she was entitled. "It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program." Davis v. Mann, 882 F.2d 967, 974 (5th Cir. 1989). Thus, for due process purposes, medical residents are considered to be students. Ekmark v. Matthews, 524 Fed. Appx. 62, 63 (5th Cir. 2013). "In recognition of the complex student-faculty relationship, students are not entitled to the same due process protections as employees." Id. at 63. "A school is an academic institution, not a courtroom or administrative hearing room, and thus it should not be weighted down with formalized procedural requirements imposed by actors estranged from the academic environment." Davis, 882 F.2d at 974, quoting, Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 88 (1978).

Dismissal from a residency program is considered academic, rather than disciplinary, when the reasons for dismissal implicate the resident's fitness to perform as a doctor. Shaboon v. Duncan, 252 F.3d 722, 731 (5th Cir. 2001). Broadly, an academic dismissal is "more subjective and evaluative than the typical factual questions presented in the average disciplinary decision." Fenje v. Feld, 398 F.3d 620, 624-25 (7th Cir. 2005), quoting Horowitz, 435 U.S. at 89-90. The Eleventh Circuit has held that academic dismissals are not easily adapted to the traditional review of procedural due process violation claims. Page, 773 Fed. Appx. at 520. Formal hearings are not required in academic dismissals. Haberle v. University of Alabama, 803 F.2d 1536 (11th Cir. 1986). Instead, the decision-making process need only be careful and deliberate. Page, 773 Fed. Appx. at 519. The only notice requirement is that the student have prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal. Fenje, 398 F.3d at 626; Trotter v.

Regents of the Univ., 219 F.3d 1179, 1185 (10th Cir. 2000); Schuler v. Univ. of Minn., 788 F.2d 510, 514 (8th Cir. 1986).

Here, there is no question that Plaintiff's dismissal from the residency program was academic. She lost her privileges and was dismissed as the result of a pattern of unprofessional actions which, in the aggregate, made her unreliable and untrustworthy to the point that she could not practice anesthesiology safely. (Exh. A – Arthur Dec. at ¶ 86; Exh. B – Coule Depo. at pp. 88 and 90-96; Exh. G – Meiler Dec. at ¶ 52.) Plaintiff was entitled to only minimal process, which she received. She was given notice of the possibility of dismissal from the CCC hearing and the Ad Hoc Committee Hearing. The process leading to her dismissal (detailed at length above) was both careful and deliberate, involving multiple hearings and review by numerous administrators. State Defendants are entitled to summary judgment on this claim.

### 3.    The Individual Defendants Are Entitled to Qualified Immunity

Plaintiff's due process claim is also barred by the doctrine of qualified immunity. Qualified immunity protects government officials performing discretionary functions from suit so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. Minnifield v. City of Birmingham Dep't of Police, 791 Fed. Appx. 86, 89 (11th Cir. 2019). "In all but exceptional cases, qualified immunity protects government officials performing discretionary functions from the burdens of civil trials and from liability." McMillian v. Johnson, 88 F.3d 1554, 1562 (11th Cir. 1996); see also Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

This Court has already found that "there is no question that the Individual Doctors and Dr. Keel were acting within the scope of their discretionary authority at all relevant times outlined in

the Amended Complaint." (Doc. 60 at pp. 7-8.) "In the context of public employment cases, it is only in the rarest of cases [that] reasonable governmental officials truly know that the termination or discipline of a public employee violated clearly established federal rights." Joseph, 2020 U.S. Dist. LEXIS 208570, at *33-34, quoting, Anderson v. Burke Cty., 239 F.3d 1216, 1222 (11th Cir. 2001). For constitutional rights to be clearly established in a given case, their contours "must be so clear that every, objectively reasonable official must understand that what the defendant, in the context of the circumstances of the case, is doing clearly violated the right." Snider v. Jefferson State Community College, 344 F.3d 1325, 1328 (11th Cir. 2003). The law must have been earlier developed in such concrete and factually defined context to make it obvious to all reasonable government actors that what the defendants did violates federal law. Crawford v. Carroll, 529 F.3d 961, 977-78 (11th Cir. 2008).

Here, Plaintiff cannot show that the Individual Doctors violated any of her clearly established constitutional rights. Indeed, as shown above, Plaintiff's constitutional rights were not violated at all. However, even if some constitutional violation did occur, in the context of the circumstances of this case, such violation was not so clear as to be a violation of clearly established law. The Individual Doctors are entitled to qualified immunity, and they should be granted summary judgment on that basis.

