**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| DR. LESLEY WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No.: |
| v. | ) | 1:20-cv-00100 |
| | ) | |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY SYSTEM OF GEORGIA; | ) | |
| AU HEALTH SYSTEM, Inc.; | ) | |
| AU MEDICAL CENTER, Inc.; | ) | |
| DR. BROOKS KEEL, in his individual | ) | |
| capacity; | ) | |
| DR. PHILLIP COULE, in his individual | ) | |
| capacity; | ) | |
| Dr. STEFFEN Meiler, in his individual | ) | |
| capacity; | ) | |
| DR. MARY ARTHUR, in her individual | ) | |
| capacity; | ) | |
| and JOHN DOES, | ) | |
| | ) | |
| Defendants. | ) | |

## STATE DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

NOW COME Defendants Board of Regents of the University System of Georgia ("the BOR"); Dr. Brooks Keel, in his individual capacity; Dr. Steffen Meiler, in his individual capacity; and Dr. Mary Arthur, in her individual capacity (collectively "the Individual Doctors", collectively with the BOR "State Defendants") and file this Statement of Undisputed Material Facts pursuant to Rule 56.1 of the Local Rules of the Southern District of Georgia.

1.  Beginning July 1, 2017, Plaintiff, Dr. Lesley Williams, was a resident in the Department of Anesthesiology and Perioperative Medicine ("the Department") at Augusta University. (Doc. 23 at ¶ 25.)

2.      Dr. Steffen Meiler is the Chair of the Department, and Dr. Mary Arthur is the Director of the Department's residency program. (Doc. 23 at ¶ 37 and 41.)

3.      Dr. Walter Moore served as Senior Associate Dean for Graduate Medical Education at the Medical College of Georgia. (Doc. 23 at ¶ 39.)

4.      Dr. Brooks Keel is the President of Augusta University. (Doc. 23 at ¶ 33.)

5.      At all relevant times, Drs. Keel, Moore, Meiler, and Arthur were employed by the BOR, d/b/a Augusta University. (Doc. 23 at ¶ 20; Doc. 26 at ¶ 20.)

6.      AU Medical Center Inc. ("AUMC" or "the hospital") is a private, non-profit corporation that operates the hospital affiliated with the Medical College of Georgia. (Doc. 73, *passim*.)

7.      AU Health System, Inc. is the sole corporate member of AUMC. (Doc. 73 at p. 4 n.1.)

8.      Dr. Phillip Coule is AUMC's Chief Medical Officer. (Doc. 80, *passim*.)

9.      A medical residency occurs after a doctor graduates from medical school and involves in-depth training within a specific medical specialty. (Exh. A – Arthur Dec. at ¶ 3.)

10.     Residents learn "by actually providing medical care." (Exh. B – Coule Depo. at pp. 13-14.)

11.     Resident education is hands-on, and residents treat patients under the supervision of other, more experienced, physicians ("attending physicians"). (Exh. A – Arthur Dec. at ¶ 4.)

12.     Anesthesiology residents practice under the supervision of attending physicians and are given increasing responsibility to get them to the point of being independently responsible for all aspects of patient care. (Exh. C – Meiler Depo. at p. 20.)

13.     During their training, anesthesiology residents rotate through a series of different subspecialties (for example: Pediatrics, Obstetrics, and the General Operating Room). Each rotation typically lasts four weeks. (Exh. A – Arthur Dec. at ¶¶ 5and 6.)

14.     Residents are students first, but they are also employees who receive a salary. (Exh. A – Arthur Dec. at ¶ 7.)

15.     Residents at Augusta University are primarily trained at the hospital – AUMC. (Exh. D – Arthur Depo. at p. 20.)

16.     Attending physicians are granted "clinical privileges" by the hospital that authorize them to treat patients at AUMC as members of the medical staff. (Exh. B – Coule Depo. at pp. 16-17; Exh. E – Bylaws at Coule MD 0230.)

17.     Residents are not members of the medical staff and do not have the same clinical privileges as attending physicians. (Exh. B – Coule Depo. at pp. 14 and 17.)

18.     Residents are considered "housestaff" and have limited housestaff privileges to train at AUMC, which may include providing supervised clinical services, without full clinical privileges and without being members of the medical staff. (Exh. B – Coule Depo. at pp. 17-18.)

19.     Residents cannot provide patient care without the supervision of an attending physician. (Exh. B – Coule Depo. at p. 14.)

20.     A resident whose housestaff privileges at AUMC are suspended cannot complete their residency at Augusta University. (Exh. D – Arthur Depo. at pp. 20-21.)

21.     Anesthesiology is a high-stress profession where the stress can be unpredictable. (Exh. A – Arthur Dec. at ¶ 8; Exh. F – Plaintiff Depo. Vol. 1 at p. 86.)

22.    Patients are sedated, the anesthesiologist is attending to them, and those patients depend on the anesthesiologist to respond to any emergencies that might arise. (Exh. A – Arthur Dec. at ¶ 9; Exh. F – Plaintiff Depo. Vol. 1 at p. 87.)

23.    Emergencies can arise suddenly and unpredictably, and a patient's status can go from normal to disastrous very quickly. (Exh. A – Arthur Dec. at ¶ 10; Exh. F – Plaintiff Depo. Vol. 1 at p. 87.)

24.    Anesthesiology requires attention to detail, concentration, and memory. (Exh. A – Arthur Dec. at ¶ 11; Exh. F – Plaintiff Depo. Vol. 1 at p. 87.)

25.    Anesthesiology residents must be able to deal with life-threatening situations independently and rapidly. (Exh. A – Arthur Dec. at ¶ 12.)

26.    Anesthesiology residents must rapidly and independently acquire and process information in order to assure individual responsibility for all aspects of anesthesiology care. (Exh. A – Arthur Dec. at ¶ 13.)

27.    On March 15, 2018, Plaintiff was sexually assaulted in her home. (Doc. 23 at ¶ 45.)

28.    Plaintiff does not contend that any Defendant was in any way responsible for the assault. (Exh. F – Plaintiff Depo. Vol. 1 at p. 55.)

29.    During the assault on March 15, 2018, Plaintiff was hit in the head several times, she lost consciousness, and she was "probably" concussed. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 55-56.)

30.    Plaintiff returned to the residency program on March 20, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 64-65.)

31.    When Plaintiff returned to the residency program, she was "absolutely not" prepared to return to full duty, and she asked her supervisors not to put her to work in the operating room. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 66-67.)

32.    On March 26, 2018, Plaintiff met with Drs. Meiler and Arthur (and other representatives of the Department) to discuss her fitness for duty. (Exh. F – Plaintiff Depo. Vol. 1 at p. 66 and Depo. Exh. AU-6.)

33.    Plaintiff was having trouble sleeping, moments of forgetfulness, trouble concentrating, and difficulty paying attention to detail. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 68-69 and 72.)

34.    Drs. Meiler and Arthur were concerned that these problems would affect Plaintiff's ability to safely care for patients. (Exh. A – Arthur Dec. at ¶ 15; Exh. G – Meiler Dec. at ¶ 4.)

35.    Plaintiff agreed to provide Drs. Meiler and Arthur with information from her therapist regarding her ability to work. (Exh. A – Arthur Dec. at ¶ 16; Exh. F – Plaintiff Depo. Vol. 1 at pp. 70-71; Exh. G – Meiler Dec. at ¶ 5.)

