**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| DR. LESLEY WILLIAMS,<br>Plaintiff,<br>v.<br><br>BOARD OF REGENTS OF THE<br>UNIVERSITY SYSTEM OF GEORGIA;<br>AU HEALTH SYSTEM, Inc.;<br>AU MEDICAL CENTER, Inc.;<br>DR. BROOKS KEEL, in his individual capacity;<br>DR. PHILLIP COULE, in his individual capacity;<br>DR. WALTER MOORE, in his individual<br>capacity;<br>Dr. Steffen Meiler, in his individual capacity; DR.<br>MARY ARTHUR, in her individual capacity; and<br>JOHN DOES;<br><br>Defendants. | Civil Action File No.:<br>1:20-cv-00100 |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Dr. Lesley Marie Williams (hereinafter referred to as "Plaintiff"), by and

through her attorneys, and files Plaintiff's Memorandum in Opposition to State Defendants'

Motion for Summary Judgment. The Board of Regents of the University System of Georgia

("BOR"), and individual defendants Dr. Steffen Meiler, Dr. Mary Arthur, and Dr. Brooks Keel

(collectively the "State Defendants") filed a single consolidated State Defendants' Motion for

Summary Judgment (Doc. 104), Brief in Support of State Defendant's Motion for Summary

Judgment (Doc. 105), and State Defendants' Statement of Undisputed Material Facts (Doc. 106).

Plaintiff asserts that she lost her career when the Defendants terminated her residency in

Anesthesiology at Augusta University ("AU") in violation of her civil right to be free from sex

discrimination (Count 1) and retaliation under Title IX (Count 2); disability discrimination

(Count 9) and retaliation under ADA Title II (Count 10) and § 504 of the Rehabilitation Act

(Counts 12 and 13); unlawful reprisal under Georgia's Whistleblower Act (Count 3), and Breach of Contract (Count 14). Against Drs. Arthur and Meiler, Plaintiff asserts a § 1983 claim for violation of her right to Due Process (Count 7). Plaintiff asserts claims for attorney's fees, should she prevail, under the various statutes as well as O.C.G.A. § 13-6-11 (Count 15). Plaintiff submits that Defendants' motion should be denied as there are genuine issues of material fact as to the Defendants' motives for the adverse actions that preclude summary judgment.

## I.    BACKGROUND FACTS

Beginning on July 1, 2017, Dr. Lesley Williams was a second-year anesthesia resident working in the GME Residency Program at the Medical College of Georgia of Augusta University ("AU"). (Doc. 23 ¶ 25). Plaintiff's Resident Milestone Evaluations ending June 15, 2018, show that she was meeting the goals of her program with favorable comments in all areas including Patient Safety and Quality Improvement. (2017-2018 Milestone Evals - BOR 0969-0974, attached as BOR Memo Ex. 1). Unfortunately, her whole life changed when on March 15, 2018, Plaintiff was sexually assaulted by an unknown attacker. (Pl.'s Am. Compl. - Doc. 23-1 ¶ 45; PSOF Ex. 1 - Pl. Depo. p. 66; PSOF Ex. 2 - Critical Issues Grid - BOR 2180). AU assigned Plaintiff a Title IX case manager, Michele Reed. (PSOF ¶ 9, PEx. 7 - Reed Depo. p. 14, 15; PSOF Ex. 8 - April 3, 2018, Title IX Reed Email to Meiler). As a result of her sexual assault, Plaintiff was diagnosed with Post Traumatic Stress Disorder ("PTSD"). The assault caused her to have difficulties with sleeping and concentration. She immediately began treatment with Dr. Amy House. Dr. House is a Ph.D. Clinical Psychologist. She was employed at Augusta University since 1997. (House Depo. p. 10-13, attached as Memo. Ex. 2). Dr. House met with the Plaintiff about once a week as part of Plaintiff's psychological therapy. (PSOF Ex. 3 – 3.27.18 Dr. House Ltr.; PSOF Ex. 4 - Accommodation Request). On March 20, 2018, Plaintiff

returned to the residency program. Dr. House recommended that Plaintiff return to her residency duties because the best recovery outcomes after traumatic events are usually facilitated by a return to normal work and life activities as quickly as possible. (PSOF ¶ 3, Ex. 3 - House 3-27-18, Accommodation Request). Dr. House recommended that the residency program accommodate her with some elective rotations out of usual sequence to maximize her recovery and allow her to continue with her training. Dr. House explained that Plaintiff reported to her the issues she was having as a result of the sexual assault and that Plaintiff felt that she should not engage in patient care at that time. (House Depo. p. 18 – Memo Ex. 2). On March 27, 2018, Dr. House recommended that the Department accommodate Plaintiff, "perhaps with some elective rotations out of the usual sequence." (Doc. 106 – State Defendants Undisputed Material Facts "SDUMF" ¶ 39). While the Department accommodated this request from Plaintiff and her physician, this accommodation began on April 1, 2018, and ran through the month and it was temporary as she began to recover from the sexual assault. (Doc. 106 – SDUMF ¶ 40-43).

## A. Plaintiff's Requests For Accommodations So She Could Return To Patient Care

On or about April 20, 2018, over a month later, Dr. House informed Drs. Arthur and Meiler that they should communicate with HR with regard to reasonable accommodations in the workplace for Plaintiff because she was able to engage in "supervised patient care." (House April 20, 2018 Email, attached as Memo Ex. 3). Plaintiff requested to return to "supervised patient care" based upon her own self-assessment which Dr. House agreed was reasonable and likely accurate. (Id.). Dr. House testified that as Plaintiff progressed in her therapy and her PTSD symptoms improve, she was more likely to be able to attend and focus and concentrate and return to full work duties, the symptoms of PTSD were less likely to get in the way. (Memo Ex. 2 - House Depo. p. 23). It was possible to have some symptoms of PTSD being addressed in therapy related to trauma or PTSD and nonetheless be able to return to full work capacity. (Id. p.

24). In her April 20, 2018, email, again, Dr. House informed Drs. Arthur and Meiler to reach out to HR about ideas as to how to move forward in a stepped way toward full work duties. (Memo Ex. 3 – House April 20, 2018 Email). AU's Fitness for Duty Policy stated that when the supervisor has reliable information of the need for a fitness for duty evaluation ("FFDT"), the supervisor will contact Human Resources, Associate Vice President University HR Services, or Vice President of Human Resources for guidance on how to proceed. The Supervisor completes the Fitness for Duty Request Form which will include a behavioral or physical description of the circumstances leading to request for the evaluation. (PSOF Ex. 9 – LW Disability & Gender Discrimination Inv. Summary - BOR 2866-2867).

On May 15, 2018, without having completed a Fitness for Duty Request Form, Dr. Arthur sent an email to Dr. Hertza formally requesting a Physician Back to Work Evaluation for Plaintiff stating "Dr. House had determined that she should refrain from patient care until such time that she could be evaluated." (PSOF Ex. 10 – Arthur May 15, 2018 FFD Email Request). However, Dr. House testified that this statement by Dr. Arthur was not true because Plaintiff is the one who determined she was not able to engage in patient care right after her sexual assault, and she was ready to support her return to work by April. (Memo Ex. 2 – House Depo. p. 67). In her Declaration, Dr. Arthur states that Dr. House recommended that Plaintiff should be evaluated. (Doc. 106, SDOUF ¶ 47). Dr. House testified that it was the department that requested an evaluation to determine that she was fit to return to clinical settings. (Id.). Dr. Arthur requested that Dr. Hertza answer the following questions: 1. Is she cognitively and psychologically able to perform in the high stress environment of the operating room? 2. What would be the potential impact of a tragic outcome in the operating room on Dr. William's recovery? There is no record that HR was involved in the determination on whether a fitness

duty evaluation was required. (PSOF Ex. 9, p.4). In May of 2018, Plaintiff took the FFDT and she passed with Dr. Hertza recommending 7 accommodations which would allow her to return to work: 1) extra time to complete tasks; 2) frequents breaks; 3) slow transition into a high stress work environment; 4) avoid serial days on call with little sleep/high stress; 5) provide her with contact to reach out to if stress or PTSD symptoms arise; 6) frequent meetings with supervisors. (Doc. 106, SDSUF ¶121). On July 26, 2018, Drs. Arthur andMeiler and others met, without the Plaintiff present, to discuss Dr. Hertza's report and recommendations. At that meeting, without Plaintiff present, Dr. Arthur decided that "the department would be unable to grant the requested accommodations because of the nature of anesthesiology." (PSOF Ex. 9, p. 3). Approximately 2 weeks later, on August 9, 2018, Dr. Arthur met with the Plaintiff, Dr. House, and her Rape Crise Representative, to discuss Dr. Hertza's report and recommendation. Plaintiff again requested that she be allowed to return to work with the accommodations recommended by Dr. Hertza. (August 9, 2018 Recorded Meeting, attached as Memo Ex. 4). Drs. Arthur and Meiler denied the request stating that it would be difficult to accommodate the requests on some days. Plaintiff agreed to do the simulation test but on September 14, 2018, she had her lawyer Mike Brown send a letter to Drs. Arthur and Meiler notifying them that she felt she was being treated differently than the male residents who had drug/alcohol abuse, PTSD, and mental breakdowns but were not required to do a simulation exam and she was suspended from her program due to her sexual assault.[1] Mr. Brown asked them to accept Dr. Hertza's accommodation recommendations. (PSOF ¶51, PEx. 32).

On October 2, 2018, Plaintiff filed a gender and disability complaint with the Office of Employee Relations. Plaintiff voiced her complaints to Antoinette Lewis, the Employment

---

[1] Mike Brown is now deceased.

Relations and ADA Coordinator. She voiced her opposition to discrimination based upon her disability and gender, retaliation, and violation of her rights by her department. (PSOF ¶ 52, PSOF Ex. 33 - 10-2-18 ADA Compl. to Lewis). Plaintiff felt she was being treated differently because she was raped and female noting that there was gender bias in the program and males who were suicidal and had breakdowns in the operating room or w[2]ho committed vehicular homicide who did not have to do Fit For Duty tests or simulations. Ms. Lewis forwarded Plaintiff's Complaint to Glenn Powell, the Office of Employment Equity.

Soon thereafter, Antoinette Lewis sent a letter to Dr. Arthur advising her of the process under the ADA, which required an interactive process, and provided her with the information from Dr. House and the request for the following accommodation: Supervision and breaks as needed and, specifically, Plaintiff requested a "10 to 15 minute break every 2-3 hours" The supervised patient care was the key. (PSOF Ex. 34 - Accommodation Review, BOR 2815-2819).

On October 2, 2018, Dr. Arthur provided the ADA Coordinator with the essential functions of an Anesthesia Resident as requested. (Nov. 12, 2018, ADA Letter to Arthur - BOR2825, attached as Memo Ex. 5). The essential functions were submitted to Dr. House for review as her treating physician. Dr. Arthur was asked to accept or reject the request for an accommodation, and informed Dr. Arthur of managements rights to submit the justification for review. (Id.). Drs. Arthur and Meiler never provided a hardship justification request for their

---

[2] The investigation into Plaintiff's gender and disability compliant revealed that the department, Drs. Arthur and Meiler, did not provide a written hardship justification for denying the accommodations requested. Moreover, the investigation revealed that there was nothing to show that the two alternatives, the simulation exam or the treatment plan, would have assisted Plaintiff in performing the essential functions of her duties. (PSOF Ex. 9 - Disability & Gender Discrimination Inv. Summary, p. 5).

denial until now in Dr. Meiler's Declaration offered in support of summary judgment. (Doc. 106, SDUMF ¶¶134-144).

In response to her request for an accommodation of supervision and interim breaks, on November 9, 2018, Glenn Powell, of the Office of Employment Equity, recommended that they "handle Dr. Williams' request for an accommodation in accordance with our regular practice under the ADA." That is, to forward to the department the recommendation documented from Plaintiff's physician medical certification, and give them an opportunity to consider the recommendations. If they choose to decline the recommendations, the ADA allows them two options: 1) provide another acceptable accommodation that accomplishes the same objective (i.e. get the employee back to work and allows her to perform the essential functions of her job), or 2) provide an undue hardship justification. (Powell Nov. 9, 2018 ADA Email – BOR 7839, attached as Memo Ex. 6). Drs. Arthur and Meiler did neither. Instead, the Plaintiff was out on administrative leave, not progressing in her education for over seven months, from June of 2018 to December of 2018, when Plaintiff passed the simulation exam. The investigation into her compliant revealed that the department, Drs. Arthur and Meiler, did not provide a written hardship justification for denying the accommodations requested. Moreover, the investigation revealed that there was nothing to show that the two alternatives, the simulation exam or the treatment plan, would have assisted Plaintiff in performing the essential functions of her duties. (PSOF Ex. 9 - Disability & Gender Discrimination Inv. Summary, p. 5).

At this time, Plaintiff had not been attaining credit towards her residency requirements for more than six months since she was placed on leave pending the June 2018 drug test results and was denied credit for the work she performed in May of 2018 by being forced to delete her case logs. On February 23, 2019, Plaintiff was accused of "irregular examination behavior" for

having access to study materials during an examination break and Defendant's Drs. Meiler and Arthur moved to terminate her residency. (PSOF ¶ 59). Plaintiff learned in discovery that as of March 4, 2019, the Clinical Competency Committee had recommended professional remediation.  (PSOF ¶ 60, Ex. 38). However, on March 19, 2019, Dr. Meiler sent Plaintiff a letter informing her that the CCC recommended dismissal and he was upholding that determination. She was placed on administrative leave status pending her dismissal.  (PSOF ¶ 61, Ex. 39).  In accordance with AU procedures, Plaintiff appealed this attempt to terminate her to an Ad Hoc Committee. (PSOF ¶ 62). On May 2, 2019, the Ad Hoc Committee found that termination was not warranted and recommended to Dean Hess a performance improvement plan, remediation and/or probation, stating that no plan for remediation or probation had been considered and she had evaluations that showed no professionalism concerns. (PSOF ¶ 63,  PEx. 40).  On May 17, 2019, Dean Hess **agreed** with the Ad Hoc Committee' recommendation and he **overturned** the proposed termination and ordered the Plaintiff reinstated with a performance improvement plan. (PSOF ¶ 65, PEx. 41). Plaintiff was scheduled to return to her residency on June 3, 2019.  She sent a nice email to Dr. Arthur stating that she wanted to let the past go. (Fresh Start Email – BOR 6342-6343, attached as Memo Ex. 7)

### Post-Reinstatement, Violation of Due Process, and Retaliation

On or about May 31, 2019, Dr. Meiler learned "of our inability to appeal based on process" the Plaintiff's reinstatement.  (Meiler Text, May 31, 2019, BOR7945, attached as Memo Ex. 8).  Drs. Meiler and Arthur convened a series of faculty meetings.  On June 3, 2019, the handwritten meeting minutes show where they poisoned as evidenced by faculty comments of threats to sue and Plaintiff hiring lawyers and her accommodations. (6.3.19 Meeting Handwritten Notes - BOR 1686-1689, attached as Memo Ex. 9). Dr. Arthur solicited evaluations

and patient safety issues to submit to Dr. Coule in an effort to overturn Plaintiff's reinstatement, including having the faculty draft undeserved negative performance evaluations, which Plaintiff only learned about after her termination. (PSOF ¶ 67-73, PEx. 45; Coule Depo. PEx. 5, Depo. Ex. 102A, Coule MD 7-11). Drs. Meiler and Arthur provided these evaluations along with *draft* letters to Dr. Coule which included the statement "Over the years, the Department has successfully assisted several residents who have made mistakes in their career by providing professional help and a remediation plan that works for both the residents, our patients, and our department. Plaintiff has consistently challenged the good will of the department and many of the departments' actions to assist her. **She recently filed a formal claim of disability and gender discrimination with the University's employment Equity Office."** (emphasis added)(PSOF ¶ 75, Ex. 5 – June 4, 2019, Draft Termination Ltr. to Coule; Coule Depo. Pl. Ex102A). Dr. Coule suspended Plaintiff's hospital privileges, which in effect, overturned Plaintiff's reinstatement by Dean Hess. (PSOF ¶ 76-79, 81, PEx. 51).

