IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

DR. LESLEY WILLIAMS,                *
                                    *
        Plaintiff,                  *
                                    *
            v.                      *
                                    *        CV 120-100
                                    *
BOARD OF REGENTS OF THE             *
UNIVERSITY SYSTEM OF GEORGIA        *
d/b/a AUGUSTA UNIVERSITY, et.       *
al.,                                *
                                    *
        Defendants.                 *

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2022 SEP 29  A 11: 43

CLERK
SO. DIST. OF GA.

---

**O R D E R**

---

Before the Court are three motions for summary judgment: one by Defendant Phillip Coule, M.D. ("Dr. Coule") (Doc. 79); one by Augusta University Medical Center ("AUMC")[1] (Doc. 72); and one by Defendants Board of Regents of the University of Georgia ("BOR"), Dr. Brooks Keel, Dr. Steffen Meiler, and Dr. Mary Arthur (collectively, the "State Defendants") (Doc. 104). For the reasons explained below, Defendants' motions are **GRANTED.**

---

[1] AUMC has precisely one corporate member: AU Health System, Inc. ("AUHS"). (Doc. 73, at 4 n.1.) "AUHS is the overarching health system that is the sole corporate member of AUMC, AU Medical Associates, Inc., and Roosevelt Warm Springs Hospital." (Id.) Through this Order, the Court will refer to AUHS and AUMC jointly as AUMC.

## I.  BACKGROUND

The  facts  of  this  case  are  outlined  in  the  Court's  July  7,
2021  Order  granting  several  Defendants'  motion  for  partial
judgment  on  the  pleadings.   (Doc.  60.)   All  Defendants  move  for
summary  judgment  on  all  claims  remaining  against  them.   (Docs.  72,
79,  104.)   These  include,  for  Dr.  Coule:

- Count  Four:  42  U.S.C.  §  1983  equal  protection  claims;

- Count  Seven:  42  U.S.C.  §  1983  due  process  claims;

- Count  Eight:  42  U.S.C.  §  1983  fourth  amendment  claims;

- Count  Five:  libel;  and

- Count  Six:  slander.

(Doc.  23;  Doc.  113,  at  4-5.)   Plaintiff  agrees.   (Doc.  113,  at  4-
5.)   For  AUMC:

- Count  One:  Title  IX  Sex  Discrimination;

- Count  Two:  Title  IX  Retaliation;

- Count  Three:  Violation  of  the  Georgia  Whistleblower  Act,
  O.C.G.A.  §  45-1-4;

- Count  Five:  libel;

- Count  Six:  slander;

- Count  Nine:  Disability  Discrimination  pursuant  to  the
  Americans  with  Disabilities  Act  ("ADA"),  Title  II;

- Count  Ten:  ADA  Title  II  Retaliation;

- Count Eleven: ADA Title III Disability Discrimination;

- Count Twelve: Disability Discrimination pursuant to § 504 of the Rehabilitation Act;

- Count Thirteen: Rehabilitation Act Retaliation;

- Count Fourteen: Breach of Contract.

(Doc. 73, at 4-5.)  Plaintiff agrees.  (Doc. 111, at 1-3.)  For the State Defendants,

- Count One: Title IX Sex Discrimination;

- Count Two: Title IX Retaliation;

- Count Three: Violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4;

- Count Seven: 42 U.S.C. § 1983 due process claims

- Count Nine: ADA Title II Discrimination;

- Count Ten: ADA Title II Retaliation;

- Count Twelve: Disability Discrimination pursuant to § 504 of the Rehabilitation Act;

- Count Thirteen: Rehabilitation Act Retaliation;

- Count Fourteen: Breach of Contract.

(Doc. 105, at 31.)  Plaintiff agrees.  (Doc. 132, at 1-2.)  The Court addresses the Parties' arguments below.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation marks omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th

Cir. 1991) (explaining _Adickes v. S.H. Kress & Co._, 398 U.S. 144 (1970) and _Celotex_, 477 U.S. 317).  Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  _Jones v. City of Columbus_, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).  A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient.  _Clark_, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."  _Id._  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  _Id._  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."  _Fitzpatrick_, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  _Id._

5

at 1116-17 (citation omitted).  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Local Rules require the movant to include a statement of undisputed material facts with its motion.  See L.R. 56.1, SDGa.  "Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."  Preis v. Lexington Ins. Co., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007).  Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment."  Id. (citing Resol. Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)).  Accordingly, the Court will only review the materials the Parties have specifically cited and legal arguments they have expressly advanced.  See id.

In this action, the Clerk of Court provided all parties notice of the motions for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default.  (Docs. 77, 85, 108.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have

been satisfied.  The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motions are now ripe for consideration.

### III. DR. COULE'S MOTION FOR SUMMARY JUDGMENT

Dr. Coule and Plaintiff agree that Plaintiff asserts five claims against him: three 42 U.S.C. § 1983 claims for sex discrimination, unlawful search, and violations of due process as well as Georgia law claims of slander and libel.[2]  (Doc. 113, at 4-5; Doc. 137, at 2.)  The Court addresses those claims below.

### A. 42 U.S.C. § 1983 Actions (Counts Four, Seven, and Eight)

First, Dr. Coule asserts he cannot be held liable in this § 1983 action because AUMC is a private, non-governmental entity and he acts as an agent for this private entity.  (Doc. 80, at 5-6.)  In the alternative, Dr. Coule argues he is entitled to qualified immunity.  (Id. at 10-13.)  Plaintiff counters that AUMC is not a private entity and engaged in state action for a number of reasons.  (Doc. 113, at 14-28.)  First, she argues AUMC and its agents have a history of asserting that they are governmental

---

[2] Plaintiff's Amended Complaint does not clarify whether she brings Counts nine, ten, eleven, and twelve against Dr. Coule, but Plaintiff's omission of these claims in her summary of charges indicates she does not.  (See Doc. 23.)  Even if she had, the Court would dismiss the claims.  See, e.g., Mazzola v. Davis, 776 F. App'x 607, 610 (11th Cir. 2019) ("It is well established in this [C]ircuit that '[o]nly public entities are liable for violations of Title II of the ADA.'" (citing Edison v. Douberly, 604 F.3d 1307, 1308 (11th Cir. 2010))); Williams v. Board of Regents of the Univ. Sys. of Ga., 477 F.3d 1282, 1300 (11th Cir. 2007) ("Title IX does not allow claims against individual school officials.").

entities to avoid liability and are inextricably entangled with the Board of Regents.  (Id. at 24-28.)   Second, she argues Dr. Coule engaged in state action because he acted on behalf of and in concert with the Board of Regents.  (Id. at 14-15.)   Third, she argues Dr. Coule engaged in state action because his actions were compelled by the State.  (Id. at 16-21.)

1. AUMC is a Private Entity that Engaged in State Action

The Court recently addressed Dr. Coule's argument that AUMC is a private, non-governmental entity and he acts as its agent in a separate case, Street v. Augusta Univ. Health Sys., Inc., No. 1:20-cv-084, (S.D. Ga. Mar. 22, 2021).  There, the Court found that AU Health System, Inc., formerly known as MCG Health System, Inc., was "a private, non-profit corporation."[3]  See Gordon v. MCG Health, Inc., 301 F. Supp. 2d 1331, 1335 (S.D. Ga. 2003).  The Court took judicial notice[4] of the Office of the Georgia Secretary of State's website listing AU Heath System, Inc. as a "domestic

---

[3] MCG Health System, Inc. was renamed to AU Health System, Inc. effective September 1, 2016.  See Business Search for AU Health System, Inc., Georgia Secretary of State—Corporations Division, https://ecorp.sos.ga.gov/BusinessSearch/NameChangeHistory (last visited Mar. 18, 2021).  Moreover, MCG Health System, Inc. took over the operations of the Medical College of Georgia Hospital through a lease agreement with the Board of Regents of the University System of Georgia on July 1, 2000.  See MCG Health, Inc. v. Nelson, 606 S.E.2d 576, 578 (Ga. Ct. App. 2004).  Thus, the Board of Regents does not currently operate AU Health System, Inc.

[4] "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).  The Court may do so "on its own" and "at any stage of the proceeding." Id. 201(c)(1), (d).

nonprofit corporation."[5]   Since AU Health System, Inc. and AUMC are both privately owned and operated nonprofit corporations, their employees, such as Dr. Coule, are private parties.   (See Doc. 23, at 5.)  As such, they cannot be held liable under § 1983 unless their actions amount to state action.

"Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes."  Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992).  Private parties will be found to be state actors if one of the following three conditions is met:

> (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) "the State had so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise" ("nexus/joint action test").

Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001) (citing NBC, Inc. v. Commc'ns Workers of Am., 860 F.2d 1022, 1026-27 (11th Cir. 1988)) (alterations omitted).

---

[5] See Business Search for AU Health System, Inc., Georgia Secretary of State—Corporations Division,
https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=1530821&businessType=Domestic%20Nonprofit%20Corporation&fromSearch=True (last visited Mar. 18, 2021).

Here, Plaintiff argues Dr. Coule satisfies the state compulsion test and the nexus/joint action test. (Doc. 113, at 14-21.) The Court will address each argument in turn.

