**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | |
|---|---|
| DR. LESLEY WILLIAMS,<br>Plaintiff,<br>v.<br><br>BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA; Et. al.<br><br>Defendants. | Civil Action File No.:<br>1:20-cv-00100 |

**PLAINTIFF'S MOTION TO AMEND AND ALTER (RECONSIDER) JUDGMENT**

COMES NOW the Plaintiff, Dr. Lesley Williams, by and through undersigned counsel and files her Motion to Alter and Amend Judgment pursuant to F. R. Civ. P. 52, F. R. Civ. P. 59, and F. R. Civ. P. 60. Plaintiff requests that the Court alter and amend the Order granting summary judgment filed and entered on September 29, 2022. (Order - Doc. 152; Clerk's Judgment – Doc. 153). "On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." F. R. Civ. P. 52; *See also*, F. R. Civ. P. 59(e). Plaintiff does not concede that any of her claims should have been dismissed and reserves for appeal the issues and arguments made in her pleadings. (Docs. 111, 113, 132, 136, 137, and 150). However, in the interest of judicial economy and seeking justice as an AU medical resident and victim of a rape who—after complaining that she was being treated differently because of the disability of PTSD from the rape and as compared to male residents—was terminated from her residency for "challenging the goodwill" of the department by filing a formal complaint of sex discrimination and disability discrimination, Plaintiff respectfully requests the Court to amend its judgment. Plaintiff understands that the Court disagrees with the Plaintiff's

characterization of what happened; thus, Plaintiff will avoid simply reasserting past arguments, but will attempt to point out what appears to be error in the Court's Order holding that none of the evidence presented by Plaintiff creates a question of fact as to the discriminatory intent of Dr. Coule, AUMC, or the State Defendants when, following her due process grievance hearing and reinstatement on May 17, 2019, they worked jointly to terminate the Plaintiff's residency by encouraging Dr. Coule to "suspend her clinical privileges" at AUMC on June 4, 2019, so Dean Hess would then have to terminate her based upon lack of clinical privileges. The second termination came after the Ad Hoc Committee recommended probation as the appropriate response to Plaintiff's behavior which Dean Hess agreed and reinstated Plaintiff.

**I. POINTS FOR RECONSIDERATION**

The Order and Judgment in this matter should be amended and altered because **(1)** it appears from the Order that the Court did not consider all evidence presented by the Plaintiff to show pretext; **(2)** contrary to Rule 56, it appears the Court drew all inferences, which derived from the inconsistencies, contradictions and circumvention of the grievance procedure in favor of the Defendants; **(3)** the Court erred in failing to consider all methods a plaintiff may use to establish pretext; **(4)** it appears from the Order that the Court did not apply the "but for" standard as described by the Supreme Court in Bostock in its analysis of the Plaintiff's sex discrimination, disability discrimination, and retaliation claims; **(5)** it appears from the Order that the Court did not consider the "cat's paw" theory of liability; **(6)** the Court's Order finding that Plaintiff only points to one specific allegation against Dr. Coule, that he did not investigate the claims and that Dr. Coule did investigate the claims is not supported by the record. (Doc. 152, p. 19, 20); **(7)** the Order employs a heightened standard for comparator evidence not required by law; **(8)** following the Court's Order granting summary judgment to all Defendants on all claims, Plaintiff received a

March 14, 2019 email from AU legal counsel, Melcher, to Dr. Coule stating that "we will defer to AUMC and GME on how they will structure an "appeal right" for the resident with regard to privileges or credentials, which she **must** be offered in some format. USG has clarified for us in the past that residents must be afforded two separate appeal rights if they are dismissed or terminated, an academic appeal and an employment appeal." (3/14/2019 - Melcher Email, attached as Ex. 1, *emphasis in original*). This email constitutes new evidence relevant to the Court's holding that the Defendants were entitled to qualified immunity because Plaintiff failed to show any clearly established law that "suspension of a resident's hospital privileges" violates due process. (Doc. 152, p. 24- Dr. Coule; p. 48- State Defs.). The email constitutes new evidence relevant to the Court's finding that Plaintiff's due process claims fail because she received all the process she was due (Doc. 152, p. 52-53-, State Defs); **(9)** the Court's Order fails to address Plaintiff's claims for disparate treatment based on disability[1]; **(10)** the Court's Order dismissing Plaintiff's Whistleblower claim for failing to plead in her complaint that she reported a violation to her direct supervisor creates a heightened pleading standard contrary to law (Doc. 152, p. 47); **(11)** the Court erred in relying on the Jones case to dismiss the Breach of Contract claim as this case is distinguishable from Jones in that Plaintiff had a contractual right to firing for 'just cause.'

**1. The Order did not address all evidence presented by Plaintiff to show pretext.**

Rule 56 requires the Court to credit the Plaintiff's evidence and draw all reasonable inferences derived therefrom in the non-moving party's favor. United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991. The Court's Order does not provide a statement of facts addressing the Statement of Undisputed Facts submitted by the Plaintiff showing the

[1] "She alleges the BOR required unlawful testing, failed to provide her with reasonable accommodations, and unlawfully subjected her to disparate treatment and termination based on her disability." (Doc. 153, at 53). The Order lists Plaintiff's claims but only addresses her claims for unlawful testing and failure to accommodate and does not address her disparate treatment claim. Plaintiff submits the evidence presents a question of fact for the jury.

evidence considered. (Doc. Nos. 112, 130). A statement of facts would show how the Court drew the inferences from the evidence in the Plaintiff's favor and still concluded that no reasonable juror could question the motives or intentions of the State Defendants and Dr. Coule who worked jointly to suspend Plaintiff's privileges as a basis to terminate her residency after she was reinstated by Dean Hess. The Order begins by noting, "The facts of this case are outlined in the Court's July 7, 2021 Order granting several Defendants' motion for partial judgment on the pleadings." (Doc. 152, at 2). The facts as outlined pre-discovery did not include evidence Plaintiff obtained through deposition testimony and requests to produce. Importantly, Plaintiff notes that she received the text messages relied upon by the Court to correctly find that Dr. Coule, in this case, was a State actor under the nexus/joint action test and AUMC was a private entity that engaged in state action, after discovery closed and when Plaintiff was responding to motions. (Doc. 152, p. 14).