### 4.    Plaintiff Failed to Take Advantage of Existing State Remedies

 "A procedural due process violation is not complete unless and until the State fails to provide due process." McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994). If adequate state remedies were available but Plaintiff failed to take advantage of them, she cannot claim that the state deprived her of procedural due process. Cotton v. Jackson, 216 F.3d 1328, 1331 (11th Cir. 2000). "In other words, the deprivation of a state-created interest cannot sustain a procedural due process

claim if the plaintiff bypassed viable state avenues that could have adequately cured even the most egregious of procedural defects." <u>Kicklighter v. Evans Cty. Sch. Dist.</u>, 968 F. Supp. 712, 717 (S.D. Ga. 1997).

Under Georgia law, if no other remedy exists and a party has a clear right to have an act performed, that party may seek a writ of mandamus. <u>See</u> O.C.G.A. § 9-6-20; <u>Cotton</u>, 216 F.3d at 1332. The Eleventh Circuit has specifically held that Georgia's state law mandamus procedure provides an adequate post-deprivation remedy for an employee who seeks procedural protection that the employer failed to provide. <u>Cotton</u>, 216 F.3d at 1333. Here, Plaintiff has not shown or even alleged that this state remedy was unavailable to her or was somehow inadequate to remedy the alleged procedural deprivations she complains of.[23] For this additional reason, her due process claim should be dismissed.

**F.    Count Nine (ADA Disability Discrimination) Should Be Dismissed**

Count Nine of the Amended Complaint asserts violations of Title II of the Americans With Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("the ADA").[24] Plaintiff alleges that she had PTSD, which substantially limited her in one or more major life activities.[25] (Doc. 23 at ¶ 314). She further alleges that the BOR: (1) required unlawful "testing"; (2) failed to provide her with reasonable accommodations; and (3) unlawfully subjected her to disparate treatment and terminated her based

---

[23] In making this argument, State Defendants do not concede that Plaintiff would have been entitled to a writ of mandamus if she had sought one.

[24] This claim has been dismissed as to the Individual Doctors, but remains pending against the BOR (Doc. 60 at p. 25.)

[25] For purposes of this motion only, State Defendants will assume, without conceding, that Plaintiff was disabled within the meaning of the ADA.

on that disability. (Doc. 23 at ¶¶ 300-42.) State Defendants are entitled to summary judgment on this claim.

### 1.   Plaintiff's Claim Alleging "Unlawful Testing" Should Be Dismissed

Without elaboration, the Amended Complaint alleges that "Defendants discriminated against Plaintiff by subjecting her to testing exceeding the scope allowed by the ADA." (Doc. 23 at ¶ 334.) Presumably, this allegation relates to the fitness-for-duty examination and simulation examination performed by Dr. Hertza and LifeGuard. However, the ADA allows medical examinations that are "job-related and consistent with business necessity," 42 U.S.C. § 12112(d)(4)(A); Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1311 (11th Cir. 2013), and an employer may legally inquire into the ability of an employee to perform job-related functions. 42 U.S.C. § 12112(d)(4)(B).

There can be no dispute that the LifeGuard examinations satisfied the ADA. Anesthesiology requires attention to detail, concentration, and memory. (Exh. A – Arthur Dec. at ¶ 11; Exh. F – Plaintiff Depo. Vol. 1 at p. 87.) Plaintiff was having trouble sleeping, moments of forgetfulness, trouble concentrating, and difficulty paying attention to detail. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 68-69 and 72.) Drs. Meiler and Arthur had concerns about Plaintiff's ability to safely care for patients, and they wanted to evaluate Plaintiff's abilities to perform her duties as an anesthesiology resident. (Exh. A – Arthur Dec. at ¶ 24; Exh. G – Meiler Dec. at ¶ 8; Exh. J – Hertza Depo. at p. 23.) Dr. House (Plaintiff's treating therapist) recommended "an independent objective evaluation of [Plaintiff's] ability to function effectively at her job. . . " (Exh. A – Arthur Dec. at ¶ 17 and Dec. Exh. 1.) So LifeGuard was asked to perform evaluations that would demonstrate Plaintiff's ability to perform her duties. (Exh. J – Hertza Depo. at pp. 24-26.) When the Department concluded in August 2019 that it could not accommodate all seven of Dr. Hertza's

recommendations, Dr. Hertza offered the simulation as an option, because "[I]t's appropriate to have an anesthesiologist make sure that an anesthesiologist can do their job . . ." (Exh. J – Hertza Depo. at pp. 67-69.) The Department chose this option. (Exh. G – Meiler Dec. at ¶ 33.)