36.    Plaintiff's therapist was Dr. Amy House, Ph.D. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 59-60.)

37.    On March 27, 2018, Dr. House wrote a letter to the residency program indicating that Plaintiff was experiencing "reactions that make sustained attention and concentration difficult." (Exh. A – Arthur Dec. at ¶ 17 and Dec. Exh. 1; Exh. H – House Depo. at p. 16 and Depo. Exh. D-1.)

38.    Dr. House's letter of March 27, 2018 went on to say that "because of [Plaintiff's] current difficulties with sustained attention and concentration, it is not advisable that she engage

in patient care at the current time." (Exh. A – Arthur Dec. at ¶ 17 and Dec. Exh. 1; Exh. H – House Depo. at p. 16 and Depo. Exh. D-1.)

39.     Dr. House's letter of March 27, 2018 recommended that the Department accommodate Plaintiff, "perhaps with some elective rotations out of the usual sequence . . .." (Exh. A – Arthur Dec. at ¶ 17 and Dec. Exh. 1; Exh. H – House Depo. at p. 16 and Depo. Exh. D-1.)

40.     The Department accommodated this request by placing Plaintiff on a "research rotation" beginning April 1, 2018. (Exh. A – Arthur Dec. at ¶ 18.)

41.     During the research rotation, Plaintiff would do research for academic credit without treating patients. (Exh. A – Arthur Dec. at ¶ 19.)

42.     The research rotation began on April 1, 2018 and ran through the month. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 75-76 and Depo. Exh. AU-8.)

43.      As April 2018 drew to a close, the Department sought an update about Plaintiff's ability to return to work. (Exh. A – Arthur Dec. at ¶ 20.)

44.     On April 20, 2018, Dr. House sent an email to Drs. Meiler and Arthur indicating that Plaintiff's "current self-assessment [was] that she can engage in supervised patient care." (Exh. A – Arthur Dec. at ¶ 21 and Dec. Exh. 2; Exh. H – House Depo. at p. 19 and Depo. Exh. D-2.)

45.     Dr. House believed that this self-assessment was "reasonable and likely accurate," but she had not formally assessed Plaintiff's cognitive capabilities at that point. (Exh. A – Arthur Dec. at ¶ 21 and Dec. Exh. 2; Exh. H – House Depo. at p. 19 and Depo. Exh. D-2.)

46.     Dr. House's email of April 20, 2018 went on to say that evaluating Plaintiff's ability to return to full duty was "not my role as her treating provider." (Exh. A – Arthur Dec. at ¶ 21 and Dec. Exh. 2; Exh. H – House Depo. at p. 19 and Depo. Exh. D-2.)

47.     Dr. House recommended that the Department "request an independent objective evaluation of [Plaintiff's] ability to function effectively at her job, especially as it relates to attention and concentration." (Exh. A – Arthur Dec. at ¶ 21 and Dec. Exh. 2; Exh. H – House Depo. at p. 19 and Depo. Exh. D-2.)

48.     Plaintiff met with Dr. Meiler on April 20, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 87-88.)

49.     Plaintiff recorded her meeting with Dr. Meiler on April 20, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at p. 88.)

50.     During the meeting of April 20, 2018, Plaintiff told Dr. Meiler, "Right now, I know my brain is still screwed up," and indicated she was having memory problems. (Exh. I at 10:50.)

51.     Plaintiff was not comfortable making split-second, life-or-death decisions. (Exh. I at 11:30.)

52.      Plaintiff was not prepared to work in the cold, in the dark, or with a Black man as a patient. (Exh. I at 05:25.)

53.     Being exposed to cold, darkness, or Black men caused Plaintiff to experience "a reaction of high anxiety" akin to a panic attack. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 61-62.)

54.     Plaintiff's assailant was a Black man. (Exh. F – Plaintiff Depo. Vol. 1 at p. 55.)

55.      Many of the patients that Plaintiff would be required to treat were Black men. (Exh. A – Arthur Dec. at ¶ 25.)

56.     Operating rooms are kept cool for infection control purposes and may be dimly lit, particularly when minimally invasive, video assisted procedures are being performed. (Exh. A – Arthur Dec. at ¶ 26.)

57.     Plaintiff's inability or unwillingness to work in the cold, in the dark, or with Black men as patients significantly limited her ability to perform the duties of an anesthesiology resident. (Exh. A – Arthur Dec. at ¶ 27.)

58.     Plaintiff was scheduled to begin a rotation in Obstetrics ("OB") in May 2018. When Dr. Meiler asked her if she felt she could do that, Plaintiff responded, "for the most part." (Exh. I at 04:25.)

59.     At the meeting of April 20, 2018, Dr. Meiler indicated that he was concerned because he did not know Plaintiff's ability to perform her duties, said he would talk to Dr. Arthur, and suggested that "there may be requirements you will have to abide by." (Exh. I at 21:55 and 24:15.)

60.     As suggested by Dr. House, Drs. Meiler and Arthur decided to request an independent, objective evaluation of Plaintiff's ability to perform her duties as a resident. (Exh. A – Arthur Dec. at ¶ 21; Exh. G – Meiler Dec. at ¶ 6.)

61.     The decision to request an independent, objective evaluation of Plaintiff's ability to perform her duties as a resident was based on Dr. House's letters and on Plaintiff's own admission that she was having trouble with focus, memory, and sleeping. (Exh. A – Arthur Dec. at ¶ 23; Exh. G – Meiler Dec. at ¶ 7.)

62.     Plaintiff's issues with focus, memory, and sleeping gave Drs. Meiler and House concerns about her ability to safely care for patients, which is why they wanted to evaluate her ability to perform her duties as an anesthesiology resident. (Exh. A – Arthur Dec. at ¶ 24; Exh. G – Meiler Dec. at ¶ 8.)

63.     Drs. Meiler and Arthur wanted an evaluation to understand whether Plaintiff was experiencing "deficits that could interfere with her performance as a resident anesthesiologist taking care of patients in our various care areas." (Exh. C – Meiler Depo. at pp. 81-82.)

64.     Dr. Meiler met with Plaintiff on April 25, 2018 and told her he wanted a third party to evaluate her ability to work before she started seeing patients again. (Exh. F – Plaintiff Depo. Vol. 1 at p. 95; Exh. G – Meiler Dec. at ¶ 9.)  Plaintiff responded, "That's fine." (Exh. F – Plaintiff Depo. Vol. 1 at p. 95.)

65.     With Dr. House's assistance, Drs. Meiler and Arthur chose Dr. Jeremy Hertza, the Fitness for Duty Program Coordinator for a company called LifeGuard, to evaluate Plaintiff. (Exh. A – Arthur Dec. at ¶ 28; Exh. F – Plaintiff Depo. Vol. 1 at pp. 96-98 and Depo. Exh. AU-12; Exh. G – Meiler Dec. at ¶ 10; Exh. J – Hertza Depo. at p. 28.)

66.     Drs. Meiler and Arthur told Dr. Hertza they were interested in evaluating Plaintiff's abilities to perform her duties as an anesthesiology resident, and they had concerns about patient safety. (Exh. J – Hertza Depo. at p. 23.)

67.     LifeGuard's standard procedure is to perform a functional capacity evaluation and a neuropsychiatric evaluation. (Exh. J – Hertza Depo. at pp. 24-25.)

68.     The functional capacity evaluation and neuropsychiatric evaluation would demonstrate Plaintiff's ability to provide patient care and perform the duties of an anesthesiology resident. (Exh. J – Hertza Depo. at p. 26.)

69.     Plaintiff was on vacation from May 4 to May 14, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 99 and 102.)