Drs. Meiler and Arthur included in their June 4, 2019, letter to Dr. Coule 17 things for which they claim to have "lost trust" in the Plaintiff. Plaintiff never got an opportunity to address Dr. Coule regarding her suspension. (Pl. Depo. p. 145, PSOF Ex. 1). After her termination and during discovery, Plaintiff first learned of the evaluations submitted to Dr. Coule, Dean Hess, and Dr. Keel by Drs. Arthur and Meiler that were created on June 3, 2019, and were negative. Specifically, the evaluators were told that **"please know she will not see these evaluations. . . complete by 1:00 today"** (PSOF Ex. 49 - Email Request for Unseen Evals; Coule Depo. PEX. 5, Depo. Ex. 102A). These actions by Dr. Coule, in concert with Drs. Meiler and Arthur, circumvented Plaintiff's due process rights and AU Policy HS 13. (PSOF ¶ 82). On June 5, 2019, citing only the suspension of her hospital privileges, Dean Hess terminated

Plaintiff from her residency program. (PSOF ¶ 81, PEx. 53). In a text message received after depositions were complete and summary judgment briefing was underway, Dr. Meiler stated to somebody "she can't appeal Dr. Coule's decision." (6.4.19 Meiler Text, attached as Memo Ex. 10). Plaintiff submits that BOR deliberately denied her due process which resulted in her losing her career as an anesthesiologist.

## II. LEGAL ARGUMENT AND CITATION TO AUTHORITY

### A. Summary Judgment Standard

Summary judgment may be granted only where the movant shows that there is no genuine dispute as to any material fact, and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. P. 56I; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A material fact is one that is capable of affecting the outcome of litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding the motion, the Court must view evidence and factual inferences available from the evidence "in the light most favorable to the [Plaintiff], and resolve all reasonable doubts about the facts in favor of the [Plaintiff]. Skop v. City of Atlanta, 485 F.3d 1130, 1136 (quoting Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004)). In other words, as held in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000), a court reviewing a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party, and must not invade the jury's province by making credibility determinations or weighing the evidence, highlighting that in doing so the court is obligated to review the record as a whole, and "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. Evidence favoring the non-movant should be credited, as should "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." Id

**B.    Plaintiff's Title IX Sex Discrimination Claims Are Not Preempted by Title VII Because Plaintiff Was a Student and Not Just an Employee of AU.**

Defendants argue that Plaintiff's Title IX claims should be dismissed because they are preempted by Title VII but cite no binding authority for that proposition.  (Doc. 105, p. 31-32). The majority of circuit courts of appeal have held that Title VII does not preempt Title IX.[3] Furthermore, when viewing the specific facts of Eleventh Circuit cases, the district courts of this circuit consistently hold that students and student-employee hybrid plaintiffs, like medical residents, may bring either a Title VII claim, a Title IX claim, or both.

First, Joseph v. Bd. Of Regents, a case cited by Defendants, involved a women's basketball coach for Georgia Tech University who sued under Title IX on her own behalf for discrimination and retaliation related to her *employment* as the head basketball coach. No. 1:20-cv-502-TCB, 2020 U.S. Dist. LEXIS 208570 (N.D. Ga. May 8, 2020(Doc. 106, p. 31). The district court ruled that Joseph's Title IX claim was preempted by Title VII because her claim was based in her employment as a basketball coach and had no connection to her as an educator or learner at the university. Similarly, Hankinson v. Thomas Cty. Sch. Dist. also involved a coach who brought Title IX claims related to allegations of employment discrimination disconnected from the teaching and learning environment. Civil Action No. 6:04-CV-71 (HL), 2005 U.S. Dist. LEXIS 25576 (M.D. Ga. Oct. 28, 2005)(Doc. 106, p.31). In Hankinson, the

---

[3] The First, Third, Fourth, Sixth, and Eighth Circuits have held that a Title VII claim does not preempt a plaintiff's Title IX claim, while it appears that only the Fifth and Seventh Circuits have held that Title VII preempts Title IX. See Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 896 (1st Cir. 1988) (Finding employment discrimination against a student-employee actionable under Title IX); Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545, 564 (3d Cir. 2017) (reasoning that whether a plaintiff "could also proceed under Title VII is of no moment, for Congress provided a variety of remedies, at times overlapping, to eradicate private-sector employment discrimination." (internal quotation omitted)); Preston v. Comm. of Va. ex rel. New River Cmty. Coll., 31 F.3d 203, 205-06 (4th Cir. 1994) (holding that a private right of action separate from Title IX exists under Title IX for employment discrimination); Ivan v. Kent St. Univ., 92 F.3d 1185, 1996 WL 422496, at * 2 (6th Cir. 1996) (allowing plaintiff to proceed with an independent Title IX claim for alleged sex discrimination in employment); Brine v. Univ. of Iowa, 90 F.3d 271, 276 (8th Cir. 1996) (adopting First and Fourth Circuit decisions in Lipsett and Preston); but see, Lakoski v. James, 66 F.3d 751 (5th Cir. 1995); Waid v. Merrill Area Pub. Schs., 91 F.3d 857 (7th Cir. 1996).

district court held that Title VII preempted only monetary damages which may be awarded to Hankinson under Title IX and dismissed her Title IX claims as they related to injunctive relief not because of preemption but because such relief was moot under the specific facts of her case.[4] In Reese v. Emory Univ., No. 1:14-CV-2222-SCJ, 2015 U.S. Dist. LEXIS 193183 (N.D. Ga. Jan. 29, 2015), the plaintiff was neither a student nor a teacher and made allegations that were wholly related to her employment, not her education. Reese also did not pursue administrative remedies that would be a prerequisite to a Title VII suit. (Doc. 106, p. 32)

Importantly, the case of Reza v. Univ. of S. Ala., 2018 U.S. Dist. 207029, has facts most similar to the Plaintiff and the Court should rule consistent with Reza. In Reza, the district court held that a medical residents Title IX claims were not preempted by Title VII. As noted by the court in Reza:

> . . . a Title IX sex discrimination claim filed by a plaintiff who is both a student and an employee of a federally funded educational program is materially different than a Title IX sex discrimination claim filed by a plaintiff who is solely an employee of the federally funded educational program. The Court also finds persuasive the sound reasoning of other courts addressing this issue that have found that a student-employee's Title IX sex discrimination claim is not preempted by Title VII. Reza at 24.

While there is a circuit split regarding whether plaintiffs who are solely employees of an institution subject to Title IX may bring a successful Title IX claim, which could be brought under Title VII, there is no split in the circuit as to whether a plaintiff who is both student and employee, like the Plaintiff, can bring Title IX claims.[5] "Residents are students first, but they are

---

[4] It appears from the court's discussion that Hankinson did not pursue any administrative remedies, but it is not explicitly noted in the opinion.
[5] Furthermore, Plaintiff did not bring her Title IX claims to circumvent administrative processes as was the courts' concern in Joseph, Hankinson, and Reese, as is evident by the EEOC Charge of Discrimination she pursued for her ADA claims. Plaintiff brought her Title IX claims because they are proper under the facts of this case where she is the victim of a sexual assault and has been denied the privileges and benefits of her education and she has been, first

also employees who receive a salary." (Arthur Depo. p. 20:21-21:3, attached as Memo Ex. 11; Doc. 105-1 – Ex. A Dec. of M. Arthur, ¶ 7). Plaintiff is a student sexual assault survivor who was assigned a Title IX coordinator. (PSOF ¶9, PSOF Ex. 8, 9). The main adverse actions in this case are the suspension of Plaintiff's clinical privileges at AUMC and the resulting termination from her anesthesiologist residency. Plaintiff was not allowed to participate in her residency program for almost 7 months, but she was paid until November 1, 2019. (SDUMF ¶ 274, 275). A ruling by this Court that Title VII does not preempt Plaintiff's Title IX claims would be consistent with the overall goal of Title IX's focus on discrimination and retaliation that adversely impacts a sexual assault survivor's education, and the holdings in this Circuit's district courts. Therefore, this Court should deny the Defendants' motion for summary judgment based upon preemption.

**C.     The Evidence Establishes a Prima Facie Case Under Title IX Because Male Residents Who Made Mistakes In Their Careers Were Given Probation**

Title IX applies to entities with "educational programs and activities" that receive federal funds and applies to BOR as a recipient of federal funds. The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). In <u>Franklin v. Gwinnett County Public Schools</u>, 503 U.S. 60, 117 L. Ed. 2d 208, 112 S. Ct. 1028 (1992), the Supreme Court held that Title IX broadly prohibits a funding recipient from subjecting any person to discrimination "on the basis of sex." 20 U.S.C. § 1681. Like Title VII, to establish a prima facie case of disparate treatment based upon sex plaintiff must show that (1) she is a member of a protected class; (2)

---

and foremost, seeking reinstatement, and then compensation for her lost career as an anesthesiologist due to the disability discrimination, sex discrimination, and retaliation. (Doc. 23 – Pl. Amend. Cmpl. ¶¶ 449-458).

she was subjected to an adverse action; (3) similarly situated residents who were not members of her protected class were treated more favorably; and (4) she was qualified. See Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).

It is undisputed that Plaintiff, as a female student and sexual assault survivor, is a member of the protected class under Title IX. The Defendants do not argue that Plaintiff was unqualified. (Doc. 105, p. 32-35). Plaintiff was reinstated to her residency after Drs. Meiler and Arthur's attempt to have her terminated based upon the following violations of her professionalism contract presented to the Ad Hoc Committee: irregular exam behavior, logging cases while on observership status, lodging a complaint to the ACGME that she was asked to delete case logs and not get credit for the cases she actually worked; not showing up for work; using profanity when she was asked to take a drug test, which she passed, after collapsing in the OR; self-reporting drinking over graduation weekend which let to dehydration; taking THC gummies to sleep; misrepresenting facts to the VA that she had only done MAC cases and needed every third day off at 1:00 which was trying to influence her schedule; leaving her call shift early and leaving the pager unattended. (PSOF Ex. 18 – 4-26, 2019 Griev Hrg. Trans., pp. 6, 9, 12, 18, 19, 21, 23).[6] On May 2, 2019, the Ad Hoc committee determined that Plaintiff should not be terminated from her residency for these alleged professional conduct issues based upon Dr. Arthur's presentation specifically noting that:

> . . . there was no consideration for a performance improvement plan, remediation, and/or probation. There were unclear expectations outlined by the program for Plaintiff after a traumatic incident. After she returned to clinical patient care in December of 2018, after an extensive evaluation as to her fitness for duty her clinical evaluations by faculty members are all average or above average with many recommending an increase in autonomy for Dr.

---

[6] These issues of professionalism are all listed in the June 4, 2019, letter to Dr. Coule. (Coule Depo. Ex. 5, 102A).

> Williams. There are no obvious concerns for unprofessional
> behavior noted in her evaluations.

(PSOF ¶ 63, Ex. 40 - Ad Hoc Comm. Rec.). The evidence shows that Plaintiff was qualified and set to return to her residency on June 3, 2019.

As to the second element, Defendants agree that Plaintiff's warning letter and her termination from the residency program are adverse employment actions. (Doc. 105, p. 33). Other actions by Defendants were adverse actions as well, including the false and misleading statements about alleged drug and alcohol *abuse* by Plaintiff and the production of the June 3, 2019, negative performance evaluations. (Doc. 23, ¶ 222-224). Each of these actions were included in the June 4, 2019 letter to Dr. Coule. (PSOF ¶ 75, June 4, Draft Letter, p. 3, ¶3 & 7). Dr. Coule's decision to suspend the Plaintiff's privileges included the content in the letter, so contrary to the Defendants argument, the allegation that she had documented current abuse of alcohol or illegal drugs, and the June 3, 2019, negative evaluations constitute adverse actions. S*ee* Brown v. Snow, 440 F.3d 1259, 1265 (11th Cir. 2006) ("A lower score on Brown's performance evaluation, by itself, is not actionable under Title VII unless Brown can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities."); *See also*, Cain v. Geren, 261 F. App'x 215, 217 (11th Cir. 2008) (per curiam) (unpublished) (negative performance evaluations can constitute adverse actions for the purpose of a Title VII retaliation claim where they lead to more tangible job consequences).

Defendants argue that Plaintiff is unable to meet the third element in that Plaintiff cannot identify any male resident who exhibited the same pattern of unsafe and unprofessional behavior. (Doc. No. 105, p. 34). However, the record shows otherwise. When determining who the comparators are under the specific facts of this case, the Court can look at who Drs. Meiler and Arthur considered to be similarly situated to the Plaintiff since it is their intent which is at issue.