First, the Court finds Dr. Coule's actions did not satisfy the state compulsion test. "The state compulsion test limits state action to instances where the government 'has coerced or at least significantly encouraged the action alleged to violate the Constitution.'" Willis v. Univ. Health Servs., Inc., 993 F.2d 837, 840 (11th Cir. 1993) (quoting Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO, 860 F.2d 1022, 1026 (11th Cir. 1988)). Plaintiff claims she argues Dr. Coule's actions were compelled by the State, but she provides no factual basis for her assertion. (Doc. 113, at 16-21.) Rather, her argument boils down to allegations that Dr. Coule and State actors cooperated and made false statements, discussed the events underlying Plaintiff's claims as they occurred, and Dr. Coule essentially conspired with the State actors. (Id.) No evidence suggests the State coerced or in any way encouraged Dr. Coule's actions here; therefore, Dr. Coule's actions do not satisfy the state compulsion test.

Second, the Court finds Dr. Coule's actions *did* satisfy the nexus/joint action test. The nexus/joint action test applies where "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." Willis, 993 F.2d at 840 (quoting

Nat'l Broad. Co., 860 F.2d at 1026-27).  Plaintiff argues Dr. Coule

and the State actors were joint participants who "conspired to get

the same desired outcome."  (Doc. 137, at 10.)  In support of her

claim, Plaintiff:

- argues "Dr. Coule admits that he would not have suspended Plaintiff's privileges absent the communications between him and Defendants Meiler and Arthur";

- argues "Dr. Coule contends that he acted in response to the recommendations of Defendants Meiler and Arthur, who were state agents, and not those of his own private entity";

- cites a letter sent from Defendants Meiler and Arthur concluding Plaintiff had lost their support for her participation in the program;

- argues Dr. Coule participated in "discussions" with those Defendants and Defendant Hess, especially on June 3, 2019, which allegedly conflicted with his deposition testimony;

- cites a text message from Defendant Meiler to Defendant Arthur stating, "Phil Coule just called on behalf of David Hess.  I told him that you rescheduled L. and that we will have the letter to him in the morning. Thanks Mary!";

- cites an email to department faculty requesting evaluations of Plaintiff for Dr. Coule's review and decision;

- states she was handed two letters – one from Dr. Coule suspending her privileges to practice medicine, and one from Defendant Hess terminating Plaintiff from the program – at the same time; and

- cites text messages between Dr. Coule and Defendant Meiler deciding to present the letters together.

(Doc. 113, at 14-21.)   Taken together, Plaintiff argues this evidence demonstrates Dr. Coule and the state actors conspired to terminate her, compelling the finding that Dr. Coule engaged in state action.   (Id. at 21.)

As an initial matter, Plaintiff's arguments that Dr. Coule relied upon communications between himself and Defendants Meiler and Arthur, that he acted in response to their recommendations, that they sent him a letter concluding Plaintiff had lost their support, and that Dr. Coule reviewed evaluations of Plaintiff by department faculty do not necessarily demonstrate Dr. Coule acted on behalf of the state actors, nor do they necessarily show a conspiracy between Dr. Coule and those individuals.   As Dr. Coule argues, "[r]eliance by a private entity on information provided by a state actor to take an independent action does not make that action a state action."   (Doc. 125, at 10.)   While the record reflects Dr. Coule relied on information provided by state actors, it does not demonstrate Dr. Coule substituted their judgment for his own; to the contrary, Dr. Coule consistently testified he made an independent decision after considering all the relevant facts and circumstances.   (See, e.g., Doc. 113-7, at 23 ("[T]he decision to suspend her privileges was made on the totality of the information that had been presented both verbal, the written documentation, and my knowledge of [Plaintiff] from having treated her[.]").)   Even the questionnaire which was transmitted to Dr.

Coule after completion by faculty stated the evaluations were "for Dr. Coule's review and decision." (Doc. 113, at 19 (citing Doc. 113-19, at 1.).) No reasonable jury could find these actions alone transform Dr. Coule's decision into a joint action by Dr. Coule and state actors; rather, a reasonable jury could only infer these were independent actors who shared information.

Crucially, however, at least two pieces of record evidence could give rise to the reasonable inference that Dr. Coule, Defendant Hess, and Defendant Meiler conspired to engage in state action. First, Plaintiff points out an inconsistency in Dr. Coule's deposition testimony. (Doc. 113, at 18.) Dr. Coule asserts he did not speak with Defendant Hess before June 4, 2020, while a text message between Defendants Meiler and Arthur wherein Defendant Meiler wrote, "Phil Coule just called on behalf of David Hess. I told him that you rescheduled L. and that we will have the letter to him in the morning. Thanks Mary!" (Doc. 113-16, at 1.) This language – indicating that Dr. Coule called a third party *on behalf of* a state actor – could allow a juror to draw the reasonable inference that Dr. Coule and Defendant Hess were acting in concert. Such a juror could determine that without a pre-call accord between Dr. Coule and Defendant Hess, Dr. Coule would not have been able to call 'on behalf of' Defendant Hess.

Second, Plaintiff points to text messages between Defendant Hess and Defendant Meiler that show an agreement to deliver

13

Plaintiff's suspension letter and termination letter at the same time and place. (Doc. 113, at 21 (citing Doc. 113-25).) A juror crediting this evidence would read that "Phil [Dr. Coule] recommended as one option that [Defendant Hess] deliver [Dr. Coule's] suspension" and the termination letter at the same meeting. (Doc. 113-25.) Dr. Coule argues he, Defendant Meiler, and Defendant Hess "each testified that they did not confer as to what the result of the letter would be or what the intended outcome was." (Doc. 73, at 4.) However, these averments are flatly contradicted by the text message indicating Dr. Coule's suggestion to deliver the suspension and termination letters together. (Doc. 113-25.) In light of this evidence, a reasonable juror could determine that Dr. Coule acted in concert with Defendant Hess, satisfying the nexus/joint action test.

2. Dr. Coule Is Still Entitled to Qualified Immunity

Dr. Coule argues that even if he was acting jointly with the state, he is entitled to qualified immunity. (Doc. 80, at 10-13.) He argues he "was acting in a job-related function at all times relevant to the Complaint and suspension of Plaintiff's clinical privileges was done in his capacity and pursuant to his authority as the CMO." (Id. at 11.) He argues "the one action that he took . . . did not violate any constitutional right that was obviously and clearly established." (Id.)

14

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)) (alterations adopted and internal quotation marks omitted). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. (citation and internal quotation marks omitted). In other words, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Robinson v. Payton, 791 F.3d 824, 829 (8th Cir. 2015) (citing Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing Vinyard, 311 F.3d at 1346). To determine whether a government official was acting within the scope of his discretionary authority, courts consider whether the official "(a) perform[ed] a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."

Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (citation omitted).   Here, there is no question Dr. Coule was acting within the scope of his discretionary authority at all relevant times outlined in the Amended Complaint.

"Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate."   Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006) (quoting Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003)).   Accordingly, the Court must turn to the Amended Complaint to determine whether Plaintiff has alleged sufficient facts to demonstrate that Dr. Coule is not entitled to qualified immunity.   See Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1319 (11th Cir. 2016).   To overcome a qualified immunity defense, a plaintiff "must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."   Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)).[6]

"'Clearly established law' is law that is sufficiently established so as to provide public officials with 'fair notice'

---

[6] The Court may consider these issues in any order.   See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

that the conduct alleged is prohibited." Randall v. Scott, 610 F.3d 701, 715 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The Eleventh Circuit has articulated three ways in which a law can be clearly established. "First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law." Vinyard, 311 F.3d at 1350. This means "the conduct 'so obviously violates the Constitution that prior case law is unnecessary.'" Hudson v. City of Riviera Beach, No. 12-80870-CIV, 2014 WL 1877412, at *13 (S.D. Fla. May 9, 2014). Second, "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." Vinyard, 311 F.3d at 1351. "The third and final way for a right to become clearly established is 'by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose.'" Joseph v. Bd. of Regents of Univ. Sys. of Ga., No. 1:20-CV-502, 2020 WL 6494202, at *13 (N.D. Ga. May 8, 2020) (citing Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997); Vinyard, 311 F.3d at 1351-52) ("We believe that most judicial precedents are tied to particularized facts and fall into this category.")).

a. *Sex Discrimination*

At the outset, the Court again notes its July 7, 2021 Order granting the Individual Doctors' motion for judgment on the pleadings. (Doc. 60.) In that Order, the Court found Defendants Meiler and Arthur failed to violate clearly established law with regard to Plaintiff's claims for sex discrimination and illegal search and seizure. (Id. at 10-22.) Now, Plaintiff argues she "presents significant evidence that Dr. Coule acted to discriminate against Plaintiff by aiding [Defendant] Meiler and [Defendant] Arthur in terminating Plaintiff." (Doc. 113, at 11.) However, Plaintiff admits she "could not find a case with identical facts to [the facts she alleges give rise to sex discrimination]." (Id. at 8.) She simply argues the "novel facts" in this case "should be judged by the broader prohibition against sex discrimination in addition to such an obvious violation." (Id.)

As the Court previously noted, "[t]he inquiry whether a constitutional violation is clearly established is undertaken in light of the specific context of the case, not as a broad general proposition." Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d 1338, 1345 (11th Cir. 2013) (citing Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012)) (internal quotation marks omitted). The Eleventh Circuit has emphasized that "courts must not permit plaintiffs to discharge their burden by referring to general rules and the violation of abstract rights . . . because qualified

immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases." Maggio v. Sipple, 211 F.3d 1346, 1354 (11th Cir. 2000) (citation and internal quotation marks omitted).   And Plaintiff only points to one specific allegation that Dr. Coule discriminated against her: he "did not investigate the claims" against Plaintiff that supposedly led to her firing. (Doc. 113, at 11.)