In its Order, the Court dismissed all Plaintiff's claims of discrimination and retaliation based on finding insufficient evidence to establish pretext.[2] The Order is devoid of any mention of the following substantial probative evidence on the issue of pretext:

1. On May 2, 2019, the Ad Hoc Committee reviewed the allegations made by the department against Plaintiff and found that, even if true, termination was not warranted. Instead, the Ad Hoc

[2] Against Dr. Coule, the Order dismissed Plaintiff's 42 U.S.C. § 1983 equal protection claim for sex discrimination (Count 4) because "Plaintiff's argument fails because she simply provides no basis for a jury to believe that any of Dr. Coule's actions were pretextual." (Doc. 152, at 19). Against AUMC, the Order dismissed Plaintiff's claims for Title IX Sex Discrimination (Count 1), Title IX Retaliation (Count 2), Violation of the Georgia Whistleblower Act (Count 3), Disability Discrimination under ADA Title II, ADA Title III, and § 504 of the Rehabilitation Act (Counts 9, 11, and 12), and Retaliation under ADA Title II and the Rehabilitation Act (Counts 10 and 13) because "Without any significantly probative evidence to permit a reasonable juror to find pretext, Plaintiff's claim for Title IX discrimination fails as a matter of law." (Doc. 152, at 35). "As such, even if Plaintiff could establish a prima facie case of GWA retaliation, her failure to rebut the proffered reasons for termination with evidence showing pretext means summary judgment on this claim must be GRANTED." (Doc. 152, at 40). Against the State Defendants, the Order dismissed Plaintiff's claims for 42 U.S.C. § 1983 equal protection claim for sex discrimination (Count 4), Title IX Sex Discrimination (Count 1), Title IX Retaliation (Count 2), Violation of the Georgia Whistleblower Act (Count 3), Disability Discrimination under ADA Title II, ADA Title III, and § 504 of the Rehabilitation Act (Counts 9, 11, and 12), and Retaliation under ADA Title II and the Rehabilitation Act (Counts 10 and 13) because "Without citing any evidence, this evidence does not establish causation sufficient to rebut the State Defendants' offered non-retaliatory reasons." (Doc. 152, at 45).

Committee recommended an opportunity for remediation; Dean Hess agreed and reinstated Plaintiff. (Doc. 130, at ¶ 63-65; Doc. 130-40).

2. Male resident, Dr. AT, misrepresented his criminal history, consistently performed below his peers academically, and refused to take call multiple times, but was given probation and opportunities to remediate rather than terminated. (Doc. 130, at ¶ 90-93, 95, Doc. 130-63, Doc. 130-64, Doc. 130-65, Doc. 130-66).

3. Male resident, Dr. R, was cited for multiple incidents of unprofessional behavior, disruptive behavior, leaving work early and not answering pages, lack of respect for coworkers and jeopardizing patient safety. Dr. R was given multiple chances at informal remediation before being placed on three months of formal remediation. (Doc. 130, at ¶ 99; Doc. 130-73).

4. The ACGME procedure provides that residents should be placed on probation and given an opportunity for remediation prior to termination. (Doc. 130, at ¶ 102; Doc. 130-75).

5. Under her contract and ACGME rules, Plaintiff had a right to notice of the charges against her and a right to a hearing prior to termination. (Doc. 130-54; Doc. 132-22, at 1740).

6. The Ad Hoc Committee reviewed Plaintiff's historical evaluations up to the point of her administrative suspension and found them to be average to above average for the same time period. (Doc. 130, at ¶ 63-65; Doc. 130-40).

7. The Plaintiff submitted her evaluations from 12/14/2018 to 3/15 /2019 for the Court's consideration which were substantially good and included the extubation incident. (Doc. 112-47). Importantly, Plaintiff never returned to work after she was proposed for termination by Defendants Meiler and Arthur. Her suspension began on March 13, 2019; she performed no new work to evaluate and the subsequent June 3, 2019 negative evaluations, which contradicted them covered the same time period. *See* Rojas v. Florida, 285 F.3d 1339, 1343(11th Cir. 2002)(*noting* that

employees with good employment history suddenly receiving poor evaluations may be evidence of pretext.).

8. On June 3, 2019, Dr. Arthur emailed Dr. Coule stating that she is trying to pull "patient safety" issues and came up with a three page draft she sent to him along with the email. (Doc. 132-12 - Arthur Email to Coule-June 3, 2019). Coule's letter suspending Plaintiff's privileges was sent on June 4, 2022. Although he reviewed a draft of the letter on June 3rd, Dr. Coule testified that he had no input into the drafting of the letter or the information the department included along with it. (Doc. 130-5, at 22). This evidence, when viewed in the light most favorable to the Plaintiff, shows dishonesty on the part of the Defendants regarding the discriminatory action at issue—having Dr. Coule suspend her privileges so that Dean Hess would have to reverse his decision to reinstate her residency after Defendants Meiler and Arthur tried unsuccessfully to terminate her residency and realized they had no avenue to appeal.

9. While the Court focused on the extubation incident to find no pretext, the Order does not mention the deposition testimony of Attending Anesthesiology Physician, Dr. Mafdy Basta, that virtually all residents have complications during training, such as the extubation event, and those complications are treated as learning opportunities not grounds for termination. (Doc. 130, at ¶ 101, Doc. 130-74 - Basta Depo. p. 43-44).

10. Dr. Basta testified that the purpose of evaluations was to review them with residents to improve their academic performance. (Doc. 130, at ¶ 101, Doc. 130-74 - Basta Depo. p. 43-44).

11. The Order does not mention that, in a letter to the faculty on June 4, 2019, Kristina Kotz, Dr. Arthur's secretary, stated that "we are having to send out the evaluations from yesterday again so that you can **add** comments. **Please know that she will not see these evaluations."** (Doc. 130, at ¶ 77, Doc. 130-49, Kotz Email to Faculty, June 4, 2019).