These undisputed facts make it clear that the testing performed by LifeGuard (including the simulation) was related to Plaintiff's ability to perform her duties and consistent with the Department's self-evident need to ensure patient safety. Further, the evaluation and simulation were indisputably inquiries into Plaintiff's ability to perform her residency-related functions. "Requiring an employee to undergo a medical examination for job-related purposes and business necessity and placing that employee on leave pending the outcome of the examination, as Defendant did here, does not violate the ADA." Thornton v. Healthcare Staffing, Inc., 2021 U.S. Dist. LEXIS 129384, at *14 (M.D. Ga. July 12, 2021). This claim should be dismissed.

### 2. Plaintiff's Failure to Accommodate Claim Should Be Dismissed

Plaintiff also brings a failure to accommodate claim based upon the Department's inability to provide the seven "recommendations" suggested by Dr. Hertza in July 2018. (Doc. 23 at ¶¶ 321-30.) In certain circumstances, an educational institution's refusal to accommodate the needs of a disabled person amounts to disability discrimination. Goldberg v. Florida International University, 838 Fed. Appx. 487, 492 (11th Cir. 2020). However, the institution is only required to provide accommodations that are reasonable. Id. The reasonableness of an accommodation depends upon the specific facts and circumstances of the case. See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997). It is Plaintiff's burden to show that the proposed accommodations were reasonable. Willis v. Conopco, Inc., 108 F.3d 282, 285-86 (11th Cir. 1997). She cannot do so here.

An accommodation is only reasonable if it would allow Plaintiff to perform the essential functions of her position. Frazier-White v. Gee, 818 F.3d 1249, 1255 (11th Cir. 2016). An essential function of Plaintiff's position as a resident was to provide safe and effective patient care. (Exh. A – Arthur Dec. at ¶ 53 and Dec. Exh. 5.) As explained above, two of the seven "recommendations" made by Dr. Hertza in July 2018 would not allow her to perform this essential function. The Department could not allow Plaintiff extra time to complete tasks or to take frequent breaks on an as-needed basis without compromising patient safety. (Exh. A – Arthur Dec. at ¶ 54; Exh. G – Meiler Dec. at ¶¶ 23 and 26.) This is because anesthesiology residents must respond immediately and appropriately to unexpected emergencies, and because patients under anesthesia cannot be left unattended safely, such that residents sometimes have to forgo even regularly-scheduled breaks. (Exh. G – Meiler Dec. at ¶¶ 23-31.) The recommendations suggested by Dr. Hertza would not allow Plaintiff to perform the essential function of providing safe and effective patient care. (Exh. G – Meiler Dec. at ¶ 32.) Those proposed accommodations were thus not reasonable under the specific facts and circumstances of the case.

Further, the BOR was not required to provide an accommodation to Plaintiff that would impose an "undue hardship." Frazier-White, 818 F.3d at 1255. Allowing Plaintiff to return to duty pursuant to Dr. Hertza's seven recommendations would have imposed an undue hardship on the Department for essentially the same reason that those recommendations were not reasonable accommodations – they could not be put in place without compromising patient safety. (Exh. G – Meiler Dec. at ¶ 22.)

Plaintiff concedes that she would not have gone back to work in July 2018 without having the benefit of all Dr. Hertza's recommendations, because "I was not putting myself or my patients in jeopardy." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 177-78.) Dr. Hertza recommended the

simulation as an alternate option, and the Department reasonably and lawfully chose that option. Plaintiff then emailed the ADA Coordinator and eventually narrowed her request for accommodations down to "a break every two to three hours." (Exh. O – Lewis Depo. at p. 43.) A letter to Dr. Arthur transmitting this request was sent on November 12, 2018. (Exh. O – Lewis. Depo. at p. 79 and Depo. Exh. P-131.) Plaintiff was returned to the residency program two days later. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 222-23; Exh. A – Arthur Dec. at ¶ 58.) The only accommodation she required at the time was a "slow integration" back into the program. (Exh. F – Plaintiff Depo. Vol. 1 at p. 224.) She received that accommodation. (Exh. F – Plaintiff Depo. Vol. 1 at p. 225.)