70.    When Plaintiff returned from vacation, Dr. Arthur met with her and explained that she would be on "observership" until she was cleared to treat patients. (Exh. A – Arthur Dec. at ¶ 29.)

71.    While on observership, Plaintiff was expected to check in daily, read up on the cases scheduled that day, and stay in the operating room as an observer. (Exh. A – Arthur Dec. at ¶ 30.)

72.    While on observership, Plaintiff would not be permitted to provide patient care, but she would be able to stay engaged with the practice of anesthesiology and in contact with the other residents and the attending physicians in the Department. (Exh. A – Arthur Dec. at ¶ 31.)

73.    Plaintiff began a rotation in Obstetrics on May 14, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 104-05.)

74.    As of May 14, 2018, the Department was still waiting for the results of the LifeGuard evaluation, and Dr. Meiler had told Plaintiff on April 25, 2018 that he wanted a third party to evaluate her ability to work before she started seeing patients again. (Exh. F – Plaintiff Depo. Vol. 1 at p. 95; Exh. G – Meiler Dec. at ¶ 9.)

75.    Plaintiff treated patients in Obstetrics. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 109-110.)

76.    Plaintiff continued to treat patients after beginning a Pediatrics rotation in June 2018. (Exh. A – Arthur Dec. at ¶ 34.)

77.    Plaintiff treated patients in Obstetrics and Pediatrics without being released to duty. (Exh. A – Arthur Dec. at ¶ 35.)

78.     Residents are required to log the cases they perform in a database maintained by the Accreditation Council for Graduate Medical Education ("ACGME"). (Exh. A – Arthur Dec. at ¶ 36.)

79.     ACGME is an accrediting organization that sets standards for training residents to become qualified and safe practitioners. (Exh. C – Meiler Depo. at p. 24.)

80.      Logging cases allows residents' supervisors to monitor their progress and make sure they satisfy the minimum requirements for graduation. (Exh. A – Arthur Dec. at ¶ 37.)

81.     The residency program has access to the database and is able to review the information logged by residents. (Exh. A – Arthur Dec. at ¶ 38.)

82.     In early June 2018, Karen McDaniel (the Department's Residency Program Coordinator), realized that Plaintiff was logging cases in the database. (Exh. K – McDaniel Depo. at pp. 14-15.)

83.     This was incorrect, because Plaintiff was on observership and had not been cleared to treat patients. (Exh. A – Arthur Dec. at ¶ 39; Exh. K – McDaniel Depo. at pp. 15-16.)

84.     Ms. McDaniel brought the issue to Dr. Arthur's attention. (Exh. A – Arthur Dec. at ¶ 40; Exh. K –McDaniel Depo. at p. 14.)

85.     Because Plaintiff was on observership, Dr. Arthur directed her to delete the cases she had logged with ACGME in May and June 2018. (Exh. A – Arthur Dec. at ¶ 42.)

86.     On Monday, June 18, 2018, Dr. Arthur received an email from Dr. Heather Byrd, an attending physician in Pediatrics, reporting that Plaintiff had "disappeared" that day and the previous Friday. (Exh. A – Arthur Dec. at ¶ 44 and Dec. Exh. 3.)

87.    Dr. Ellen Basile, another attending physician in Pediatrics, reported to Dr. Arthur that Plaintiff had not been in the operating room the previous Thursday, either. (Exh. A – Arthur Dec. at ¶ 45 and Dec. Exh. 4.)

88.    On Tuesday, June 19, 2018, Plaintiff unexpectedly lost consciousness in the operating room. (Exh. A – Arthur Dec. at ¶ 46; Exh. F – Plaintiff Depo. Vol. 1. at pp. 147-48.)

89.    On June 19, 2018, Plaintiff was on observer status, standing against the wall while a medical procedure was being performed on a pediatric patient. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 147-48.)

90.    On June 19, 2018, Plaintiff felt light-headed and passed out. (Exh. F – Plaintiff Depo. Vol. 1 at p. 148.)

91.    On June 19, 2018, Plaintiff was taken to the emergency room where she was treated by defendant Dr. Phillip Coule. (Exh. B – Coule Depo. at pp. 34-35.)

92.    Anesthesiology is a profession with a high risk for substance abuse disorder, and anesthesiology residents in particular are at high risk because of their access to controlled substances and the stress of the profession. (Exh. C – Meiler Depo. at pp. 44-45.)

93.    Drs. Meiler and Arthur believed it was necessary to rule out substance abuse as the reason for Plaintiff's unexplained loss of consciousness. (Exh. A – Arthur Dec. at ¶ 47; Exh. G – Meiler Dec. at ¶ 12.)

94.    A previous incident in which Plaintiff had gone to the emergency room in late 2017 complaining of shortness of breath, lightheadedness, and a "heart flutter" also factored into the decision to drug test her. (Exh. A – Arthur Dec. at ¶ 49; Exh. G – Meiler Dec. at ¶ 14.)

95.    After conferring with human resources, the legal department, and the Graduate Medical Education office, Drs. Meiler and Arthur decided to require Plaintiff to be drug tested. (Exh. A – Arthur Dec. at ¶ 48; Exh. G – Meiler Dec. at ¶ 13.)

96.    On June 22, 2018, Drs. Meiler, Arthur, and Associate Program Director Dr. Ankit Jain met with Plaintiff to discuss her being drug tested. (Exh. A – Arthur Dec. at ¶ 50; Exh. G – Meiler Dec. at ¶ 15.)

97.    Plaintiff recorded the meeting of June 22, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at p. 156.)

98.    Dr. Jain began the meeting by explaining why Plaintiff was being drug tested, and he handed her a form to review and sign. (Exh. L at 00:45.)

99.    Plaintiff responded:

To start with, this is bullshit. Straight up. I'm on medication that lowers my blood pressure. I spent Friday night drinking at the roast. I spent Saturday night drinking at graduation. I spent Sunday drinking at the lake. So they gave me three liters of fluid and fixed me.

(Exh. L at 02:30.)

100.    After some additional discussion, Plaintiff stated, "I will take your drug test, just so y'all can shove it up your ass." (Exh. L at 04:50.)

101.    When Plaintiff said "bullshit" and "shove it up your ass" about the drug test, she was talking to Dr. Meiler, the Chair of the Department. (Exh. M – Plaintiff Depo. Vol. 2 at p. 84.)

102.    Dr. Meiler found Plaintiff's actions to be unprofessional and disrespectful, and he decided to discipline her for them. (Exh. G – Meiler Dec. at ¶ 17.)

103.    Dr. Meiler decided the most appropriate time to discipline Plaintiff would be when she returned to duty. (Exh. G – Meiler Dec. at ¶ 18.)

104.    On July 10, 2018, LifeGuard issued its final report of the functional capacity evaluation and neuropsychological evaluation of Plaintiff. (Exh. J – Hertza Depo. at p. 27 and Depo. Exh. D-2.)

105.    LifeGuard's report fully and completely detailed the results of those evaluations. (Exh. J – Hertza Depo. at pp. 28-29.)

106.    The purpose of LifeGuard's report was to explain Plaintiff's ability to return to work as a resident. (Exh. J – Hertza Depo. at p. 32.)

107.    The functional capacity evaluation evaluated Plaintiff's physical ability to perform her duties as a resident and found that she was able to meet the physical demands of the residency. (Exh. J – Hertza Depo. at pp. 54-55.)

108.    The neuropsychological evaluations that Dr. Hertza performed raised concerns about Plaintiff's abilities. (Exh. J – Hertza Depo. at p. 55.)