In the June 4, 2019, letter sent to Dr. Coule which resulted in the Plaintiff's termination, they stated **"that over the years the University has successfully *assisted several residents who have made mistakes in their career by providing professional help and a remediation plan* that works for both the residents, the patients and our department. Plaintiff has consistently challenged the good will of the department and many of the departments' actions to assist her. She recently filed a formal claim of disability and gender discrimination with the University's employment Equity Office.**" (PSOF ¶ 75, Ex. 5, emphasis added; Coule Depo. Ex. 102, 102A). This is not a standard employment discipline case. The question of material fact for the jury to decide is whether Drs. Meiler and Arthur, absent a discriminatory motive or retaliatory motive, would have helped the Plaintiff by following the Ad Hoc Committees' recommendation and Dean Hess' decision to reinstate the Plaintiff to her residency with a performance improvement plan like the other male residents who "made mistakes" in their careers rather than seeking out and creating negative evaluations and soliciting patient safety issues to send to Dr. Coule so that he could suspend her privileges and Dean Hess would then have to terminate her residency.

The inference of sex discrimination under Title IX arises when you consider the record showing that Dr. AT a male anesthesiology resident was found to have *lied* about his convictions for public intoxication. (PSOF ¶ 90-91; PSOF Ex. 62). Multiple times Dr. AT's academic performance was deemed unsatisfactory. Id. Like the allegation against Plaintiff with regard to abandoning a call, no less than two times Dr. AT *refused to "take call" as scheduled*. This was considered by the anesthesiology residency department headed by Drs. Meiler and Arthur to be unprofessional conduct. (PSOF ¶ 93; PSOF Ex. 66). Despite these documented instances of substance abuse, lying, criminal convictions, poor academic performance, and

unprofessionalism, Dr. AT was given remediation. Drs. Meiler and Arthur did not inform Dr. Coule. (Coule Depo. PEx. 5, p. 162-165).

Dr. R, another male anesthesiology resident, was cited for multiple incidents of unprofessional behavior, disruptive behavior, lack of respect for coworkers and jeopardizing patient safety similar to the allegations against Plaintiff. (PSOF ¶ 9, Ex. 73). His residency record included absences without leave, failure to answer pages and calls, leaving work early without notifying supervisors, ignoring a patient's pleas for pain such that "everyone in the OR" and the surgeon were so concerned that he refused to work with Dr. R without an attending anesthesiologist present, giving a patient "an unreasonably large dose of a muscle relaxant," and giving "large doses of a potent long-acting narcotic (Dilaudid) to patients" when giving breaks to other residents. (PSOF ¶ 100; Ex. 73). Notably, unlike the allegation regarding patient safety in an extubation by a resident there to learn, Dr. R's behavior was one that had a greater threat to patient safety. Yet, Dr. R was allowed multiple opportunities for remediation. Id. The Court should consider Dr. R a valid comparator as he meets the definition as defined by Drs. Arthur and Meiler in their letter to Dr. Coule as those who have made mistakes in their careers but were helped rather than their names submitted to Dr. Coule and termination proposed.

These male residents are similar in all material aspects in that they are all accused of violating their professionalism contract. In fact, the record shows they committed more egregious acts like deliberately giving a patient unnecessary and excessive doses of dangerous narcotics, leaving patients in pain and refusing to take call as opposed to mistakenly extubating a patient purportedly abandoning call. Plaintiff has reasonable explanations for her issues and sought to correct any mistakes she made. (Pl's Depo., p. 79, 99, 101, 147). Even assuming she made the mistakes as characterized by Defendants, the record contains sufficient evidence of male

residents who made "mistakes" in their careers, who were not terminated or even proposed for termination but who received remediation and probation. Importantly, the Ad Hoc Committee and Dean Hess determined that the Plaintiff should receive the same. So, here, the male comparators are substantially similar and the lack of the "exact" same discipline record does not defeat the Plaintiff's prima facie case. Therefore, the Court should find that Plaintiff has satisfied the fourth element of her prima facie case of discrimination based upon sex under Title IX by identifying similarly situated male residents who were treated differently than her regarding the terms, conditions, and benefits of their education. A reasonable jury could find that the males were offered lesser forms of discipline for violating their professionalism contract. The males were offered greater learning opportunities like remediation and probation rather than termination. Plaintiff's establishment of a prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee (based upon sex) giving rise to an inference of discrimination." Tex. Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Plaintiff will address the Defendants purported legitimate, non discriminatory reasons in one pretext section for sex discrimination and retaliation under Title IX and another for the ADA claims.

> **D.** **The Evidence Establishes a Prima Facie Case of Retaliation Under Title IX Because Plaintiff's Complaints of Sex Discrimination Were A Reason Given for A Lack of Trust and Relied Upon By Coule and Keel**

To establish a prima facie case of retaliation under Title IX, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) BOR took action that would have been materially adverse to a resident; and (3) a causal link existed between the two events. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).

To demonstrate causation, "a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." Shannon v. BellSouth Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002). Causation may be inferred by a close temporal proximity between the protected activity and the adverse action. Thomas v. Cooper Light., Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal proximity, without more, must be 'very close.'" Bowers v. Bd. of Regents of the Univ. Sys. of Ga., 509 Fed. Appx. 906, 911.

Here, the first element is satisfied. The undisputed evidence shows that Plaintiff engaged in protected activity. She complained about and opposed differential treatment between her and the male residents after she was sexually assaulted.  On September 14, 2018, Plaintiff's lawyer wrote the Defendants and stated that male residents who have suffered from drug/alcohol abuse, PTSD, and other mental breakdowns were returned to the program without having to prove themselves in a simulation exercise. (PSOF ¶ 51, Ex. 32 - Atty Brown Ltr.). Plaintiff filed her claim of gender discrimination and disability discrimination with the Office of Employment Equity on October 2, 2018. She specifically stated in the Complaint that "male residents" were not being treated as harshly as her and that there is a history of gender bias in the program and mentioning a pregnant resident who hired an attorney. (PSOF ¶ 52, Ex. 33 - LW Complaint). She opposed sex discrimination and being treated differently after her sexual assault.

The second element is satisfied. The parties agree that Plaintiff receiving a warning letter and her termination from the residency program are adverse employment actions. (Doc. 105, p. 36). While Defendants may disagree, the Court should find that the false and misleading statements about alleged drug and alcohol *abuse* by Plaintiff and the production of the June 3,

2019, negative performance evaluations are adverse actions as well in this case. *See Supra* p. 14-15.

The third element, causation, is also satisfied. It is undisputed that Drs. Meiler, Arthur and Coule were on notice of Plaintiff's protected activity. The June 4, 2019, letter was drafted by Arthur and Meiler and sent to Dr. Coule, who then sent the same letter to Dr. Keel, who then committed adverse actions against the Plaintiff adopting as their own the language that a jury could find shows retaliatory intent- "that over the years the University has successfully *assisted several residents who have made mistakes in their career by providing professional help and a remediation plan* that works for both the residents, the patients and our department. Plaintiff has consistently challenged the good will of the department and many of the departments' actions to assist her. She recently filed a formal claim of disability and gender discrimination with the University's employment Equity Office."

Plaintiff's argument is that, absent the discriminatory and retaliatory motive, the allegations of unprofessionalism would have warranted probation and remediation like the other male residents. She was granted reinstatement with probation and remediation based upon the same professionalism concerns by the unbiased Ad Hoc Committee. Only after her reinstatement, did Drs. Meiler, Arthur, and Coule work together to secure negative evaluations that she would never see. In the letter, she was accused of drug and alcohol abuse in violation of the ABA standards and there is no evidence to support that. Therefore, the Court should find that she has established a prima facie case of retaliation for complaining about sex discrimination.

BOR appears to argue that "but for" cause is synonymous with a single cause, which the Supreme Court has recently and decisively held is not accurate. As the Supreme Court held when discussing "but for" causation in the context of Title VII:

> . . . a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause. This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff 's sex was one but-for cause of that decision, that is enough to trigger the law. <u>Bostock v. Clayton Cty.</u>, 140 S. Ct. 1731, 1739 (2020)(internal citations omitted).

Plaintiff notified BOR that she felt she was being treated differently than the male residents in her program. Drs. Meiler, Arthur, Coule and Dr. Keel were all aware of her gender discrimination complaints by her attorney and her formal complaint in October of 2018, as mentioned in the June 4, letter. Importantly, on May 19, 2019, AU issued the report about her gender and disability complaint based upon the actions of Drs. Meiler and Arthur . PSOF Ex. 9). Thus, the Court should find that Plaintiff has met her burden to establish a prima facie case.

**E.      The Evidence Establishes That Defendants' Legitimate Reasons For Plaintiff's Termination Are Pretext For Discrimination And Retaliation Because But For her Protected Activity The Ad Hoc Recommendation Would Have Been Followed and Not Circumvented by the Defendants**

It is the rare case that there is such insight into the motivations of the decision makers—the Court should find that the language in the June 4, 2019, letter constitutes direct evidence of sex discrimination and/or retaliation and deny summary judgment. When viewing the statement in the context of the Plaintiff's multiple complaints of gender discrimination in a light most favorable to the Plaintiff, the evidence supports a finding "that over the years the University has successfully *assisted several (male) residents who have made mistakes in their career by providing professional help and a remediation plan* that works for both the residents, the patients and our department. **However**, the Plaintiff has consistently challenged the good will of the

department and many of the departments' actions to assist her. She recently filed a formal claim of disability and gender discrimination with the University's employment Equity Office." **She needs to be terminated from the program. (emphasis added).** If the jury believed the evidence as presented, a reasonable jury could find in the Plaintiff's favor.

If the court is not inclined to consider this direct evident, then plaintiff can show a genuine issue of material fact concerning pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 450 U.S. at 256. A genuine issue of pretext exists if reasonable jurors could find "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's stated nondiscriminatory reason for the employment action. <u>Brooks v. Cty. Comm'n of Jefferson Cty., Ala.,</u> 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). "[T]he McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Smith</u>, 644 F.3d at 1328 (reversing the district court's grant of summary judgment because sufficient circumstantial evidence of discrimination existed apart from the district court's McDonnell Douglas analysis).A plaintiff "will always survive summary judgment if he presents  circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." <u>Smith</u>, 644 F.3d at 1328. For instance, a plaintiff "will always survive summary judgment if he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." <u>Lewis v. City of Union City, Georgia</u>, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotations omitted). A plaintiff can show a convincing mosaic with "evidence that demonstrates, among other things,

(1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." <u>Lewis</u>, 934 F.3d at 1185 (quoting <u>Silverman v. Bd. of Educ. of City of Chi.</u>, 637 F.3d 729, 733-34 (7th Cir. 2011)). No matter the form of circumstantial evidence that a plaintiff presents, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." <u>Smith</u>, 644 F.3d at 1328; <u>Fulmer v. PCH Hotels & Resorts, Inc.</u>, 2020 U.S. Dist. LEXIS 69223, 25-27 (N.D. Ala. Apr. 20, 2020).

1. **The Evidence Shows The Defendants Did Confer About the Outcome Contrary to Their Deposition Testimony**

Plaintiff's case presents a convincing mosaic of facts from which a reasonable juror could conclude that BOR's concern for "patient safety" was not the real reason for Drs. Arthur and Meiler's decision to write the June 4th letter to Dr. Coule, which resulted in the suspension of her clinical privileges and ultimate termination from the program. First, the Defendants' argument that it was Dr. Coule's sole decision to terminate the Plaintiff's privileges is contradicted by the evidence in the record and creates a genuine issue of material fact that can only be resolved by determining the credibility of the witnesses. (SDUMF ¶248). Drs. Coule, Meiler, and Arthur each testified that they did not confer as to what the result of the letter would be or what the intended outcome was. (Coule Depo. p. 67, 72, PEx. 5; Meiler Depo. p. 33, Memo Ex. 11, Arthur Depo. p. 115, Doc. 80, p. 4). The recently produced text messages, however, show Dr. Arthur texting Dr. Basile that she is drafting a letter to CMO [Coule] about patient safety concerns. (Id.) At 7:52 Dr. Meiler messages Dr. Arthur stating, "Phil Coule just called on behalf of David Hess. I told him that you rescheduled L. and that we will have the letter to him in the morning." (Meiler text message - BOR 7872, attached as Ex. 15). Dr. Coule testified at his deposition that

he did not even speak with Dean Hess prior to making his decision suspend her privileges. (Coule depo. p.106, PSOF, Ex. 5). The new text messages further show that on June 4, 2019, Dr. Arthur sent another text message telling Dr. Basile that Dr. Coule suspended Plaintiff's, and Defendant Arthur states "Didn't want to use **termination** in the final letter of if [sic] respect for the dean's earlier decision." (Memo Ex. 15). On June 4, 2019, Dr. Meiler messaged Dean Hess that he "just got off the phone with Phil. He recommended as one option that I deliver the CMO's suspension for the hospital and your reversal/termination at the same meeting. (Meiler June 4, 2019, Text Message – BOR 7947-7948, attached as Memo Ex. 16). However, at that time, presumably Dean Hess had not even received notice that Dr. Coule had suspended the Plaintiff or drafted his letter of termination. Dean Hess' termination letter to Plaintiff is dated June 5, 2019, and it states "Today, I received notice and was copied on a letter from Dr. Coule that your privileges were suspended." (PSOF ¶81, PSOF Ex. 53). Based upon the contradictions in the evidence, a reasonable jury could find that the parties were untruthful about conferring with each other as to what the outcome would be. In the most recent received text message received after depositions, Dr. Meiler states "she can't appeal Dr. Coules decision." (Memo Ex. 10).

### 2. **The Allegations of Patient Safety Lack Credibility**

Second, the alleged legitimate, non-discriminatory reason asserted, regarding Plaintiff being an imminent danger to "patient safety" is weak and not supported by the record. The mistakes made by the Plaintiff outlined in the letter to Dr. Coule, even if true, *other than the June 3, 2019, solicited evaluations*, were all brought by Dr. Arthur to the Ad Hoc Committee. On May 2, 2019, the Committee considered the academic transgressions alleged against Plaintiff

and determined she should not be terminated from her residency but placed on probation.[7] Concerning those repeated allegations, the unbiased committee noted there were unclear expectations outlined by the program, that she had an extensive evaluation as to her fitness for duty and was deemed fit, and that her evaluations by faculty members were all average or above average with many recommending an increase in autonomy for Plaintiff. (Plaintiff's Reviewed Evaluations, attached as Memo Ex. 11). The allegations of cheating and unprofessionalism levied against Plaintiff were deemed insufficient for termination by BOR's own processes and the employees it tasked with making such determinations. Moreover, a juror could consider another piece of evidence to find that the proposed "imminent danger to patient safety" and evaluations were not the real reason for her termination. On June 3, 2019, Arthur prepared a letter placing Plaintiff on probation. (Pl. SOF ¶ 69, Ex. 43 - June 3, 2019, Proposed Prob. Ltr). In response to the letter, Dr. Meiler stated on May 30, 2019, **"I support this decision and it is the correct intervention in response to Dr. Williams behavior."** (PSOF ¶ 70, Ex. 44 - Meiler 5-3-2019, Email). This is the crux of the issue for the jury to decide. This is not a case where the Plaintiff is attempting to supplant her judgment with Dr. Coule's judgment, Dr. Meiler's judgment, Dr. Arthur's judgment, or Dr. Keel's judgment, but rather the evidence supports a finding that the judgment of the unbiased Ad Hoc Committee and Dr. Meiler's own words show that reinstatement and probation were the proper response "but for" a discriminatory and retaliatory intent.