Plaintiff's argument fails because she simply provides no basis for a jury to believe that any of Dr. Coule's actions were pretextual.   She cites two non-binding cases for the proposition that "refusal to conduct a meaningful investigation is indicative of pretext":   Gross-Jones v. Mercy Med., 874 F. Supp. 2d 1319, 1347-48 (S.D. Ala. 2012) and Dunson v. Tri-Maint. & Contractors, Inc., 171 F. Supp. 2d 103, 113 (E.D.N.Y. 2001).   But those cases are distinguishable.   (Id.)   In Gross-Jones, the plaintiff offered numerous reasons why the reasons the facility administrator offered for her firing were merely pretextual, including a lack of evidence the plaintiff had committed the wrongful act that supposedly caused her firing.   874 F. Supp. 2d at 1347-48.   That plaintiff showed her supervisor's "rejection of [her explanation of what happened] in favor of an inculpatory explanation for which he had no support[,]" which indicated pretext.   Id.   No such fact pattern exists here.   While Plaintiff purports to argue Dr. Coule failed to conduct an investigation, the evidence itself shows Dr.

Coule *did* investigate the claims.   (See Doc. 113-7, at 18-20.) Plaintiff points to a conversation Dr. Coule allegedly had with Defendant Hess on June 3, 2020.   (Doc. 113, at 18.)   She claims that because (at one point) his deposition testimony wrongly indicated he did not speak with Defendant Hess on that date, because Dr. Coule called other Defendants "on behalf of Defendant Hess[,]" and because Dr. Coule relied upon a letter written by other Defendants about patient safety concerns surrounding Plaintiff, Dr. Coule and those actors conspired together to terminate Plaintiff.   (Doc. 113, at 18-19.)   However, these allegations are not analogous to the Gross-Jones facts, where a court found pretext because a supervisor refused to accept a valid explanation in favor of an inculpatory one.   874 F. Supp. 2d at 1347-48. As the Gross-Jones court correctly noted, in the Eleventh Circuit, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."   Id. at 1342 (citing Springer v. Convergys Customer Mgmt. Grp. Inc, 509 F.3d 1344, 1349 (11th Cir. 2007)). Plaintiff has failed to make that showing here.

So too is Dunson distinguishable.   First, that is an out-of-jurisdiction case, so it does not clearly establish law in the Eleventh Circuit.   See Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) ("Our Court looks only to binding precedent – cases from the United States Supreme Court, the Eleventh Circuit, and

20

the highest court of the state under which the claim arose – to determine whether the right in question was clearly established at the time of the violation."). Second, in that case, the Court found a great deal of conflicting evidence surrounding the timeline of the events, particularly testimony that investigators were informed of the decision to terminate the plaintiff before even interviewing corroborating witnesses. Dunson, 171 F. Supp. 2d at 112. No such allegations exist here. Rather, Plaintiff argues "a reasonable jury could conclude the 3:00 PM meeting [which she alleges was between Defendants Arthur, Meiler, and Hess] involved recruiting Dr. Coule to terminate Plaintiff under the guise of patient safety concerns." (Doc. 113, at 19.) There is no evidence Dr. Coule attended that meeting, and even if accepted as true, the fact that Dr. Coule "called [other Defendants] on behalf of [Defendant] Hess" does not reasonably "support[] a finding that Dr. Coule and [Defendants] Meiler and Arthur discussed the undisputed fact that [Defendant] Hess's decision to reinstate the Plaintiff was not appealable." (Id. at 19.) This singular text message shows Dr. Coule and Defendant Hess communicated on June 3, 2020, but it falls well short of demonstrating Dr. Coule's decision to suspend Plaintiff was pretextual. Dr. Coule is entitled to qualified immunity on Plaintiff's claims against him for sex discrimination.

b. *Unlawful Search*

Regarding Plaintiff's claim for illegal search and seizure, she avers she "does not concede the [Fourth] Amendment claim but recognizes that the Court has dismissed this claim against the other Defendants because the Court found that suspicion-less drug testing has been allowed in analogous cases and Defendants' interest in promoting safety outweighed Plaintiff's privacy interest." (Doc. 113, at 5 n.1.)  However, she goes on to state "the drug testing under the circumstances here may not amount to a Fourth Amendment violation under the Court's analysis," although "it was an adverse action."   (Id.)   As Plaintiff herself recognizes, the search here did not amount to a Fourth Amendment violation; for the reasons stated in the Court's July 7, 2021 Order (Doc. 60), Plaintiff's Fourth Amendment claim fails.

c. *Due Process*

Finally, Plaintiff makes claims against Dr. Coule for due process violations.  (Doc. 113, at 11-14.)  Defendant argues for summary judgment because Plaintiff "did not have a property interest in her position at the hospital because it was essentially an at-will position."  (Doc. 80, at 19.)  He also argues "due process does not always require a hearing before doctors' privileges are suspended." (Id. (quoting Jackson v. Fulton-DeKalb Hosp. Auth., 423 F. Supp. 1000, 1004-05 (N.D. Ga. 1976).)  Plaintiff retorts that by suspending her, Dr. Coule effectively

22

terminated her position not only at the hospital, but as a student in her medical residency and education – positions in which she claims a property interest.  (Doc. 113, at 11-14; 23-28.)

The Court agrees with Dr. Coule.  The action Dr. Coule personally undertook was to suspend Plaintiff's privileges at AUMC.  As such, the proper question for the Court is whether Dr. Coule, by suspending Plaintiff's rights without process, violated a clearly established due process protection.  And as Dr. Coule correctly notes, no clearly established law demonstrates that medical residents are entitled to process when their privileges are suspended.  (Doc. 125, at 6-8.)

Plaintiff argues her "contract with AU forms an additional basis for a property interest in her medical residency."  (Doc. 113, at 12.)  She argues that "[b]y suspending her privileges at the teaching hospital that [she] was contracted to work at, which caused her residency to be terminated, Dr. Coule violated [her] constitutionally protected property interest."  (Id. at 13.)  Neither of Plaintiff's arguments follow.  First, the contract Plaintiff cites was between herself and AU, not AUMC or AUHS.  (Doc. 113-27.)  Neither of the latter two entities were a party to the contract, so neither was bound by AU's purported grant of a property interest.  Second, although Dr. Coule's action may have had the practical effect of allowing the State Defendants to

terminate Plaintiff's residency, he was not the actor who actually did so; rather, he suspended her privileges at AUMC.

Ultimately, Plaintiff has not pointed to any clearly established law showing that suspension of a resident's hospital privileges constitutes a deprivation of a constitutional right to due process. Even if Dr. Coule did violate a due process right by failing to afford Plaintiff a hearing on the termination of her privileges, her right to such a hearing was not clearly established so as to defeat Dr. Coule's claim to qualified immunity. As such, his motion for summary judgment on this ground is **GRANTED**.

## B. Libel and Slander Claims (Counts Five and Six)

Finally, Dr. Coule moves for summary judgment on Plaintiff's state law libel and slander claims against him. (Doc. 80, at 22-23.)

"A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1. "The publication of the libelous matter is essential to recovery." (Id.) Slander, on the other hand, consists of:

> (1) Imputing to another a crime punishable by law;

> (2) Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society;

24

(3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or

(4) Uttering any disparaging words productive of special damage which flows naturally therefrom.

O.C.G.A. § 51-5-4. Special damages are essential to support a slander action. Id.

Here, Plaintiff asserts Dr. Coule "communicated with [Defendant] Meiler following his treatment of Plaintiff." (Doc. 113, at 29.) "Furthermore, [she asserts] there is evidence sufficient to believe Dr. Coule made false allegations that Plaintiff used THC 'immediately prior' to fainting." (Id.)

The evidence is insufficient to substantiate Plaintiff's claims. In support of her allegations, she points to an email from Defendant Arthur to Ms. Basile, wherein Defendant Arthur states, "Dr. Meiler and I discussed requesting a drug screen this morning. She was in the ED under the care of Dr. Coule. I am expecting Dr. Coule to follow up with Dr. Meiler today." (Doc. 113-29, at 1.) She also points to text messages between Defendants Arthur and Meiler, wherein Dr. Meiler states, "I just got off the phone with [Dr.] Coule. He couldn't say much. Please order drug testing tomorrow right away." (Doc. 113-30.)

Even drawing all *reasonable* inferences in Plaintiff's favor, nothing about this evidence demonstrates Dr. Coule defamed

Plaintiff.  Plaintiff admits she consumed a THC edible, although she claims Dr. Coule misrepresented the timeline of her consumption to the other Defendants.  (Doc. 81-2, at 71-72.)  More importantly, neither of the cited text messages indicate Dr. Coule said anything at all to another Defendant, or anyone else, about Plaintiff's alleged drug consumption.  The first message does not show Dr. Coule said anything to anyone; rather, it says Defendant Arthur *expected* Dr. Coule to "follow up" with Defendant Meiler because Dr. Coule was treating Plaintiff after she fainted.  (Doc. 113-29, at 1; Doc, 113, at 2.)  The email, found in the record at Doc. 113-29, at 1, reveals the reason for Defendant Meiler and Arthur's concern: Dr. Basile stated she heard "some very disturbing information regarding [Plaintiff]" and suggested a urine screen drug test.  Plaintiff herself also acknowledged Dr. Coule "denied ever speaking with [Defendant] Meiler about Plaintiff's care." (Doc. 113, at 29.)  Taken together, the evidence falls well short of creating a reasonable inference that Dr. Coule conferred information about potential drug use; rather, it shows Defendants Arthur and Meiler suspected drug use after Plaintiff fainted for different reasons altogether.

The second text message is also unavailing.  That message itself states that Dr. Coule "couldn't say much" about Plaintiff's condition.  (Doc. 113-30.)  No reasonable juror could infer defamation from a statement that Dr. Coule refused to speak about

the allegedly defamatory subject-matter.  As a result, Dr. Coule's
motion for summary judgment on Plaintiff's claims for libel and
slander is due to be **GRANTED**.