12. It is undisputed that Plaintiff received her "suspension of privileges letter" from Dr. Coule when she received her "termination" letter from Dr. Hess due to the suspension of her privileges. Dr. Arthur sent a text message telling Dr. Basile that Dr. Coule suspended Plaintiff's, and Defendant Arthur states "Didn't want to use **termination** in the final letter of if [sic] respect for the dean's earlier decision." (Doc. 132-10).

13. Plaintiff did not see or review the negative evaluations, the letter or information sent to Dr. Coule prior to receiving her suspension or termination letter or sending her appeal to Dr. Keel which supports a finding of a violation of her due process right to notice of the charges against her and pretext. (Doc. 105-18, at pp. 20, 35).

14. The Court found that Plaintiff received adequate due process as a matter of law because Dr. Keel directed an investigation. (Doc. No. 152, p. 52-53). However, neither the Court nor the Plaintiff had the email from AU Counsel Melcher to Coule sent prior to Plaintiff's suspension stating that "USG has clarified for us in the past that residents must be afforded two separate appeal rights if they are dismissed or terminated, an academic appeal and an employment appeal." Plaintiff received neither one. (Ex. 1).

15. Dr. Coule entered the recent drug abuse and alcohol information into her medical record two days after treating Plaintiff and after speaking with Dr. Meiler. Yet, Dr. Coule and Dr. Meiler denied having that conversation which is another instance of dishonesty to support pretext. (Doc. 130 at ¶ 38; Doc. 130-26).

16. In addition, Plaintiff passed her drug test. Therefore, a reasonable jury could determine that Plaintiff had not engaged in recent drug use or in drug use at a time that it could have affected her work performance and using it as a basis for suspension was pretext. (Doc. 130 at ¶ 39-40; Doc. 130-25).

While the Court relied upon the facts stated in the judgment on the pleadings, critical evidence of pretext as mentioned above was not addressed in Plaintiff's response to the Judgment on the pleading. Accordingly, it would be error for the Court not to consider this evidence when dismissing all the Plaintiff's claim for no evidence to establish pretext. Alvarez v. Royal Atl. Dev., Inc., 610 F.3d 1253, 1265 (11th Cir. 2010)

**2. The Order does not view the evidence in the light most favorable to Plaintiff and draws the reasonable inferences in favor of the Defendants contrary to Rule 56.**

The Order does show, however, instances where the Court resolved many reasonable inferences in favor of the Defendant and against the Plaintiff. The Order states that Plaintiff failed to rebut AUMC's proffered reason for suspending Plaintiff's privileges stating that Plaintiff only offers conclusory allegations that Defendant's worked together to concoct negative evaluations. and finding the following: (Doc. 152, at 34):

17. The non-discriminatory reason that the Court gives considerable weight to is the extubation incident which happened on February 12, 2019 and the Court's Order does not mention or credit in the Plaintiff's favor the undisputed fact that Plaintiff's notice of termination by Defendants Meiler and Arthur was March 19, 2019, yet the extubation incident was not mentioned during the CCC meetings on February 26, 2019 and March 1, 2019, it was not mentioned in the warning letter drafted based on the CCC meetings, it was not mentioned in the March 19, 2019 termination letter from Dr. Meiler, and it was not brought up in the Ad Hoc Committee Grievance Hearing (Doc. 132-13 - Feb - Mar Meeting Mins and warning; Doc. 130-39 - 3.19.19 Meiler Termination Letter; Doc. 130-18 - Grievance Hearing Transcript)(*See* Doc. 132, p. 36-28 for arguments of patient safety issues).

18. The Order does not mention how the Court resolved in the Plaintiff's favor the evidence of the handwritten meeting notes wherein Defendants Meiler and Arthur call the faculty meeting on

June 3, 2019, and the faculty members behind the negative evaluations of Plaintiff plainly expressed unlawful motives for supporting her termination. (Doc. 132-9 - 6.3.19 Meeting Handwritten Notes; *see* Doc. 132, at 41-42 for argument concerning notes/pretext)

19. The Order does not address the evidence that Dr. Basta expressed that he was not concerned about her and was willing to mentor her. (Doc. 132-9 - 6.3.19 Meeting Handwritten Notes - BOR 1688). His testimony is especially compelling in light of some of his colleagues expressing that their actual concerns were about her having a disability or threatening to sue.

20. The Order does not address the evidence of the audio recording of a meeting wherein Dr. Arthur and Dr. Meiler again reference a break down in trust, not because Plaintiff was dishonest, but because they could not trust her not to complain or sue if she felt they violated her rights. (*See*, Doc. 150, at 15 *citing* Brown at 1182 ("To show causation, a plaintiff in a retaliation case need prove only that retaliatory animus was one factor in the adverse employment decision."). The Order does not address how "but for" causation as explained in Bostick could support a finding in Plaintiff's favor that "but for" her losing their trust by filing complaints and possibly suing, Plaintiff would not have been terminated. (*See* Doc. 132, p. 20-21, "but for" analysis).

21. The Order does not address the evidence that Antoinette Lewis concluded that "the Fitness for Duty Exam was ordered by management and conducted prior to the ADA Interactive Process…While the department chose to remove her from duty, it was never a recommendation per the report from Dr. Hertza...no evidence has been presented as to why Dr. Williams is being ordered to participate in a simulation lab before she can return to work... In addition, Dr. House stated that there is no evidence or findings that the employee would pose a direct threat to herself nor others." (Doc. 130, at ¶ 53, Doc. 130-34).

22. The Order does not address the evidence that on or about May 20, 2019, the Office of Employment Equity ("OEE") published its findings that university policy was violated by failing to follow existing procedure for reasonable accommodations and by failing to follow existing procedure for requesting fit for duty tests with regard to Dr. Williams. (Doc. 130, at ¶ 66, Doc. 130-9 - Gender and Disability Claim Report).

23. The Order states that Defendant Arthur and other Defendants *requested* the evaluations for the Plaintiff for Dr. Coule to review and draws no inference at all from evaluations solicited for the purpose of circumventing her grievance hearing and reinstatement. (Doc. 152, p. 34-35).