It is evident that Plaintiff's medical condition evolved and improved from March 2018 (when she was "absolutely not" prepared to return to full duty) to December 2018 (when she returned to her clinical duties). The undisputed facts show that the seven recommendations proposed by Dr. Hertza would not allow her to safely practice medicine during that time. The BOR's actions were in accordance with the law, and the failure to accommodate claim should be dismissed.

### 3. Plaintiff's Claim For Discriminatory Termination Should Be Dismissed

Plaintiff also alleges that the Board of Regents "terminated [her] employment because of her disability. . ." (Doc. 23 at ¶ 335.) This claim should be dismissed.

Discrimination claims under the ADA are governed by the McDonnell Douglas standard. Walls v. Lowe's Home Ctrs., LLC, 789 Fed. Appx. 852, 854 (11th Cir. 2019). The decision to terminate Plaintiff from the residency program was not influenced by her disability. (Exh. G – Meiler Dec. at ¶ 53; Exh. Hess Dec. at ¶ 19; Exh. U – Keel Depo. at pp. 121-22.) Plaintiff cannot point to any similarly-situated anesthesiology residents without disabilities who were treated more

favorably than her, and her termination was based on the legitimate, non-retaliatory reasons discussed at length above. There is no evidence that those reasons were pretextual, and summary judgment should be granted as to this claim.

### G. Count Ten (ADA Retaliation) Should Be Dismissed

Count Ten of the Amended Complaint alleges that the BOR retaliated against Plaintiff in violation of the ADA by: (1) subjecting her to "unlawful testing", and (2) terminating her from the residency program.[26] (Doc. 23 at ¶ 350-51.) This claim fails as a matter of law.

First, as described above, the LifeGuard examinations required of Plaintiff were not materially adverse actions; instead they were lawful and allowed under the ADA. 42 U.S.C. § 12112(d)(4). Plaintiff cannot found a retaliation claim upon those examinations.

Second, this claim fails for the same reasons as Plaintiff's Title IX retaliation claim, discussed above. As with that claim, retaliation claims under the ADA require a showing of but-for causation. Frazier-White, 818 F.3d at 1258. Plaintiff cannot make this showing, and thus cannot demonstrate a *prima facie* case of retaliation under the ADA. No action was taken against Plaintiff based on any complaint she may have made of discrimination. (Exh. G – Meiler Dec. at p. 53; Exh. S – Hess Dec. at ¶ 19; Exh. U – Keel Depo. at pp. 121-22.) Plaintiff's housestaff privileges were suspended because of a pattern of unprofessional actions, and she was subsequently terminated from the residency program. She cannot demonstrate that her participation in any protected activity was the "but-for" cause of her termination under these circumstances. Further, the BOR had legitimate, non-retaliatory reasons for Plaintiff's termination, and there is no

---

[26] This claim has been dismissed as to the Individual Doctors, but remains pending against the BOR (Doc. 60 at p. 25.)

evidence that those reasons were pretextual. State Defendants are entitled to summary judgment on this claim.

### H.    Count Twelve (Rehabilitation Act Discrimination) Should Be Dismissed

Count Twelve of the Amended Complaint asserts a claim of disparate treatment discrimination under the Rehabilitation Act.[27] (Doc. 23 at ¶¶ 370-97.) "Discrimination claims under the Rehabilitation Act are governed by the same standards used in cases brought under the Americans with Disabilities Act ("ADA")." Zainulabeddin v. Univ. of South Fl. Bd. of Trustees, 749 Fed. Appx. 776, 782 (11th Cir. 2018). The Rehabilitation Act claim asserted in Count Twelve is duplicative of the ADA claim asserted in Count Nine and should be dismissed for the same reasons.

### I.    Count Thirteen (Rehabilitation Act Retaliation) Should Be Dismissed

Count Thirteen of the Amended Complaint asserts a retaliation claim under the Rehabilitation Act substantively identical to the ADA retaliation claim asserted in Count Ten.[28] (Doc. 23 at ¶¶ 398-413). The Rehabilitation Act incorporates the anti-retaliation provisions of the ADA, and retaliation claims under the Rehabilitation Act are governed by the same standards used in ADA cases. Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 Fed. Appx. 243, 245 (11th Cir. 2011). As explained above, Plaintiff's ADA retaliation claim should be dismissed. Summary judgment should be granted as to this claim for the same reasons.