109.    A neuropsychological evaluation is a process by which a doctor looks at a person's brain function using standardized tests. (Exh. J – Hertza Depo. at p. 29.)

110.    Dr. Hertza conducted his neuropsychological evaluation of Plaintiff in order to determine if there were any cognitive or psychiatric/psychological factors that would impact her ability to successfully manage her responsibilities at the medical school. (Exh. J – Hertza Depo. at p. 29.)

111.    During the examination, Plaintiff reported to Dr. Hertza that she was experiencing symptoms including difficulty with increased startle responses, fear in certain situations, hyper-vigilance, difficulty being alone, triggers of cold and darkness, variable ability to handle stress, and increased emotionality. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 172-73; Exh. J – Hertza Depo. at p. 35.)

112.    Plaintiff reported experiencing a rapid onset of cognitive difficulties. (Exh. J – Hertza Depo. at p. 40.)

113.    Plaintiff was slowly improving, but was not back to baseline. (Exh. J – Hertza Depo. at p. 40.)

114.    Plaintiff reported changes in her ability to pay attention to things and her mental organization. (Exh. J – Hertza Depo. at p. 40.)

115.    The changes reported by Plaintiff were supported by objective tests Dr. Hertza performed. (Exh. J – Hertza Depo. at p. 40.)

116.    Dr. Hertza's testing showed that Plaintiff functioned in the high average range intellectually, but she was having difficulty with attention and processing speed and would take more time to complete tasks. (Exh. J – Hertza Depo. at p. 36.)

117.    Plaintiff's ability to sustain focus during prolonged activities was with difficulty. (Exh. J – Hertza Depo. at p. 42.)

118.    Dr. Hertza's tests also showed that Plaintiff's weaknesses and variability would get worse in the event that she was subjected to high stress. (Exh. J – Hertza Depo. at pp. 36-37.)

119.    Plaintiff's attention and processing speed issues would get worse under high-stress situations – for example, if a patient had a sudden emergency. (Exh. J – Hertza Depo. at p. 56.)

120.    Dr. Hertza's report stated, "As anesthesiology consists of almost constant stress in high pressure environments typically involving high risk patient safety situations, extreme caution should be used when reintegrating [Plaintiff]." (Exh. J – Hertza Depo. at p. 37.)

121.    LifeGuard and Dr. Hertza included seven "recommendations" in the report:

1.    [Plaintiff] should be provided with extra time to complete tasks to help compensate for her attention and processing speed issues;

2.      [Plaintiff] should be provided with frequent breaks to help compensate for her mild attentional issues;

3.      [Plaintiff] should slowly transition into a high stress work environment; any work in a high stress environment should begin in smaller blocks of time (half days) and slowly increase (it may be prudent to have [Plaintiff] participate in a simulation to evaluate how she copes with various stress scenarios prior to her return to practice);

4.      [Plaintiff] should avoid serial days on call with little sleep/high stress;

5.      [Plaintiff] should be provided a contact within her company to whom she can reach out if stress and/or PTSD symptoms arise;

6.      [Plaintiff] should have frequent meetings with supervisors to ensure no risk to patient safety arises; and

7.      [Plaintiff] should continue with individual therapy.

(Exh. J – Hertza Depo. at p. 55 and Depo. Exh. D-2 at p. 7.)

122.    It was Dr. Hertza's opinion that these recommendations were necessary for Plaintiff to function within her work environment in the Department. (Exh. J – Hertza Depo. at p. 54.)

123.    Plaintiff testified that she would not have gone back to work in July 2018 without having all seven recommendations in place, because "I was not putting myself or my patients in jeopardy." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 177-78.)

124.    Dr. Hertza met with Drs. Moore, Meiler, and Arthur on July 26, 2018 to discuss the results of the evaluations. (Exh. G – Meiler Dec. at ¶ 19.)

125.    At the meeting of July 26, 2018, Dr. Hertza reviewed the results of his evaluations, including Plaintiff's issues with focusing and processing speed that the evaluations had revealed. (Exh. J – Hertza Depo. at p. 61.)

126.    At the meeting of July 26, 2018, Dr. Hertza also discussed the recommendations contained in his report. (Exh. J – Hertza Depo. at p. 60-61.)

127.    Because of the attention and processing speed issues Plaintiff was experiencing, Dr. Hertza recommended Plaintiff be provided with extra time to complete tasks, including the patient care tasks that an anesthesiologist would perform on a day-to-day basis. (Exh. J – Hertza Depo. at pp. 55-56.)

128.    In order to compensate for Plaintiff's attentional issues, Dr. Hertza recommended that she be provided with frequent breaks on an as-needed basis. (Exh. J – Hertza Depo. at p. 56.)

129.    Dr. Hertza's report also indicated, "it may be prudent to have [Plaintiff] participate in a simulation lab to evaluate how she copes with various stress scenarios prior to her return to practice." (Exh. J – Hertza Depo. at p. 57.)

130.    The simulation would expose Plaintiff to various scenarios that might occur in the practice of anesthesiology in a controlled environment in order to assess her ability to perform the duties of an anesthesiology resident. (Exh. A – Arthur Dec. at ¶ 52; Exh. J – Hertza Depo. at pp. 62 and 67.)

131.    At his deposition, Dr. Hertza explained why he recommended the simulation:

> I am not an anesthesiologist. So what I wanted to make sure . . . is that we were very diligent in looking at all the potential risks to patient care prior to really clearing her for anesthesiology because it's a very high risk, high pressure situation. And you can sit there in my office and you can go through five hours' worth of testing, which is pretty intense, but it's not sitting there in an anesthesia-like environment. So we can predict some of the challenges that she would have and we're very accurate in that, but ultimately when we're talking about people's lives we really want to make sure that we're spot on and we're comfortable with our conclusions. . . . I think it's appropriate to have an anesthesiologist make sure that an anesthesiologist can do their job and that was the idea behind that evaluation.

 (Exh. J – Hertza Depo. at pp. 57-58.)

132.    Ultimately, Dr. Hertza offered the Department two options: (1) slowly integrate Plaintiff back into the residency program according to the seven recommendations contained in

the report; or (2) allow Plaintiff additional time to continue with her therapy and then clear her for duty through the simulation. (Exh. J – Hertza Depo. at pp. 67-69.)

133. An essential function of Plaintiff's position as a resident was to provide safe and effective patient care. (Exh. A – Arthur Dec. at ¶ 53 and Dec. Exh. 5.)

134. The Department could not feasibly provide at least two of Dr. Hertza's seven recommendations. (Exh. A – Arthur Dec. at ¶ 54; Exh. G – Meiler Dec. at ¶ 21.)

135. First, the Department could not allow Plaintiff extra time to complete tasks. (Exh. G – Meiler Dec. at ¶ 23.)

136. As a resident, Plaintiff would be required to respond immediately to sudden and unexpected emergencies. (Exh. G – Meiler Dec. at ¶ 24.)

137. There was simply no way to give Plaintiff extra time to respond in an emergency situation when a patient's life could be at risk. (Exh. G – Meiler Dec. at ¶ 25.)

138. Second, the Department was not able to allow Plaintiff to take frequent breaks on an as-needed basis. (Exh. G – Meiler Dec. at ¶ 26.)

139. In the Department, one attending physician typically supervises two residents at a time. (Exh. G – Meiler Dec. at ¶ 27.)

140. Each of those residents works in a different room, and the attending physician moves between them as necessary. (Exh. G – Meiler Dec. at ¶ 28.)