The remaining paragraphs of the June 4, 2019 letter concern patient safety issues that were added to the issues already considered by the Ad Hoc Committee. Defendants argue that it was the totality of the allegations of cheating and unprofessionalism combined with the patient

---

[7] Paragraphs 2 through 7, of the June 4, 2019, letter include the same allegations brought before the Ad Hoc Comm.

safety issues which justifies her termination. Regarding those supposed patient safety issues, there  are legitimate questions of fact to be answered by a jury to determine if the patient safety allegations are pretext for discrimination and retaliation.

At the time of her reinstatement, Plaintiff had been on leave since March 19, 2019 pending the results of her grievance. Therefore, she had performed no new work and had no patient safety incidents that Dr. Meiler and Dr. Arthur could present to Dr. Coule, and her past work was already deemed to be "average or above average . . . [with] no obvious concerns for unprofessional behavior noted in her evaluations." (PSOF ¶ 63, Ex. - 40 - Ad Hoc Comm. Rec.). Consequently, Dr. Meiler and Dr. Arthur conducted a faculty meeting where they slandered Plaintiff and told the faculty that Plaintiff was threatening legal action against them and the department. They then required the faculty to draft new evaluations, which Plaintiff would never see, and in doing so, they cherry-picked a few negative comments from her years of residency and removed all of the positive commentary. Likewise, the faculty gave her lower scores than her "average to above average" scores on these new evaluations despite the evaluations covering the same time periods for which she had already been rated. Specifically, in BOR's supplemental discovery received on January 21, and February 13, 2022, after almost 2 years of discovery, there is an email on June 3, 2019 from Arthur to Dr. Meiler stating that she is trying to pull all the "patient safety" issues. Defendant Arthur further notes that "I also requested faculty to send me 360 evaluations on Lesley. All her evaluations were below average. So far only 7 faculty members had filled out the 360 evals." (Arthur Email to Coule, June 3, 2019 - BOR 7896, attached as Memo Ex. 12).

Importantly, they attempted to turn the extubation and pager incidents into major patient safety concerns where they had not been treated as such prior to her reinstatement. A reasonable

juror could find that if Plaintiff was such a patient safety risk to warrant immediate suspension based upon this event during her training, why wasn't that information brought to the Ad Hoc Committee's attention as a basis to terminate her so that she could have had the ability to rebut the issues or brought to Dr. Coule's attention before June 3, 2019. According to their own motion, the intubation incident happened on February 12, 2019 and Plaintiff's notice of termination was March 19, 2019, yet the extubation incident was not mentioned during the CCC meetings on February 26, 2019 and March 1, 2019, it was not mentioned in the warning letter drafted based on the CCC meetings, it was not mentioned in the March 19, 2019 termination letter from Dr. Meiler, and it was not brought up in the Ad Hoc Committee Grievance Hearing (Feb - Mar Meeting Mins and warning BOR 1363 - BOR 1369, attached as Memo Ex. 13; PSOF Ex. 39 - 3.19.19 Meiler Termination Letter; PSOF Ex. 18 - Grievance Hearing Transcript). It strains credulity that Dr. Meiler and Dr. Arthur would have allowed Plaintiff to continue to practice for a month after the incident and failed to mention it during the grievance proceedings if the concerns for patient safety were justified and sincere. A reasonable jury could conclude that not only is Plaintiff telling the truth about the "extubation incident" in that she handled it the way she was trained to do, but also that even if she "made a mistake" it did not warrant termination. This is evident by the fact that the Defendants treated it like a non-issue, or at best, like the type of mistake residents make as they learn. There is no evidence that when the event occurred Plaintiff's actions were reported to her or anyone else as a significant patient safety concern such that Plaintiff's continuing on in her residency involved "imminent danger" to patient safety.

Furthermore, Dr. Basta's testimony supports a finding that the extubation incident was not a patient safety issue worthy of termination stating, "everybody has complications during

their residency training, or a good number, and we just discuss it and see why the complication happened and try to take corrective steps so it wouldn't happen again. The evaluations are reviewed with the residents so they can see how they are doing." (PSOF ¶ 101, PSOF Ex. 74 - Basta Depo. p. 43-44). To that end, all resident evaluations have a section where the faculty acknowledges that they went over the evaluations with the resident, but this box is not checked on any of the June 3, 2019 or June 4, 2019 evaluations.  A jury could conclude that the evaluations lack credibility because they were drafted for the sole purpose of giving Dr. Coule sufficient ammunition to terminate Plaintiff's privileges.  In fact, a juror could further question their legitimacy based upon the evidence that on June 4, 2019, Dr. Arthur's secretary, stated that "we are having to send out the evaluations from yesterday again so that you can **add** comments. **Please know that she will not see these evaluations."** (PSOF ¶ 77, PEx. 49 – Kotz Email to Faculty, 6-4-19).  A reasonable jury could find that there should be no need to hide the truth.

### **The Evidence Shows Inconsistencies In That Professionalism Issues of Male Residents Were not Reported to Dr. Coule by Drs. Arthur and Meiler.**

Importantly, Defendants want the Court to believe by way of Declarations submitted in support of their motion for summary judgment, that they were only reporting the Plaintiff's conduct to Dr. Coule because they had a duty to report patient concerns to him and the faculty was concerned. (Doc. 105-26 – Hess Decl. p. 4). The fact that Plaintiff's alleged patient safety issues were not reported to Dr. Coule contemporaneously allows a jury to conclude that their motivations for the report were not patient safety.  Furthermore, there were similar incidents involving patient safety from the male anesthesiology residents and Dr. Coule testified he knew nothing about them.  (Coule Depo. p.  ; PEx. 5). Similar to selective prosecution, selective reporting of academic or professional conduct to circumvent the Ad Hoc Committees' recommendation and Plaintiff's reinstatement by Dean Hess, creates a question of fact as to the

intent of Drs. Arthur and Meiler.  While reporting legitimate patient safety concerns to Dr. Coule is not by itself unlawful, where those concerns are reported in retaliation for past complaints of discrimination, and where there is selective reporting, as is the case here, where men with professionalism issues and non-disabled residents were not reported, the report becomes unlawful. *See, e.g.* Stone & Webster Const., Inc. v. United States Dep't of Labor, 684 F.3d 1127, 1134-35 (11th Cir. 2012)(Even if a plaintiff is admittedly guilty of misconduct the employer may be liable for unlawful retaliation if it imposes disparate discipline as between similarly situated employees because of federally protected activity); Holley v. Seminole County Sch. Dist., 755 F.2d 1492, 1505 (11th Cir. 1985)("'plaintiff has right to prove unequal treatment or discriminatory enforcement'"); McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282-293, 96 S. Ct. 2574 (1976)(recognizing that disparate discipline based on race violates Title VII).

Drawing all reasonable inferences in favor of Plaintiff, a jury could find that the decision to suspend her privileges so that she could be terminated was determined before Dr. Coule even received the *draft* or *final* letter and that the end goal was termination by way of his use of the word "suspension" of her privileges.  Specifically, a jury could find that they violated the law because they worked together to circumvent Plaintiff's reinstatement that she received after exercising her right to due process under ACGME rules, her contract, and her constitutional right to her education. Drs. Arthur and Meiler made sure she was terminated rather than given the benefit of remediation/probation like other similarly situated male residents who had not filed claims of disability or gender discrimination. This is not a case where the Plaintiff is trying to supplant her judgment for that of the decision makers. Plaintiff is relying on their own words, text messages, and inconsistent statements regarding conferring with each other about what the outcome would be.  For the reasons set forth herein, there is sufficient evidence from which a

jury could conclude that Defendants' asserted legitimate non-discriminatory reason for their adverse actions were pretext for gender discrimination and/or retaliation. Therefore, the Court should find that that the Defendants have failed to meet their burden and deny summary judgment as to Plaintiff's Title IX claims (Counts 1 and 2).

F.   **Count Nine (ADA Disability Discrimination) and Count Twelve (Rehabilitation Act Discrimination) Should Not Be Dismissed**

A disability discrimination claim (under the ADA and/or the Rehabilitation Act)[8] can be based on either a conventional "disparate treatment" theory or a theory that the defendant failed to make "reasonable accommodations," or both. See Forbes v. St. Thomas Univ., Inc., 768 F. Supp. 2d 1222, 1227 (S.D. Fla. 2010), aff'd, 456 F. App'x 809 (11th Cir. 2012); Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)(stating that the ADA and the Rehabilitation Act recognize disparate treatment and reasonable accommodation theories). Disparate treatment involves discriminatory intent and occurs when a disabled person is singled out for disadvantage because of his disability. Forbes, 768 F. Supp. 2d at 1227. A failure-to-make-reasonable-accommodations claim requires no animus and occurs when a covered entity breaches its affirmative duty to reasonably accommodate the known physical or mental limitations of an otherwise qualified person. Id. In this matter, Plaintiff asserts claims of disparate treatment, unlawful testing, and failure to accommodate against BOR.

1.   **Plaintiff's Claim Alleging Unlawful Testing Should Not Be Dismissed**

---

[8] Section 504 of the Rehabilitation Act, similar to Title II of the ADA, prohibits discrimination against a qualified individual with a disability by entities that receive federal financial assistance. 29 U.S.C. § 794. BOR is subject to liability under Section 504 because it receives federal financial assistance. 29 U.S.C. ¶ 794 (a); 42 U.S.C. ¶ 12101(b)(1). Given the textual similarities between the two statutes, "the same standards govern" claims under both, and we "rel[y] on cases construing [Title II and § 504] interchangeably." Silberman v. Miami Dade Transit, 927 F.3d 1123, 1133 (11th Cir. 2019) (quoting T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla., 610 F.3d 588, 604 (11th Cir. 2010)).

"Plaintiff need not establish she is a qualified individual with a disability to maintain her claims that defendants made improper medical inquiries under the ADA and retaliated against her for engaging in protected activity in violation of the ADA." Riechmann v. Cutlter-Hammer, 95 F. Supp. 2d 1171, 1184 (D. Kan. 2000); See 42 U.S.C. § 12203(a) & 12112(d)(4)(A); Griffin v. Steeltek, Inc., 160 F.3d 591, 594 (10th Cir. 1998) (prohibition against disability related inquiries not limited to qualified individuals with disabilities); Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997) (ADA retaliation claim available to individuals who are not individuals with a disability); Matthews v. American States Ins. Co., 1997 U.S. Dist. LEXIS 19256, 1997 WL 752442, 2 (D. Kan. Oct. 21, 1997). The ADA prohibits an employer from making disability-related inquiries and from requiring medical examinations unless the inquiries are job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.13(b). The ADA provides:

> A covered entity shall not require a medical examination and shall not make inquires of an employee as to whether such employee is an individual with a disability or as to the nature and extent of the disability, unless such examination is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). This prohibition is intended to prevent medical inquiries that do not serve legitimate business purposes. 29 C.F.R. Pt. 1630, App. § 1630.13(b). Even where an employer has a valid reason for a medical inquiry, where that inquiry is not job-related and consistent with business necessity, it is unlawful. See, Riechmann at 1184-5.  When Plaintiff stated that she was subject to unlawful testing and her lawyer stated that she should not have to take the simulation exam, this was the reason she felt discriminated against and retaliated against, although in trying to get back to work she agreed to the simulation. She did not at any

point waive her right to claim that the simulation was overly intrusive and not related to business necessity,

In <u>Riechmann</u>, the plaintiff suffered a stroke which caused her to miss time from work for recovery and rehabilitation. Like the instant Plaintiff, Riechmann was required to undergo two different medical examinations. The Court found that both of the exams were based on legitimate concerns regarding the plaintiff's fitness for duty but that one of the examinations exceeded the permissible scope of a permissible medical inquiry by asking questions that were not job-related and consistent with business necessity. Specifically, the court found that questions about the plaintiff's prescription medications and whether she was receiving counseling solicited information that was unnecessary for determining fitness for duty, a need to accommodate, or the nature of any needed accommodations. See, <u>Riechmann</u> at 1184-5

Similar to <u>Riechmann</u>, the scope of the examinations requested by Dr. Arthur and Dr. Meiler exceeded the scope allowable by the ADA. For instance, in her email to Dr. Hertza, Dr. Arthur wrote:

> The questions we will need answered are:
>
> Is she cognitively and psychologically able to perform in the high stress environment of the operating room?
>
> What would be the potential impact of a tragic outcome in the operating room on Dr. William's recovery?

(PSOF Ex. 10 – 5.15.18 M. Arthur Request for Fit For Duty Test - BOR 5757-5758). While her first question is job-related and consistent with business necessity, the second question is not job-related and is inconsistent with business necessity. Potential effects on Plaintiff's recovery from PTSD are outside the scope of determining her ability to perform the essential duties of her residency with or without a reasonable accommodation. To that end, Dr. Hertza questioned Plaintiff about and reported to her department information such as Plaintiff's mental health

treatment from six years prior and her family history which included depression and suicide. (PSOF Ex. 13 - Hertza Report, p. 8 - BOR 341). Such information had no bearing on Plaintiff's present ability to perform her job duties and subjected Plaintiff to the type of dissemination of irrelevant and potentially embarrassing medical information the ADA and Rehabilitation act prohibit. This is what prompted the Plaintiff to file a formal complaint of disability discrimination. As noted by the ADA coordinator: "the Fitness for Duty Exam was ordered by management and conducted prior to the ADA Interactive Process. Plaintiff was removed from her duties based on the recommendations from Dr. Herza. While the department chose to remove her from duty, it was never a recommendation per the report from Dr. Hertza. In addition, there was no attempt to mitigate the issues from the recommendations. Instead, Plaintiff was removed from duty and told she had to undergo a stress test. Even if management felt she was a direct threat, under ADA we are required to determine if there is an accommodation that would eliminate or minimize the threat before we make a decision that negatively impacts the employee…according to the recommendation #3, it stated that she should slowly transition back into a high stress work environment; however, the employee has not been allowed to return. Instead, they have requested that she remain out until she completes a simulation lab…no evidence has been presented as to why Plaintiff is being ordered to participate in a simulation lab before she can return to work…After reviewing the Fitness for Duty report and the Medical Certification, both physicians indicated that the employee could gradually return to full duty work status. In addition, Dr. House stated that there is no evidence or findings that the employee would pose a direct threat to herself nor others."(PSOF Ex. 34 - Accommodation Review Doc - BOR 2815-2819).