### IV.  AUMC'S MOTION FOR SUMMARY JUDGMENT

AUMC also moves for summary judgment on all Counts against
it.  (Doc. 72.)  These are Counts 1, 2, 3, 5, 6, 9, 10, 11, 12,
13, and 14.

## A. Previously-Addressed Claims

Before addressing the merits of Plaintiff's motion against
AUMC, the Court notes that summary judgment is due on several of
Plaintiff's claims against AUMC.  First, "Plaintiff does not
contest her claims of [d]efamation of [c]haracter and [l]ibel,
Counts 5 and 6, against AUMC/AUHS." (Doc. 111, at 2 n.1.)  Summary
judgment is therefore **GRANTED** on those claims.

## B. Discrimination Claims (Counts One, Nine, Eleven and Twelve)

First, AUMC moves for summary judgment on Plaintiff's claims
for Title IX sex discrimination (Count 1); ADA Title II disability
discrimination (Count 9); ADA Title III disability discrimination
(Count 11); and Rehabilitation Act discrimination (Count 12).
(Doc. 73, at 9-18.)  AUMC notes the "claims are reviewed under
similar frameworks" and accordingly discusses them in tandem; it
also notes "[e]ach claim also fails because AUMC suspended
Plaintiff's Housestaff Privileges for legitimate non-

discriminatory reasons: [she] had potentially endangered patients and engaged in a pattern of highly unprofessional conduct." (Id. at 9.)

When there is no direct evidence of discrimination, a disparate treatment claim must be analyzed under the burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under McDonnell Douglas, a plaintiff establishes a prima facie case of disability discrimination by showing "(1) [s]he ha[d] a disability (2) [s]he [was] otherwise qualified for the position; and (3) [s]he was subjected to unlawful discrimination as the result of his disability." Sutton v. Lader, 185 F.3d 1203, 1207 (11th Cir. 1999). Similarly, to establish a prima facie case for disparate treatment under Title IX, a Plaintiff "must show that: (1) [s]he is a member of a protected class; (2) [s]he was subject to an adverse admissions action; (3) the school treated similarly situated applicants who were not members of [her] protected class more favorably; and (4) [s]he was qualified." Bowers v. Bd. of Regents of Univ. Sys. of Ga., 509 F. App'x 906, 910 (11th Cir. Feb. 15, 2013) (citing Burke-Fowler v. Orange Cnty., 447 F.3d 1319, 1323 (11th Cir. 2006)). Doing so creates a rebuttable presumption that the employer acted illegally. See McDonnell Douglas, 411 U.S. at 802. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the

28

[termination]."   _Id._   The employer's burden is an "exceedingly light" one of production, not persuasion, which means the employer "need only produce evidence that could allow a rational fact finder to conclude that [the plaintiff's] discharge was not made for a discriminatory reason." _Standard v. A.B.E.L. Servs., Inc.,_ 161 F.3d 1318, 1331 (11th Cir. 1998); _Meeks v. Comput. Assocs. Int'l,_ 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting _Miranda v. B & B Cash Grocery Store, Inc.,_ 975 F.2d 1518, 1529 (11th Cir. 1992)).   If the employer meets this burden, the burden shifts back to the plaintiff who can only avoid summary judgment by presenting "significantly probative" evidence that the proffered reasons are pretextual. _Young v. Gen. Foods Corp.,_ 840 F.2d 825, 829 (11th Cir. 1988). "To show pretext, an employee must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" _Alvarez v. Royal Atl. Dev., Inc.,_ 610 F.3d 1253, 1265 (11th Cir. 2010).   An employee must meet those reasons "head on and rebut [them]." _Chapman v. Al Transp.,_ 229 F.3d 1012, 1030 (11th Cir. 2000).

Plaintiff does not put forth any direct evidence of discrimination.   (Doc. 73, at 10; Doc. 111, at 6-12.)[7]   As such,

---

[7] Plaintiff states she _does_ have direct evidence of discrimination, but moves directly into the McDonnell Douglas analysis and eventually argues her direct evidence is disparate treatment of her and similarly situated male residents.

Plaintiff is required to plead a prima facie case for discrimination under each theory, and if she does so, AUMC would have to meet its "exceedingly light" burden to "produce evidence that could allow a rational fact finder to conclude that [Plaintiff's] discharge was not made for a discriminatory reason." Standard, 161 F.3d at 1331. Here, the Court finds AUMC has easily produced such evidence, so it need not address whether Plaintiff made out a prima facie case. Specifically, Dr. Coule, AUMC's employee, cited numerous legitimate reasons for suspending Plaintiff's Housestaff privileges, including an instance when "Plaintiff began extubating a high[-]risk patient without initiating certain clinically required pulse monitoring processes." (Doc. 73, at 12 (citing Doc. 83-3, at 24.).) He noted unprofessional behavior such as Plaintiff swearing at her supervisor, allegedly cheating on board exams, admitting to use of THC edibles, and abandoning call duties. (Doc. 73, at 12-13.) Accordingly, the Court turns to whether Plaintiff has met her burden of presenting "significantly probative" evidence that the proffered reasons are pretextual. Young, 840 F.2d at 829.

After reviewing the evidence, the Court finds Plaintiff has failed to meet her burden. Plaintiff cites to a letter written by Dr. Coule and relied upon to suspend Plaintiff's clinical

---

(Doc. 111, at 6-12.) This is not direct evidence of the sort that "require[es] no inference or presumption"; rather, it is circumstantial evidence. See Burke-Fowler, 447 F.3d at 1323.

privileges.   (Doc. 111, at 9.)   The letter states, in relevant part:

> The department and its leadership have made honest and timely interventions to provide support to Dr. Williams and offered her a structured reintegration plan with the ultimate goal of transitioning her back into residency at the appropriate level of competency.  Over the years, the department has successfully assisted several residents who have made mistakes in their career by providing professional help and a remediation plan that works for both the residents, our patients, and our department.  Dr. Williams has consistently challenged the good will of the department and many of the department's actions and interventions to assist her.  She recently filed a formal claim of disability and gender discrimination with the University's Employment Equity Office.

(Doc. 112-5, at 28.)  Plaintiff argues this letter implies she was being treated differently than other male residents who made mistakes in their careers.  (Doc. 111, at 9.)  The Court cannot agree.  Read in context, the letter indicates the department "made honest and timely interventions to provide support to Dr. Williams and offered her a structured reintegration plan with the ultimate goal of transition her back into residency."  (Doc. 112-5, at 28.)  The letter does not imply any residents received more or better accommodations than Plaintiff; rather, it provides Plaintiff received similar efforts for her benefit, but, unlike the other residents, "consistently challenged the good will of the department" and the remedial actions.  (Id.)  The letter is

evidence Plaintiff was treated similarly to other residents, not differently; it cannot be read as direct, or even circumstantial, evidence of discrimination.

Plaintiff also argues two comparators – Dr. AT and Dr. R – were similarly situated to Plaintiff but received more favorable treatment. (Doc. 111, at 10-12.) Plaintiff's arguments fail because the evidence shows neither of those alleged comparators were similarly situated to Plaintiff. In evaluating comparators, the Court "evaluates 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" Burke-Fowler, 447 F.3d at 1323 (citation omitted). "When making that determination, courts 'require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" Id.

Dr. AT "was found to have lied about his number of convictions for public intoxication"; was deemed to have unsatisfactory academic performance multiple times; and "refused to 'take call' as scheduled" several times, which was considered unprofessional conduct. (Doc. 111, at 10-11.) None of these facts make Dr. AT a comparator to Plaintiff for several reasons. First of all, the record demonstrates the department of anesthesiology itself disciplined those residents, not Dr. Coule. (Doc. 122, at 14 (citing Doc. 74-3, at 43).) Second, the facts of Plaintiff's

situation and those of the alleged comparators are dissimilar. As Dr. Coule testified, "missing a shift is not the same thing as departing early, so there's a big distinction between the two because missing a shift can occur because of scheduling issues or confusion. Leaving a shift without . . . proper hand-off is a major patient safety event." (Doc. 74-3, at 26.) In addition, Dr. AT's disciplinary issues were for lying about his number of convictions for public intoxication, not actually being intoxicated. (Doc. 111, at 10.) Moreover, Dr. AT's "unsatisfactory" academic performance – failing the "BASIC" examination – is not the same as *cheating* on an examination. (Doc. 112, at 20.) The Court cannot find Dr. AT and Plaintiff are proper comparators, so this purported evidence of discrimination is unavailing.

Nor is Dr. R a proper comparator. Plaintiff alleges he was absent without permission, "fail[ed] to answer pages and calls, [left] work early without notifying supervisors, [ignored] a patient's pleas for pain such that 'everyone in the OR' and the surgeon were so concerned that [the surgeon] refused to work with [Dr.] R without an attending anesthesiologist present, [gave] a patient 'an unreasonably large dose of a muscle relaxant,' and [gave] 'large doses of a potent long-acting narcotic (Dilaudid) to patients.'" (Id. at 21–22.) Only one of Dr. R's actions is similar to one of those allegedly undertaken by Plaintiff (leaving

work early without notifying supervisors), and none of the other cited reasons for Plaintiff's suspension are present. As such, Dr. R is not a proper comparator. That he was "allowed multiple opportunities for remediation" accordingly does not permit a reasonable inference of discrimination against Plaintiff. (Doc. 111, at 11.)