24. The Order dismissed the Title IX claims and absolves Dr. Coule of wrongdoing by noting that he did not review evaluations contradicting those presented to him on June 4th. (Doc. 152, at 34-35). The issue in this case is that the Defendants selected negative reviews only and the Court did not credit the conflict with the AHC's review of her performance and probation recommendation or the entire reviews that Plaintiff submitted in her briefs. (Doc. 132, at 27-28).

25. Dr. Coule received a draft letter from Dr. Arthur the day before the final letter and was informed that she was building a case around a solitary issue. The Court states Dr. Coule was not included on the request for reviews (Doc. 152, p. 34) but the evidence shows he was reviewing a *draft* of the letter. Dr. Arthur noted that only seven reviews were complete, but she only provided one (1) complete evaluation along with a compilation of selected text from others. (Doc. 130-5, at 101-111 - Coule depo. Exhibits). The Court drew the inference in favor of the Defendants.

26. Rather than drawing inferences from the evidence in favor of the Plaintiff, the Order specifically draws the conclusion that "Defendant Meiler's opinion that probation was 'the correct intervention in response to [Plaintiff's] behavior' does not create a reasonable inference that Plaintiff's protected activity was the cause of her termination." (Doc. 152, at 44-45). Dr. Meiler's

opinion that probation and not termination was the correct response to Plaintiff's mistakes shows pretext in that it supports an inference that her mistakes were not sufficient to warrant termination and that being worthy of probation and not termination, the decision to terminate Plaintiff must have been motivated by something else. Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538, 10 Fla. L. Weekly Fed. C 731 (11th Cir. 1997).

27. In dismissing other residents as comparators for insufficient similarity in conduct, the Court also found that because the department of anesthesiology disciplined those residents, and not Dr. Coule, they were not valid comparators. (Doc. 152, p. 33). In making this conclusion, the Court did not draw any inference in the Plaintiff's favor from the fact that given the comparators misconduct which was at times more egregious than the Plaintiffs and involved patient safety, Defendants Meiler and Arthur never sent a letter to Dr. Coule or pushed for their termination. (Doc. 132-11, at 23; Doc. 130-73). The Court drew inferences in favor of the Defendant.

28. In discussing Plaintiff's sex discrimination claim against Dr. Coule, the Court found that because there was no evidence that Dr. Coule attended the June 3, 2022 meeting where it was discussed by faculty that there was no way for the Defendant's Meiler and Arthur to appeal Dean Hess's decision to reinstate the Plaintiff, no reasonable juror could conclude that "Dr. Coule and Defendant's Meiler and Arthur discussed the undisputed fact that Hess's decision to reinstate the Plaintiff was not appealable." (Doc. 152, at 21). Here, the Court draws all reasonable inferences in favor of the Defendants and not the Plaintiff. When viewing the facts in the light most favorable to the Plaintiff, the Court should find that, although Dr. Coule stated he never talked to Hess, the later text messages show that he did. This is another inconsistency of Defendant's Coule, Arthur and Meiler showing pretext and a jury could, therefore, not believe that their non-discriminatory reasons were the real reason especially when Plaintiff won her termination hearing for her conduct.

29. The Court's Order determined that Plaintiff did not meet her "…burden of presenting 'significantly probative' evidence that the proffered reasons are pretextual." (Doc. 152, at 30-31). The Order then addresses the letter written by State Defendants and relied upon by Coule and Keel, that Plaintiff offered as evidence of discrimination and rather than resolving any inferences from the letter in favor of the Plaintiff as required, the Court found that "The letter is evidence Plaintiff was treated similarly to other residents, not differently; it cannot be read as direct, or even circumstantial, evidence of discrimination." (Doc. 152, at 31-32). The Order concludes that the only possible reading of the letter is in favor the Defendants; however, the Order does not even mention or address the final sentence of the paragraph, "She recently filed a formal claim of disability and gender discrimination with the University's Employment Equity Office." (Doc. 152, at 31). A reasonable inference can be drawn from the letter that "filing a formal claim of disability and gender discrimination" is how Plaintiff "challenged the good will of the department."

30. The order found, "at the time Plaintiff was reinstated on May 17, she received a letter that provided '[t]here will be zero tolerance for any unprofessional behavior' and '[a]ny future problems with [her] performance or behavior will result in further action up to and including termination.' (Doc. 105-26, at 8.) This letter was sufficient to notify Plaintiff that she could still be terminated following her reinstatement." (Doc. 152, at 50-51). The Court takes this letter out of context of the case. The letter sent on May 17, 2019 cannot be notice sufficient to satisfy due process requirements as there was no **"future"** behavior. Plaintiff appealed her termination by Dr. Arthur and Meiler, she won, was reinstated, and she never returned to work between the May 17, 2019 letter because then Dr. Coule "suspended her privileges" and she was terminated June 5, 2019. This circumvention of her due process right to appeal is evidence of pretext.

In finding no evidence of pretext, the Order assigns no evidentiary value to the Plaintiff's evidence in light of the dishonesty of the Defendants. The Order recognizes instances of dishonestly, which are only a subset of their misrepresentations highlighted herein. (*See, e.g.* Doc. 152, at 13-14). Therefore, a reasonable juror would not have to accept their bare assertions, especially due to their interest in the case, and could find those assertions to be untrue. "[O]nce the plaintiff introduces evidence sufficient to permit the factfinder to disbelieve the employer's proffered explanations, summary judgment is not appropriate, because '[i]ssues of fact and sufficiency of evidence are properly reserved for the jury.'" Id.