---

[27] This claim has been dismissed as to the Individual Doctors, but remains pending against the BOR (Doc. 60 at p. 25.)

[28] This claim has been dismissed as to the Individual Doctors, but remains pending against the BOR (Doc. 60 at p. 25.)

### J.      Count Fourteen (Breach of Contract) Should Be Dismissed

Count Fourteen of the Amended Complaint asserts a breach of contract claim against the BOR.[29] Specifically, Plaintiff contends that the Notice of Appointment between her and the BOR incorporated various ACGME and BOR policies. (Doc. 23 at ¶¶ 423-28.) She then contends that the BOR breached its contract with her by denying her due process of law.[30] (Doc. 23 at ¶ 432.) This claim should be dismissed.

Plaintiff claims first that the Notice of Appointment incorporates various ACGME policies. (Doc. 23 at ¶¶ 426-30.) It does not. In order to incorporate another document, a contract must "make[] clear reference to the document to be incorporated and describe[] it in such terms that its identity can be ascertained beyond doubt." Henkel Corp. v. Leggett & Platt, Inc., 2009 U.S. Dist. LEXIS 76703, at *6 (N.D. Ga. July 24, 2009). The Notice of Appointment makes no mention of any ACGME policy at all. (Exh. M – Plaintiff Depo. Vol. 2 at p. 37 and Depo. Exh. AU-50.) Thus, no ACGME policy is incorporated into the document, and no alleged violation of any ACGME policy gives Plaintiff a claim for breach of contract against the BOR.

The Notice of Appointment arguably incorporates various "Augusta University policies and procedures", including the grievance policy for residents – Policy H.S. 13.0.[31] (Exh. M – Plaintiff Depo. Vol. 2 at p. 37 and Depo. Exh. AU-50.) However, in the employment context,

---

[29] This claim has been dismissed as to the Individual Doctors, but remains pending against the BOR (Doc. 60 at p. 25.)

[30] The Amended Complaint references policies related to drug testing, but does not allege that those policies were violated. (Doc. 20 at ¶¶ 420-22.) At her deposition, the only alleged policy violations Plaintiff identified involved due process, grievances, and termination. (Exh. M – Plaintiff Depo. Vol. 2 at p. 38.)

[31] Plaintiff's contract is arguably unclear on this point.  For purposes of this Motion, State Defendants will assume, without conceding, that the contract incorporated Policy H.S. 13.0.

Georgia courts have long held that a failure to adhere to policies and procedures for termination hearings are not actionable as a breach of contract. Doss v. City of Savannah, 290 Ga. App. 670, 677 (2008); Jones v. Chatham County, 223 Ga. App. 455, 459 (1996), but see, Kuritzky v. Emory Univ., 294 Ga. App. 370, 371 (2008) ("Georgia law permits an expelled student to bring a breach of contract action against a private educational institution for failure to abide by the hearing procedures set forth in the student handbook"). As long as the requirements of due process are met, "the employer's failure to follow all the procedures in the manual does not even give rise to an action for breach of contract." Norris v. Henry Cty., 255 Ga. App. 718, 720, (2002). Further, educational contracts have unique qualities and should be construed in a manner which leaves the school sufficient discretion to properly exercise its educational responsibility. Jansen v. Emory Univ., 440 F. Supp. 1060, 1062 (N.D. Ga. 1977) see also Life Chiropractic Coll., Inc. v. Fuchs, 176 Ga. App. 606, 608 (1985) (affirming grant of summary judgment against a student suspended by a private college because "there is no basis for a finding that the suspension was imposed in an arbitrary or capricious manner").

Policy H.S. 13.0 does not require that dismissals be "for cause" or any similar language. (Exh. P – Browder Dec. at ¶ 3 and Dec. Exh. 1.) It only indicates that the CCC shall "recommend disciplinary action, including dismissal, of a [resident] who has violated any applicable Law or policy, or otherwise failed to meet the criteria for continued employment according to academic and non-academic guidelines." Id. The CCC's recommendation goes to the Chair of the Department (in this case Dr. Meiler) who makes an initial decision. Id. The resident may then request a hearing before the Ad Hoc Committee, which makes another recommendation, this time to the Dean of the Medical College (in this case Dean Hess). Id. The Dean then renders another, independent decision. Id. The resident has a right to appeal the Dean's decision to the President

(in this case President Keel). Id. The policy gives the various administrators involved significant discretion when making their decisions. It contains no restriction on the President's discretion at all.