141. The Department is short-staffed and very busy. (Exh. G – Meiler Dec. at ¶ 29.)

142. Patients under anesthesia cannot be left unattended safely, and residents sometimes have to forgo even regularly-scheduled breaks in order to provide appropriate patient care. (Exh. G – Meiler Dec. at ¶ 30.)

143.    Thus, Plaintiff could not safely take breaks as needed. (Exh. G – Meiler Dec. at ¶ 31.)

144.    Because the Department could not provide all seven of Dr. Hertza's recommendations, the decision was made to go with his other option – the simulation. (Exh. G – Meiler Dec. at ¶ 33.)

145.    Drs. Moore, Meiler, and Arthur met with Plaintiff on August 6, 2018. (Exh. G – Meiler Dec. at ¶ 34.)

146.    During the meeting of August 6, 2018, Drs. Meiler and Arthur explained that the Department could not provide the extra time to complete tasks and frequent breaks recommended by Dr. Hertza. (Exh. A – Arthur Dec. at ¶ 55; Exh. G – Meiler Dec. at ¶ 36.)

147.    During the meeting of August 6, 2018, Drs. Meiler and Arthur told Plaintiff that they wanted her to take the simulation before returning to duty. (Exh. A – Arthur Dec. at ¶ 56; Exh. G – Meiler Dec. at ¶ 37.)

148.    Drs. Moore, Meiler, Arthur, and Jain met with Plaintiff, Ms. Bing, and Drs. House and Hertza (who attended via telephone) on August 9, 2018. (Exh. G – Meiler Dec. at ¶ 39.)

149.    Plaintiff recorded the meeting of August 9, 2018. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 6-7.)

150.    At the meeting, Dr. Hertza explained that Plaintiff's processing speed was "highly variable," particularly when under pressure. (Exh. J – Hertza Depo. at p. 65; Exh. N at 00:20.)

151.    Plaintiff was triggered by being in a cold room, in the dark, or around individuals who reminded her of her assailant. (Exh. J – Hertza Depo. at p. 65; Exh. N at 01:30.)

152.    Dr. Hertza was not sure if exposure to those triggers would potentially put a patient at risk, and he told the Department, "That's the problem." (Exh. J – Hertza Depo. at p. 66; Exh. N at 02:25.)

153.    At the meeting of August 9, 2018, Dr. Hertza went over the options he had previously discussed with the Department: provide Plaintiff a "very guided, very slow" return to the residency program in accordance with the seven recommendations in his report or evaluate her through the simulation. (Exh. J – Hertza Depo. at p. 67; Exh. N at 02:55.)

154.    At the meeting of August 9, 2018, Dr. House identified an error in Dr. Hertza's report – the report indicated that Plaintiff's memory was mildly to moderately impaired when it was actually in the high average range. (Exh. N at 07:30.)

155.    At his deposition, Dr. Hertza testified that this error did not change any of his recommendations. (Exh. J – Hertza Depo. at pp. 71-72.)

156.    At the meeting of August 9, 2018, Dr. House asked Dr. Hertza to explain how Plaintiff's variable processing speed might affect her functioning. Dr. Hertza responded that the data suggested Plaintiff could function at a very high level, but may not do so consistently. (Exh. J – Hertza Depo. at p. 72; Exh. N at 08:40.)

157.    Dr. Hertza's concern was that, under pressure, there were times when Plaintiff would be "spot on," but at other times, she would "not be responding as fast as she needs to in a crisis." (Exh. J – Hertza Depo. at pp. 72-73; Exh. N at 11:10.)

158.    At the meeting of August 9, 2018, Dr. House opined that Plaintiff's PTSD symptoms had become "sub-clinical" and were no longer having a "major impact" on her. Dr. Hertza responded, "So the question would be . . . if it's not impacting day-to-day functioning, it

may or may not be indicative of how she's going to handle a really intense situation in the [operating room]." (Exh. J– Hertza Depo.at p. 74; Exh. N at 14:25.)

159.    Ultimately, it was decided that Plaintiff would have to complete the simulation before she could return to duty. (Exh. A – Arthur Dec. at ¶ 56; Exh. G – Meiler Dec. at ¶ 40.)

160.    It took some time to schedule the simulation, and Plaintiff remained on paid leave during this time. (Exh. G – Meiler Dec. at ¶ 41.)

161.    On September 14, 2018, attorney Mike Brown wrote a letter to Drs. Moore, Meiler, and Arthur on Plaintiff's behalf. (Exh. C – Meiler Depo. at pp. 77-78 and Depo. Exh. P-17.)

162.    On September 26, 2018, Plaintiff emailed ACGME, because "I wanted my department to stop with all the crap they were putting me through." (Exh. M – Plaintiff Depo. Vol. 2 at pp. 10-11 and Depo. Exh. AU-39.)

163.    Plaintiff was not part of any conversations between ACGME and Dr. Moore regarding her email of September 26, 2018. (Exh. M – Plaintiff Depo. Vol. 2 at p. 12.)

164.    On October 1, 2018, Plaintiff sent an email to ADA Coordinator Antoinette Lewis. (Exh. F – Plaintiff Depo. Vol. 1 at p. 210; Exh. M – Plaintiff Depo. Vol. 2 at p. 10 and Depo. Exh. AU-38.)

165.    In response to Plaintiff's email, Ms. Lewis obtained the essential functions Plaintiff's position from Dr. Arthur and sent Plaintiff an ADA accommodation request form to complete. (Exh. O – Lewis Depo. at pp. 32-33 and Depo. Exh. 132.)

166.    The completed ADA accommodation form is attached to Volume 1 of Plaintiff's Deposition as Exhibit AU-25. On that exhibit, pages Bates-stamped BOR 2810 and 2811 were completed by Plaintiff, and pages Bates-stamped BOR 2812 through 2814 were completed by Dr.

House. (Exh. F – Plaintiff Depo. Vol. 1. at pp. 215 and 218; Exh. H – House Depo. at pp. 32, 34, and 60.)

167.    Dr. House indicated on the form that she was treating Plaintiff for post-traumatic stress, and she checked a box indicating that the impairment did not affect Plaintiff's ability to perform the essential functions of her job. (Exh. H – House Depo. at pp. 31-32 and Depo. Exh. D-5.)

168.    Dr. House went on to recommend accommodations for Plaintiff. Dr. House's recommended accommodations were essentially the same as Dr. Hertza's seven recommendations. (Exh. H – House Depo. at pp. 34-36 and Depo. Exh. D-5.)

169.    Ms. Lewis also put Plaintiff in touch with Director of Employment Equity Glenn Powell, because she believed some of the issues in Plaintiff's email raised EEO issues under Title VII. (Exh. O – Lewis Depo. at p. 26-27.)

170.    Mr. Powell contacted Plaintiff via email on October 15, 2018 and spoke with her twice about her complaints. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 8-9.)

171.    Ms. Lewis spoke with Plaintiff, who stated that the only accommodation she believed she needed was a break every two to three hours. (Exh. O – Lewis Depo. at p. 43.)

172.    Ms. Lewis eventually sent a letter to Dr. Arthur, dated November 12, 2018, stating, "when [Plaintiff] returns to work, a 10-15 minute break is recommended every 2-3 hours . . ." (Exh. O – Lewis. Depo. at p. 79 and Depo. Exh. P-131.)

173.    Plaintiff was returned to the residency program on November 14, 2018 – two days after Ms. Lewis' letter to Dr. Arthur. (Exh. A – Arthur Dec. at ¶ 58; Exh. F – Plaintiff Depo. Vol. 1 at pp. 222-23.)