Furthermore, Dr. House, Glenn Powell, and Ms. Lewis all informed Drs. Arthur and Meiler as to the proper ADA process but they intentionally refused to follow it. (Powell ADA Email - BOR 7839-7843, attached as Ex. 17). Therefore, the Court should find that a genuine issue of material fact exists as to whether BOR violated the ADA and Rehabilitation Act by asking for more medical information than was necessary to determine if she was fit for duty or how to accommodate her if she were not.

## 2. Plaintiff's Failure to Accommodate Claim Should Not Be Dismissed

The ADA requires employers to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A); Morisky v. Broward Cnty., 80 F.3d 445, 447 (11th Cir. 1996). Under the ADA, an employer discriminates against a qualified individual on the basis of disability by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability or terminating an individual because of her disability. See 42 U.S.C. § 12112(b)(5)(A), (B); 29 C.F.R. § 1630.9(a), (b). Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases. See Silberman v. Miami Dade Transit, 927 F.3d 1123, 1133 (11th Cir. 2019); Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000). An unreasonable delay may amount to a failure to provide reasonable accommodation. See, e.g., Valle-Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 200-01 (1st Cir. 2011); Kintz v. United Parcel Serv., Inc., 766 F. Supp. 2d 1245, 1256-57 (M.D. Ala. 2011); Terrell v. USAir, Inc., 955 F. Supp. 1448, 1454 (M.D. Fla. 1996), aff'd, 132 F.3d 621 (11th Cir. 1998); Hartsfield v. Miami–Dade Cnty., 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000); Ungerleider v. Fleet Mortg. Grp. of Fleet Bank, 329 F. Supp. 2d 343, 355 (D. Conn. 2004). However, even when there is some delay, a short one may still permit a conclusion that a defendant's accommodation was reasonable. See, e.g., Kintz, 766 F. Supp. 2d at 1256-57 (15- day delay

reasonable); <u>Terrell</u>, 955 F. Supp. at 1454 (3-month delay reasonable); <u>Hartsfield</u>, 90 F. Supp. 2d at 1373 (several month delay reasonable).

In this matter, there are genuine issues of material fact as to whether the Defendant was able to accommodate Plaintiff without an undue hardship and whether the delay in accommodating her was unreasonable. BOR argues that Plaintiff's failure to accommodate claim should be dismissed because (1) she was accommodated, and (2) any delay in accommodating her was reasonable. (Doc. 105, p. 46-49). Both arguments by Defendant rest on the apparent assertion that the accommodations requested by Plaintiff and the accommodations suggested by Dr. Hertza, specifically two of them, were an undue hardship. This after the fact justification for failing to accommodate Plaintiff and delaying her accommodations first appears in the Dr. Arthur's declaration in support of the instant motion. (Doc. 105; Doc. 105-1 Arthur Dec.). While Defendants were supposed to be engaged in the interactive accommodation process, they never asserted that Dr. Hertza's recommended accommodations posed an undue hardship or gave Plaintiff an opportunity to propose alternatives. Instead, they merely asserted "Because of the nature of anesthesiology, the department will be unable to grant the requested accommodations." (PSOF Ex. 17 - 7.26.18 Meeting minutes - BOR 1022-1024.). Defendants never specified which of the accommodations it was unable to grant; this "justification" should be rejected by the Court as it would lead to an absurd result in that any institution receiving federal funds and under a duty to accommodate could simply say, "due to our nature, we cannot accommodate," which would defeat the entire purpose of the ADA's accommodation requirement.

Similarly, while Defendants now claim they accommodated Plaintiff, contemporaneous documentation shows otherwise. For example, on October 16, 2018, ADA Coordinator Antoinette Lewis wrote a letter which contained:

> After reviewing the Fitness for Duty and the Medical Certification, both physicians indicated that the employee could gradually return to full work status. There is no evidence or findings that the employee would pose a direct threat to herself nor others. It is therefore my recommendation that the employee be allowed to return to her duties as a Resident without further delay to her education. (A. Lewis Letter - BOR 7800, attached as Memo Ex. 18)(emphasis added)

Likewise, in a meeting held on November 9, 2018, where Dr. Meiler and Dr. Arthur were present, BOR suggested, "any requests for clinical accommodation will be reviewed after [the simulation report] is received. If she is determined to be unfit for duty, any discussion of accommodation will be unnecessary." (PSOF Ex. 36 - 11.9.18 Meeting Minutes – BOR 6032). Notably, the Defendant argues that there is no evidence of retaliation for engaging in protected activity, however, this meeting was titled "Williams Meeting" with the topic, "EEOC charges and lawsuit filed against Dr. Mary Arthur and the Anesthesiology department by resident Lesley Williams, MD," (PSOF Ex. 36 ). A reasonable jury could conclude that the delay in accommodating was due to her EEOC charge. Moreover, even if Plaintiff were found to be unfit for duty, due to her disability, the department would be required to determine if reasonable accommodations would make her fit. Plaintiff asserted and Dr. House and Dr. Hertza agreed that she could return to patient care with supervision and some breaks by June of 2018, and the evidence showing that she passed her simulation exam with a return to work in Decembers further shows that she could was fit for duty and able to work prior to the results coming back which makes the delay retaliatory and unreasonable. A reasonable jury could further conclude that the two medical examinations were not truly for the purpose of assessing Plaintiff's fitness or need for accommodation but were instead required of Plaintiff in hopes that she would fail so she could be terminated without accommodation in retaliation for the "EEOC charges and lawsuit filed against Dr. Mary Arthur and the Anesthesiology department." No lawsuit had even

been filed but the meeting minutes were entitled that way and her accommodation was discussed and denied.

Finally, a genuine issue of material fact exists as to whether the delay in accommodating Plaintiff was reasonable because the Investigative Findings of Office of Employment Equity stated:

> "There were seven (7) recommendations for accommodations coming out of the fitness report. However, there is no record of the department having an approved written undue hardship justification for each accommodation that was denied . . . There is no documentation that the two options offered as alternatives by the department in the July 16, 2018 meeting would have assisted Dr. Williams in performing her essential functions.
>
> . . .
>
> it is determined that all parties considered the seven (7) recommendations coming out of the LifeGuard fitness report to be, in fact, requests for accommodations. However, the interactive process was not utilized in denying the accommodations, and no justification was approved (per the AU practice) for denying each of the accommodations. Although two alternative accommodations were presented by management, alternative options were not presented or approved for each of the seven accommodation requests which came out of the LifeGuard report. Based on these findings, the EEO Investigators have determined the following AU policies were not followed appropriately: 1 . AU Fitness for Duty Policy 2. AU Accommodating Employees with Disabilities Policy.

(PSOF Ex. 9 - Disability & Gender Discrimination Inv. Summary, p. 4-5, 7) Therefore, in spite of Defendants now claiming by way of declarations that they either accommodated Plaintiff or had a good reason for their delay in doing so, there is sufficient evidence from which a reasonable juror could conclude that the Defendants failed to accommodate her by honoring her request at a minimum for "supervision and breaks" from June through December of 2018, to ensure patient safety, a time period during which her education was delayed without a finding that she was unfit, a direct threat, nor that accommodating her posed an undue hardship.

Therefore, the Court should find that Plaintiff has submitted sufficient to support her failure to accommodate claim and the Defendant has failed to show that it is entitled to judgement as a matter of law.

      **3.**      **Plaintiff's Claim for Discriminatory Termination Should Not Be Dismissed**

In order to plead a prima facie case of disparate treatment disability discrimination under Title II of the ADA or § 504 of the Rehabilitation Act, a Plaintiff must show that: (1) she has a disability, (2) she is otherwise qualified for the position, and (3) she was subjected to unlawful discrimination as a result of her disability. Boyle, 866 F.3d at 1288 (11th Cir. 2017). The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S. Code § 12102(1) "Major life activities include, but are not limited to, . . . sleeping, . . . learning . . . concentrating." 42 U.S. Code § 12102(2)(A). Post-Traumatic Stress Syndrome that impacts a major life activity is considered a disability for the purpose of the ADA. The Rehabilitation Act definitions are nearly identical. 29 U.S.C. 794.

Prior to her sexual assault, Plaintiff was proceeding with her education the same as the other residents, both male and female. However, after her sexual assault, she was diagnosed with PTSD which impacted her ability to sleep and concentrate. (PSOF ¶ 3, PSOF Ex. 3 - Dr. House Ltr.; Accommodation Request, PSOF Ex. 4). Accordingly, she had a qualifying disability, was regarded as having a disability by BOR, and had a record of having disability. (PSOF ¶ 16; PSOF Ex. 13 - Hertza Report; PSOF Ex. 15 - Arthur FFD Review Email).

Regarding the second prong, Dr. House and Dr. Hertza both indicated that in August of 2018, five months after her sexual assault, Plaintiff was ready to return to work with some relatively minor accommodations. (Pl. SOF ¶ 48; PSOF Ex. 14 – Aug. 9, 2018, Meeting Minutes). Dean Hess, based upon the unbiased Ad Hoc Committee resolution, had reinstated

Plaintiff to her residency. Therefore, BOR does not argue that Plaintiff does not have a disability or that she was unqualified for her position and Plaintiff has satisfied the first and second prong of her prima facie case.

Regarding the third prong, there is substantial evidence from which a jury could conclude that Plaintiff was terminated because of her disability. First, as discussed above regarding male comparators under Title IX, in addition to those comparators being male they were also not disabled. A jury could find that the disparate treatment of Plaintiff, even under a "but for" standard, was due to her sex, her disability, or both. In light of the foregoing, including Plaintiff's earlier discussions of pretext based upon the letter stating that she filed a formal claim for disability discrimination, a question of material fact exists as to Plaintiff's disability discrimination claims and Defendant's motion should be denied.

### G. Count Ten (ADA Retaliation) Should Not Be Dismissed and Count Thirteen (Rehabilitation Act Retaliation) Should Not Be Dismissed

Under the ADA's anti-retaliation provision, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). This anti-retaliation provision is similar to Title VII's prohibition on retaliation. Stewart, 117 F.3d at 1287. Accordingly, a court assesses a plaintiff's retaliation claims pursuant to the ADA and the Rehabilitation Act under the same framework used for Title VII retaliation claims. Id. To establish a prima facie case of retaliation, plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action; and (3) the adverse action was causally related to the protected expression. Shotz v. City of Plantation, Fla., 344 F.3d at 1180. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." Gupta v. Florida Bd. of Regents, 212 F.3d 571,

590 (11th Cir. 2000) (citation, quotation marks and alterations omitted), abrogated on other

rounds by <u>Burlington N. and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.

Ed. 2d 345 (2006).

### 1.     Plaintiff Engaged in Protected Activity

Here, it is undisputed that Plaintiff complained about and voiced her opposition to being

discriminated against based upon her disability. On October 1, 2018, Plaintiff filed a complaint

of ADA discrimination and gender discrimination with AU. (Pl. SOF ¶ 52, PSOF Ex. 33 - LW

ADA Complaint). In her letter, she requested that she be allowed to come back to work with the

recommendations of supervised work as per the recommendations of Dr. Hertza. However, she

was told that they could not accommodate supervision and her having breaks. Yet, no hardship

justification was provided by anyone. In addition, Plaintiff's attorney sent two letters to

Defendants and September and November of 2018 which alleged and objected to disparate

treatment of Plaintiff due to her sex and disability. (PSOF Ex. 32; PSOF Ex. 35) Lastly, on or

about May 20, 2019, the Office of Employment Equity ("OEE") published to Dean Hess its

findings that university policy was violated by failing to follow existing procedure for reasonable

accommodations and by failing to follow existing procedure for requesting fit for duty tests with

regard to Plaintiff. (PSOF Ex. 9 - Disability & Gender Discrimination Inv. Summary - BOR

2866-2867). Therefore, Plaintiff's formal complaints were meritorious. Therefore, the record is

clear that Plaintiff engaged in protected activity.

### 2.     Plaintiff Suffered an Adverse Action

Likewise, the second element is met as BOR admits that her termination from the

residency program was an adverse action but denies that it caused her termination and asserts

that it had legitimate, non-discriminatory and non-retaliatory reasons justifying her termination.

(Doc. 105, p. 36).

### 3. Plaintiff's Protected Activity Caused the Adverse Action and Pretext

As argued above, Plaintiff complaints of disability discrimination appeared on the very face of the letter drafted by Defendant's Meiler and Arthur requesting her termination. The meeting notes indicate that attempts to appeal her reinstatement or to terminate her "will not meet the criteria to not be able to be supported procedurally," despite telling Plaintiff that she could return to work on June 3, 2019, Dr. Meiler and Dr. Arthur, knowing that there was no right to appeal the Ad Hoc Committee's recommendation of reinstatement and Dean Hess' reinstatement with probation, deliberately chose to circumvent the established due process and convened a special faculty meeting to ensure that Plaintiff was terminated. (Doc. 23-1 Pl. Amend. Cmpl. ¶ 135; Meeting Minutes 6.3.19 - BOR 759, attached as Memo Ex. 19; PSOF Ex. 45 - Email re 6.3.19 Meeting - BOR 6346). This plan included Dr. Coule and the faculty meeting who were all informed about Plaintiff's complaints of discrimination, that she hired a lawyer and threatened to sue. The dissemination of this information to all the faculty members and then to have those same faculty members declare they could not "trust her" and provide supportive evaluations for her termination tainted the whole process. Specifically, the meeting included 27 participants and lasted over an hour. The handwritten notes from the June 3, 2019 indicate that Dr. Hess questioned why there was no plan to reintroduce Plaintiff and Dr. Meiler indicates that she has irreparably damaged professional relationships with faculty and residents. (Memo Ex. 9 - 6.3.19 Meeting Handwritten Notes - BOR 1686-1689). Dr. Moore expressed that Plaintiff had approached the process "combatively." (Memo Ex. 9 - 6.3.19 Meeting Handwritten Notes - BOR 1688). Dr. Munoz expressed concerns with having her work knowing she had PTSD. (Memo Ex. 9 - 6.3.19 Meeting Handwritten Notes - BOR 1688). Dr. Basta expressed that he was not concerned about her and was willing to mentor her. (Memo Ex. 9 - 6.3.19 Meeting Handwritten Notes - BOR 1688). Dr. Diaz questioned how it was okay for her to return given her threats to

sue. (Memo Ex. 9 - 6.3.19 Meeting Handwritten Notes - BOR 1689). Dr. Pak expressed concerns about her "calling lawyers." (Memo Ex. 9 - 6.3.19 Meeting Handwritten Notes - BOR 1689).