Put simply, Plaintiff has failed to rebut AUMC's proffered reasons for suspending her privileges. The only evidence Plaintiff offers in rebuttal to one of AUMC's stated reasons for suspending Plaintiff – the improper extubation of a high-risk patient – is the conclusory allegation that Defendants "worked together to concoct negative evaluations on June 3, . . . to provide support for a 'patient safety concern' that was so immediate that it would warrant immediate termination of clinical privileges." (Id. at 27.) Rather than "concocting negative evaluations[,]" the evidence shows Defendant Arthur and other Defendants – not including Dr. Coule – requested evaluations of Plaintiff for Dr. Coule's review. (Id. (citing Doc. 111-2, at 1.).) Compiling negative evaluations for the purpose of advocating for suspension on the basis of those evaluations does not demonstrate the suspension was pretextual, nor does it sufficiently rebut AUMC's proffered reason for termination. Further, and more importantly, Plaintiff does not dispute that failure to extubate a patient is "problematic." (Doc. 81-2, at 163.) And while Plaintiff alleges

34

the "evaluations Dr. Coule did not see show she was on track as any other resident before or after her attack[,]" Dr. Coule obviously did not consider evaluations he did not see, and those evaluations would not create a reasonable inference of pretext. (Doc. 111, at 26.)  Without any significantly probative evidence to permit a reasonable juror to find pretext, Plaintiff's claim for Title IX discrimination fails as a matter of law.

The same is true for Plaintiff's discrimination claims under Titles II and III of the ADA and under the Rehabilitation Act (Counts 9, 11, and 12).  In support of her rebuttal of AUMC's proffered non-discriminatory reasons for her suspension, Plaintiff simply rehashes the factual assertions discussed above.  Although Plaintiff repeatedly states that genuine issues of material facts exist as to whether AUMC's proffered reasons for her suspension were pretextual, she does not provide any evidence that would demonstrate AUMC's actions were pretextual.  (See Doc. 111, at 24-34.)  Plaintiff's conclusory allegations fall well short of the type of "significantly probative" evidence required to rebut AUMC's proffered reason for her termination, so her claims for discrimination fail.  Young, 840 F.2d at 829.

Before moving to the retaliation claims, the Court notes Plaintiff relies upon Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328-29 (11th Cir. 2011) and purports to present "a convincing mosaic of circumstantial evidence that would allow a

jury to infer intentional discrimination by the decisionmaker."
Id. at 1328; (Doc. 111, at 24-34.)  The Court finds no reasonable
jury could be convinced to infer discrimination by Dr. Coule or
AUMC.  Even if the Court went beyond reasonable inferences and
accepted all of Plaintiff's allegations, there is not a scintilla
of evidence in the record of any discriminatory intent or decision-
making by Dr. Coule or AUMC.  Plaintiff provides no reason to
believe the motivating factor behind any alleged conspiracy,
assuming arguendo that the same exists, was discriminatory in any
way.  As the Eleventh Circuit has held, "[a]n employer may fire an
employee for a good reason, a bad reason, a reason based on
erroneous facts, or for no reason at all, as long as its action is
not for a discriminatory reason."  Chapman, 229 F.3d at 1030
(citation and quotation marks omitted).  Courts "are not in the
business of adjudging whether employment decisions are prudent or
fair."  Id. (citation and quotation marks omitted).  Without
sufficient evidence of discrimination within the meaning of the
ADA, Rehabilitation Act, or Title VII, AUMC's motion for summary
judgment on these claims is due to be **GRANTED**.

**C. Retaliation Claims (Counts Two, Ten, and Thirteen)**

Next, AUMC moves for summary judgment on Plaintiff's three
claims for retaliation: under Title IX, the ADA, and the
Rehabilitation Act. (Doc. 73, at 18-19.)  It argues that even if
Plaintiff has presented a prima facie case of ADA retaliation, it

"has proffered unrebutted nondiscriminatory reasons for terminating Plaintiff's employment[,]" which it alleges defeats the claim. (Id. at 19.)   It also argues the evidence shows Plaintiff "did not engage in protected activity under the ADA or Rehabilitation Act." (Id.)   In response, Plaintiff argues "AUMC had notice of Plaintiff's complaints of gender discrimination and retaliated against her . . . by suspending her clinical privileges at AUMC." (Doc. 111, at 12.)

Even if this were true – and AUMC disputes both its truth and relevance – and even if Plaintiff had satisfied the elements of a prima facie case of retaliation, AUMC's above-described non-retaliatory, legitimate proffered reasons for termination are still valid.   And Plaintiff has entirely failed to establish "a connection between her protected expression and adverse action." Kocsis v. Fla. St. Univ. Bd. of Trs., 788 F. App'x 680 (11th Cir. 2019). "A plaintiff must show pretext with 'concrete evidence in the form of specific facts.'" Id. (citing Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009)).   Mere awareness of Plaintiff's requested accommodations is not strong evidence of retaliation – in fact, it is not necessarily evidence of retaliation at all. Plaintiff also points to the alleged comparators – Dr. AT and Dr. R – but as discussed above, those individuals are not proper comparators.   In short, Plaintiff fails to provide any evidence that would allow a reasonable jury to find AUMC retaliated against

her, so her claims for retaliation fail.  As such, AUMC's motion for summary judgment on these claims is due to be **GRANTED**.

## D. Georgia Whistleblower Act Claim (Count Three)

Next, AUMC moves for summary judgment on Plaintiff's claim for violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 (the "GWA"). (Doc. 23, at 27-29.)  Plaintiff alleges AUMC violated the GWA by retaliating against her for "objecting to practices by AU that she reasonably believed were discriminatory and retaliatory in violation of federal law."  (Id., at 28.)  She asserts her "conduct of objecting to and reporting to [Accreditation Council for Graduate Medical Education ("ACGME")] the fact that the Defendants requested her to delete and falsely report her completion of cases, procedures, and hours . . . constituted objecting to, or refusing to participate in" a policy, practice, or activity of her public employer.  (Id.)  Defendant seeks summary judgment because it is not a public employer. (Doc. 73, at 21-22.)  Plaintiff "does not concede that AUMC is not a public employer but submits that determination is again based upon the Court finding that AUMC acted as an agent of the State." (Doc. 111, at 23 n.5.)

The GWA provides, "[n]o public employer shall retaliate against a public employee for objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe

is in violation of or noncompliance with a law, rule, or regulation." O.C.G.A. § 45-1-4(d)(3). It defines "public employer" as:

> the executive, judicial, or legislative branch of the state; any other department, board, bureau, commission, authority, or other agency of the state which employs or appoints a public employee or public employees; or any local or regional governmental entity that receives any funds from the State of Georgia or any state agency.

O.C.G.A. § 45-1-4(a)(4). "Public employee" is defined as:

> any person who is employed by the executive, judicial, or legislative branch of the state or by any other department, board, bureau, commission, authority, or other agency of the state. This term also includes all employees, officials, and administrators of any agency covered by the rules of the State Personnel Board and any local or regional governmental entity that receives any funds from the State of Georgia or any state agency.

O.C.G.A. § 45-1-4(a)(3).

Georgia courts have applied the McDonnell Douglas framework to retaliation claims under the GWA. Touhy v. City of Atlanta, 771 S.E.2d 501, 504 (Ga. Ct. App. 2015). To prove a prima facie retaliation claim, a plaintiff must show that "(1) he was employed by a public employer; (2) he made a protected disclosure or objection; (3) he suffered an adverse employment action; and (4) there is some causal relationship between the protected activity and the adverse employment action." Albers v. Ga. Bd. of Regents of Univ. Sys. of Ga., 766 S.E.2d 520, 523 (Ga. Ct. App. 2014).

Plaintiff asserts she is a public employee. (Doc. 23, at 28.) However, she does not point to any evidence or cite any

caselaw that would define under what circumstances a private employer would be considered a public employer for the purposes of the GWA.   And while the Court held above that Dr. Coule, for purposes of 42 U.S.C. § 1983, was a state actor, it is uncertain whether AUMC and Dr. Coule should be similarly viewed as state actors for the purposes of the GWA.   However, the Court need not decide this issue because, as explained above, it finds Plaintiff has failed to demonstrate her firing was not the result of any of the legitimate reasons proffered by AUMC.   Plaintiff has failed to point to any evidence rebutting those reasons and has failed to demonstrate her suspension was pretextual.   As such, even if Plaintiff could establish a prima facie case of GWA retaliation, her failure to rebut the proffered reasons for termination with evidence showing pretext means summary judgment on this claim must be **GRANTED**.

## E. Breach of Contract Claim (Count Fourteen)

Lastly, AUMC seeks summary judgment on Plaintiff's claim against it for breach of contract. (Doc. 73, at 24-25.) It argues AUMC is indisputably not a party to the employment contract between Plaintiff and the BOR, and a party cannot breach a contract to which it is not a party. (Id. at 25.) Plaintiff counters there is "a genuine issue of material fact . . . as to whether AUMC as well as AU breached [her] contract by rendering it impossible for her to do her training at AUMC." (Doc. 111, at 35.)

Even if Plaintiff is correct, that allegation is more properly an allegation for tortious interference with contract — not breach. Plaintiff admits she is not a party to AUMC's contract with BOR, and she admits AUMC is not a party to her contract with BOR. (Doc. 111, at 34-35; Doc. 23, at 53-56.) As AUMC points out, privity is a requirement for breach of contract actions, and Plaintiff points to no evidence that AUMC was a party to the contract between her and the BOR. (Doc. 122, at 18.); Cline v. Lee, 581 S.E.2d 558, 562 (Ga. Ct. App. 2003) ("[T]he plaintiff in a breach of contract action has the burden of proving three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms."). Without any evidence AUMC assented to the contract terms at issue, Plaintiff's claim against AUMC for breach of contract fails and summary judgment is due to be **GRANTED.**

## V. STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Lastly, the State Defendants move for summary judgment on all Counts against them. (Doc. 104.)