3. **The Order imposed an onerous pretext standard and did not consider all methods for establishing pretext which are supported by the evidence in the record.**

A plaintiff may establish pretext and "discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision. *See* Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997)(*referring to methods of proof as stated in* Walker v. NationsBank N.A., 53 F.3d 1548, 1564 (11th Cir. 1995)). Regarding what the parties have loosely referred to as the "extubation incident" or "improper extubation," the order creates an overly onerous and insurmountable standard for establishing pretext, noting "Plaintiff does not dispute that failure to extubate a patient is 'problematic.'" (Doc. 152, at 34). Plaintiff was not accused of failing to extubate a patient and the issue in this case does not turn on the extubation being "problematic" because this is a case involving a resident physician exercising her privileges to learn at AUMC. Plaintiff explained that she did not begin the extubation on her own volition, but instead that the patient began to fight staff and to "self-extubate." (Pl. Depo. – Doc. 105-9 at p. 244-247). In doing so, the patient inadvertently detached the monitoring equipment and Plaintiff had to make a split

second decision to administer additional anesthesia or complete the extubation. Plaintiff's explicit testimony was that she did not agree with the department's representation of the incident but that if a resident did as they described it would be "problematic." (Pl. Depo. Day 2 81-2, at 163-164; Pl. Depo. – Doc. 105-9 at p. 244-247). The Order seems to indicate that Plaintiff admitted to doing something "problematic," which was not her testimony. Furthermore, even if Plaintiff made a mistake, that would not preclude her from establishing pretext. Plaintiff is not required to disprove the occurrence as a factual matter or that if it did, it was not problematic. Doing so would be only one of multiple ways to establish pretext. Others would include showing that even if true, the event was not the true motivation behind her termination or that it was insufficient to warrant termination. *See infra* Combs *referring to* Walker.

To that point, the order did not credit Dr. Basta's testimony that such an incident, even if true, did not warrant termination, stating that everyone has complications during their residency training and those complications are used to take corrective steps, so it does not happen again. (Basta Depo. - Doc. 112-74, at 43-44). Moreover, the Order draws all reasonable inferences in favor of the Defendants to specifically include stating  that Meiler stating that probation "was the correct intervention in response to [Plaintiff's] behavior" was not probative evidence of causation. (Doc. 152, at 45).  A reasonable juror could infer that even if the extubation incident occurred as described by the Defendants, it was not the true motivation for the Defendants Coule, Meiler, and Arthur in circumventing her reinstatement and placement on probation like other residents, and instead using Dr. Coule to "suspend" her privileges at AUMC so that she would then be unable to complete her residency at AU. The order denies medical residents at AU the meaningful process they were promised because AU has found a way to circumvent the due process procedures promulgated by the state of Georgia to comply with ACGME.

The preceding evidence shows that discriminatory animus motivated the Defendants to write the June 4, 2019 letter. The Court should consider amending its Order dismissing Counts 1, 2, 3, 4, 9, 10, 11, 12, and 13 based upon a finding of no pretext.

**4. The Order does not address the "but for" standard.**

Implicit in the Order is the idea that because Defendants' reasons to terminate Plaintiff were not wholly lacking a basis in fact, Plaintiff cannot establish causation and pretext. In so reasoning, the Order contravenes the "but for" causation standard as explained by the Supreme Court in Bostock. Bostock held that there may be multiple "but for" causes for an employment action, some legitimate and some unlawful, and where there is a single unlawful "but for" cause, a Defendant may still be liable even where also motivated by legitimate reasons. (*See* Bostock at 1739; Doc. 132, at 20-21). There is considerable evidence from which a reasonable jury could conclude that, even if the Defendants genuinely believed their proffered reasons for terminating Plaintiff, they were also motivated by the desire to retaliate against Plaintiff for filing formal claims of discrimination and hiring a lawyer who asserted her right to be treated the same as her fellow residents. A jury should determine whether "but for" Plaintiff's complaints, Defendants Arthur and Meiler would have even sent information to Dr. Coule after she won her grievance appeal and encouraged him to "suspend her privileges" so that she would be terminated anyway despite winning her appeal and being reinstated by Dean Hess based upon the unbiased Ad Hoc Committees assessment of her conduct, evaluations, and progress as a resident. A jury should consider Dr. Meiler's statement that probation is the appropriate response to her behavior, and "but for" her threats to sue, blowing the whistle about deleting her logs, and filing a recent claim of gender and disability discrimination probation would have been the response.

**5. The Order does not address the "cat's paw" theory of liability.**

The Order makes two factual findings that implicate the "cat's paw" theory propounded by Plaintiff, but the Order does not discuss why it determined cat's paw liability for Dr. Coule is inappropriate in this case. First, the Order inaccurately notes that Dr. Coule performed his own investigation into the allegations against Plaintiff. (Doc. 152, at 19-20). Second, the Court concludes that Dr. Coule never viewed Plaintiff's conflicting positive evaluations, only those drafted on June 3rd and 4th, so those unseen evaluations cannot establish pretext for his decision. (Doc. 152, at 34-35). While Plaintiff has argued that Dr. Coule conspired with the State Defendants, where the Court seems to divorce him from that conspiracy, a cat's paw theory of liability still applies. (Doc. 152, at 13). Even if Dr. Coule was a passive recipient of information, he may still be held liable. Ziyadat v. Diamondrock Hosp. Co., 3 F.4th 1291, 1298, 29 Fla. L. Weekly Fed. C 30 (11th Cir. 2021)("Pursuant to the cat's-paw theory, a defendant may be held liable for the racial animus of its non-decisionmaking employee when, as is alleged here, that employee's discriminatory conduct causes a decisionmaking employee to take an injurious action against the plaintiff."); *see also,* Godwin v. WellStar Health Sys., 615 Fed. App'x. 518, 528 (11th Cir. 2015). ("[u]nder certain circumstances, a plaintiff can establish but-for causation even where the person who ultimately decided to take the adverse employment action was neutral and unbiased."). Furthermore, while an independent investigation may render a decisionmaker's decision sufficiently independent to avoid liability, it does not do so as a matter of law. Staub v. Proctor Hosp., 562 U.S. 411, 420, 131 S. Ct. 1186, 1193, 179 L.Ed.2d 144, 154 (2011)("Proctor suggests that even if the decisionmaker's mere exercise of independent judgment does not suffice to negate the effect of the prior discrimination, at least the decisionmaker's independent investigation (and rejection) of the employee's allegations of discriminatory animus ought to do so. We decline to adopt such a hard-and-fast rule."). Consequently, even if Dr. Coule was unaware

of Plaintiff's positive, contradictory evaluations and even if Dr. Coule investigated, which he did not, he is still liable. Likewise, where Dr. Keel directed an investigation, he is still liable because he relied on the discriminatory and retaliatory information provided by the State Defendants and did not inform her of her right to "**an academic and employment appeal.**" (Doc. 152, at 52).