As detailed above, Plaintiff in the case at hand received the due process to which she was entitled as a resident in anesthesiology. Her dismissal was neither arbitrary nor capricious. Under the rule set out in Doss and Jones, her claim for breach of contract should be dismissed for those reasons alone. To the extent that rule might not apply, the Georgia "Supreme Court has held that the breach must be more than *de minimus* and substantial compliance with the terms of the contract is all that the law requires." Kuritzky, 294 Ga. App. at 371; See also, Widen v. Atlanta Hosp. Sub Issue B, 194 Ga. App. 890, 892 (1990) (summary judgment properly granted as to resident's breach of contract claim because "the procedure afforded plaintiff was in substantial compliance with the provisions of defendant's bylaws"). The steps set out in Policy H.S. 13.0 were followed in this case. It was not a violation of Augusta University policy for Drs. Meiler and Arthur to take patient safety concerns involving Plaintiff to Dr. Coule. (Exh. P – Browder Dec. at ¶ 11.) It was Dr. Coule's prerogative to suspend Plaintiff's housestaff privileges pursuant to AUMC's Bylaws. (Exh. P – Browder Dec. at ¶ 12.) It was appropriate for Dean Hess to terminate Plaintiff from the residency program after her privileges were suspended. (Exh. P – Browder Dec. at ¶ 14.) Because Dean Hess had made the decision to terminate Plaintiff, the next level of appeal was to President Keel. (Exh. P – Browder Dec. at ¶ 5; Exh. S – Hess Dec. at ¶ 18.) President Keel ordered an investigation and upheld Dean Hess' decision based on the verbal report of the investigators. (Exh. U – Keel Depo. at pp. 119-20.) These undisputed facts show at least substantial compliance with the procedural requirements of policy H.S. 13.0. State Defendants are entitled to summary judgment on this claim.

### K.    Count Fifteen (Attorney's Fees) Should Be Dismissed

Finally, Plaintiff seeks attorney's fees pursuant to O.C.G.A. § 13-6-11. (Complaint at ¶ 440-48.) Plaintiff's claim for attorney's fees depends upon the success of her substantive claims. Benchmark Builders, Inc. v. Schultz, 289 Ga. 329, 330 (2011) ("an award of attorney fees but no other damages or affirmative relief under a statute that authorizes an award of attorney fees to the 'prevailing party' is illegal and void, not merely erroneous and voidable"). As explained in detail above, State Defendants are entitled to summary judgment as to the substantive claims against them. Because those claims should dismissed, Plaintiff's claims attorney's fees should also be dismissed.

## IV.    CONCLUSION

For the reasons stated above, State Defendants respectfully request that their Motion for Summary Judgment be granted, and that the Court enter an Order dismissing with prejudice all of Plaintiffs' claims against them.

Respectfully submitted this 22nd day of February, 2022.

CHRISTOPHER M. CARR    112505
Attorney General

BRYAN K. WEBB             743580
Deputy Attorney General

Katherine Powers Stoff
Katherine Powers Stoff              536807
Senior Assistant Attorney General

/s/ Thomas L. Cathey                  116622
Thomas L. Cathey

*Attorneys for Defendant Board of*
*Regents of the University System of*
*Georgia d/b/a Augusta University;*
*Medical College of Georgia;*
*Dr. Brooks Keel, in his individual capacity;*

*Dr. Steffen Meiler, in his individual capacity; and*
*Dr. Mary Arthur, in her individual capacity.*

OF COUNSEL:

HULL BARRETT, PC
Post Office Box 1564
Augusta, Georgia 30903-1564
(706)722-4481
tcathey@hullbarrett.com

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have this day electronically filed the foregoing **BRIEF IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system and served upon counsel of record by electronic filing as follows:

**Tanya D. Jeffords**
**Kenneth S. Ratley**
The Law Offices of Tanya D. Jeffords and Associates, PC
437 Walker Street
Augusta, GA 30901

**Robert C. Threlkeld**
**Elliott Coward**
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326

This 22nd day of February, 2022.

<u>/s/ Thomas L. Cathey</u>
Thomas L. Cathey