174.     On November 14, 2018, Plaintiff was assigned another one-month research rotation, for which she would receive academic credit. (Exh. A – Arthur Dec. at ¶ 59; Exh. F – Plaintiff Depo. Vol. 1 at p. 223.)

175.     The only accommodation Plaintiff required as of November 14, 2018 was a "slow integration" back into the residency program. She received that accommodation. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 224-25.)

176.     When Plaintiff returned to the residency program on November 14, 2018, she received a disciplinary warning for unprofessional behavior based on her conduct when she was told to take a drug test on June 22, 2018. (Exh. F – Plaintiff Depo. Vol. 1 at p. 225 and Depo. Exh. AU-27.)

177.     LifeGuard issued its Final Report regarding the Simulation on December 10, 2018. This report recommended:

> [A]fter a brief period of close observation and appropriate mentoring [Plaintiff] should be given the opportunity to proceed with her anesthesia training at her current level without the need to keep her away from high acuity/high stress situations and without the need for breaks over and above what is normally given at her institution.

(Exh. F – Plaintiff Depo. Vol. 1 at p. 228 and Depo. Exh. AU-28.)

178.     The Department returned Plaintiff to clinical duties beginning December 17, 2018. (Exh. A – Arthur Dec. at ¶ 61; Exh. F – Plaintiff Depo. Vol. 1 at p. 231.)

179.     Plaintiff was slowly integrated back into the residency program, as the simulation report recommended. She accepted that process. (Exh. A – Arthur Dec. at ¶ 62; Exh. F – Plaintiff Depo. Vol. 1 at p. 231-33.)

180.     On February 12, 2019, Plaintiff improperly extubated a patient under the care of attending physician Panthea Taghizedeh, M.D. while the patient was still on the ventilator. (Exh.

A – Arthur Dec. at ¶ 63 and Dec. Exh. 6; Exh. F – Plaintiff Depo. Vol. 1 at pp. 243-44 and 246;
Exh. M – Plaintiff Depo. Vol. 2 at p. 8.)

181.    In Plaintiff's words, "When I actually extubated her, [the patient] was still on the
little bit of assist on the breathing." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 243-44.)

182.    Plaintiff should have removed the patient from pressure support before extubating
her. (Exh. F – Plaintiff Depo. Vol. 1 at p. 246.)

183.    The patient experienced a very quick and critical decline, and multiple other
attending physicians had to be called to resuscitate and rescue the patient. (Exh. A – Arthur Dec.
at ¶ 63 and Dec. Exh. 6; Exh. F – Plaintiff Depo. Vol. 1 at pp. 245.)

184.    On February 23, 2019, Plaintiff took a standardized test called the In-Training
Examination ("ITE"). (Exh. F – Plaintiff Depo. Vol. 1. at p. 257.)

185.    The ITE is a standardized test created and graded by the American Board of
Anesthesiology and is administered annually across the country. (Exh. A – Arthur Dec. at ¶ 65.)

186.    The ITE is taken on a computer, and it is structured so that test takers can review
and change their answers if they want to. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 258-59.)

187.    Plaintiff signed a form prior to taking the ITE that forbade her from bringing
"books, papers, or memoranda of any kind to the examination site." (Exh. F – Plaintiff Depo. Vol.
1 at pp. 259-60 and Depo. Exh. AU-32.)

188.    The form Plaintiff signed also indicated that she must not "in any way provide or
receive unauthorized information about the content of the examination while it is in progress."
(Exh. F – Plaintiff Depo. Vol. 1 at pp. 259-60 and Depo. Exh. AU-32.)

189.    A proctor is present during the ITE "to make sure that no one has notes" during the
examination. (Exh. K – McDaniel Depo. at p. 38.)

190.    The ITE is 200 questions long. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 258-59.)

191.    Plaintiff had completed 100 questions on the test when she left the test room and went to a breakroom next door. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 264-66.)

192.    Plaintiff's study guide was on a chair in the breakroom. (Exh. F – Plaintiff Depo. Vol. 1 at p. 265-66.)

193.    There had been two questions on the previous year's test about a cardiology matter called "TEE pictures." (Exh. F – Plaintiff Depo. Vol. 1 at p. 267.)

194.    Plaintiff had not done a cardiology rotation, and she wanted to "refresh her knowledge" about TEE pictures. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 267-69.)

195.    Plaintiff began flipping through her study guide looking for the section on cardiology. (Exh. F – Plaintiff Depo. Vol. 1 at p. 267.)

196.    Plaintiff was looking for information about TEE pictures in her study guide, when another student and then the proctor caught her. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 267-68.)

197.    The American Board of Anesthesiology considered Plaintiff's behavior on February 23, 2019 to be cheating. (Exh. F – Plaintiff Depo. Vol. 1 at p. 270 and Depo. Exh. AU-33.)

198.    Plaintiff was on overnight call on March 13, 2019. (Exh. F – Plaintiff Depo. Vol. 1 at pp. 279-80.)

199.    Plaintiff was on duty until 7:00 a.m. and required to carry a pager, which would be used to notify her in case of an emergency. (Exh. A – Arthur Dec. at ¶ 66; Exh. F – Plaintiff Depo. Vol. 1 at p. 280.)

200.    At the end of her shift, Plaintiff was expected to hand the pager to the next resident on duty and notify the senior resident before leaving. (Exh. A – Arthur Dec. at ¶ 67.)

201.    The senior resident on the night of March 13, 2019 was Dr. Lydia Searcy. (Exh. A – Arthur Dec. at ¶ 68.)

202.    Dr. Searcy notified Dr. Arthur that plaintiff had been seen outside the hospital at about 6:30 that morning. (Exh. A – Arthur Dec. at ¶ 69.)

203.    Plaintiff had not told Dr. Searcy she was leaving, and she had not received permission to leave early. (Exh. A – Arthur Dec. at ¶ 70; (Exh. F – Plaintiff Depo. Vol. 1 at pp. 288-89.)

204.    When Dr. Searcy finally reached Plaintiff on the phone, Plaintiff indicated she had left the building and left the pager on a desk. (Exh. A – Arthur Dec. at ¶ 71.)

205.    Dr. Arthur also spoke to Dr. Salman Janjua (the resident scheduled to relieve Plaintiff that morning) and to the attending physician, Dr. Victor Rizzo. (Exh. A – Arthur Dec. at ¶ 72.) Both confirmed Dr. Searcy's report. Id.

206.    Dr. Arthur concluded that Plaintiff had abandoned her call by leaving early on the morning of March 14, 2019. (Exh. A – Arthur Dec. at ¶ 73.)

207.    On March 18, 2019, the Department's Clinical Competency Committee ("CCC") held a hearing to consider a formal disciplinary recommendation for Plaintiff's cheating on the ITE. (Exh. A – Arthur Dec. at ¶ 74.)

208.    Plaintiff spoke at length to the CCC and admitted that she had opened her study guide during the ITE, "just for refreshing knowledge." (Exh. F – Plaintiff Depo. Vol. 1 at pp. 263-69; Exh. Q at pp. 4-5.)

209.    Moreover, at the conclusion of the CCC hearing, Plaintiff confessed that she had used "THC Gummies". (Exh. Q at p. 9.)

210.    In April or May 2018, Plaintiff had consumed an edible containing THC – the psychoactive component of marihuana. (Exh. F – Plaintiff Depo. Vol. 1 at p. 271-73.)