In the meeting where Dr. Arthur and Dr. Meiler communicated Plaintiff's termination following her reinstatement, Dr. Arthur referenced an inability to trust Plaintiff because she complained about deleting her case logs and noted that the department should not be required to "cross their T's and dot their I's." In that same meeting, Dr. Arthur and Dr. Meiler refused to answer Plaintiff's question, "When have I ever endangered a patient?" The letter Dr. Arthur and Dr. Meiler sent to Dr. Coule explicitly referenced that she "filed a formal complaint of gender and disability discrimination." The notes from the June 3, 2018 meeting show extensive discussion about her disability, formal complaints of discrimination, and possibility that she may sue the department or the individual doctors therein. Considering the foregoing, there is ample information from which a jury could conclude that BOR circumvented Plaintiff's reinstatement by Dean Hess, not because of any actual patient safety concerns, but because she had PTSD and threatened to sue. A jury could conclude that the departments claimed inability to trust her was not because they could not trust her to safely care for patients but because they were not willing to accommodate her disability which occurred only due to her sexual assault. Therefore, there are genuine issues of material fact as to the motive of the defendants so Defendant's have failed to carry their burden and their motion should be denied.

**H.    Count Three (Georgia Whistleblower Act) Should Not Be Dismissed**

**1.    <u>Plaintiff Engaged in Protected Activity By Disclosing a Violation of a Law, Rule or Regulation to a Supervisor or Government Agency</u>**

Defendant argues that Plaintiff's GWA claim fails because her "report" did not concern a violation of law, rule, or regulation and was not made to a "supervisor;" however, Plaintiff did disclose a violation of law, rule, or regulation to one of her supervisors. Pursuant to Georgia's

Whistleblower Act, "'Law, rule, or regulation' includes any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." O.C.G.A. § 45-1-4(a)(2). This definition includes rules adopted for compliance with a statute or ordinance, but does not require that the rule itself be a statute or ordinance. Pursuant to 42 C.F.R. § 413.75, in order to receive Direct GME payments, Augusta University is required to maintain accreditation through ACGME or a similar organization. 42 C.F.R. § 413.75(b)(3); 42 C.F.R. § 415.152.[9] As noted in the preceding discussions of Title IX, it is undisputed that BOR receives federal funding in support of its graduate medical education or "residency" programs. Furthermore, adhering to the requirements of ACGME accreditation is codified in AU policies, such as HS 13.0 (Pl. SOF ¶ 82), which also establishes Plaintiff's due process rights, is the basis for AU's Graduate Medical Education office of which Dr. Walter Moore was the Senior Associate Dean (Doc. 105, p. 2), and is incorporated in the contract between BOR and AUHS (PSOF Ex. 77 – BOR/AUHS Contract – AUHS 231-233). The contract between BOR and AUHS provides:

> Graduate Medical Education is a strategic priority of the Health System and shall be a joint priority of the Parties to this Agreement . . . Regents designates the AU Medical Center as a teaching hospital for the University System of Georgia, and anticipates that the AU Medical Center shall continue to function as the primary, but not exclusive teaching hospital and clinics for AU. . . AUHS agrees and acknowledges that Regents intends that AU Medical Center will continue to serve as the primary teaching hospital and clinics for Trainees participating in any academic or clinical programs of AU in accordance with the guidelines of ACGME and other accrediting organizations as appropriate, AU Medical Center will remain a participating institution with respect to Education Programs research activities. AUHS shall cooperate with Regents or its

---

[9] "Approved graduate medical education (GME) program means one of the following…A residency program approved by the Accreditation Council for Graduate Medical Education…" 42 C.F.R. § 415.152. Furthermore, under the Medicare Act, 42 U.S.C.S. § 1395 et seq., the costs of certain educational programs for interns and residents, known as graduate medical education programs, are allowable costs for which a hospital may receive reimbursement.

designee in facilitating the education of Trainee and in supporting Regents' teaching mission. . . AUHS shall provide facilities adequate to satisfy all accreditation requirements for the AU academic programs involving Clinical Facilities. AUHS shall be responsible for compliance of Clinical Facilities with all applicable "participating institution" standards of ACGME…

(PlSOF Ex. 77 – BOR/AUHS Contract – AUHS 231-233). [10]

Therefore, Plaintiff's reporting of Dr. Arthur's demand that she delete case logs for procedures she actually performed was the reporting of violations of federal regulations governing AU as a recipient of GME payments as well as reporting of violations of the rules AU enacted to ensure compliance with those federal regulations. When Plaintiff reported these violations, she did so with the genuine and true belief that she was being required to commit fraud and subjecting AU to possible sanctions which could lead to AU losing the federal funding its ACGME accreditation secured. Instead of requiring that accurate reports be made, Dr. Moore supported the department in misrepresenting Plaintiff's case logs CGME.[11]

In addition, Defendants' motion focuses on Plaintiff's report of these violations to ACGME, but overlooks Plaintiff's report of these same issues to Dr. Moore, who meets the GWA's definition of supervisor. Under the GWA, "supervisor" is defined as any individual: To whom a public employer has given authority to direct and control the work performance of the affected public employee; (B) To whom a public employer has given authority to take corrective action regarding a violation of or noncompliance with a law, rule, or regulation of which the

---

[10] See also Grievance Hearing Transcript p. 10 where Dr. Arthur describes case logs and the RTID system as the reporting mechanism for medical procedures completed by residents; PSOF Ex. 54 - HS Policy 13.0 – BOR 1842-1845, which states, "The term House Officer is used as a generic term to include interns, residents and fellows in an approved ACGME Residency Training Program at Augusta University"

[11] Dr. Arthur now admits that Plaintiff performed cases and was required to report that she did so. "Dr. Williams treated patients in Obstetrics and Pediatrics without being released to duty. Residents are **required** to log the cases they perform in a database maintained by the Accreditation Council for Graduate Medical Education ("ACGME")." (Doc. 105-1 – Def. Ex. A Arthur Decl, ¶ 35-36, emphasis added). While Plaintiff has always maintained that she was not aware that Dr. Arthur and Dr. Meiler did not want her to perform cases, Dr. Arthur repeatedly accused her of trying to take credit for cases she did not perform and only recently acknowledges that Plaintiff actually performed the cases she logged. (Basile Unclear Email, attached as Memo Ex. 21)

public employee complains; or (C) Who has been designated by a public employer to receive complaints regarding a violation of or noncompliance with a law, rule, or regulation. O.C.G.A. § 45-1-4(a)(6). Dr. Moore was the Designated Institutional Official or "DIO" during Plaintiff's residency at AU. (PSOF Ex. 39 - 3.19.19 – Termination Letter – cc'd to "Walter Moore, DIO"). As DIO Dr. Moore's responsibilities included ensuring compliance with ACGME policies for accreditation and advocating for AU's residents. The AU Website displays a link to "Report Compliance Issues or Concerns – Anonymously Report Compliance issues or concerns to the DIO." (AU GME Website, attached as Memo Ex. 20). Therefore, Dr. Moore as the DIO is undeniably someone to whom AU had "given authority to take corrective action regarding a violation of or noncompliance with a law, rule, or regulation of which the public employee complains; or who has been designated by a public employer to receive complaints regarding a violation of or noncompliance with a law, rule, or regulation." As Plaintiff testified at her grievance hearing, contemporaneously with Dr. Arthur demanding that she delete case logs for work she actually performed,[12] Plaintiff printed a copy of case logs before deleting them and presented it to Dr. Moore in support of her complaint to him that she was being forced to delete case logs for work she had actually done. (PSOF Ex. 18 - Grievance Hearing Tr., p. 51).

Not only did Plaintiff report a violation of a law, rule, or regulation designed to maintain essential federal funding, but considering that Dr. Moore was the DIO and her other supervisors, Dr. Arthur and Dr. Meiler, were the ones perpetrating the fraud, Dr. Moore was the most appropriate supervisor to whom she could report the wrongdoing. Only after Dr. Moore chose not to "advocate for his resident" did Plaintiff report Dr. Arthur to ACGME. Consequently, Plaintiff meets all the elements of a whistleblower claim; she disclosed violations of applicable

---

[12] (Doc. 105, p. 8)

federal regulations and rules derived therefrom, she disclosed those violations to her supervisor, and she suffered multiple adverse actions thereafter, up to and including, her ultimate termination. Therefore, Plaintiff's claim under the GWA should not be dismissed and jury should determine if Plaintiff was terminated or subjected to the other adverse actions described herein because of her disclosure that she was being forced to delete case logs for work that she actually performed mistakenly when she was under observership status.

## I. Count Seven (Procedural and Substantive Due Process Under § 1983) Should Not Be Dismissed

### Plaintiff Was Deprived of a Constitutionally-Protected Property Interest

Defendants argue that Plaintiff § 1983 Due Process claim fails because she did not have a constitutionally protected property interest giving rise to a right to procedural due process, that she did not exhaust her state-provided remedies, and that she received all the process she was due. (Doc. 105, p. 39-45). Contrary to the Defendants argument, "Procedural due process is, as its name suggests, a guarantee of fair procedure" and the record in this case supports a finding that nothing was fair about Plaintiff's suspension of privileges and termination from her residency. J.R. v. Hansen, 803 F.3d 1315, 1320 (11th Cir. 2015) (citations and internal quotation marks omitted). "[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action[13]; and (3) constitutionally [] inadequate process." Id.

### (1) Plaintiff had a Constitutionally-Protected Property Interest in Her Medical Residency and Education

"State law defines the parameters of a plaintiff's property interest for section 1983 purposes, ... and whether state law has created a property interest is a legal question for the court

---

[13] The moving Defendants are undisputedly state actors. See e.g., Doc. 105, p. 45 fn. 23 referring to "State Defendants."

to decide." <u>Morley's Auto Body, Inc. v. Hunter</u>, 70 F.3d 1209, 1212 (11th Cir. 1995) (citations and internal marks omitted). Students have a protected property interest in their public education, and they cannot be deprived of this interest without due process. <u>Goss v. Lopez</u>, 419 U.S. 565, 576, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975)(holding that for disciplinary actions, as opposed to academic actions, students are entitled to notice and a formal hearing). <u>Sasser v. Bd. of Regents</u>, Civil Action No. 1:20-cv-4022-SDG, 2021 U.S. Dist. LEXIS 188703, at 21 (N.D. Ga. Sep. 30, 2021). Defendants argue that as a medical resident (graduate student), Plaintiff has no property interest in her continued residency. This distinction they attempt to draw between graduate students and undergraduate students is not supported by the law. Defendants cite cases where medical residents were held to have due process rights, though limited process was owed for academic actions. (See, e.g. Doc. 105 p. 42 citing <u>Ekmark v. Matthews</u> and <u>Shaboon v. Duncan</u>.)

Furthermore, Plaintiff's contract with AU forms an additional basis for a property interest in her medical residency. Plaintiff's contract included the terms "This appointment is made subject to the policies, procedures and regulations of Augusta University and the Board of Regents of the University System of the State of Georgia, which are hereby incorporated into this contract by reference." (PSOF Ex. 76 - Pl. Residency Contract). The policies incorporated by reference include HS Policy 13, which provides a resident such as Plaintiff an opportunity to appeal a proposed termination to an Ad Hoc Committee which would conduct a formal hearing. (PSOF Ex. 54 – HS Policy 13.0). Such a contract requiring cause for termination which may be challenged through a hearing also creates a property interest in addition to the general interest in education recognized in <u>Goss v. Lopez</u>. (Due process provides a property right for students in their education, so a hearing is required before they are deprived of it.); See, also, <u>Gilbert v. Homar</u>, 520 U.S. 924, 928-29 (1997)('[Public employees who can be discharged only for cause

have a constitutionally protected property interest in their tenure and cannot be fired without due process .... "); <u>Omni Behavioral Health v. Miller</u>, 285 F.3d 646, 652 (8th Cir. 2002) ('It is well settled that a contract with a state entity can give rise to a property right protected under the Due Process Clause [such as] 'where the contract itself includes a provision that the state entity can terminate the contract only for cause.'" (quoting <u>Unger v. Natl Residents Matching Program</u>, 928 F.3d 1392, 1399 (3d Cir. 1991)).

While Defendants attempt to minimize the rights conferred by Plaintiff's contract, her right to due process is clearly delineated in her residency contract and acknowledged in Defendant's correspondence with Plaintiff. (Doc. 105, p. 40). The contract states, "The Augusta University Policies and procedures for House Officers govern the following conditions of your employment . . . residency supervision, House Officer responsibilities, duty hours… House Officer eligibility . . . procedures for discipline and redress of grievances. . ." (PSOF Ex. 76 - Pl. Residency Contract). To that end, Dr. Meiler's March 19, 2019 termination letter to Plaintiff stated, "As a reminder per Housestaff Policy 13.0 House Officer Evaluation Grievance and **Due Process**, **House Officers have a right** to file a request for a hearing, in writing to the DIO, within 10 days from the date of notification of this decision . . . Under the House Staff Policies & Procedures, HS 13.0 House Officer Evaluation, Grievance & **Due Process** (attached) **you have the right to appeal** this decision within ten (10) days of receipt of this letter." (PSOF Ex. 39 – 3.19.19 Amend. Termination Letter). Lastly, the ACGME policies require, "The Sponsoring Institution must have a policy that provides residents/fellows with due process relating to the following actions regardless of when the action is taken during the appointment period: **suspension**, **non-renewal**, non-promotion; or **dismissal**." BOR 1728-1743 – ACGME Institutional Policies, attached as Memo Ex. 22, citation at 1740, emphasis added). Therefore, by

virtue of being a student at a public institution and by virtue of her contract with AU, Plaintiff

had a constitutionally-protected property interest in continuing her residency.

Defendants argue that Plaintiff's dismissal was academic, therefore virtually no process

was due; she was only required to have notice of the department's dissatisfaction with her

academic performance and notice that termination was a possible outcome. (Doc. 105, p. 42-43).

To the contrary, Drs. Meiler, Arthur and Dr. Coule, assert many different reason for Plaintiff's

termination and admit that it was the totality of those reasons that justified her termination.