### A. Title IX Sex Discrimination (Count One)

First, the State Defendants seek summary judgment on Count one — Plaintiff's claim for sex discrimination under Title IX. (Doc. 105, at 31-35.) As discussed above, to establish a prima facie case for disparate treatment under Title IX, Plaintiff "must show that: (1) [s]he is a member of a protected class; (2) [s]he

41

was subject to an adverse admissions action; (3) the school treated similarly situated applicants who were not members of [her] protected class more favorably; and (4) [s]he was qualified." Bowers, 509 F. App'x at 910 (citing Burke-Fowler, 447 F.3d at 1323). The State Defendants concede at least two actions – Plaintiff's termination from the residency program and the disciplinary warning issued to her in November 2019 – could be considered adverse employment actions. (Doc. 105, at 33.) However, the State Defendants correctly note – as the Court held above – that Plaintiff cannot establish a prima facie case of sex discrimination because she has not provided evidence of any proper comparators. See supra, section IV.B. To be a proper comparator, "the quantity and quality of the comparator's misconduct be nearly identical." Burke-Fowler, 447 F.3d at 1323 (citation and internal quotation marks omitted). As discussed above, the two comparators to whom Plaintiff points – Dr. AT and Dr. R – are not proper here because their misconduct was materially different. As a result, the State Defendants' motion for summary judgment on Plaintiff's claim for Title IX sex discrimination is **GRANTED**.[8]

**B. Retaliation Claims (Counts Two, Ten, and Thirteen)**

"To establish a prima facie case of retaliation under Title VII, 'the plaintiff must show (1) that she engaged in statutorily

---

[8] For the same reason, the State Defendants are entitled to summary judgment on Plaintiff's claims for discriminatory termination under the ADA and Rehabilitation Act (part of Counts Nine and Twelve).

42

protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events.'" Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting Meeks, 15 F.3d at 1021).

Here, the Parties largely do not dispute the first and second elements.[9] (Doc. 105, at 36; Doc. 132, at 19-20.) However, they hotly dispute the third element: causation. (Doc. 105, at 36-37; Doc. 132, at 20-21.) Plaintiff first argues causation is established because of the letter sent by Defendants Meiler and Arthur to Dr. Coule, who then sent the same letter to Defendant Keel. (Doc. 132, at 20.) However, as the Court found above, the letter is evidence Plaintiff was treated similarly to other residents, not differently; it cannot be read as direct, or even circumstantial, evidence of discrimination. See supra, Section IV.B. She also alleges she was treated differently than male comparators in her program. (Doc. 132, at 20-21, 28-30.) This argument, too, is unavailing, also for the reasons explained above. See supra, Section IV.B.

Plaintiff also argues there is a genuine dispute of material fact concerning pretext. (Doc. 132, at 22.) Similar to Dr. Coule and AUMC, the Court finds the State Defendants have proffered numerous legitimate, non-discriminatory reasons for Plaintiff's

---

[9] The State Defendants contest that some of the adverse employment actions Plaintiff offers constitute adverse employment actions. (Doc. 105, at 36.)

termination, so the burden shifts to Plaintiff to show those reasons are pretextual. Gross-Jones, 874 F. Supp. 2d at 1341-42; see supra, Section III.A.2.a.

Plaintiff's arguments for pretext are numerous. First, she argues Defendants Arthur, Meiler, Coule, and Hess conferred about the proposed outcome of their actions – termination – while writing and sending the letter summarizing their concerns about patient safety. (Doc. 132, at 23-24.) Plaintiff notes the evidence shows they conferred in spite of their deposition testimony to the contrary, and cites to Lewis v. City of Union, 916 F.3d 1169, 1185 (11th Cir. 2019) for the proposition they can show a "convincing mosaic with 'evidence that demonstrates, among other things . . . suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn.'" Even if they did confer, that does not create a reasonable inference that Plaintiff's protected activity caused the termination. See supra, Section III.A.2.a.

She next argues "the allegations of patient safety lack credibility." (Doc. 132, at 24.) She claims "a juror could consider another piece of evidence to find that the proposed 'imminent danger to patient safety' and evaluations were not the real reason for her termination." (Id., at 25.) However, this does not rebut the State Defendants' proffered reason – it simply offers an alternative theory. Further, Defendant Meiler's opinion

that probation was "the correct intervention in response to [Plaintiff's] behavior" does not create a reasonable inference that Plaintiff's protected activity was the cause of her termination. (Id.) She also argues her reviews were "average or above average" and claims – without citation to any evidence – that Defendants Meiler and Arthur "cherry-picked a few negative comments from her years of residency and removed all of the positive commentary." (Id. at 26.) Without citing any evidence, this evidence does not establish causation sufficient to rebut the State Defendants' offered non-retaliatory reasons. As such, summary judgment on these claims is **GRANTED**.

## C. Georgia Whistleblower Act Claims (Count Three)

Next, the State Defendants seek summary judgment on Plaintiff's GWA Claims for two reasons. First, they argue Plaintiff's disclosure to ACGME failed to allege a violation of a law, rule, or regulation to any supervisor or government agency. (Doc. 105, at 37-38.) Second, they argue legitimate, non-discriminatory reasons support Plaintiff's termination, and she cannot show those reasons to be pretextual. (Id. at 38-39.)

As to the first argument, Plaintiff points out the GWA defines "law, rule, or regulation" as "any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." O.C.G.A. § 45-1-4(a)(2). 42 CFR § 413.75 and § 415.152 require that for AU to

receive federal Medicare funding ("Direct GME payments") in support of its residency programs, it must be an "[a]pproved graduate medical education ("GME") program[,]" which means, among other things, "[a] residency program approved by the [ACGME]." As a result, the contractual language between AUHS and the BOR requiring those entities to act in accordance with ACGME guidelines could constitute a 'rule' which the State Defendants allegedly violated by requesting Plaintiff delete her case logs. (Doc. 132, at 43-44.) And the State Defendants do not seriously dispute Plaintiff had a "genuine and true belief that she was being required to commit fraud and subjecting AU to possible sanctions which could lead to AU losing the federal funding its ACGME accreditation secured." (Doc. 143, at 19 (citing Doc. 132, at 44).)

The State Defendants counterargue that Plaintiff's email to ACGME does not mention any federal regulation, Medicare, fraud, or "any other such thing." (Id., at 19.) But that does not mean Plaintiff failed to meet the requirements of O.C.G.A. § 45-1-4. Rather, under the terms of that statute, Plaintiff was required to disclose a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency. O.C.G.A. § 45-1-4. Plaintiff did so via email to the ACGME. (Doc. 105-19, at 8 ("the department later made me DELETE all of my case logs").)

46

The State Defendants also argue "Plaintiff's GWA claim . . . fails because it is not based on any disclosure made to a supervisor or government agency." (Doc. 105, at 38.)  The State Defendants point out that ACGME is not a local, state, or federal agency, and Plaintiff's Amended Complaint does not allege she reported the violation to a supervisor as defined by the GWA. (Id.)  Plaintiff counterargues that the State Defendants "overlook[] Plaintiff's report of these same issues to Dr. Moore, who meets the GWA's definition of supervisor." (Doc. 132, at 44.) But the State Defendants are correct that Plaintiff did not allege she was retaliated against due to a report to Dr. Moore; rather, she claims "she reported the [Anesthesiology Residency Department's ("ARD")] actions [requiring her to delete the case logs] to the [ACGME,]" and "[t]he ARD would later cite this report to ACGME as grounds for terminating [Plaintiff]." (Doc. 23, at 11.)  In her GWA claim, Plaintiff asserts her "conduct of objecting to and reporting *to ACGME*" the alleged violations constituted protected activity under the GWA.  (Id. at 28 (emphasis added).) Without an allegation in her complaint that she reported a violation to a direct supervisor, the State Defendants are entitled to judgment on Plaintiff's GWA claim as a matter of law and summary judgement is **GRANTED**.

**D. Procedural Due Process (Count Seven)**

Next, the State Defendants seek summary judgment on Plaintiff's claim for procedural due process.[10] (Doc. 105, at 39-45.) Plaintiff alleges the State Defendants deprived her of due process when they terminated her from her medical residency program. (Doc. 23, at 34-39.) As discussed above, the Court finds that Plaintiff has not pointed to any clearly established law showing that suspension of a resident's hospital privileges constitutes a deprivation of a constitutional right to due process. See supra, Section III.A.2.c. Therefore, the remaining issue is whether Plaintiff was deprived of a constitutional right to due process when her enrollment in the residency program was terminated.

In order to state a procedural due process claim, a plaintiff must show (1) she had a protected property interest in continued enrollment in her residency program and (2) she was denied sufficient process related to a deprivation of that property interest. Ross v. Clayton Cnty., 173 F.3d 1305, 1307 (11th Cir. 1999). The State Defendants argue that Plaintiff did not have a property interest in her medical residency program. (Doc. 105, at

---

[10] Although the Amended Complaint does mention terms such as "liberty" and "substantive due process" in passing and Plaintiff's Response to Defendants' Motion for Summary Judgment mentions "substantive due process", it is clear that her only claim is that she was deprived of a property interest without due process of law. See, e.g., Am. Compl. (Doc. 23, at 34-39); Pl.'s Resp. to Def.s' Mot. for Summ. J. (Doc. 132, at 46-62).