**6. The Order incorrectly states that Plaintiff's only allegations against Dr. Coule was that he failed to investigate the claims against her and that he did in fact investigate.**

The Order states, "Plaintiff only points to one specific allegation that Dr. Coule discriminated against her: "he 'did not investigate the claims' against Plaintiff that supposedly led to her firing." (Doc. 152, at 19). The Order also states, "While Plaintiff purports to argue Dr. Coule failed to conduct an investigation, the evidence itself shows Dr. Coule *did* investigate the claims." (Doc. 152, at 19-20). Plaintiff did not allege that Defendant Coule discriminated against her solely by virtue of his failure to investigate the allegations against her. Instead, she argued that "Dr. Coule acted to discriminate against Plaintiff by aiding Dr. Meiler and Dr. Arthur in terminating Plaintiff." (Doc. 113, at 11). Secondarily, Plaintiff argued that even if Dr. Coule claims to be a separate actor without knowledge of the falsity of the allegations against Plaintiff and without knowledge of the discriminatory motives of Dr. Meiler and Dr. Arthur, his blind acceptance of their allegations without investigation precludes his ignorance of their motives and lack of knowledge of the falsity of the allegations as a defense. (Doc. 113, at 11; Doc. 137, at 7-8). Plaintiff further argued that Dr. Coule's failure to investigate was also probative evidence on the issue of pretext. Id. The crux of Plaintiff's case has consistently been that Dr. Coule worked in concert with Dr. Meiler and Dr. Arthur to accomplish her discriminatory and retaliatory termination. To that end, in concluding that Dr. Coule was a state actor such that Section 1983 and qualified immunity applied to his actions, the Order concluded that based on the record, "a reasonable juror could determine that Dr. Coule acted in concert with Defendant Hess, satisfying the nexus/joint action test." (Doc. 152, at

14). The Court likewise noted that "…at least two pieces of record evidence could give rise to the reasonable inference that Dr. Coule, Defendant Hess, and Defendant Meiler conspired to engage in state action." (Doc. 152, at 13). Consequently, it was not just Dr. Coule's failure to investigate the allegations against Plaintiff that amount to discrimination but also his "act[ing] in concert with" and conspiring with the State Defendants to terminate Plaintiff based upon her gender, disability and protected activity that amount to discrimination.

In addition, the finding that "the evidence itself shows Dr. Coule *did* investigate the claims" directly contradicts the record. The Order cites to Dr. Coule's deposition—Doc. 113-7, at 18-20—however, nowhere in that portion of the deposition or elsewhere does Dr. Coule claim to have investigated the claims against Plaintiff. First, on page 18, Dr. Coule testified that "I relied on information that was presented to me by the resident program concerning safety events and my knowledge of prior issues with Dr. Williams." (Doc. 113-7, at 18). He further testified that after receiving the information, "I acted on it and wrote this letter of suspension." Id. Dr. Coule does not testify that he investigated the allegations against Plaintiff. Moreover, when asked if he talked to anyone other than Dr. Meiler and Dr. Arthur, Dr. Coule responded, "I don't know. I don't remember." Id. The Court did recognize that this statement by Dr. Coule was untrue because the text messages establish otherwise.

Regarding the information which Dr. Coule proffered as his true motivation, when considering the evidence disregarded by the Court, the Plaintiff has offered sufficient evidence to support the reasonable inference that those reasons were insufficient to motivate the decision to suspend her privileges and to terminate her residency rather than placing her on probation which was the appropriate response to her behavior "but for" her having recently filed claims of gender and disability discrimination as stated in the June 4th letter. The Order is devoid of discussion of

the Ad Hoc Committee's review and findings in this matter and Plaintiff's reinstatement. It is undisputed that all of Plaintiff's transgressions occurred prior to the letter of termination sent by Dr. Meiler in March of 2019 and prior to the Ad Hoc Committee's review of the proposed termination. The committee found that Plaintiff's existing performance reviews placed her as an average or above average resident. (Ad Hoc Comm. Rec. – Doc. 136-11). The committee noted there were "no obvious concerns for unprofessional behavior noted in her evaluations." (Ad Hoc Comm. Rec.–Doc. 136-11). The Committee also determined that remediation was appropriate, and that termination was not warranted. Nevertheless, the Order found no reason to doubt subsequent evaluations drafted the day before her termination, drafted after extensive discussions of her disability, protected activity, and willingness to "hire lawyers" and sue, edited the following day, even though those evaluations covered no new performance by Plaintiff and were in direct contradiction to her past evaluations. (Doc. 130, at ¶ 72-73). Where negative evaluations are drafted for the singular purpose of supporting a termination rather than their stated purpose of being an educational tool and those evaluations directly contradict past evaluations covering the same time period, a reasonable jury could infer that those evaluations were not only false but also created in service of discriminatory or retaliatory motives.

**7. <u>The Order applied a higher standard for comparators than is required by law.</u>**

In rejecting Plaintiff's comparators, the Order correctly states the "similar in all material respects" standard but actually applies the more onerous "nearly identical" standard, requiring doppelganger like sameness between Plaintiff and her fellow residents. (Doc. 152, at 32-34). *See*, <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1226, 28 Fla. L. Weekly Fed. C 127 (11th Cir. 2019)(… there is a risk that litigants, commentators, and (worst of all) courts have come to believe that it requires something akin to doppelganger-like sameness…").

> Ordinarily, for instance, a similarly situated comparator—will have: 1) engaged in the same basic conduct (or misconduct) as the plaintiff, 2) will have been subject to the same employment policy, guideline, or rule as the plaintiff, 3) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, 4) will share the plaintiff's employment or disciplinary history. Lewis v. City of Union City, 918 F.3d 1213, 1227-28 (11th Cir. 2019)(internal citations omitted).