211.    With one abstention, the CCC voted unanimously to recommend Plaintiff's immediate termination from the residency program. (Exh. A – Arthur Dec. at ¶ 75.)

212.    The CCC notified Dr. Meiler of its decision via email on March 19, 2019. (Exh. G – Meiler Dec. at ¶ 42 and Dec. Exh. 1.)

213.    According to the email, the CCC had considered the cheating incident along with "previous professionalism lapses." (Exh. G – Meiler Dec. at ¶ 42 and Dec. Exh. 1.)

214.    Dr. Meiler considered the CCC's recommendation and agreed with it. (Exh. G – Meiler Dec. at ¶ 43.)

215.    Dr. Meiler issued a letter to Plaintiff terminating her from the residency program. (Exh. G – Meiler Dec. at ¶ 44 and Dec. Exh. 2.)

216.    Plaintiff had the option of appealing Dr. Meiler's decision, and she did so. (Exh. M – Plaintiff Depo. Vol. 2 at p. 14 and Depo. Exh. AU-41; Exh. P – Browder Dec. at ¶ 3 and Dec. Exh. 1.)

217.    An Ad Hoc Committee met to consider Plaintiff's appeal on April 26, 2019.

218.    At the Ad Hoc Committee hearing of April 26, 2019, Dr. Arthur, assisted by Dr. Basile, presented the reasons why the Department sought to terminate Plaintiff from the residency program. (Exh. R at p. 5.)

219.    At the Ad Hoc Committee hearing of April 26, 2019, Drs. Arthur and Basile described numerous incidents of Plaintiff behaving unprofessionally, including: Plaintiff cheating on the ITE; logging cases while on observer status; taking credit for cases performed by other residents; "disappearing" while on observership in pediatrics; behaving inappropriately and using

of profanity when told to take a drug test on June 22, 2018; admitting to the use of THC gummies; and abandoning call on the morning of March 14, 2019. (Exh. R at pp. 6-24.)

220.    At the Ad Hoc Committee hearing of April 26, 2019, Plaintiff spoke at length on her own behalf, offering her rebuttal to the issues raised by Drs. Arthur and Basile. (Exh. R at pp. 27-97.)

221.    On May 2, 2019, the Ad Hoc Committee recommended against terminating Plaintiff from the residency program. (Exh. S – Hess Dec. at ¶ 3 and Dec. Exh. 1.)

222.    On May 17, 2019, Dean David Hess issued a letter to Plaintiff informing her that he had decided to not uphold her termination and return her to the residency program. (Exh. S – Hess Dec. at ¶ 5 and Dec. Exh. 2.)

223.    Once it became known that Dean Hess had reinstated Plaintiff to the residency program, "[the] faculty voiced great concerns" to Dr. Meiler. (Exh. C – Meiler Depo. at p. 34.)

224.    The Department faculty had lost trust in Plaintiff's professionalism and ability to be trained. (Exh. C – Meiler Depo. at p. 139.)

225.    The Department faculty felt that they could not trust Plaintiff due to a number of professional transgressions, and the incident in which Plaintiff had cheated on the ITE was the final event that led them to lose trust in her. (Exh. C – Meiler Depo. at pp. 123-24.)

226.    A faculty meeting took place on June 3, 2019. (Exh. C – Meiler Depo. at p. 119.)

227.    At the faculty meeting of June 3, 2019, the Department faculty were nearly unanimous in opposing Plaintiff's return to the residency program. (Exh. A – Arthur Dec. at ¶ 78; Exh. G – Meiler Dec. at ¶ 46; Exh. S – Hess Dec. at ¶ 7.)

228.    At the faculty meeting of June 3, 2019, faculty members expressed concerns about Plaintiff's self-reported use of THC. (Exh. A – Arthur Dec. at ¶ 79; Exh. G – Meiler Dec. at ¶ 47; Exh. S – Hess Dec. at ¶ 8.)

229.    At the faculty meeting of June 3, 2019, faculty members also expressed concerns that Plaintiff was dishonest and could not be trusted. (Exh. A – Arthur Dec. at ¶ 80; Exh. G – Meiler Dec. at ¶ 48; Exh. S – Hess Dec. at ¶ 9.)

230.    Plaintiff's trustworthiness was in question because she had cheated on the ITE. (Exh. A – Arthur Dec. at ¶ 81; Exh. G – Meiler Dec. at ¶ 49; Exh. S – Hess Dec. at ¶ 10; Exh. T – Cartwright Depo. at p. 21.)

231.    Throughout the faculty meeting of June 3, 2019, numerous faculty members expressed concerns that Plaintiff's unprofessional behavior was a threat to patient safety. (Exh. A – Arthur Dec. at ¶ 82; Exh. G – Meiler Dec. at ¶ 50; Exh. S – Hess Dec. at ¶ 11.)

232.    At the faculty meeting of June 3, 2019, the faculty gave a vote of no confidence to Plaintiff. (Exh. C – Meiler Depo. at p. 122.)

233.    After the meeting of June 3, 2019, Dr. Arthur encouraged the faculty to put their concerns about Plaintiff in writing. As Dr. Arthur testified:

> I asked a rhetorical question [to the faculty]: Are you willing to back up your statement with evaluations? And it was a categorical, yes, send us 360 evaluations and we will complete them.

(Exh. D – Arthur Depo. at p. 117.)

234.    Dr. Arthur thus arranged for evaluation forms to be sent to the faculty, and a number of faculty members completed evaluations of Plaintiff on June 3 and 4, 2019. (Exh. A – Arthur Dec. at ¶ 84.)

235.     Dean Hess recognized that there were patient safety issues at hand. (Exh. S – Hess Dec. at ¶ 12.)

236.     As Chief Medical Officer, Dr. Coule is responsible for oversight of patient safety issues at the hospital. (Exh. B – Coule Depo. at pp. 8-10; Exh. S – Hess Dec. at ¶ 13.)

237.     As Chair of the Department and Program Director of the residency program, Drs. Meiler and Arthur had an obligation to bring safety concerns involving residents to the Chief Medical Officer's attention. (Exh. S – Hess Dec. at ¶ 14.)

238.     Dean Hess recommended that Drs. Meiler and Arthur bring their patient safety concerns about Plaintiff to Dr. Coule's attention. (Exh. C – Meiler Depo. at pp. 128-29.)

239.     Dr. Coule asked Drs. Meiler and Arthur to submit their concerns about Plaintiff to him in writing. (Exh. B – Coule Depo. at pp. 72 and 77.)

240.     Drs. Arthur and Meiler sent Dr. Coule a letter dated June 4, 2019 outlining their concerns about Plaintiff. (Exh. A – Arthur Dec. at ¶ 85; Exh. G – Meiler Dec. at ¶ 51 and Dec. Exh. 3.)

241.     Plaintiff had engaged in a pattern of unprofessional actions which, in the aggregate, made her unreliable and untrustworthy to the point that she could not practice anesthesiology safely. (Exh. A – Arthur Dec. at ¶ 86; Exh. G – Meiler Dec. at ¶ 52.)

242.     Dr. Coule had treated Plaintiff after she passed she passed out in the operating room on June 19, 2018. (Exh. B – Coule Depo. at pp. 33-34.)

243.     When Dr. Coule treated Plaintiff, she told him that she had been drinking heavily over the previous weekend. (Exh. B – Coule Depo. at pp. 42-43.)

244.     Plaintiff also mentioned some substance abuse that weekend – specifically her use of THC gummies. (Exh. B – Coule Depo. at pp. 36 and 41.)