(Coule Depo. p. 88; PSOF Ex. 5 - 6.4.19 Meiler/Arthur Letter to Coule). While some of the

reasons are academic, many of the others were not, and to the extent non-academic issues

justified Plaintiff's termination, she had a right to notice and hearing on those issues. See, e.g.

Allahverdi v. Regents of the Univ. of N.M., 228 F.R.D. 696 (D.N.M 2005)("disciplinary

dismissals "are those involving the violation by a student of valid rules of conduct or disruptive

and insubordinate behavior." *citing* Fenje v. Feld, 398 F.3d 620, 625 (7th Cir. 2005)).  For

example, Defendants accused Plaintiff of violating rules of conduct and being insubordinate by

using profanity in the workplace stating, "using profanity in the workplace is a violation of our

medical staff code of conduct and can result in suspension." (Coule Depo. p. 103:22-104:1).

Such accusations are not subjective judgments of her academic performance, but instead

objective conclusions that she violated a code of conduct.

Moreover, all the performance evaluations provided to Plaintiff before her termination

rated her as average to above average and recommended that she be given additional autonomy.

(PSOF ¶ 63, Ex. 40 - Ad Hoc Comm. Rec.). After Plaintiff was reinstated by Dean Hess and

placed on probation/remediation plan, Plaintiff had no indication that there remained allegations

against her, either disciplinary or academic, that could result in her termination from the

program. In fact, it is undisputed that her negative performance reviews were created on June 3,

2019 and it was intended that Plaintiff would never see them or have a chance to address them.

(PSOF Ex. 49 – Kotz Email to Faculty, June 4, 2019, "Please know that she will not see these

evaluations"). Therefore, even if the Court finds that the asserted reasons for Plaintiff's

termination were wholly academic, she still had no notice of the negative evaluations, as was

intended, and no idea that they could or would lead to her termination.

Lastly, the case of <u>Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.</u>, 245 F.3d

1172 (10th Cir. 2001) is instructive in this matter. In <u>Gossett</u>, the Plaintiff filed suit for sex

discrimination and violation of his right to procedural due process. The Court of Appeals for the

Tenth Circuit found that because the Plaintiff's established a genuine issue of material fact as to

whether his dismissal was based on sex discrimination, there also existed a genuine issue of

material fact as to whether his dismissal was based on academic judgment or unlawful

discrimination. Consequently, the court reversed and remanded the dismissal of Gossett's

procedural and substantive due process claims. For the same reasons, Plaintiff's Due Process

claim should not be dismissed; as argued above, she has a established a genuine issue of material

fact concerning whether her termination was due to sex discrimination, disability discrimination,

and retaliation. Where such non-academic reasons exist for her termination, a jury must decide

the reasons for her termination before the amount of due process she was owed may be

determined.

Nevertheless, even if Plaintiff's dismissal was wholly academic, she received no process

at all because she was reinstated with remediation/probation like other residents who made

career mistakes, and then the evidence in the record supports a finding that each Defendant, Dr.

Arthur, Dr. Meiler and Dr. Coule deliberately, wantonly, and with a specific objective in mind to

circumvent their "inability to appeal based on process" her reinstatement, created documents and made up reasons like patient safety concerns to have her terminated which Plaintiff learned about in discovery after filing suit. (Memo Ex. 8 - Meiler, May 31, 2019, text to Coule - BOR7945). A plaintiff can't be said to have received due process under a state contract or the State or Federal Constitution if she first learns what evidence was presented against her to Dr. Coule to make him suspend her privileges during her federal lawsuit. In this case, the Court should find that not only did the Defendants fail to provide her with the minimal amount of due process required for academic or conduct discipline required of a young lady who had completed over ten (10) years of higher education and had three (3) more to go become an Anesthesiologist, but they deliberately violated her rights under Section 1983.

1.     **<u>Plaintiff Did Not Receive Any Due Process</u>**

The facts show that Plaintiff was denied an opportunity to review the evidence that Dr. Arthur and Dr. Meiler assembled against her and presented to Dr. Coule, which led to her ultimate termination. Following her reinstatement by Dean Hess, Dr. Arthur and Dr. Meiler assembled a second case against her, with newly created evidence she first learned about through discovery in this matter. Following her reinstatement, Plaintiff had no notice of these new allegations and no opportunity to be heard regarding them.

On May 17, 2019, Dean Hess sent a letter to Plaintiff showing his decision to overturn her termination and return her to the Anesthesiology and Perioperative Medicine residency program. (PSOF Ex. 41 – Hess Reinstatement Letter - BOR 1711). On May 18, 2019, Plaintiff emailed Dr. Arthur and Dr. Meiler expressing well-wishes and a desire for a fresh start. (Memo Ex. 7 – 5.18.19 Fresh Start Email - BOR 6342-6343). Prompted by her email, Drs. Meiler, Arthur, Basile, and Jain discuss continuing her on administrative leave while the department appeals Plaintiff's reinstatement by Dean Hess. <u>Id</u>.

On May 24, 2019 Dr. Arthur asked her assistant to set up a meeting with Dr. Moore and Dr. Meiler to discuss Plaintiff. (5.24.19 Text Message - BOR 7876, attached as Memo Ex. 23). This message and other messages, emails, and meeting minutes that follow show the intent of these meetings was to find a way to overturn Dean Hess's decision and get rid of Plaintiff because there was no way to appeal the decision after Dr. Hess adopted the recommendation of the Ad Hoc Committee in accordance with Plaintiff's due process and contractual rights.

Initially Defendants Dr. Meiler and Dr. Arthur indicated to Plaintiff that they would appeal Dean Hess's decision, an action that was not allowed by or consistent with AU policies. (Memo Ex. 7 - 5.19.19 Fresh Start/Email re: appealing reinstatement - BOR 6343). Subsequently, on or about May 24, 2019, Dr. Arthur emailed Plaintiff informing her that they decided not to appeal Dean Hess's decision and she could return to work on June 3, 2019. (Doc. 23-1 Pl. Amend. Cmpl. ¶ 134). On May 30, 2019, Defendant Arthur emailed Defendant Meiler and others, stating "Since me (sic) are being made to take Lesley Williams back into the program, we will have to place her immediately on **PROBATION** for professionalism." Importantly, Defendant Meiler replied, "I support this decision and it is the correct intervention in response to Dr. Williams' behavior." (PSOF Ex. 44 – 5.30.19 Email re reinstatement on probation – BOR 6347-6348, emphasis in original). That goes to the ultimate question of fact for the jury in this case, whether even if the allegations against Plaintiff were true, which they are not, was she terminated instead of being given an opportunity for remediation like other male residents who made professional mistakes but who did not file formal claims of disability and gender discrimination. Despite telling Plaintiff the contrary, on June 3, 2019, Dr. Meiler and Dr. Arthur, without Plaintiff's knowledge, convened a special faculty meeting to create additional support for her termination. (Ex. 20 - 6.3.19 Meeting Minutes - BOR 759; PSOF Ex. 45 - Email

re 6.3.19 Meeting - BOR 6346). The meeting included 27 participants and lasted over an hour, but the meeting minutes prepared by Dr. Meiler are devoid of particulars. The minutes make no mention of drafting new resident evaluations for Plaintiff. (Memo Ex. 19).

Plaintiff later learned that attendant to the meeting, Dr. Meiler, Dr. Arthur, and Dr. Moore provided this additional information, in violation of Plaintiff's due process rights to notice of and opportunity to be heard concerning the accusations against her. (PSOF Ex. 5 - Ltr. Meiler to Coule 6.4.19 - BOR 2155-2158). At the request of the Dr. Arthur, the evaluations completed on June 3 were augmented on June 4 following discussions between Dr. Meiler, Dr. Arthur, Dean Hess, and Dr. Coule.

On June 3, 2019 at 11:32, Dr. Arthur and Dr. Basile began a conversation where Dr. Arthur informed Dr. Basile of a 3:00 pm meeting with Dean Hess. Dr. Basile then states, "Hopefully they are coming up with there [sic] plan B. Plan b should not be our responsibility." (Memo Ex. 16 - Text Messages, BOR 7872). Later that day, Dr. Meiler text messaged Dr. Arthur stating, "Mary, I just talked to the Dean [Hess] and he would like both of us to be present at the called meeting at 3 PM in the Dean's office," and Dr. Arthur confirms that she is leaving her home to attend the meeting.

On June 3, 2019 at 3:00 pm, Dr. Arthur and Dr. Meiler met with Dean Hess. (Memo Ex. 1 - Text Messages - BOR 6757). Defendants provided no minutes or other documentation of this meeting through discovery except for the text message contained in BOR 6757. The evening of June 3, 2019, Dr. Coule called Dr. Meiler "on behalf of David Hess" and requested that Dr. Meiler and Dr. Arthur send him a letter to support his suspension of Plaintiff' privileges. (PSOF Ex. 48). On June 3, 2019 at 3:30 pm, sometime after the scheduled start of the meeting with Dean Hess, Dr. Arthur requested her assistant to "pull all evaluations on Lesley for me." (Text

Messages - BOR 7879, attached as Memo Ex. 24).  On June 3, 2019 at 7:08 pm, Dr. Arthur

messaged Dr. Basile stating, "I am in the middle of drafting a letter to the CMO highlighting

patient safety concerns." Id. At 7:52 pm, Dr. Meiler messaged Dr. Arthur, stating "Phil Coule

just called on behalf of David Hess. I told him that you rescheduled L. and that we will have the

letter to him in the morning. Thanks Mary!" (PSOF Ex. 48). These messages further show the

cooperation and false statements of Dr. Coule. First, he testified that he did not speak with Dean

Hess prior to "suspending" Plaintiff's privileges. (PSOF Ex. 5 - Coule Depo. p. 106:7-9).[14] This

message shows that to be untrue.[15]

From these messages, especially combined with the other evidence discussed herein, a

reasonable jury could conclude that the 3:00 pm meeting involved recruiting Dr. Coule to

terminate Plaintiff under the guise of patient safety concerns and to then use the separate private

entity status of AUMC, as Defendants are presently doing in their motions for summary

judgment, to argue that Plaintiff was not entitled to due process for Dr. Coule's decision. The

Defendants want this Court and, possibly a jury to believe, that Dr. Coule was unknowing and

acting independently, and that these supposedly separate parties could not be liable for the

actions of each other. Nevertheless, the evidence of their collaboration belies those claims and

neither a jury nor this Court must believe their assertions of separation in the face of clear

---

[14] This message shows that Dr. Coule spoke with Dean Hess, at the latest, on June 3, 2019, which is before he claims to have made his decision to terminate Plaintiff. (PSOF Ex. 5 - Coule Depo. p. 88, his decision was based at least in part on written information which he did not receive until the evening of June 4, 2019.).

[15] Similarly, misrepresented the fact of discussions about his treatment of Plaintiff in June of 2018. Dr. Coule testified that he only spoke to counsel about Plaintiff's treatment; however, the record shows that he did speak with Dr. Meiler as an email from Dr. Arthur's indicated he would. (PSOF Ex. 23 – 6.19.18 Follow Up Email -BOR 1104). While he specifically denied speaking to Dr. Meiler, recently provided text messages show the contrary. (Coule Depo. p. 34-35; PSOF Ex. 24 - 6.19.18 Meiler/Coule message – BOR 7851)(On June 19, 2018 at 7:35 pm, Dr. Meiler sent a text message to Dr. Arthur stating, "I just got off the phone with Phillip Coule. He couldn't say much. Please order drug testing tomorrow right away."). The note that she admitted to drug and alcohol use was added two days after his treatment of Plaintiff and in the midst of her department having difficulty justifying for cause drug testing to their legal department. (PSOF Ex. 26 - ER Report – Coule MD 264-266; PSOF Ex. 27 - Timeline for Resident LW – BOR 2437).

cooperation. The facts support a finding that Dr. Coule and Drs. Meiler and Arthur discussed the undisputed fact that Dean Hess's decision to reinstate the Plaintiff was not appealable and that the parties needed another way to terminate her residency so that they would not have to grant her accommodation requests especially when she had filed a formal claim of disability and gender discrimination and hired a lawyer. Rules, regulations, grievance hearings and appeals are afforded residents under their contracts just for the purpose of ensuring that residents would not be summarily dismissed without an opportunity to be heard. Drs. Coule, Meiler, and Arthur's actions stole that opportunity from the Plaintiff.

Furthermore, the record shows that on June 4, 2019 at 9:13 am, Kristina Kotz emailed the department faculty, most of whom were present at the June 3, 2019 meeting stating, "We are having to send out the evaluations from yesterday again so that you can add comments. **Please know that she will not see these evaluations**. It is vital for you to complete them **by 1 pm today with details in the comment section**. They are for Dr. Coule's review and decision." (PSOF Ex. 49 - 6.4.19  Kotz Email For Evaluation Comments – BOR 6756, emphasis in original). On June 4, 2019 at 1:13 pm, Dr. Arthur asked her assistant to obtain the transcript from the ad hoc committee grievance hearing and asked if Clark Speese, the lawyer for AUMC had responded. (Text Message - BOR 7880, attached as Memo Ex. 25). On June 4, 2019 at 5:33 pm, Defendant Arthur addressed an email to Dr. Coule, Dr. Moore, Dr. Hess, Dr. Meiler, Clark Speese, and Kristina Kotz with a letter signed by her and Dr. Meiler addressed to Dr. Coule, seeking the termination of Plaintiff. The email stated, "I have attached the letter regarding Dr. Lesley Williams. **I will send the <u>corrected</u> supporting documentation in a separate email.**" (PSOF Ex. 50 - Email Arthur Letter and "corrected" documentation - BOR 6758-6762, emphasis added). Defendant Dr. Coule sent the  letter dated June 4, 2019 which effectuated the suspension

of Plaintiff' privileges to practice medicine at the AU Medical Center and revoked her access to AU medical facilities, effectively terminating her employment and continuation of her residency training with the university. (PSOF Ex. 51 - Coule Susp. of Privileges Coule MD 341).