39-41.)   Although the Eleventh Circuit has not addressed this issue, some courts have held that medical students have no protected property interest in their medical residency programs while other courts have found the opposite to be true.   Compare Shaboon v. Duncan, 252 F.3d 722, 732 (5th Cir. 2001) (finding medical resident has no property interest in a medical residency program) with Barsoumian v. Williams, 29 F. Supp. 3d 303, 313 (W.D.N.Y. 2014), aff'd sub nom. Barsoumian v. Univ. at Buffalo, 594 F. App'x 41 (2d Cir. 2015) (finding medical resident had a property right not to be terminated from residency program without due process).   Plaintiff argues she had a protected interest in her medical residency because of her property interest in public education and because she was entitled to a grievance process in accordance with House Staff Policy 13.0.   (Doc. 132, at 46-48.) Even if the House Staff Policy 13.0 was incorporated into her contract, "[a] procedure required by contract, statute, or regulation does not create a constitutionally protected right nor does violation of a contract, statute, or regulation, by itself, constitute a violation of due process."   Fenje v. Feld, 301 F. Supp. 2d 781, 802-03 (N.D. Ill. 2003), aff'd, 398 F.3d 620 (7th Cir. 2005) (citations omitted).

However, like in Bd. of Curators of Univ. Missouri v. Horowitz where the Supreme Court found that the Plaintiff received all the process she was entitled to and therefore did not need to determine

49

the existence of a property interest, the Court at this time does not need to decide whether Plaintiff had a protected interest in her medical residency program but only whether she received the process to which she was entitled.   435 U.S. 78, 84-85 (1978). Courts overwhelmingly agree that "[i]n the context of due process, medical residents are students rather than employees of the hospital" and are therefore entitled to lesser due process protections than employees whether they are dismissed for academic or disciplinary reasons. Ekmark v. Matthews, 524 F. App'x 62, 63-64 (5th Cir. 2013) (per curiam) (unpublished) (citing Shaboon, 252 F.3d at 729-30); see also Trotter v. Regents of Univ. of N.M., 219 F.3d 1179, 1185 (10th Cir. 2000); Davis v. Mann, 882 F.2d 967, 972-73 (5th Cir. 1989); McLean v. Miss. State Univ., CIVIL ACTION NO. 1:19-CV-00122-GHD-RP, 2020 WL 3980026, at *4 (N.D. Miss. July 14, 2020) (citations omitted); Allahverdi v. Regents of Univ. of N.M., No. Civ 05-277 JB/DJS, 2006 WL 1313807, at *18 (D.N.M. Apr. 25, 2006).   This is true because the education and employment are inseparable.   Residency programs "[are] distinct from other types of employment in that the resident's 'work' is what is academically supervised and evaluated." Davis, 882 F.2d at 974.   Therefore, the Court agrees with the State Defendants that Plaintiff's dismissal from the residency program was academic in nature because the "[s]uccessful completion of the residency program depends upon subjective evaluations by trained faculty members into areas of

expertise that courts are poorly equipped to undertake in the first instance or to review." Id. at 974. Although the Supreme Court has made it clear that no hearing is required for dismissals on academic grounds, Plaintiff was still entitled to notice and an opportunity to respond. Fenje, 301 F. Supp. 2d at 801.

Here, Plaintiff received all the process to which she was entitled. Plaintiff argues that she did not receive notice of her termination. (Doc. 132, at 51.) However, at the time Plaintiff was reinstated on May 17, she received a letter that provided "[t]here will be zero tolerance for any unprofessional behavior" and "[a]ny future problems with [her] performance or behavior will result in further action up to and including termination." (Doc. 105-26, at 8.) This letter was sufficient to notify Plaintiff that she could still be terminated following her reinstatement. Moreover, in the June 5 letter, the State Defendants informed Plaintiff that she was terminated from the residency program because she no longer had clinical privileges and access to the Medical Center had been revoked. (Id. at 10.)

Plaintiff also argues that she was deprived of a hearing. While it is true that Plaintiff did not receive a hearing prior to her June 5 termination, the State Defendants did not have to provide her with elaborate pretermination proceedings but only an opportunity to respond. It is undisputed that Plaintiff appealed her June 5 termination by sending an email with the subject "Appeal

of Termination" that provided her with the opportunity to respond. (Pl.'s Dep. Ex. AU-45.)   Upon receiving Plaintiff's appeal, Dr. Keel directed an investigation.   This was sufficient opportunity to respond.   Norris v. Henry Cnty., 566 S.E.2d 428, 430 (Ga. Ct. App. 2002) (finding no violation of procedural due process where an employee had "an opportunity to be heard when he appealed the matter to the county manager").

Regardless of if there was a deficiency in the notice or opportunity to respond, "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise."   McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994).   Therefore, when Dr. Keel informed Plaintiff of her right to apply for a review of his decision to uphold the termination, he provided her another opportunity to be heard to remedy any pretermination deprivation.   "[T]he focus of the procedural due process analysis is whether the state makes adequate procedures available—not whether the plaintiff takes advantage of those procedures and achieves a successful outcome."   Jones v. Chatham Cnty., 477 S.E.2d 889, 892 (Ga. Ct. App. 1996).

Thus, because the State Defendants put Plaintiff on notice in the May 17 letter that any performance or behavior problems could lead to termination, provided Plaintiff an explanation for her

termination in the June 5 letter, and provided her opportunities to appeal the June 5 termination, Plaintiff received the process she was due as a medical resident and summary judgment is **GRANTED**.[11]

E. **ADA Disability and Rehabilitation Act Discrimination (Counts Nine and Twelve)**

The State Defendants also seek summary judgment on Plaintiff's claims for ADA and Rehabilitation Act discrimination. (Doc. 105, at 45-50, 51.) Plaintiff alleges she has post-traumatic stress disorder ("PTSD") which limited her in one or more major life activities. (Doc. 23, at 42.) She alleges the BOR required unlawful testing, failed to provide her with reasonable accommodations, and unlawfully subjected her to disparate treatment and termination based on her disability. (Id. at 41-45.) The State Defendants argue these claims fail, and the Court addresses the arguments below.

1. Unlawful Testing

The State Defendants claim Plaintiff's fitness-for-duty examination and simulation examination did not exceed the scope of testing allowed by the ADA. (Doc. 105, at 46.) As they argue, "an employer may legally inquire into the ability of an employee to perform job-related functions." (Id. (citing 42 U.S.C.

---

[11] To the extent that Plaintiff asserts that she had a property interest in the continued employment, summary judgment is still warranted. It is undisputed that Plaintiff was paid for the entire duration of her initial contract and therefore, suffers no compensable damage. Davis, 882 F.2d at 973.

§ 12112(d)(4)(B)).)  Plaintiff, however, argues she was asked two
questions that exceeded the scope allowable by the ADA.   (Doc.
132, at 32.)  Specifically, Defendant Arthur asked Dr. Hertza to
pose the following two questions:

> Is   [Plaintiff]   cognitively   and
> psychologically able to perform in the high
> stress environment of the operating room?
>
> What would be the potential impact of a tragic
> outcome in the operating room on [Plaintiff's]
> recovery?

(Doc. 130-10, at 1.)  Plaintiff argues the "[p]otential effects on
Plaintiff's recovery from PTSD are outside the scope of determining
her ability to perform the essential duties of her residency with
or without a reasonable accommodation."  (Doc. 132, at 32.)  She
also argues she was asked her "mental health treatment from six
years prior and her family history which included depression and
suicide."  (Id. at 32-33.)  She asserts this "information had no
bearing on Plaintiff's present ability to perform her job duties."
(Id. at 33.)

As an initial matter, the first question – whether Plaintiff
would be able to perform her job duties in the operating room – is
clearly permissible under the ADA.  As stated above, the State
Defendants were permitted under § 12112(d)(4)(B) to inquire into
Plaintiff's ability to perform job-related functions.

The disagreement is sharpest on the second question.  Indeed, even at the time Defendant Arthur asked Lifeguard to ask Plaintiff the question, several individuals raised concerns.  Dr. House, Plaintiff's treating physician, expressed "concern [about] whether, from a legal standpoint, you can make a determination about her return to work based on anything other than her capacity to do the work effectively."  (Doc. 105-15, at 147.)  Defendant Meiler agreed, "clarify[ing] . . . we asked this question simply out of concern for [Plaintiff], and not as a determinant of her ability to return to work."  (Id. at 146.)  Dr. Hertza responded, "[c]orrect.  We will look at functionality which will help determine forward progress."  (Id.)  After this colloquy, the State Defendants assert "[t]he question was then dropped."  (Doc. 143, at 13.)  Plaintiff disagrees, stating, "[i]n fact, her fitness for duty tests included questions . . . [asked] about 'the potential impact of a tragic outcome in the operating room on [Plaintiff's] recovery.'"  (Doc. 150, at 20 (citing Doc. 143, at 13).)

Crucially, Plaintiff points to no evidence Lifeguard (or any State Defendant) ever asked Plaintiff this question.  (Id. at 20-21.)  While Plaintiff shows "Dr. Arthur had already submitted the unlawful question to Life[g]uard[,]" the evidence shows Defendant Meiler agreed — before Lifeguard began its evaluation — that the question was beyond the permissible scope of determining Plaintiff's ability to work.  (Doc. 105-15, at 146.)  As discussed

above, since Plaintiff carries the burden at trial of proving her claim for ADA discrimination, she must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency" if the movant shows an absence of evidence on a material fact. Fitzpatrick, 2 F.3d at 1116-17 (citation omitted). The State Defendants have pointed to an absence of evidence they ever asked Plaintiff an impermissible question; it is therefore Plaintiff's burden to show she can meet her burden at trial. Plaintiff fails to do so, so summary judgment is appropriate.