Here, Plaintiff and her comparators were accused of the same basic conduct of unprofessionalism and compromising patient safety in violation of their code of ethics in their contracts. All were anesthesiology residents, subject to the same rules, policies, and guidelines and supposedly violated the same or similar rules although each action was not exactly the same. They shared the same supervisors. Lastly, Plaintiff's discipline history at the time she was considered for probation and termination was cleaner than that of her comparators. Dr. AT had a history of dishonesty when he was confronted about his academic underperformance and refusal to take call. (Doc. 130, at ¶ 90-94). Dr. R had multiple prior instances of unprofessional behavior, disruptive behavior, lack of respect for coworkers and jeopardizing patient safety, whereas the only entry on Plaintiff's history prior to her termination was a single instance of unprofessionalism. (Doc. 130, at 99; Doc. 130-73). Consequently, the Court should alter and amend the Order to reflect that Dr. AT and Dr. R are sufficiently similar comparators to Plaintiff. The male residents committed similar or objectively worse transgressions like deliberately overmedicating a patient, actual drug use, and were given repeated opportunities for remediation. Even if not sufficiently similar comparators, their treatment compared to Plaintiff's remains probative on the issue of pretext. The fact is that Plaintiff was not counseled or allowed to remediate, but she was terminated. This fact combined with other evidence is sufficient for a jury to infer pretext under the Rule 56 standard when resolving factual inferences in the Plaintiff's favor rather than the Defendants.

**8. There is new evidence relevant to the issues of Qualified Immunity and Due Process.**

Federal Rules of Civil Procedure 59 and 60 allow a Court to reconsider its decision in light of new evidence. "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." F. R. Civ. P. 60(b). In dismissing Plaintiff's Due Process claims, Plaintiff submits new evidence for the Court's consideration. While finding State action based upon testimony by Dr. Coule that contradicted the physical text messages received after his deposition, the Court found that even if Dr. Coule violated Plaintiff's constitutional rights by suspending her hospital privileges for the purpose of terminating her residency, a right to be free from such action was not clearly established and Dr. Coule would be entitled to qualified immunity. "And as Dr. Coule correctly notes, no clearly established law demonstrates that medical residents are entitled to process when their privileges are suspended." (Doc. 152, at 23).

It is undisputed that, as a resident, Plaintiff is a student-employee hybrid. The policies of AU and AUMC establish Plaintiff's legitimate property interest in her continued enrollment at AU. *See*, Barnes v. Zaccari, 669 F.3d 1295, 1304, 23 Fla. L. Weekly Fed. C 775 (11th Cir. 2012)("[student's] entitlement is established by both the Board's Policy Manual and the [code of conduct . . . Both these documents constitute official regulations of the state of Georgia."). In this matter, HS Policy 13.0 creates not only a property interest in Plaintiff's continued enrollment, but also establishes the nature of the process she was due. "Indeed, **no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment**. *See*, e.g., Goss v. Lopez, 419 U.S. 565, 574, 576 n.8, 95 S. Ct. 729, 736, 737 n.8, 42 L. Ed. 2d 725 (1975). Thus, we now turn to the second question: What process is due?

Fifty years ago in Dixon v. Alabama State Board of Education, the court said, "[D]ue process **requires notice and some opportunity for hearing before** a student at a tax-supported college is expelled for misconduct." Dixon, 294 F.2d at 157

This Court found that the State Defendants did not have to provide Plaintiff with elaborate pre termination proceedings, and she received all the process she was due which is contrary to Supreme Court precedent. (Doc. 152, p. 51). The finding that Plaintiff received all the process she was due appears to also be premised on the Court's belief that Dr. Coule, AUMC and the State Defendants were not aware that suspension of her privileges would implicate her due process rights. Yet, given that Plaintiff's due process rights are not only established in constitutional law regarding student education, but are also established in the rules and procedures of the University System of Georgia of which Dr. Coule was aware, the new email from counsel Mr. Melcher for AU on March 19, 2019, to Dr. Coule should be considered by the Court as it states:

> In short, AUMC and GME have exclusive authority over credentials and privileges for residents, **if those are withdrawn then AU will terminate the resident as an employee**. This is similar to MCG physician faculty, if a doctor's privileges are revoked by AUMC (which has exclusive authority over privileges) then the AU faculty employment will be terminated. We will defer to AUMC and GME on how they will structure an "appeal right" for the resident with regards to privileges or credentials, which she must be offered in some format. Thereafter, there should be a separate employment appeal that will focus primarily on whether in fact she has current privileges/credentials - if not, termination upheld. **USG has clarified for us in the past that residents must be afforded two separate appeal rights if they are dismissed or terminated - an academic appeal and an employment appeal.** (Ex. 1).

This email was sent prior to the Plaintiff's "suspension" and termination in June of 2019 and a reasonable juror could find Dr. Coule discussed with and/or was aware that AU will terminate a resident if privileges are withdrawn when he was jointly working with the State Defendants on June 3 and 4th. In this way Defendant AU can purposefully circumvent all medical residents' due

process rights and still receive immunity. To decide as a matter of law that the Plaintiff received all the process which she was due as it is related to the suspension of her privileges and termination from her residency when she received both the suspension and termination at the same time and she did not receive the June 4, 2019 letter or the evaluations prior to the suspension or termination, or before she appealed to Dr. Keel is error. The Court assigned no weight in its Order to the fact that the suspension of privileges was designed to circumvent the due process right where she won her appeal of her termination. The new email should be considered by this Court to amend its finding that she received all the process she was due since the amount of due process is also governed by what the State rules are. Here, the email shows that the "**residents must be afforded two separate appeal rights if they are dismissed or terminated - an academic appeal and an employment appeal.**" The Plaintiff received neither and the Defendants deprived her of her due process rights by going behind her back and working jointly to overturn her reinstatement by suspending her privileges. It was disingenuous for Dr. Coule to represent to the Court that Plaintiff had no property interest and was owed no process. (Doc. 80, at 19).[3]