245.    Dr. Coule would have suspended Plaintiff's privileges in June 2018 based on her reports of alcohol and drug use, but because he learned that information as her treating physician, he chose not to act on it in order to preserver her patient privacy. (Exh. B – Coule Depo. at p. 70.)

246.    Dr. Coule reviewed Drs. Meiler and Arthur's letter, along with the attached documentation, in detail. (Exh. B – Coule Depo. at p. 76.)

247.    Dr. Coule wrote a letter suspending Plaintiff's privileges to practice medicine as a resident in anesthesia at AUMC and the Children's Hospital of Georgia and revoking her access to the Medical Center. (Exh. B – Coule Depo. at p.66 and Depo. Exh. P-325.)

248.    The decision to suspend Plaintiff's privileges was solely Dr. Coule's. (Exh. B – Coule Depo. at p. 67.)

249.    In making his decision, Dr. Coule relied on the information presented to him by the residency program combined with his own knowledge from treating Plaintiff on June 19, 2018. (Exh. B – Coule Depo. at pp. 67, 73 and 88.)

250.    Dr. Coule's decision was based on the totality of the information available to him, "not on any one piece of information." (Exh. B – Coule Depo. at p. 135.)

251.    Dr. Coule made his decision "in the interest of patient safety." (Exh. B – Coule Depo. at p. 108.)

252.    When he made his decision, Dr. Coule was acting in accordance with the authority granted him as Chief Medical Officer of AUMC under Section 5.1 of the Bylaws of the Medical Staff of the AU Medical Center. (Exh. B – Coule Depo. at p. 153.)

253.    Section 5.1 of AUMC's Medical Staff Bylaws allowed Dr. Coule, in his capacity as the hospital's Chief Medical Officer, to suspend Plaintiff's privileges as a resident if, in his sole

opinion, he believed she presented a risk to AUMC's patients. (Exh. B – Coule Depo. at pp. 152-154 and Depo. Exh. P-23; Exh. E – Bylaws at Coule MD 0238.)

254.    Dean Hess received a copy of Dr. Coule's letter. (Exh. S – Hess Dec. at ¶ 15 and Depo. Exh. 3.)

255.    Dean Hess agreed that Plaintiff presented a risk to patient safety. (Exh. S – Hess Dec. at ¶ 16.)

256.    On June 5, 2019 Dean Hess issued a letter to Plaintiff informing her that she could no longer return to the residency program because she no longer had clinical privileges or access to the Medical Center. (Exh. S – Hess Dec. at ¶ 17 and Dec. Exh. 4.)

257.    On June 25, 2019, Plaintiff directed an email to Dean Hess and Dr. Moore with the subject "Appeal of Termination." (Exh. M – Plaintiff Depo. Vol. 2 at p. 20 and Depo. Exh. AU-45.)

258.    Because Dean Hess had made the decision to terminate Plaintiff, the next level of appeal was to the President of Augusta University. (Exh. P – Browder Dec. at ¶ 5; Exh. S – Hess Dec. at ¶ 18.)

259.    Plaintiff's email thus escalated the grievance process to Dr. Brooks Keel, the President of Augusta University. (Exh. M – Plaintiff Depo. Vol. 2 at p. 20.)

260.    President Keel directed Dr. Gretchen Caughman, Provost and Executive Vice President for Faculty Affairs, and Dr. Kathy Browder, Associate Provost for Faculty Affairs, to investigate Plaintiff's appeal. (Exh. P – Browder Dec. at ¶ 6; Exh. U – Keel Depo. at p. 119.)

261.    Dr. Browder took the lead in the investigation. (Exh. P – Browder Dec. at ¶ 7.)

262.    Dr. Browder obtained information from Dean Hess's office. (Exh. P – Browder Dec. at ¶ 8.)

263. Dr. Browder reviewed documents related to the case and spoke at length with Plaintiff over the phone about her grievances. (Exh. P – Browder Dec. at ¶ 9.)

264. It appeared to Dr. Browder that the evidence of patient safety concerns related to Plaintiff was strong. (Exh. P – Browder Dec. at ¶ 10.)

265. It was not a violation of Augusta University policy for Drs. Meiler and Arthur to take patient safety concerns involving Plaintiff to Dr. Coule. (Exh. P – Browder Dec. at ¶ 11.)

266. It was Dr. Coule's prerogative to suspend Plaintiff's housestaff privileges. (Exh. P – Browder Dec. at ¶ 12.)

267. It was appropriate for Dean Hess to terminate Plaintiff from the residency program after her privileges were suspended. (Exh. P – Browder Dec. at ¶ 14.)

268. After discussing the matter, Dr. Browder and Dr. Caughman verbally recommended that Plaintiff's termination from the residency program be upheld. (Exh. P – Browder Dec. at ¶ 15.)

269. President Keel received the verbal report from Drs. Caughman and Browder and decided on that basis to uphold Dean Hess' decision. (Exh. U – Keel Depo. at pp. 119-20.)

270. President Keel issued a letter to Plaintiff on July 18, 2019 upholding Dean Hess' decision to terminate her from the residency program. (Exh. U – Keel Depo. at p. 84 and Depo. Exh. P-9.)

271. President Keel's letter informed Plaintiff that she had a right to apply for a review of his decision with the University System Board of Office of Legal Affairs. (Exh. U – Keel Depo. at pp. 30 and 55 and Depo. Exh. P-9.)

272. Plaintiff's counsel directed a letter to Edward Tate, Vice Chancellor for Legal Affairs, on August 7, 2019. (Exh. M – Plaintiff Depo. Vol. 2 at p. 25 and Depo. Exh. AU-47.)

273.    Mr. Tate issued a letter affirming Plaintiff's termination from the residency program on October 24, 2019. (Exh. M – Plaintiff Depo. Vol. 2 at pp. 25-26 and Depo. Exh. AU-48.)

274.    Plaintiff's last day of employment as a resident was November 1, 2019. (Exh. M – Plaintiff Depo. Vol. 2 at p. 26.)

275.    Plaintiff was paid continuously from March 18, 2018 until November 1, 2019. (Exh. M – Plaintiff Depo. Vol. 2 at p. 26.)

Respectfully submitted this 22nd day of February, 2022.

CHRISTOPHER M. CARR    112505
Attorney General

BRYAN K. WEBB              743580
Deputy Attorney General

Katherine Powers Stoff
Katherine Powers Stoff          536807
Senior Assistant Attorney General

/s/ Thomas L. Cathey            116622
Thomas L. Cathey

*Attorneys for Defendant Board of*
*Regents of the University System of*
*Georgia d/b/a Augusta University;*
*Medical College of Georgia;*
*Dr. Brooks Keel, in his individual capacity;*
*Dr. Steffen Meiler, in his individual capacity; and*
*Dr. Mary Arthur, in her individual capacity.*

OF COUNSEL:

HULL BARRETT, PC
Post Office Box 1564
Augusta, Georgia 30903-1564
(706)722-4481
tcathey@hullbarrett.com

01637627-1                         34

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the foregoing **STATE DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS** with the Clerk of Court using the CM/ECF system and served upon counsel of record by electronic filing as follows:

**Tanya D. Jeffords**
**Kenneth S. Ratley**
The Law Offices of Tanya D. Jeffords and Associates, PC
437 Walker Street
Augusta, GA 30901

**Robert C. Threlkeld**
**Elliott Coward**
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326

This 22nd day of February, 2022.

/s/ Thomas L. Cathey
Thomas L. Cathey