As further evidence of their cooperation and dishonesty, at 6:44 pm on June 4, 2019, Dr. Arthur messaged Dr. Basile saying, "Phillip Coule has suspended Lesley. Didn't want to use termination in the final letter out if [sic] respect for the dean's earlier decision." (Memo Ex. 10 – Text Messages - BOR 7866). The record shows that the whole purpose of getting Dr. Coule to suspend Plaintiff's privileges was to overturn Dean Hess and the Ad Hoc Committee's decision to reinstate her. Contrary to his claim that they did not confer about a specific result, Dr. Coule's "suspension" always was and was always intended to be a termination. The conversation continued with Dr. Arthur saying, "Knowing her, she will appeal," and Dr. Basile responding, "Dr. Meiler told me she can't appeal Dr. Coule's decision." (Memo Ex. 10). The message further shows their intent of finding a way to circumvent their own due process policies and get rid of her in a way that appears to be legitimate. Not only did they deny Plaintiff her right to appeal the termination of her residency to the Ad Hoc Committee, but Plaintiff was only able to discover the extent of the scheme between Dr. Arthur, Dr. Meiler, and Dr. Coule by filing suit.

Dr. Coule suggested on June 4, 2019, that Dean Hess's yet to be written termination letter be given to Plaintiff in person at the same time as Dr. Coule's suspension letter. (Memo Ex. 17 - BOR 7947-7948). On June 5, 2019, citing only the suspension of her privileges to practice medicine by Defendant Dr. Coule and failing to mention consideration of newly provided information, Dean Hess terminated Plaintiff from the AU residency program altogether. (PSOF Ex. 53 - Termination Letter - BOR 1710). Plaintiff was handed both letters at the same time.

**2.** **Substantive Due Process**

To establish a substantive due process claim based on an academic decision, a Plaintiff must show that the decision was the product of arbitrary state action rather than a conscientious, careful and deliberate exercise of professional judgment.[16] *See,* Univ. of Michigan v. Ewing, 474 U.S. 214, 224-25 (1985). A plaintiff may make such a showing by evidence that the challenged decision was based on "nonacademic or constitutionally impermissible reasons," rather than the product of conscientious and careful deliberation. Ewing, at 225. Where a plaintiff presents evidence sufficient to create a fact issue on whether the decision to terminate her was motivated by impermissible discrimination or retaliation rather than based on an exercise of professional judgment as to his academic ability, summary judgment was improper. *See,* Gossett at 1182. Therefore, due to there being a question of fact concerning whether Plaintiff was terminated because of her gender, disability, or formal complaints of discrimination, Plaintiff's substantive due process claim should not be dismissed.

### 3. Plaintiff Did Not Fail to Take Advantage of Existing State Remedies

Defendants cite Cotton v. Jackson, 216 F.3d 1328 (11th Cir. 2000) for the proposition that Plaintiff's § 1983 Due Process claim should be dismissed because Plaintiff did not seek a writ of mandamus pursuant to O.C.G.A. § 9-6-20. Plaintiff's case, however, is distinguishable from Cotton. In Johnston v. Borders, 724 F. App'x 762 fn.  (11th Cir. 2018), the Court noted that the plaintiff in Cotton requested a hearing and was denied one. As a result of being denied the requested hearing, the Plaintiff "could have sought mandamus to compel…a hearing…by contrast [plaintiff] never requested a hearing because [she] was never notified of her right to do so". Id. citing Cotton at 1330.

---

[16] As noted above, Plaintiff disputes that her termination was wholly academic, but to the extent the purported reasons for her termination are facially for academic concerns, to the extent they are pretext for discrimination or retaliation, Plaintiff's claim remains viable.

Similarly, Plaintiff in this matter was not informed of nor was she made aware of her right to a hearing when Dr. Arthur and Meiler again sought her termination through a suspension of privileges by Dr. Coule as plan B after her reinstatement. In fact, Plaintiff did not become aware of the extent to which Drs. Arthur, Meiler and Coule worked to solicit and assemble new allegations and new evidence against her until this case was underway and, more specifically, until the last batch of text messages were received during the briefing period for summary judgment.

Similarly, in Williams v. Town of Morris, 2018 U.S. Dist. LEXIS 185470 (N.D. Ala. Oct. 30, 2018) the court addressed this issue:

> The town failed to give Williams notice of the charges against him and deprived him of his right to respond. Despite this fact, the town, citing [Cotton], argues that Williams has not alleged a violation of his procedural due process rights because he failed to first pursue state remedies. This case is distinguishable from Cotton, however, because the plaintiff in Cotton received notice of the charges against him and a chance to respond before his termination. See Cotton, 216 F.3d at 1329; see also McKinney, 20 F.3d at 1561-62 (noting that McKinney received written notice of the charges against him and a hearing).
>
> . . .
>
> Williams' allegations are more similar to those in Fetner v. City of Roanoke, 813 F.2d 1183 (11th Cir. 1987), a case in which the city discharged its police chief without providing written notice of the charges or a hearing. The chief sued under § 1983 for violations of his right to procedural due process. 813 F.2d at 1183-84. The district court granted the city's motion for summary judgment, finding, among other things, "adequate due process was provided by the post-deprivation remedies available through state personnel proceedings and a state law suit . . . ." Id. at 1185. The Eleventh Circuit reversed, finding that "[p]ost-deprivation remedies do not provide due process if pre-deprivation remedies are practicable," Id. at 1186 (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 436, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982)), and that a public employee may state "a valid procedural due process claim when he

alleges that the defendants failed to give him written notice or a hearing before firing him," Id.

The instant case is distinguishable from Cotton and McKinney and is more like Williams, Fetner, and Johnston in that Plaintiff never had a notice of opportunity to be heard concerning the new allegations concerning patient safety. In fact, Defendants admit that they presented this evidence and had multiple meetings and conversation between May 28, 2019 and June 4, 2019, wherein they argued for Plaintiff's termination, yet Plaintiff had no knowledge of and no notice of those multiple meetings over the course of multiple days to advocate for her termination. She certainly was not given an opportunity to be heard concerning the allegations; she was not heard by the faculty that attended the June 3rd meeting, she was not heard by Dean Hess, she was not heard by Dr. Coule, and she did not have the opportunity for a hearing in front of an Ad Hoc Committee as was her "right" under her contract, HS 13.0, the ACGME accreditation policies, and the Fourteenth Amendment. Therefore, there is a question of fact as to whether the Individual State Defendants deprived Plaintiff of her procedural due process right by denying her notice and a hearing and as to whether they deprived her of her substantive due process right that the decision to terminate her not be arbitrary and capricious by being based on unlawful discrimination and retaliation.

### 4. The Individual Defendants Are Not Entitled to Qualified Immunity

The Defendants are not entitled to qualified immunity because Plaintiff had a clearly-established right to Due Process, which Dr. Meiler and Dr. Arthur knowingly and intentionally conspired to deny Plaintiff. "Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." Sanders v. Howze, 177 F.3d 1245,

1249 (11th Cir. 1999) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). Once that is shown, the plaintiff must demonstrate: (1) that the defendant violated her constitutional rights, and (2) that, at the time of the violation, those rights were "clearly established" See Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled, in part, on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). "We may decide these issues in either order, but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings." Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017)

"When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that [the government official] engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." Jones, 857 F.3d at 851 (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)). Fair warning may be shown by a materially similar case that has already been decided, by a broader, clearly established principle that should control the novel facts of the situation, or where the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations, quotation marks, and alterations omitted). In this matter, Plaintiff's rights were clearly established as is argued below.

Plaintiff's allegations are more similar to those in Fetner v. City of Roanoke, 813 F.2d 1183 (11th Cir. 1987). Like the Plaintiff, Fetner was simply informed that he was being terminated without being provided with notice of any allegations against him or a hearing at which he could challenge those allegations. The chief sued under § 1983 for violations of his

right to procedural due process. 813 F.2d at 1183-84. The district court granted the city's motion for summary judgment, finding, among other things, "adequate due process was provided by the post-deprivation remedies available through state personnel proceedings and a state law suit . . . ." Id. at 1185. However, the Eleventh Circuit reversed, finding that "[p]ost-deprivation remedies do not provide due process if pre-deprivation remedies are practicable," Id. at 1186 (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 436, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982)), and that a public employee may state "a valid procedural due process claim when he alleges that the defendants failed to give him written notice or a hearing before firing him," Id.

     In arguing for qualified immunity, Dr. Arthur and Dr. Meiler pretend that to the extent they violated Plaintiff's right to due process, they did not have adequate notice they were doing so. (Doc. 105, p. 44). To the contrary, they plotted and devised a way to accomplish her termination in a way that would circumvent her Due Process rights which appear in her contract, their policies, and is required by ACGME. Dr. Coule's suspension of her hospital privileges was not a solitary act, but was done at the behest of Dr. Arthur and Dr. Meiler and to accomplish their goal of terminating Plaintiff. To that end they chose to call Dr. Coule's removal of Plaintiff's hospital privileges "suspension" rather than a "termination" because that would conceal their true intentions, and he suggested that his "suspension" letter be delivered alongside a yet to be written termination letter from Dean Hess. Such subterfuge shows contemporaneous knowledge of wrongdoing. Furthermore, Plaintiff's right to due process appeared in the very termination letter issued by Dr. Meiler, in the Grievance and Due Process policy he attached to it, and her ability to "appeal" or sue permeated all of their conversations. Going to Dr. Coule was the Plan B after the Plaintiff won her appeal in accordance with due process. Going to Dr. Coule was a way of circumventing Plaintiff's due process rights and they specially say in text messages received

during the briefing stage of summary judgment that "she can't appeal Dr. Coule." (Memo Ex. 10). Therefore, there is clear case law in the Eleventh Circuit that put the Defendants on notice of her right to not just be fired without a pre-termination hearing. it is clear that Defendants were aware of Plaintiff's right to address the allegations against her and that they purposefully took actions to circumvent her right to due process, so they should be denied the protection qualified immunity offers to state actors who in good faith mistakenly violate a person's rights.

### J.    Count Fourteen (Breach of Contract) Should Not Be Dismissed

"The elements for a breach of contract claim in Georgia are the (l) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Uhlig v. Darby Bank & Tr. Co., 556 F. App'x 883, 887 (11th Cir. 2014) (per curiam) (unpublished) (internal marks omitted) (quoting Norton v. Budget Rent A Car Sys. Inc., 705 S.E.2d 305,306 (Ga. Ct. App. 2010)). "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." UWork.com, Inc. v. Paragon Techs., Inc., 740 S.E.2d 887, 893 (Ga. Ct. App. 2013)(citation omitted).

Here Defendants admit that the "Notice of Appointment" was a contract between Plaintiff and BOR, but argues that Plaintiff was an at will employee (Doc. 105, p. 40).[17] The contract included the terms, "This appointment is made subject to the policies, procedures and regulations of Augusta University and the Board of Regents of the University System of the State of Georgia, which are hereby incorporated into this contract by reference." (PSOF Ex. 76 - Pl. Residency Contract – BOR 0062). The policies incorporated by reference include HS Policy 13,

---

[17] "… unlike other employees, a medical resident is [both] constructively prohibited from negotiating offers between prospective employers" and "contractually obligated to the terms of the program contract, including a start date." Robert N. Wilkey, The Non-Negotiable Employment Contract—Diagnosing the Employment Rights of Medical Residents, 44 Creighton L. Rev. 705, 716 (2011).

which provides a resident such as Plaintiff an opportunity to appeal a proposed termination to an Ad Hoc Committee which would conduct a formal hearing. (PSOF Ex. 54 – HS Policy 13.0). The contract also contained, "The Augusta University Policies and procedures for House Officers govern the following conditions of your employment . . . residency supervision, House Officer responsibilities, duty hours… House Officer eligibility . . . procedures for discipline and redress of grievances. . ." (PSOF Ex. 54 – Residency Contract). In this matter, as discussed above, it is undeniable that after Dean Hess reinstated Plaintiff at the recommendation of the Ad Hoc committee, BOR by and through Dr. Meiler, Dr. Moore, and other agents, made a second attempt to terminate Plaintiff. As was shown above, that second attempt was carried out in a manner which purposefully violated the policies incorporated into Plaintiff's contract to include her right to a hearing prior to dismissal and the absence of a policy which would allow for appeal or reconsideration of a previous decision, particularly where that subsequent attempt at termination involved new allegations and new evidence to which Plaintiff was denied an opportunity to respond. Therefore, by terminating Plaintiff without notice and hearing as required by her contract breached the contract entitling Plaintiff to damages.

Lastly, to the extend BOR argues that paying Plaintiff throughout the term of the contract remedies the breach or eliminates any damages to which Plaintiff may have been entitled, this is incorrect. HS 13.0, as discussed above, also requires due process for a non-renewal of Plaintiff's contract and recommendations for non-renewal must be made at least four months prior to the end of the contract. Therefore, at the time of her termination, Plaintiff's contract was going to be

renewed for an additional year as a matter of right because BOR had not met the requirements for non-renewal. Therefore, Plaintiff's breach of contract claim should not be dismissed.[18]

## III.     CONCLUSION

In conclusion, the evidence in this matter establishes material questions of fact as to whether Plaintiff was treated less favorably than similarly situated male residents and residents without disabilities, whether BOR accommodated Plaintiff's disability, whether BOR made unlawful medical inquiries related to her fitness for duty evaluations, whether Dr. Meiler, Dr. Arthur, and Dr. Keel denied Plaintiff Due Process, whether BOR breached its contract with Plaintiff, and whether BOR retaliated against Plaintiff due to her complaints of sex discrimination, disability discrimination, and fraud related to AU's funding and accreditation. Whereas Plaintiff has shown sufficient evidence in support of her claims and submits that the record in this case establishes genuine disputes of material fact, Plaintiff respectfully requests that this Court DENY Defendants' motion and allow her remaining claims to proceed to trial.

Respectfully submitted this 25th day of March, 2022.

/s/ Kenneth Ratley
Kenneth S. Ratley
GA Bar No. 359246
Tanya D. Jeffords, Esq.
GA Bar No. 390055
*Attorneys for Plaintiff*
*Dr. Lesley Williams*

The Law Offices of Tanya D. Jeffords
and Associates, PC
437 Walker Street
Augusta, GA 30901
tjeffords@jeffordslaw.com

---

[18] Plaintiff's claim for attorney's fees pursuant to O.C.G.A. § 13-6-11 (Count Fifteen) requires success on her substantive claims. Therefore, the Court should dismiss Count 15, if and only if, the Court finds no triable issues of facts and dismisses each of Plaintiff's substantive claims.

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF" which was generated as a result of electronic filing.

This 25th day of March, 2022.

/s/ Tanya Jeffords
Tanya D. Jeffords, Esq.
GA Bar No. 390055
Kenneth S. Ratley
GA Bar No. 359246
*Attorneys for Plaintiff*
*Dr. Lesley Williams*

The Law Offices of Tanya D. Jeffords
and Associates, PC
437 Walker Street
Augusta, GA 30901
tjeffords@jeffordslaw.com