Plaintiff also asserts "Dr. Hertza questioned [her] and reported to her department information such as Plaintiff's mental health treatment from six years prior and her family history which included depression and suicide. . . . Such information had no bearing on Plaintiff's present ability to perform her job duties." (Doc. 132, at 32-33.) However, the State Defendants argue the record contains no evidence they ever directed Lifeguard to ask questions about this subject area, and Plaintiff points to none. Plaintiff's argument is therefore unavailing. As a result, the State Defendants' motion for summary judgment on Plaintiff's unlawful testing claim is **GRANTED.**

2. Failure to Accommodate

The State Defendants next argue Plaintiff's claim for failure
to accommodate should be dismissed because the unfulfilled
accommodations were not reasonable.  (Doc. 105, at 47-48.)  They
argue that allowing Plaintiff to return to duty pursuant to the
requested accommodations would have compromised patient safety.
(Id. at 48.)  Plaintiff argues there are genuine issues of material
fact surrounding whether the accommodations were reasonable.
(Doc. 132, at 35.)

Unlawful discrimination can occur when an employer "fails to
provide a reasonable accommodation" to an otherwise qualified
person "unless doing so would impose an undue hardship on the
employer." Boyle v. City of Pell City, 866 F.3d 1280, 1289 (11th
Cir. 2017).  An accommodation is only reasonable if it enables an
employee with a disability "to perform the essential functions" of
a position or "to enjoy equal benefits and privileges of employment
as are enjoyed by its other similarly situated employees without
disabilities."   29  C.F.R.   § 1630.2(o)(1)(ii),  (iii).   The
reasonableness of an accommodation depends upon the specific facts
and circumstances of the case.  See Stewart v. Happy Herman's
Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997).

An employer need not demonstrate undue hardship until an
employee meets his "burden of identifying an accommodation and
demonstrating that it is reasonable." Frazier-White v. Gee, 818

F.3d 1249, 1255 (11th Cir. 2016) (citing <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1255-56 (11th Cir. 2001)). "Moreover, an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" <u>Id.</u> at 1255-56 (quoting <u>Gaston v. Bellingrath Gardens & Home, Inc.</u>, 167 F.3d 1361, 1363-64 (11th Cir. 1999)).

If it is unclear what sort of reasonable accommodation is appropriate, "an informal, interactive process with the disabled individual *may* be necessary." <u>Webb v. Donley</u>, 347 F. App'x 443, 446 (11th Cir. 2009) (citing 29 C.F.R. § 1630.2(o)(3)) (emphasis in original); <u>accord</u> <u>Stewart</u>, 117 F.3d at 1286-87. As provided in 29 C.F.R. § 1630.2(o)(3), the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."

If the employer engages in an interactive process, the employer will not be liable for failing to accommodate the employee if there is a breakdown in the interactive process not due to the employer or there is no reasonable way to accommodate the employee.[12] <u>See</u> <u>Stewart</u>, 117 F.3d at 1286-87.

---

[12] An employer can also satisfy its requirements by showing a reasonable accommodation would cause an undue hardship. <u>Stewart</u>, 117 F.3d at 1285. Defendant, however, does not argue any potential accommodations would cause an undue hardship.

In the Eleventh Circuit, at the summary judgment stage, courts do not reach the question of whether the employer engaged in the interactive process unless and until the employee shows she requested a reasonable accommodation. Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015) (per curiam). "When a request is patently unreasonable, the employer has no duty to investigate it or begin the interactive process. The same is true if the request does not make a sufficiently specific demand." Hargett v. Fla. Atl. Univ. Bd. of Trs., 219 F. Supp. 3d 1227, 1243 (S.D. Fla. 2016) (citations omitted). Therefore, the initial burden is on Plaintiff to show she made a sufficient request for a reasonable accommodation. Only then will the burden shift to the State Defendants to show they satisfied their requirements under the ADA by (1) providing a reasonable accommodation or (2) by engaging with Plaintiff in an interactive process to determine a reasonable accommodation but no accommodation was provided because either (a) there was a breakdown in the process not due to the State Defendants or (b) there was no reasonable way to accommodate Plaintiff.

Here, Plaintiff provides insufficient evidence that her requested accommodations were reasonable. Plaintiff argues the State "Defendants were able to accommodate Plaintiff by providing

supervision, which would also allow her any needed breaks."[13]   (Doc. 150, at 21.)   In support of this proposition, Plaintiff argues the State Defendants "never asserted [the] recommended accommodations posed an undue hardship or gave Plaintiff an opportunity to propose alternatives."   (Doc. 132, at 35.)   Plaintiff also claims a different resident in the same department - Dr. TS - allegedly received the same accommodations Plaintiff requested.   (Doc. 150, at 21-22.)

However, Plaintiff does not point to evidence showing the two residents were similarly situated, nor that the State Defendants shared similar concerns about patient safety amongst the two residents.   As the State Defendants note, Defendant Arthur explained "[e]ven if we were able to accommodate it on one day, there is absolutely no guarantee we would be able to accommodate it on subsequent days, and patient care is also an issue."   (Doc. 143-2, at 7:35.)   Lastly, the Court notes that in the case of Dr. TS, Defendants Arthur, Meiler, and Moore "made the decision to recommend that Dr. [TS] no longer continue in anesthesiology and that he choose a different specialty" as a result of the condition giving rise to his need for accommodations.   (Doc. 150-6, at 137.)

---

[13] The Court notes that although Plaintiff first argued (1) the State Defendants' claims about reasonableness were post-hoc justifications for failure to accommodate and (2) the State Defendants never specified which of the accommodations it was unable to grant, she later concedes these arguments were incorrect and that she "has no evidence to contradict" them.   (Doc. 132, at 35; Doc. 150, at 21.)

This further evidences the reasonableness of the State Defendants' assertion that they could not accomplish the accommodations Plaintiff requested. After all, "what is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation." Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1527 (11th Cir. 1997). Without showing the reasonableness of her requested accommodations, Plaintiff has failed to carry her burden at this stage and summary judgment is **GRANTED.**

**F. Breach of Contract (Count Fourteen)**

Finally, the State Defendants move for summary judgment on Plaintiff's claim against BOR for breach of contract. (Doc. 105, at 52-54.) "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Moore v. Lovein Funeral Home, Inc., 852 S.E.2d 876, 880 (Ga. Ct. App. 2020). Plaintiff alleges the State Defendants breached the contract, specifically House Staff Policy 13.0, when they terminated her without a formal hearing. (Doc. 132, at 62-63.) The State Defendants raise the question of whether House Staff Policy 13.0 is even incorporated in the contract and argue that even if the policy is incorporated, "Georgia courts have long held that a failure to adhere to policies and procedures for termination

hearings are not actionable as a breach of contract." (Doc. 105 at 52-53.)

Assuming, without deciding, that House Staff Policy 13.0 was incorporated into the contract, the question is whether the State Defendants' failure to comply deprived Plaintiff of her procedural due process rights.  This is because "if the requirements of due process are met, the employer's failure to follow all the procedures in the manual does not give rise to an action for breach of contract." Jones, 477 S.E.2d at 893.

Here, the Court agrees with Plaintiff that BOR did not follow all the procedures of House Staff Policy 13.0 for her June 5 termination.[14]  However, as discussed above, the State Defendants did not violate Plaintiff's due process rights when she was terminated from the residency program.  Because Plaintiff was given the process, to which she was entitled, the State Defendants' failure to follow the procedures in House Staff Policy 13.0 does not give rise to an action for breach of contract and summary judgment is **GRANTED.**

---

[14] Plaintiff also alleges in her Amended Complaint that the State Defendants violated ACGME policies incorporated into the contract between her and BOR. (Doc. 23, at 53-56.)  However, Plaintiff does not raise this argument in the pleading that follows. See, e.g., Pl.'s Resp. to Def.s' Mot. for Summ. J. (Doc. 132, at 62-64).  Therefore, the Court agrees with the State Defendants that the Notice of Appointment does not incorporate ACGME policies because it is not clearly referenced. Kavianpour v. Bd. of Regents of the Univ. Sys. of Georgia, No. 120CV00152, 2021 WL 2638999, at *42 (N.D. Ga. Jan. 28, 2021) (citation and internal quotation marks omitted) ("the language included in the House Staff Policies does not make it reasonably clear that [the] provisions of the [ACGME] are incorporated by reference into the contract").

## VI. CONCLUSION

For the reasons explained above, Defendants' motions (Doc. 72, 79, 104) are **GRANTED**.[15] The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Dr. Phillip Coule, Augusta University Medical Center, Board of Regents of the University System of Georgia, Dr. Brooks Keel, Dr. Steffen Meiler, and Dr. Mary Arthur and **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 29th day of September, 2022.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[15] Plaintiff's requests for punitive damages and attorneys' fees (Count Fifteen) are dismissed. "In accordance with O.C.G.A. § 51-12-5.1, punitive damages can only be awarded as *additional* damages." Nelson v. Glynn-Brunswick Hosp. Auth., 571 S.E.2d 557, 564 (Ga. Ct. App. 2002) (citing § O.C.G.A. 51-12-5.1) (emphasis added). "Punitive damages cannot be awarded in the absence of any finding of compensatory damages." Martin v. Martin, 600 S.E.2d 682, 683 (Ga. Ct. App. 2004) (citation omitted). Attorney's fees are also unavailable when no damages are awarded. See Alea London Ltd. V. Am. Home Servs., Inc., 638 F.3d 768, 780 (11th Cir. 2011).