The uncontradicted evidence that the Order does not discuss is that the Plaintiff was reinstated because of her due process right to be terminated for "just cause" after all the conduct that the Defendants claim was their legitimate, non-legitimate reason for suspending her privileges had occurred. The Court's reliance on the May 17, 2019, letter as some sort of warning is not consistent with the facts. A jury could find that when the State Defendants realized she had won her appeal, they formulated this scheme with Dr. Coule to have him "suspend her privileges" so

[3] Notably, the Melcher email and Ms. Norton's notes were not produced by Dr. Coule or AUMC in this matter despite Plaintiff's request that Dr. Coule produce the documents in discovery and the documents are responsive to at least one of Plaintiff's requests. (See Dr. Coule and AUMC Discovery Responses, attached hereto as Ex. 2).

that she would be terminated anyway. This email which Dr. Coule, AUMC or the State Defendants failed to produce is indicative of their discriminatory motives. This evidence further supports the inference that Defendants Coule, Meiler, Arthur and Dean Hess spoke about the lack of appeal rights they had when the Plaintiff was reinstated, and that suspension of her privileges was the way to go. Only by drawing all inferences in favor of Defendants may one find as a matter of law that based upon this record no juror could conclude that the reason Dr. Meiler and Dr. Arthur wrote the draft letter and then final letter and sent them to Dr. Coule, requested additional evaluations and had a meeting where they discussed her suing, her disability and trusting her, had **nothing** to do with her "recent filing of a formal claim of disability and gender discrimination." Due to the Order having no Statement of Facts, there is no way to tell what the Court considered and did not consider. Accordingly, Plaintiff respectfully requests that the Court reconsider its finding that Plaintiff failed to present any evidence of pretext on all her claims, that she failed to provide valid comparators, and that the Defendants are entitled to qualified immunity on the due process claims and reverse the finding of summary judgment based upon the evidence not produced.

**9. <u>The Order fails to address at all Plaintiff's claims for disparate treatment based on disability and plaintiff has produced sufficient evidence for the jury to decide.</u>**

The Order states, "She alleges the BOR required unlawful testing, failed to provide her with reasonable accommodations, and unlawfully subjected her to disparate treatment and termination based on her disability." (Doc. 152, at 53). After noting the three forms of discrimination alleged by Plaintiff, the Order discusses Plaintiff's claims for unlawful testing and failure to accommodate, but never addresses her claim for disparate treatment before dismissing all three claims. Moreover, the fact that the department was able to supervise resident TS against his wishes and the recommendations of his peers and at least one attending, creates a sufficient question of fact as to whether the department could offer Plaintiff the same supervision. In light of

supervision for TS, Dr. Arthur's denial of the ability to similarly supervise Plaintiff creates a credibility issue as to the truth of that assertion. A reasonable juror could infer that Defendants were able to supervise Plaintiff without undue hardship but chose not to. The fact that a disabled resident, TS, had unnecessary supervision forced upon him and Plaintiff, a disabled resident, was denied supervision evinces that State Defendants treated disabled residents worse than other residents by subjecting them to excess scrutiny and denying them accommodations. The Court, if it addresses this claim, should deny summary judgment. (Doc. 132, p. 30- 39).

**10. <u>The Order imposes an improper pleading standard for Plaintiff's GWA claim.</u>**

The Order states, "Without an allegation in her complaint that she reported a violation to a direct supervisor, the State Defendants are entitled to judgment on Plaintiff's GWA claim as a matter of law and summary judgement is GRANTED." (Doc. 152, at 47). This ruling is improper for two reasons. First, Plaintiff reported the violations to Dr. Moore, who was a direct supervisor and as the Designated Institutional Offices, was the person designated by AU to receive complaints such as Plaintiff's. (Doc. 132, at 43-46). Moreover, Plaintiff was not required to plead specifically that she made the report to Dr. Moore and the Order's requirement that she do so overstates the specificity required in pleading and is legal error. F. R. Civ. P. 8. Second, even if Plaintiff's pleading that she "reported" violations was insufficient for not specifying a supervisor, a plaintiff may engage in protected activity by "disclosing" a violation of law and also by "objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation." O.C.G.A. § 45-1-4(d)(3). Plaintiff plead that she objected to and refused to participate in what she believed was unlawful activity regarding the deletion and submission of her case logs. (Doc. 23, at ¶ 15, 61, 67, 68). Therefore, dismissing Plaintiff's GWA claim was improper.

**11. <u>The Court erred in dismissing Plaintiff's Breach of Contract Claim.</u>**

Relying on Jones, the Order concludes that Plaintiff's breach of contract claim must be dismissed because there was no due process violation after finding that BOR did not follow all policies of House Staff 13. (Doc.152, p. 62). The Terms and Conditions for House Staff in this case states that "AU will develop a formal employment contract . . . The job description will address evaluation criteria, compliance with AU Health policies and procedures and the process for **removal of residents from clinical duties for cause**. (Ex. 3-House Staff Policy AUHS 480-484; Doc. No. 130-76). Accordingly, Plaintiff's case is distinguishable from Jones in that Jones involved a Plaintiff claiming entitlement to a process contained in a workplace policy manual in the absence of an employment contract. Here, Plaintiff had a written contract which specifically incorporated by reference the terms that the Defendants breached and she seeks to enforce. A jury could find breach of contract and due process violations. Plaintiff now knows with the new email that she did not receive an academic or employment appeal with notice of the charges against her or a hearing.

Respectfully submitted this 27th day of October, 2022.

/s/ Tanya Jeffords
Tanya D. Jeffords, Esq. - GA Bar No. 390055
Kenneth S. Ratley - GA Bar No. 359246
*Attorneys for Plaintiff - Dr. Lesley Williams*

The Law Offices of Tanya D. Jeffords
and Associates, PC
437 Walker Street | Augusta, GA 30901
tjeffords@jeffordslaw.com

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that I have on this day served all the parties in this case in accordance with the directives from the Court Notice of Electronic Filing which was generated by electronic filing.

Respectfully submitted this 27th day of October, 2022.

/s/ Tanya Jeffords
Tanya D. Jeffords, Esq. - GA Bar No. 390055